**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 18-108 |
| **v.** | : | |
| | : | |
| **MARK GIBSON,** | : | September 17, 2018 |
| | : | 11:30 a.m. |
| | : | |
| | : | |
| **Defendant.** | : | Washington, D.C. |
| | : | |
| ............................ | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:     **Emory Vaughan Cole, Assistant U.S.
                           Attorney**
                           U.S. ATTORNEY'S OFFICE FOR THE
                           DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-7692
                           Fax: (202) 616-2296
                           Email: Emory.Cole@usdoj.gov

For the Defendant:         **Mary Manning Petras, Assistant
                           Federal Public Defender**
                           FEDERAL PUBLIC DEFENDER FOR THE
                           DISTRICT OF COLUMBIA
                           625 Indiana Avenue, NW
                           Suite 550
                           Washington, DC 20004
                           (202) 208-7500 Ext. 109
                           Fax: (202) 208-7515
                           Email: Mary_petras@fd.org

```
APPEARANCES:  Cont.

For the Defendant:            Sandra Roland, Assistant Federal
                             Public Defender
                             FEDERAL PUBLIC DEFENDER FOR THE
                             DISTRICT OF COLUMBIA
                             625 Indiana Avenue, NW
                             Suite 550
                             Washington, DC 20004
                             (202) 208-7500
                             Email:  Sandra_roland@fd.org

Court Reporter:              Scott L. Wallace, RDR, CRR
                             Official Court Reporter
                             Room 6503, U.S. Courthouse
                             Washington, D.C. 20001
                             202.354.3196
                             scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

# C O N T E N T S

**EXAMINATIONS**                                                          **Page**

DIRECT EXAMINATION OF MATTHEW HILLER                          10
BY MR. COLE:
CROSS-EXAMINATION OF MATTHEW HILLER                           58
BY MS. PETRAS:
REDIRECT EXAMINATION OF MATTHEW HILLER                        107
BY MR. COLE:
RECROSS-EXAMINATION OF MATTHEW HILLER                         140
BY MS. PETRAS:

## EXHIBITS

**DESCRIPTION**

                                                                  8
Government's Exhibits 1-10 admitted
Defendant's Exhibit 6 admitted                                    86

Defendant's Exhibit 7 marked                                      87

Defendant's Exhibit 8 marked                                      92

Defendant's Exhibit 11 marked                                     97

Defendant's Exhibit 4 admitted                                    74

Defendant's Exhibit 3 admitted                                    74

Defendant's Exhibit 5 admitted                                    82

Defendant's Exhibit 7 admitted                                    88

Defendant's Exhibit 8, 9, and 10 admitted                         96

Defendant's Exhibit 11 admitted                                   99

Defendant's Exhibit 12 admitted                                   100

<u>**MORNING SESSION, SEPTEMBER 17, 2018**</u>

1

2     (11:53 a.m.)

3          THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4     18-108, *United States of America versus Mark Gibson*.  Would

5     parties please come forward to this lectern and identify

6     yourselves for the record.

7          MR. COLE:  Good morning, Your Honor.  I am, if it pleases

8     the Court, Emory V. Cole, representing the United States in this

9     matter.  As always, it's good to see you.  I have assisting me

10    today my paralegal extraordinaire, Mrs. Jeanette Litz.

11         THE COURT:  All right.  Good morning to you both.

12         MS. LITZ:  Good morning.

13         MS. PETRAS:  Good morning, Your Honor.  Mary Petras, along

14    with Sandra Roland, on behalf of Mr. Gibson.

15         THE COURT:  All right.  Mr. Roland, Ms. Petras.

16         Mr. Gibson, how are you today?

17         THE DEFENDANT:  Hi.  How are you?

18         THE COURT:  Doing okay?  Good.

19         All right.  I just asked -- I forgot a notepad.  I just

20    asked Kristy to bring me one.  Thanks, Kristy.

21         All right.  Let's proceed.

22         How many witnesses, Counsel?  And then I'm going to invoke

23    the rule on witnesses, too, so...

24         MR. COLE:  Yes, Your Honor.  The government -- all of the

25    government's witnesses are outside, so there are no witnesses

1    inside.

2          THE COURT:  All right.

3          MR. COLE:  And I had just told Mrs. Petras that I would be

4    invoking the rule on witnesses as well.

5          I anticipate one witness, Your Honor, in this matter.

6          THE COURT:  All right.  Sure.

7          MR. COLE:  I do have others, but I only anticipate one.

8          THE COURT:  All right.  That's fine.  Go right ahead.

9          MR. COLE:  Oh, okay.  Thank you, Your Honor.  Your Honor,

10   before I proceed with the witness, I would like your permission

11   just to outline for you --

12         THE COURT:  Sure.

13         MR. COLE:  -- just the parameters of where we are?

14         THE COURT:  Sure.

15         MR. COLE:  In this particular case, Your Honor, we believe

16   there was no violations.  It was appropriate police work that

17   happened in this case.  What we anticipate the evidence to show

18   is that on April 2nd, 2018, in the late evening hours, four MPD

19   officers were in one vehicle.  They had tactical vests on that

20   said "Police," and they approached the defendant in the 1600

21   block of Galen Street.

22         THE COURT:  Were they in uniform?

23         MR. COLE:  Yes -- well, no.  They had a tactical vest that

24   said "Police" on the front and "Police" on the back.

25         THE COURT:  All right.

1          MS. PETRAS:  Your Honor, I'm sorry.  I want to object on

2     Mr. Cole proceeding by proffer.  I think he needs to put the

3     evidence on.

4          MR. COLE:  It's not --

5          THE COURT:  I'd like to hear an opening statement anyway,

6     so --

7          MR. COLE:  That's what I was doing, Your Honor.  I have

8     witnesses.  I'm going to put the witness on.

9          THE COURT:  Sure.

10          MR. COLE:  This is what the government anticipates the

11     evidence to show.

12          THE COURT:  Right.

13          MR. COLE:  And I just wanted to highlight that for the

14     Court.

15          THE COURT:  No, go ahead.

16          MR. COLE:  So they had tactical vests on that said

17     "Police" on the front and on the back, "Metropolitan Police

18     Department," or words to that effect.  As a matter of fact, the

19     evidence will show when the driver of the vehicle, who was

20     Officer John Wright, approached the defendant, he asked the

21     defendant -- first he said, "This is the police," the evidence

22     will show.  And then he says words to the effect, "Do you have

23     any weapons on you?"

24          The defendant said, the evidence will show, "I don't have

25     any guns.  I don't of any guns."

1          And then shortly thereafter while the officers are still

2     seated in the vehicle -- front seat passenger, back seat

3     passengers, and the driver -- the defendant took off running.  It

4     is immediately after that -- the front seat officer is Matthew

5     Hiller, the backseat officer is Matthew Mancini -- they give

6     chase.  At the time that they give chase, they activate their

7     body-worn camera, which captures audio and video of what actually

8     happened.

9          In an effort to aid and assist the Court today, we

10    provided, with counsel's permission, a copy of the body-worn

11    camera to the Court so you could look at it.  I don't anticipate

12    playing every second of it.  I may, but I anticipate that we will

13    introduce all of the body-worn camera for Officer Hiller and

14    Mancini.  In that you will note the first two minutes -- the

15    evidence will show the first two minutes or so are silent.

16    There's a reason why.  Metropolitan Police Department body-worn

17    camera procedures is:  Once the officers go out, the camera is on

18    at all times.  So the camera is on with no audio.  It is on a

19    loop, a two-minute loop.  And you may ask -- and the evidence

20    will show from the witness stand -- what is a two-minute loop?

21    Meaning, every two minutes it deletes and starts over again.

22    Every two minutes it stops, deletes, and starts over again.

23    Otherwise, for a eight-hour, ten-hour shift there would be

24    insurmountable number of hours of body-worn camera video just

25    available driving around the streets and the like.

1     What you will hear and what you will see is that that is

2  MPD's policy.  Because once they activate it, push a button,

3  activate it, that activates audio and it captures the prior two

4  minutes that was in the loop.  So that's why the first two

5  minutes are not with audio.  It's only when they do the

6  activation.

7     So once the defendant runs --

8     THE COURT:  Okay.  We're getting into argument now, it

9  sound like.  I mean, I read the pleadings.  I have a pretty good

10  idea --

11     MR. COLE:  Okay.

12     THE COURT:  -- of what this case is about.  And --

13     MR. COLE:  I just wanted to give you a --

14     THE COURT:  No, no, no.  I appreciate it.

15     MR. COLE:  I'm ready and I'm prepared, Your Honor.

16     THE COURT:  I appreciate that.  And I'm just going to

17  counsel Counsel to not lead the officer.  Let them testify.

18     MR. COLE:  Yes, of course, Your Honor.  I've appeared

19  before you many times.

20     THE COURT:  I know.  I know you have.

21     MR. COLE:  Right.

22     THE COURT:  And I'm not suggesting that -- I'm not

23  suggesting that your questions in the past have ever been

24  inappropriate, but, you know, it's -- the standard is somewhat

25  lax here, hearsay comes in, but I think it's great -- I think

1    it's best to get the direct testimony of the officers.

2        MR. COLE:  That's fine.  I would say, so we can move just

3    a little further, Your Honor, we have Exhibits 1 through 10.  It

4    is 1-A, 1-B, 2 through 10.  With the Court's permission, and

5    defense counsel does not object to any of those exhibits, and we

6    would move them into evidence.

7        THE COURT:  All right.  No objection, Counsel?

8        MS. PETRAS:  No objection.

9        THE COURT:  All right.  Okay.  They're admitted.

10       (Government's Exhibits 1-10 admitted into the record.)

11       THE COURT:  Now, I'm not -- look, I'm not going to

12   overlook counsel.

13       Did you want to say anything?

14       MS. PETRAS:  No, Your Honor.  I'm fine.

15       THE COURT:  I'm not going to -- I don't want to be accused

16   of letting the government say something.

17       MS. PETRAS:  I'm sure you'll give us our chance.

18       THE COURT:  I will.  Of course I will.  All right.  All

19   right.  So let the record reflect that Ms. Petras said, "No,"

20   clearly said, "No."

21       MS. PETRAS:  That would be --

22       THE COURT:  She rejected the invitation of the Court.  All

23   right.  Okay.

24       MR. COLE:  Your Honor, the United States respectfully

25   calls Officer Matthew Hiller.

1    THE COURT:  All right.

2    Good afternoon.  How are you?

3    THE WITNESS:  Good.

4    THE COURT:  Is it afternoon already?

5    THE DEFENDANT:  Uh-huh.

6    THE COURT:  Almost, almost.

7     (MATTHEW HILLER, GOVERNMENT'S WITNESS, SWORN)

8    THE COURT:  All right.  Counsel, you may proceed.

9    MR. COLE:  Thank you, Your Honor.

10              <u>DIRECT EXAMINATION OF MATTHEW HILLER</u>

11   <u>BY MR. COLE:</u>

12   **Q.**    Officer, I want you to keep your voice loud and clear for

13   the benefit of His Honor and everyone that's present.  So we all

14   can hear what you have to say, speak into the mic, please.

15       Do you understand that?

16   **A.**    Yes.

17   **Q.**    All right.  State your name, spell your first and last

18   name for the record, please.

19   **A.**    Matthew Hiller, M-A-T-T-H-E-W, H-I-L-L-E-R.

20   **Q.**    How are you employed?

21   **A.**    Metropolitan Police Department.

22   **Q.**    How long have you been employed in that capacity?

23   **A.**    A little over six years.

24   **Q.**    And in what divisions have you worked in that six-year

25   period?

**A.**     Patrol, and I'm currently residing in the Gun Recovery
Unit.

**Q.**     And Patrol in what section, throughout the whole city?

**A.**     Patrol with Second District.

**Q.**     And you mentioned a Gun Recovery Unit.

        How long have you been assigned to that division?

**A.**     A little over three years now.

**Q.**     And what is the purpose of the Gun Recovery Unit?

**A.**     Recover illegal firearms throughout the District of
Columbia.

**Q.**     And have you done so for the past three years?

**A.**     Yes, I have.

**Q.**     On about how many cases have you participated in --

**A.**     Hundreds.

**Q.**     -- about?

**A.**     A few hundred.

**Q.**     And in that capacity do you work alone or with others?

**A.**     Mostly with others.

**Q.**     And I want to just specifically draw your attention to --
therefore, to April 2nd, 2018 at about 11:48 p.m.

        Do you recall that date and time?

**A.**     Yes, I was.

**Q.**     And can you tell His Honor, were you alone or with
others?

**A.**     I was with others.

1  **Q.**     And who were you with -- with other law enforcement

2  officers?

3  **A.**     Yes.

4  **Q.**     And who were you with?

5  **A.**     Officer John Wright, Officer Merissa McCaw, and Officer

6  Matthew Mancini.

7  **Q.**     All right.  And McCaw is M-C-C-A-W?

8  **A.**     Yes.

9  **Q.**     And Mancini is the common spelling?

10 **A.**     Yes.

11 **Q.**     And were you on foot patrol or in a vehicle?

12 **A.**     Vehicle.

13 **Q.**     What type of vehicle?

14 **A.**     Unmarked police Chevy Impala.

15 **Q.**     How many doors?

16 **A.**     Four.

17 **Q.**     And can you tell His Honor how you were addressed and

18 where you were seated, if any place?

19 **A.**     I was wearing casual attire with an outer vest with a

20 police identifier affixed to the front and back, and I was

21 seated in the front passenger seat.

22 **Q.**     And just -- and describe where everyone was seated prior

23 to anything happening.

24 **A.**     Officer Wright was driving the vehicle.  Officer Mancini

25 was seated directly behind me.  Officer McCaw was seated

1  directly behind Officer Wright, the driver.

2  Q.    All right.  So the passengers -- I'm sorry, the --

3        THE COURT:  You were in the shotgun seat?

4        THE WITNESS:  Yes, sir.

5        THE COURT:  All right.  Okay.

6  BY MR. COLE:

7  Q.    Commonly known as the shotgun seat?

8  A.    Yes.

9  Q.    All right.  Can you tell us:  Were all four of you

10 dressed this that same fashion?

11 A.    Similar attire, yes.

12 Q.    And were you, I want to say, armed with a body-worn

13 camera?  Are you familiar with that?

14 A.    Yes, sir.

15 Q.    Did you have one, I should, not armed with it?

16 A.    Yes.

17 Q.    Just tell us:  How does a body-worn camera work?

18 A.    A body-worn cameras are affixed to -- I had mine affixed

19 to my vest, but it's usually affixed to your outermost garment,

20 and it runs for the entirety of the tour.  The body-worn camera,

21 once activated, there's a two-minute buffer without audio, but

22 it captures video, and once you activate it, that's when the

23 camera picks up audio and video.

24 Q.    I just want to focus particularly on -- you said

25 "buffer."

What -- why isn't that buffer period recorded?

**A.**    The camera's constantly on, and it's looping for two minutes.  So as soon as you activate, that's -- it'll pick up the two minutes of video but not the audio prior to hitting the button.

**Q.**    And by activation, what do you have to do, if anything, to activate it?

**A.**    Hit a button in the middle of the camera.

**Q.**    I know.  I said that for the record and for the Court to be aware.

So, and once you push the button with the body-worn camera, when does audio begin?

**A.**    Immediately after hitting the button.

**Q.**    All right.  And with the two minutes buffering, as you said, is that consistent with MPD executive orders?

**A.**    Yes.

**Q.**    And is that consistent with the procedures of MPD regarding the body-worn camera as well?

**A.**    Yes.

**Q.**    And when you say "looping," does -- is it only two minutes that's recorded during the looping period and then it's deleted, the two minutes?

**A.**    Yes.

**Q.**    So then it starts all over again?

**A.**    Well, yes.

1   **Q.**    Tell us.

2   **A.**    It just --

3   **Q.**    Tell us?

4   **A.**    It goes back two minutes prior to hitting the button,

5   whenever you hit the button.

6   **Q.**    Right.  But if you didn't hit the button, it'd just be a

7   two-minute video recording.

8           Is that -- would that be fair to say?

9   **A.**    Yes.

10  **Q.**    All right.  Now, let me just draw your attention to that

11  particular day.

12          Did you have an occasion to be in the 1600 block of --

13  1600 block -- I'm sorry -- 16th Street and Galen Street in that

14  intersection at some point?

15  **A.**    16th and Galen Street, Southeast, yes.

16  **Q.**    All right.  And had you ever patrolled in that area

17  before?

18  **A.**    Yes, many times.

19  **Q.**    How would you describe that particular area?

20  **A.**    It's a residential area.

21  **Q.**    And as it relates to crime?

22  **A.**    It's a high-crime area.

23  **Q.**    Have you ever patrolled in that area, made arrests in

24  that area?

25  **A.**    Yes.

1  **Q.**     Had other police activity in that area during the time of

2  your assignments --

3  **A.**     Yes.

4  **Q.**     -- in the Gun Recovery Unit?

5  **A.**     Yes.

6  **Q.**     Have you ever recovered guns in that area?

7  **A.**     Yes.

8  **Q.**     Now, I want to just draw your attention to -- you've

9  indicated that Officer Wright was driving.

10      Tell us what happened that brings you into court today.

11  **A.**     We made an arrest.  You want me to go through the

12  whole --

13  **Q.**     Yes.  Well, let's just start off at the beginning.

14  **A.**     Okay.

15  **Q.**     Did something happen that brought you into contact with a

16  person you see in court today?

17  **A.**     Yes.

18  **Q.**     And who is that?  Can you point to him and identify an

19  article of clothing, please?

20  **A.**     Mr. Gibson sitting off to my right in the orange

21  jumpsuit.

22      MR. COLE:  Your Honor, may the record reflect an

23  identification of the defendant, Mark Gibson in that matter?

24      THE COURT:  Any objection?

25      MS. PETRAS:  No, Your Honor.

1        THE COURT:  The record shall so reflect.

2   BY MR. COLE:

3   **Q.**    Tell us how did you and the other officers, if any, came

4   in contact with Mr. Gibson on that day at about that time.

5   **A.**    We made -- we arrested Mr. --

6        THE COURT:  Just tell you how you came in contact with

7   him.  What was your first contact with him?

8        THE WITNESS:  When we first saw Mr. Gibson, he was

9   walking.

10       THE COURT:  No, you -- when did you first see him?

11  BY MR. COLE:

12  **Q.**    Don't say "we."  Just when you.

13  **A.**    When I first saw him?

14  **Q.**    Yeah, when you first saw him.

15  **A.**    He was walking on the sidewalk.

16  **Q.**    All right.  Was he walking to your left or to your right?

17  **A.**    We were driving down northbound on 16th Street, and he

18  was at the intersection going east on Galen.

19  **Q.**    All right.  And he would be to your left or to your

20  right?

21  **A.**    To my right.  While we're on 16th Street he's to my

22  right, and then once we turn on Galen, he'll be to my left.

23  **Q.**    All right.  And then did you see him at that time?

24  **A.**    Yes.

25  **Q.**    And what, if anything, happened after you saw him at that

1    time?

2    **A.**    When we first saw Mr. Galen, as we drove closer he

3    appeared to start walking at a quicker pace and looking over his

4    shoulder back at our police vehicle.

5    **Q.**    And then what happened?

6    **A.**    Officer Wright slowed the vehicle and greeted Mr. Gibson.

7    **Q.**    In what fashion?

8    **A.**    Conversational tone, identifying himself as police, and

9    asked Mr. Gibson if he had any firearms on him.

10   **Q.**    What happened next?

11   **A.**    Mr. Gibson responded with, "I ain't got no guns.  I ain't

12   got no guns," and continued to walk on Galen.

13   **Q.**    And are you inside of the vehicle at this time?

14   **A.**    Yes, we all are.

15   **Q.**    And any guns out or anything like that?

16   **A.**    No.

17   **Q.**    You've mentioned conversational tone?

18   **A.**    Yes.

19   **Q.**    Was there any yelling, fighting going on, anything like

20   that?

21   **A.**    No.

22   **Q.**    What happened next?

23   **A.**    Officer Wright then asked Mr. Gibson if he had any -- if

24   he minded showing us his waistband, at which time Mr. Gibson

25   again replied, "I ain't got no guns.  I ain't got no guns."

1    **Q.**    And then what happened?

2    **A.**    Officer Wright pulled forward a little bit.  Mr. Gibson

3    kind of stopped, turned back towards 16th Street and ran back

4    down towards 16th Street where he was originally seen coming

5    from.

6    **Q.**    Let me stop you there.

7         Were any police officers -- any police officers on -- out

8    of the vehicle at that time before Mr. Gibson started to run?

9    **A.**    No.

10   **Q.**    Were there any weapons, sticks, knives, guns, or anything

11   pointed in his direction?

12   **A.**    No.

13   **Q.**    And you've indicated that Mr. Gibson began to run.

14        Did anyone say anything that would cause Mr. Gibson to

15   run?

16   **A.**    At that time, no.

17   **Q.**    At any time?

18   **A.**    At any time?  No.

19   **Q.**    And was he walking alone or with others?

20   **A.**    He was walking by himself.

21   **Q.**    And once Mr. Gibson began to run, what direction did he

22   run in relation to your vehicle?

23   **A.**    Opposite direction our vehicle was facing.

24   **Q.**    And once Mr. Gibson began to run, what, if anything, did

25   you do?

1    **A.**      I exited the vehicle and pursued on foot.

2    **Q.**      You have to speak up a little bit.

3    **A.**      I exited the vehicle and pursued on foot.

4    **Q.**      And when you exited the vehicle, what, if anything, did

5    you do in relationship to the body-worn camera?

6    **A.**      Activated it.

7    **Q.**      And by "activated it," again, you mean pushing the

8    button?

9    **A.**      Pushed the button.

10   **Q.**      And by doing that it allows the body-worn camera to do

11   what?

12   **A.**      Capture audio and video at this time.

13   **Q.**      Prior to Mr. Gibson running, was there any police

14   activity outside of the vehicle, other than talking to

15   Mr. Gibson?

16   **A.**      No.

17   **Q.**      Did anyone force or threaten him to run --

18   **A.**      No.

19   **Q.**      -- prior to him running?

20   **A.**      No.

21   **Q.**      Now, you've indicated you had an opportunity to activate

22   your body-worn camera.  I just want to -- I just want you to

23   take it from there, and then I'll show you the body-worn camera,

24   but let's take it.

25          What happened when you exited the vehicle?

**A.**     I chased -- pursued Mr. Gibson on foot.

**Q.**     And what, if anything, did you see?

**A.**     As we were running, we ran back down -- it's like a little bit of a hill -- towards 16th and Galen.  Mr. Gibson appeared to try to do a maneuver to lose Officer Mancini.

**Q.**     What type of a maneuver?

**A.**     Like -- almost like a juke to his right type move, at which time Mr. Gibson lost his footing and a firearm came from Mr. Gibson and landed on the ground.

**Q.**     And you saw that?

**A.**     Yes.

**Q.**     And that was prior to any police officer touching him?

**A.**     Yes.

**Q.**     And prior to seeing the gun, did you see -- what, if any, other items did you see Mr. Gibson discard, if any?

**A.**     I personally only saw him discard the gun.  Afterwards there was also like a little black pouch laying by the gun, and Mr. Gibson's phone was off to the left a little bit away from where he was ultimately stopped.

**Q.**     How do you know Mr. Gibson -- it was his phone, Mr. Gibson's phone?

**A.**     I believe Mr. Gibson told us it was his phone.

**Q.**     All right.  And the body-worn camera that you mentioned, was that gun captured in the body-worn camera?

**A.**     The -- on the ground?

1    **Q.**    Yes, on the ground.

2    **A.**    You could see it on the ground.  The camera's kind of

3    blurry when we're running because it -- because we're running.

4    **Q.**    Right.

5    **A.**    But you can see it -- later once Mr. Gibson stopped and

6    the camera's still, you can see the firearm laying there.

7    **Q.**    And once you saw the firearm, what -- was Mr. Gibson

8    placed under arrest?

9    **A.**    Yes.

10   **Q.**    And was he placed under arrest or any police activity

11   other than running prior to that time?

12   **A.**    I'm sorry.  Can you say that one more time?

13   **Q.**    Yes, I can.

14         He was placed under arrest why?

15   **A.**    Because of -- due to the firearm that we saw come from

16   him.

17   **Q.**    And incident to that arrest, were certain other items

18   recovered from him, prominently contraband?

19   **A.**    Yes.

20   **Q.**    And what was that?

21   **A.**    11 zips of a white rock-like substance.

22   **Q.**    And was it field-tested?

23   **A.**    Yes.

24   **Q.**    And it field-tested as what?

25   **A.**    Positive for cocaine base.

1    **Q.**     Now, I had mentioned to you earlier a body-worn camera.

2   I want to show you what has been already admitted into evidence

3   as Government's Exhibit Number 1-A, and I want to justify it

4   first.

5         And for the record, you've had an opportunity to look at

6   it; is that right?

7   **A.**     Yes.

8   **Q.**     Is it a fair and accurate description of what happened

9   once you activated the body-worn camera?

10  **A.**     Yes.

11  **Q.**     This is during the two minutes of buffering, no audio; is

12  that right?

13  **A.**     Correct.

14  **Q.**     I'm going to let it play, but this is your body-worn

15  camera; is that right?

16  **A.**     Yes.

17  **Q.**     And just narrate the two --

18         MR. COLE:  And, Your Honor, I know you've had an

19  opportunity to see it.

20         THE COURT:  Yes.

21         MR. COLE:  I'd like to -- this part, I would like to just

22  move forward a little bit, but I would introduce the whole long

23  body-worn camera, with your permission.

24         THE COURT:  No, go right ahead.

25         MR. COLE:  Okay.

1              (Videotape played.)

2      BY MR. COLE:

3      **Q.**     Now, as you've testified, the body-worn camera is on, and

4      what's going on now?

5      **A.**     We're -- it appears that we're in the car.  We just

6      turned onto Galen, and Mr. Gibson should be over to our left.

7      **Q.**     What happens now?

8      **A.**     I'm exiting the vehicle.  Camera's activated.

9      **Q.**     There's an officer, female officer, to the right of this

10     particular part of the video; is that right?

11     **A.**     Yes.

12     **Q.**     Who is that?

13     **A.**     Officer McCaw.

14     **Q.**     And is there anything significant that you see in this

15     particular pause at two -- 2 minutes 14 seconds?

16     **A.**     You could see the light on the firearm that was -- that

17     we saw Mr. Gibson discard.

18     **Q.**     All right.

19             THE COURT:  I'm sorry.  You can see the light on the what?

20             THE WITNESS:  The firearm that we saw Mr. Gibson discard.

21             THE COURT:  Okay.  Where did that light come from?

22             THE WITNESS:  I'm not sure.  I'm not sure whose -- that

23     might be my flashlight.  I'm not sure.

24             THE COURT:  That's a flashlight?

25             THE WITNESS:  Yeah, that's a flashlight, Your Honor.

1          THE COURT:  All right.

2          MR. COLE:  And -- may I have just one moment?  I just

3   wanted to see if this was an interactive one, Your Honor.

4          (Brief pause in proceedings.)

5   BY MR. COLE:

6   Q.    All right.  For the record, can you circle the firearm as

7   well?

8   A.    (Complied).

9   Q.    Thank you.

10          MR. COLE:  Your Honor, Officer Hiller has circled a

11   firearm that's the -- at the left foot of Officer McCaw.

12   BY MR. COLE:

13   Q.    Is that right?

14   A.    Yes.

15   Q.    All right.

16          MR. COLE:  And we'll let it play.  Continue.

17          (Videotape played.)

18   BY MR. COLE:

19   Q.    And did you hear that remark?

20   A.    Yes.

21   Q.    And who stated that remark?

22   A.    That was myself.

23   Q.    And what did you say?

24   A.    "When he was running, he was holding the right side; and

25   when he fell, the gun came out."

1   Q.     All right.  You can continue.

2          THE COURT:  Did you say the gun fell out?

3          THE WITNESS:  I believe that's what I said on the camera,

4   yeah.

5          MR. COLE:  We can play it.

6          THE COURT:  Yeah.

7          MS. PETRAS:  We can play it back.

8          (Videotape played.)

9          THE COURT:  Sounds like --

10         MR. COLE:  Yes, sir.

11         THE COURT:  Sounds like, The gun fell out."

12         THE WITNESS:  Yes.

13         THE COURT:  All right.

14         MR. COLE:  All right.

15   BY MR. COLE:

16   Q.     And you agree with that?

17   A.     Yes.

18         THE COURT:  Well, Mr. Cole, can you roll that back --

19         MR. COLE:  Yes, sir.

20         THE COURT:  -- in slow motion?  So it's kind of hard to

21   see.  Can you slow everything down?

22         MRS. LITZ:  We can't slow it down.

23         MR. COLE:  I don't think we have the capacity to slow --

24   at the time of the running, we don't -- we don't have that, Your

25   Honor.

1          THE COURT:  You don't?  All right.

2          MR. COLE:  I mean, we could pause it in a particular point

3     if you wanted to, but --

4          THE COURT:  No.  I just thought it'd be easier to see, I

5     guess, in slow motion, but that's all right.

6          MR. COLE:  That's about the best that we have --

7          THE COURT:  All right.

8          MR. COLE:  -- with our technology today.

9          THE COURT:  All right.  Maybe you can roll it back again

10    now in realtime.

11         MR. COLE:  Oh, yes, Your Honor.

12         THE COURT:  All right.

13         (Videotape played.)

14    BY MR. COLE:

15    Q.    What are you doing at this time?

16    A.    I'm just moving the vehicle because now Mr. Gibson and

17    the firearm both are in the middle of the intersection, just so

18    no traffic will come through.

19    Q.    All right.

20         (Videotape played.)

21    BY MR. COLE:

22    Q.    And Officer Hiller, you see the flashlight and the light

23    now.  You see the light from the flashlight that is illuminating

24    the firearm; is that right?

25    A.    Yes.

1    **Q.**    There's another black object there.

2          What is that?

3    **A.**    Looks like a little black satchel type thing that was

4    empty.

5    **Q.**    All right.  And what was done with that black -- would it

6    be better to say a pouch?

7    **A.**    A pouch, yeah.

8    **Q.**    What -- where would -- what happened to that pouch?

9    **A.**    It was determined it was Mr. Gibson's, and it was put in

10   his prisoner's property.

11   **Q.**    All right.

12         MR. COLE:  And you can continue.  Thanks.  You can

13   continue.

14         (Videotape played.)

15   BY MR. COLE:

16   **Q.**    What's going on now?

17   **A.**    I'm going to fill out the quick booking form.  It just

18   has basic information about Mr. Gibson, name, date of birth,

19   address.

20   **Q.**    And this is your hands, and you actually have the quick

21   booking form?

22   **A.**    Yes.

23   **Q.**    And who's taking photographs?

24   **A.**    Officer Wright, our crime scene officer.

25   **Q.**    And what are you writing down on this form, just

1  generally?

2  **A.**     Right now I'm writing 16th Street/Galen Street, the

3  intersection.

4       (Videotape played.)

5  BY MR. COLE:

6  **Q.**     And what does CPWL stand for?

7  **A.**     Carrying a pistol without a license.

8  **Q.**     And this body-worn camera is a fair and accurate and a

9  complete copy of what happened in realtime?

10  **A.**     Yes.

11  **Q.**     What is Officer Wright doing at this time?

12  **A.**     He's asking me to feel if it's warm.

13  **Q.**     What is warm?

14  **A.**     Like, if the firearm's warm.

15  **Q.**     For what -- why do you believe that he did that?

16  **A.**     I personally thought he was asking if it was -- if it was

17  recently possibly fired.

18  **Q.**     Okay.  And who recovered the gun from the ground?  Was it

19  Officer Wright?

20  **A.**     Officer Wright, yes.

21  **Q.**     And I don't know if the body-worn camera showed it, but

22  who put it in the paper bag?

23  **A.**     Officer Wright.

24  **Q.**     All right.  And what do you continue to do at this time?

25  **A.**     Complete the quick booking form.

1      (Videotape played.)

2  BY MR. COLE:

3  **Q.**    Is that consistent with the Metropolitan Police

4  Department procedures?

5  **A.**    Yes.

6  **Q.**    And what were the duties of the crime scene officer, John

7  Wright?

8  **A.**    His duties are to document the crime scene; recover the

9  firearm; any other narcotics or contraband that's possibly

10 found; and once we get back to the office, to process said

11 firearm and narcotics.

12 **Q.**    What about the cell phone?

13 **A.**    What about it?

14 **Q.**    I'm sorry.

15      What about the defendant's cell phone, was that

16 recovered?

17 **A.**    I don't know if that was recovered or put in his

18 property.  I don't recall.

19 **Q.**    All right.  But the black pouch, what's -- what is

20 Officer McCaw doing at this time?

21 **A.**    She's just looking in it.

22 **Q.**    At what?

23 **A.**    Inside the black pouch.

24 **Q.**    Was there anything inside of there?

25 **A.**    No.

1  **Q.**    And was that put on the defendant's prisoner property?

2  **A.**    Yes.

3  **Q.**    Now, the next couple of minutes there will be a -- there

4  was something else that was found that was important to this

5  investigation; is that right?  Important to this particular

6  case; is that right, some other contraband?

7  **A.**    Yes.

8  **Q.**    All right.  Now, what are you doing at this particular

9  point?

10 **A.**    Just making sure no other contraband was discarded in

11 Mr. Gibson's flight path.

12 **Q.**    Now, do marked police cars come to the scene?

13 **A.**    I believe we -- usually to transport, yes, and sometimes

14 if crowds form or something to help with crowd control, but this

15 is -- that might just be a unit in the area.  I don't -- I don't

16 know if that was actually the transport or not.

17 **Q.**    Okay.  Did you hear the defendant ever remark about the

18 swiftness of the officer's speed, you or Officer Mancini, in

19 catching him?

20 **A.**    I didn't hear it at the time, but going back watching the

21 body camera, he commented how fast Officer Mancini was.

22 **Q.**    Now, there's -- a marked police van comes.

23        What's the significance of that?

24 **A.**    That will be the transport unit.

25 **Q.**    And transport to where?

**A.**      The Seventh District.

**Q.**      For what purpose?

**A.**      To be processed.

**Q.**      Now, is it important to make sure when someone is arrested, to make sure they don't have any contraband on them when they are put into the processing penal system?

**A.**      Yes.

**Q.**      Why is that?

**A.**      For their safety, the safety of other prisoners, it's illegal to bring contraband into a penal system.

**Q.**      Now, if on your body-worn camera something happens regarding contraband and you see it there or you notice it, let us know.

**A.**      Okay.

**Q.**      What's going on now?

**A.**      Officer Mancini's just taking, like, the belt, like, chargers, headphones.

**Q.**      And the defendant's under arrest?

**A.**      Yes.

**Q.**      All right.

**A.**      Officer Mancini just asked if anybody had gloves after looking in defendant's front right pants pocket.

**Q.**      And did you have an opportunity to look in there as well?

**A.**      Yes.

**Q.**      What, if anything, was there?

1    **A.**      It appeared to be packaged narcotics.

2    **Q.**      And there was a hand with a flashlight.

3            Was that your hand?

4    **A.**      Yes.

5    **Q.**      And you see -- what, if anything, did you see in the

6    defendant's right front pants pocket?

7    **A.**      There's a sandwich bag containing 11 zips.

8    **Q.**      And this search of the defendant's front pants pocket was

9    incident to his arrest?

10   **A.**      Yes.

11   **Q.**      Now, what happens next?  Did anyone have gloves?  Just

12   walk us through.

13   **A.**      Officer Wright, since he's crime scene, he's going to

14   come over, document it and recover the narcotics.

15   **Q.**      And did he do so in this case, Officer Wright?

16   **A.**      Yes.

17   **Q.**      And did you witness that?

18   **A.**      Yes.

19   **Q.**      And who is to the defendant's right side?

20   **A.**      Officer Mancini.

21   **Q.**      And who's in front of the defendant?

22   **A.**      Myself.

23   **Q.**      And for the record, all of the four of you all had on

24   body-worn cameras on that day; is that right?

25   **A.**      Yes.

1    Q.    And that has been turned over to the defense in this case

2    as well; is that right?

3    A.    Yes.

4    Q.    Along with other officers who came later.

5          Would that be fair to say?

6    A.    Yes.

7          (Videotape played.)

8    BY MR. COLE:

9    Q.    What's that?

10   A.    That's Mr. Gibson's prisoner's property.

11   Q.    Which includes what?  U.S. currency.

12         Do you see that?

13   A.    U.S. currency, looks like a cell phone, looks like a

14   charger, like a hair brush, a belt.

15   Q.    All right.  And that's you manipulating that bag; is that

16   right?

17   A.    Yes.

18   Q.    All right.

19   A.    You might be able to make it louder next to the -- to

20   your right, that little -- no, no.  Right next to the pause

21   button.

22   Q.    Okay.  Right here.

23         (Videotape played.)

24   BY MR. COLE:

25   Q.    Who's the police officer who still has contact with the

1    defendant?

2    **A.**      Officer Mancini.

3    **Q.**      And what is he doing at this time?

4    **A.**      He's just going through all of Mr. Gibson's garments to

5    make sure that there's nothing left in any of the pockets or

6    anything.

7    **Q.**      And the 11 zips of cocaine, have they been recovered at

8    this time?

9    **A.**      Yes.

10   **Q.**      And they were recovered by whom?

11   **A.**      Officer Wright.

12   **Q.**      And did you witness that?

13   **A.**      Yes.

14   **Q.**      For the purposes of your body-worn camera, just moments

15   later, the defendant is transported and moved away; is that

16   right?

17   **A.**      Yes.

18   **Q.**      All right.  Thank you.

19          MR. COLE:  Let's just pause it right there, Mrs. Litz.

20   BY MR. COLE:

21   **Q.**      And did you have an opportunity, during the course of

22   this case and talking to me, to review the videos of Officer

23   Mancini as well, body-worn cameras?

24   **A.**      Yes.

25   **Q.**      Were they fair and accurate?

1   **A.**    Yes.

2   **Q.**    Were they made in realtime as well as you?

3   **A.**    Yes.

4   **Q.**    And was there a -- can you -- was there a two-minute loop

5   also as well?

6   **A.**    Yes.

7   **Q.**    Were you able to see when he activated his body-worn

8   camera?

9   **A.**    Yes -- after watching his video?

10  **Q.**    Yes.

11  **A.**    Yes.

12  **Q.**    And was that correct, fair and accurate, the scene?

13  **A.**    Yes.

14  **Q.**    All right.

15        MR. COLE:  Let me just play for a moment, briefly,

16  Government's Exhibit 1-B and move it into evidence.  All of my

17  exhibits, Your Honor, I would ask to be moved into evidence

18  without objection, if I have it, without objection from defense

19  counsel.

20        THE COURT:  They've already been admitted.

21        MR. COLE:  Okay.  That'll be 1-B.

22        And I'm going to ask Ms. Litz to move it up to about 1:30.

23  BY MR. COLE:

24  **Q.**    Because this is just with no audio, and you all are

25  driving around; is that right?

1    **A.**      Yes.

2    **Q.**      Officer Mancini was seated where in relation to the

3    vehicle again?

4    **A.**      Directly behind me.

5    **Q.**      All right.  And I want to play it at around 1:30 -- 1

6    minute 36 seconds, and whenever you see anything of importance,

7    we'll pause it.  Just let us know.

8           (Videotape played.)

9           THE WITNESS:  You can see Mr. Gibson's head.

10   BY MR. COLE:

11   **Q.**      All right.  We'll go back just a little bit.

12          Do you see -- in the video, I don't know, do you see

13   clearly?

14   **A.**      You just -- you can.

15   **Q.**      All right.  You circled the top left-hand portion an

16   individual and their hands; is that right?

17   **A.**      Yes.

18   **Q.**      And that person, are you -- had you ever had any contact

19   with Mr. Gibson prior to that day?

20   **A.**      Not to my knowledge.

21   **Q.**      And on that day, the person you circled -- for the

22   record, in the top left-hand portion at 1 minute 51 second --

23   who is that?

24   **A.**      Mr. Gibson.

25   **Q.**      The same one you've identified in court today?

1    **A.**    Yes.

2    **Q.**    Now, specifically, in this particular video, does that

3    show where you were positioned at the time Mr. Gibson was on the

4    sidewalk?

5    **A.**    In --

6    **Q.**    In the vehicle.

7    **A.**    Yes.

8    **Q.**    And does it show where all the other officers that were

9    with you on that day were seated?

10   **A.**    You could see shadowy figures, and then McCaw is to the

11   left, but yes.

12   **Q.**    All right.  Were any officers out of the car at the time

13   you encountered Mr. Gibson?

14   **A.**    No.

15   **Q.**    Did any officer, you or anyone else, threaten him or

16   force him in any way?

17   **A.**    No.

18   **Q.**    This motion that he did, in this particular section of

19   the video, did anyone direct him to do that?

20   **A.**    No.

21   **Q.**    Can you tell us:  Do you know why he did that?

22   **A.**    I do not know.

23   **Q.**    For the record, can you just describe what is going on

24   and what, if anything, the defendant is saying that recall at

25   this time?

1  **A.**     I don't -- I don't recall if this is -- if he's even

2  saying anything at that time.  He might just be walking, because

3  I know the initial conversation has already happened where he

4  told us he hadn't had any guns.

5  **Q.**     Right.  And did anyone tell him to put his hands up --

6  **A.**     No.

7  **Q.**     -- or anything like that?

8  **A.**     No.

9  **Q.**     In this particular video, at least you can see a right

10  hand; is that right?

11  **A.**     Yes.

12  **Q.**     Did anyone tell him to make that motion?

13  **A.**     No.

14  **Q.**     And you've indicated that no police officer was there.

15         How was your demeanor and contact with the defendant at

16  that time?

17  **A.**     Conversational.

18  **Q.**     So anyone have any -- any police officer have any other

19  tone with the defendant at that time?

20  **A.**     No.

21  **Q.**     Specifically, for His Honor's and for the record, can you

22  tell us who had verbal contact, if any, with the defendant prior

23  to the defendant running?

24  **A.**     Officer Wright.

25  **Q.**     Did you have any verbal contact with him?

1    **A.**      I did not.

2    **Q.**      What about Officer McCaw?

3    **A.**      She did not.

4    **Q.**      What about Officer Mancini?

5    **A.**      He did not.

6    **Q.**      All right.

7         MR. COLE:  And you can continue, Mrs. Litz, and I want to

8    ask what happens next.

9         (Videotape played.)

10        MR. COLE:  Right there.  Stop.

11   BY MR. COLE:

12   **Q.**      What happens at that moment?

13   **A.**      Kind of stops, turns back towards 16th Street and begins

14   a full sprint towards 16th.

15   **Q.**      Who does that?

16   **A.**      Mr. Gibson.

17   **Q.**      And what happened?

18        MR. COLE:  Let's play it next.  Thank you.

19        (Video played.)

20   BY MR. COLE:

21   **Q.**      I just want to go back for a moment.

22        Was the body-worn camera on Officer Mancini activated?

23   **A.**      I'm sorry.  It's hard to hear you with that on.

24   **Q.**      Now, I called -- right there.  I paused it at 2 minutes 3

25   seconds, and the defendant is seen falling to the ground; is

1    that right?

2    **A.**    Yes.

3    **Q.**    Prior to that time, had anyone touched him?

4    **A.**    No.

5    **Q.**    Any police officer or anything like that?

6    **A.**    No.

7    **Q.**    When in relationship to the defendant falling did you see

8    the gun thrown to the ground?

9    **A.**    I'm sorry?

10   **Q.**    When was the gun thrown to the ground?

11   **A.**    As he was falling.

12   **Q.**    All right.

13           MR. COLE:  We're going to play it from like 1:30, 1:40 and

14   go from there.

15           (Videotape played.)

16   BY MR. COLE:

17   **Q.**    And was the body-worn camera activated?

18   **A.**    Yes, once Officer Mancini exited the vehicle.

19   **Q.**    All right.

20           MR. COLE:  Yeah, right there, let it play.

21           And I will introduce the whole 1-B into evidence totally

22   and completely as I did with 1-A, Your Honor.

23           THE COURT:  All right.

24           (Videotape played.)

25   BY MR. COLE:

1   **Q.**    There are cuffs being put on the defendant; is that

2   right?

3   **A.**    Yes.

4   **Q.**    Who did that?

5   **A.**    Officer Mancini, and Officer Wright's assisting him.

6   **Q.**    And do you see the gun out at that time?

7   **A.**    Yes.

8          (Videotape played.)

9   BY MR. COLE:

10  **Q.**    Who said that?

11  **A.**    Mr. Gibson.

12  **Q.**    Do you see the gun and black pouch in this scene --

13  **A.**    Yes.

14  **Q.**    -- at 3:17, 3:15?

15         (Videotape played.)

16  BY MR. COLE:

17  **Q.**    Who said that?

18  **A.**    Mr. Gibson.

19         MR. COLE:  Can you pause it there?

20  BY MR. COLE:

21  **Q.**    Who said, "You're the one that ran up on me"?

22  **A.**    Mr. Gibson.

23  **Q.**    And he was directing that question to who?

24  **A.**    Officer Mancini.

25  **Q.**    And who said, "You are fast as" shh, S-H blank blank?

1   **A.**      Mr. Gibson.

2   **Q.**      And he was referring that to who?

3   **A.**      Officer Mancini.

4   **Q.**      Who said -- who was -- that, "You all pulled up on me" or

5   words to that effect, who said that?

6   **A.**      Mr. Gibson.

7   **Q.**      And did you recall Mr. Gibson saying that he ran during

8   the course of this statement that he made?  Do you want me to

9   play it back for you, a few seconds?

10   **A.**      Yeah, if you could play it back.

11   **Q.**      Okay.

12          (Videotape played.)

13   BY MR. COLE:

14   **Q.**      He said "ran up on me and caught me"?

15   **A.**      Yes.

16   **Q.**      Who was that?

17   **A.**      Mr. Gibson.

18   **Q.**      How would you characterize the treatment you gave -- law

19   enforcement gave Mr. Gibson that day, prior to his arrest, after

20   his arrest?

21   **A.**      I would say fair.

22   **Q.**      Even after arrest, did you have any negative interactions

23   with him?

24   **A.**      No.

25   **Q.**      Other than arresting him, but any negative conversation?

1   **A.**      No.   It was just -- it was positive.   It was

2   professional, in my opinion.

3   **Q.**      And was he respectful to you all?

4   **A.**      Yes.

5   **Q.**      And that's depicted on -- is that depicted on the

6   body-worn camera as well?

7   **A.**      Yes.

8   **Q.**      Now, there are two black objects at the top to the right.

9        What is that?

10   **A.**      The firearm and the black pouch.

11   **Q.**      Can you tell His Honor, the body-worn -- does the

12   body-worn cam- -- body-worn camera capture your interactions

13   with the defendant until he is placed into the transport

14   vehicle?

15   **A.**      Yes.

16   **Q.**      And who's asking the biographical weight questions?

17   **A.**      That's me asking -- completing the two -- the quick

18   booking form.

19   **Q.**      And that was shown on your body-worn camera; is that

20   right?

21   **A.**      Yes.

22   **Q.**      Now, in this particular case, when the items were

23   recovered from the defendant's pocket, were those items better

24   shown on the body-worn camera of Officer Mancini at the time of

25   the discovery?

1   **A.**     You can fast forward and see if it's better depicted.

2   My --

3   **Q.**     We're going to.  We're going to play it to that point.

4          (Videotape played.)

5   BY MR. COLE:

6   **Q.**     What's this questioning about?

7   **A.**     Officer Wright's trying to verify that the phone on --

8   that was over on the side is Mr. Gibson's and so it could

9   properly be returned to him.

10  **Q.**     And that was returned to him after he gave some

11  identifying information?

12  **A.**     Yes.

13  **Q.**     And it was placed in his property bag?

14  **A.**     Yes.

15  **Q.**     Who's that picture of the officer in the scene?

16  **A.**     That's myself.

17  **Q.**     So was the phone returned to the defendant?

18  **A.**     Yes.  Mr. Gibson just said that little pouch was his

19  headphone pouch.

20  **Q.**     What's going on now?

21  **A.**     Just removing personal effects from Mr. Gibson.

22  **Q.**     What's going on now?

23  **A.**     Removing the belt.

24  **Q.**     Why is that important?

25  **A.**     He can't have any -- anything but the garments and

1    clothing on him when he goes to --

2    Q.    And that's consistent with police procedure?

3    A.    Yes, for any arrest.

4    Q.    And who's physically doing the searching at this time?

5    A.    Officer Mancini.

6    Q.    And I'm going to focus the -- at some point here you see

7    contraband.

8          What's going on now, money is taken out?

9    A.    Yes.

10   Q.    What do you do when you hear "gloves"?

11   A.    Just put a light -- I've been assisting him by --

12   Q.    Hold on one second.

13         (Videotape paused.)

14         All right.  What did you do?

15   A.    I've just been assisting him this whole time.

16   Q.    All right.  And was there something significant that you

17   found out moments later about when Officer Mancini said "gloves"

18   or something to that effect?

19   A.    I just assumed he found narcotics.

20   Q.    And did you have an opportunity to verify that?

21   A.    When I -- yes.

22   Q.    And it's coming up in a moment?

23   A.    Yes.

24   Q.    All right.

25         (Videotape played.)

BY MR. COLE:

**Q.**   During this whole time did anybody raise their voice or have any threatening or violent behavior with the defendant?

**A.**   No.

**Q.**   And is that depicted on the body-worn camera?

**A.**   Yes.

**Q.**   What's going on now?

**A.**   Narcotics are being removed by Officer Wright, removed and recovered.

**Q.**   From what position?

**A.**   Mr. Gibson's front right pants pocket.

**Q.**   And that's shown on the body-worn camera?

**A.**   Yes.

**Q.**   Okay.  Is this incident to his arrest for the firearm?

**A.**   Yes.

**Q.**   Who said, "The currency came out of the same pocket"?

**A.**   Officer Mancini.

**Q.**   Was there a response to the question, "Do you know how many you had"?

**A.**   He said, "No."

**Q.**   Was there a response to the question, "Is this it?"

**A.**   Yes.

**Q.**   And what was that?

**A.**   He said -- he advised it was, that was it, yes.

THE REPORTER:  I'm sorry.  Say that again.

 1          THE WITNESS:  He advised that that was it.

 2    BY MR. COLE:

 3    Q.    You mean a complete amount?

 4    A.    Yes.

 5    Q.    And was this a -- did a complete and thorough search of

 6    the defendant occur, as best as it could, out on the street at

 7    that time?

 8    A.    Yes.

 9    Q.    Why was that important?

10    A.    I'm sorry?

11    Q.    Why was that important?

12    A.    To make sure that he had nothing that he shouldn't have

13    had going to be processed in.

14    Q.    What was that conversation about?

15    A.    I didn't -- I couldn't understand it.  It was hard to

16    hear.

17    Q.    Do you recall -- are you familiar with whether or not

18    there was a readjustment of the handcuffs on him at that time --

19    A.    Yes.

20    Q.    -- in the latter part of this?

21    A.    Yes.

22    Q.    And why?

23    A.    We usually switch -- we take the handcuffs that we can go

24    back to our station and process, and the transport puts their

25    handcuffs on.

Q.    Okay.  You mean transporting officers, for the record?

A.    Yes.

Q.    Okay.  You and your team didn't transport him for further processing; is that right?

A.    Correct.

Q.    And what's that mean, "with the defendant at this time"?

A.    He's going to be transported to Seventh District.

Q.    And do you see him placed into the van?

A.    It appeared -- yeah, it appears he's already in there.

Q.    All right.  And the gun is recovered, the cocaine is recovered and submitted for further processing; is that right?

A.    Yes.

Q.    All right.

     MR. COLE:  You can stop, Mrs. Litz.

     Can we go -- may I have an opportunity, Mr. Coates, for the ELMO, please.

BY MR. COLE:

Q.    I want to show you what has been marked respectively as Government's Exhibit Number 2, and it'll be moved into evidence at that time.

     I mentioned to you earlier about the body-worn camera standby mode.

     Do you recall that?

A.    Yes.

Q.    And looking at Government's Exhibit 2, the executive --

1    was there an executive order by the chief of police regarding

2    the care and how to ensure that the body-worn camera safety mode

3    is on at all times?

4    **A.**    Yes.

5    **Q.**    And does this -- and you are aware of this executive

6    order -- I'm sorry.

7          You were aware of this procedure prior to this executive

8    order; is that right?

9    **A.**    Yes.

10   **Q.**    Now, let me show you also what has been marked as

11   Government's Exhibit Number 3.  There we go.  Government's

12   Exhibit Number 3.

13         Do you see the firearm?  And this is just a photographic

14   review of what was on the body-worn camera; is that right?

15   **A.**    Yes.

16   **Q.**    And just for a brief synopsis, what is this and what do

17   you see in it?

18   **A.**    You can see Mr. Gibson.  You can see the firearm.  You

19   can see the black pouch that I mentioned.  You can see my shoes,

20   and you can see Officer Mancini --

21   **Q.**    And yourself?

22   **A.**    Yes.

23   **Q.**    For the Court's benefit, I had asked you, "How were you

24   dressed that particular night?"  Can you tell us?  In this

25   photograph, can you show us and tell us for the record how you

1   were dressed?

2   **A.**     Yes.

3   **Q.**     Go ahead.

4   **A.**     Oh.  Casual attire with outer vest with police

5   identifiers affixed to the front and the back.

6   **Q.**     Do you have it on the front and the back of your outer

7   garment?

8   **A.**     Yes.

9   **Q.**     Is that a tactical vest?  Are you familiar with that

10  term?

11  **A.**     Yes.

12  **Q.**     What is this particular item you have on that says

13  "Police"?

14  **A.**     A tactical -- an outer tactical vest.

15  **Q.**     Is that a -- are you familiar with the term "bulletproof

16  vest"?  Which one is better?

17  **A.**     Well, the bulletproof vest goes inside --

18  **Q.**     Okay.

19  **A.**     -- the mass carrier, which --

20  **Q.**     And with Officer Mancini, do you see any police insignia

21  on his person?

22  **A.**     Yes.

23  **Q.**     And what is it?

24  **A.**     It says "Police" in big letters across his chest.

25  **Q.**     And about how in inches?  Can you give me just

1    approximation generally, kind of sort of?

2    **A.**     3 to 4-inch block lettering.

3    **Q.**     All right.  And the Court will be able to make

4    that determination.  That is Government's Exhibit Number 3.

5         I want to show you, just as we proceed, Government's

6    Exhibit Number 2.

7         And who took all of these pictures?

8    **A.**     Officer Wright.

9    **Q.**     This is Government's Exhibit Number 4, and this is a

10   close-up photograph of what?

11   **A.**     The firearm.

12   **Q.**     All right.  And I want to show you Government's Exhibit

13   Number 5.  Looking at Government's Exhibit Number 5, do you

14   recognize Government's Exhibit Number 5?

15   **A.**     Yes.

16   **Q.**     And you recognize it as what?

17   **A.**     The cell phone.

18   **Q.**     Who -- and who proclaimed that that cell phone was

19   theirs?

20   **A.**     Mr. Gibson.

21   **Q.**     And in relationship to this particular cell phone and the

22   gun, just paint a word picture for us.  Where are they in

23   connection with one another, which was depicted on the body-worn

24   camera?

25   **A.**     This is the corner of 16th and Galen.

1   **Q.**     All right.  And the firearm was found in the

2   intersection?

3   **A.**     In the intersection of 16th and Galen.

4   **Q.**     All right.  And, lastly, I just want to show you a couple

5   of photographs.  Let me show you, therefore, Government's

6   Exhibit Number 6.

7        Looking at Government's Exhibit Number 6 -- and I don't

8   know if I've asked you this question, but -- was this firearm

9   loaded or unloaded?

10  **A.**     It was loaded.

11  **Q.**     And it was loaded with how many rounds in what nature?

12  **A.**     One in the chamber; ten in the magazine.

13  **Q.**     And looking at Government's Exhibit Number 6, it shows a

14  firearm and one bullet; is that right?

15  **A.**     Yes.

16  **Q.**     And the one bullet, as depicted here, is what?

17  **A.**     The cartridge from the chamber.

18  **Q.**     And, for the record, can you tell us what type of firearm

19  this is?

20  **A.**     It was a .40 caliber Taurus semi-automatic pistol.

21  **Q.**     And what's the difference between a semi-automatic pistol

22  and a revolver?

23  **A.**     A semi-automatic pistol is fed through a magazine feeding

24  device.

25  **Q.**     What is the significance of one bullet being in the

1    chambers, as opposed to all of them in the magazine?  Can you

2    tell us?

3    **A.**     One in the chamber means one is -- when one's seated in

4    the chamber, it's ready to be fired.

5    **Q.**     And you had mentioned the magazine.  I want to show you

6    what has been marked -- and moved into evidence, Government's

7    Exhibit Number 7.

8          Do you see that?

9    **A.**     Yes.

10   **Q.**     And what is that, just for the record?

11   **A.**     It's the magazine removed from the well of the firearm.

12   **Q.**     All right.  And the one that was recovered in this case?

13   **A.**     Yes.

14   **Q.**     Let me show you Government's Exhibit Number 8.  I'm

15   looking at Government's Exhibit Number 8.

16         Do you recognize Government's Exhibit Number 8?

17   **A.**     Yes.

18   **Q.**     What is it?

19   **A.**     The magazine with the ammunition removed from it.

20   **Q.**     And how many ammunitions are there?

21   **A.**     Ten.

22   **Q.**     Now, I want to show you just in photographic form

23   Government's Exhibit Number 9.

24         Do you see Government's Exhibit Number 9?

25   **A.**     Yes.

1   **Q.**     And tell us what that is.

2   **A.**     That's the sandwich bag containing the 11 zips recovered

3   from Mr. Gibson's front right pants pocket.

4   **Q.**     And, finally, I want to show you -- and this is after his

5   arrest; is that right?

6   **A.**     Yes.

7   **Q.**     Let me show you Government's Exhibit Number 10.

8         Recognizing and looking at Government's Exhibit

9   Number 10, what is that?

10  **A.**     That's the zips removed from the white -- from the clear

11  sandwich bag containing the white rock-like substance.

12  **Q.**     And the recovery of these items and where they were

13  found, were they captured on your body-worn camera and/or the

14  body-worn camera of Officer Mancini?

15  **A.**     Yes.

16  **Q.**     And you just previously just testified to it earlier

17  today?

18  **A.**     Yes.

19  **Q.**     All right.

20        MR. COLE:  And I believe that's all I have.

21        THE COURT:  All right.  I just have one question.

22        You mentioned the word "waistband" during your direct

23  testimony, correct?

24        THE WITNESS:  Yes.

25        THE COURT:  All right.  Tell me how that word was used,

1    who used it.  Tell me how that word was used and who used it.

2         THE WITNESS:  Officer Wright asked Mr. Gibson if he minded

3    showing his waistband.

4         THE COURT:  What did he -- what did he say, to the best of

5    your recollection?

6         THE WITNESS:  Something almost exactly to that effect, "Do

7    you mind showing me your waistband?"

8         THE COURT:  All right.  "Do you mind showing me your

9    waistband?"

10        THE WITNESS:  Yes.

11        THE COURT:  And what tone was used?

12        THE WITNESS:  Again, conversational throughout.

13        THE COURT:  Like you and I are having?

14        THE WITNESS:  Yes.

15        THE COURT:  If I were to use the word "authoritative,"

16   would you agree it was an authoritative manner or conversational

17   manner?

18        THE WITNESS:  I believe it was a conversational manner.

19        THE COURT:  All right.  Had it been in an authoritative

20   manner, how would it have sounded to you, a hypothetical?

21        THE WITNESS:  It wouldn't have been a question.  It'd have

22   been, "Show me your waistband."

23        THE COURT:  All right.

24        MR. COLE:  That's all I have.

25        THE COURT:  Okay.  That's fine.  It's after 1.  I just

1    have a suggestion.  We started late.  Hindsight's 20/20.  We

2    probably should have started at 10 but we didn't.  So my

3    suggestion is this -- and I don't want to create a hardship for

4    others who may have other matters scheduled for this afternoon --

5    I've got a 1:00 matter that's going to take some time, a little

6    time, and I have a 2:00 matter, and I'm -- the jury's out on

7    that.  I'm not sure how long that's going to take.

8          So what I was going to suggest is that -- and I'm sure

9    cross-examination's going to be a while or not?

10         MS. PETRAS:  A while.

11         THE COURT:  All right.  What about if we assemble at 2:30?

12   And I say that also because my staff, they've been here since

13   probably 6 a.m. this morning -- and I'm kidding about that, but

14   they were here very early.

15         THE COURTROOM DEPUTY:  It was about 5:30.

16         THE COURT:  Yeah.  And they haven't had lunch, so I'm

17   mindful of that.  So is it a hardship for anyone if we come back

18   at 2:30?

19         MS. PETRAS:  No, Your Honor.

20         THE COURT:  All right.  Mr. Cole?

21         MR. COLE:  No, Your Honor.

22         THE COURT:  What about you, Officer?

23         THE WITNESS:  That's fine, Your Honor.

24         THE COURT:  Okay.  All right.  Thank you so much.  I'm

25   going to ask the officer not to discuss his testimony since he's

1    under direct.  Okay?  But enjoy your lunch.  You don't have to go

2    downstairs, but, you know, if you want to, that's fine.

3            THE WITNESS:  Thank you, Your Honor.

4            THE COURT:  Mr. Gibson, take care.  All right.  And we'll

5    talk again at 2:30, Mr. Gibson.  Okay?

6            THE DEFENDANT:  Okay.

7            THE COURT:  Okay.  Thank you, all.

8            (Thereupon, a break was had from 1:04 p.m. until 3:08

9    p.m.)

10           **AFTERNOON SESSION, SEPTEMBER 17, 2018**

11   (3:08 p.m.)

12           MR. COLE:  May I get the witness, Your Honor?

13           THE COURT:  Yes, please, sure.

14           Okay.  Officer, you're still under oath.  All right.

15           Cross-examination, Ms. Petras.

16           MS. PETRAS:  Thank you, Your Honor.

17               CROSS-EXAMINATION OF MATTHEW HILLER

18   BY MS. PETRAS:

19   **Q.**    Officer, in relation to this case you wrote the Gerstein

20   Report, correct?

21   **A.**    Yeah.  I assisted in writing it, yes.

22   **Q.**    And the Gerstein is the sworn statement in support of

23   probable cause for Superior Court, correct?

24   **A.**    Yes.

25   **Q.**    And you also wrote the Cobalt description of what

1    occurred that day.

2         Cobalt is the main police report, correct?

3    **A.**    I don't know if I wrote the actual Cobalt.  Because I'm

4    the arresting officer my name is on the Cobalt, if that make

5    sense.

6    **Q.**    Would it help -- are you saying you don't remember

7    whether or not you wrote the descriptive portion of it, the

8    statement of facts?

9    **A.**    I doubt that I wrote that.  I mean, I don't remember.

10   Like I said, since I was the arresting, my name goes on all

11   those documents.

12   **Q.**    Okay.  Well, if you're -- if it says -- reports that you

13   were the reporting officer, that means you wrote it or you read

14   it and agreed to it?

15   **A.**    I read and it agreed to it, yes.

16   **Q.**    Okay.  So at a minimum, you read and agreed to the police

17   report, correct?

18   **A.**    Yes.

19   **Q.**    And you swore under oath to the Gerstein, correct?

20   **A.**    Yes.

21   **Q.**    Okay.  And you didn't take any notes in relation to this

22   case, correct?

23   **A.**    I'm sorry?

24   **Q.**    You didn't take any notes whatsoever in relation to this

25   case, correct?

1  A.     Just the quick booking form that I filled out on the

2  scene.

3  Q.     Did you write anything else in relation to this case?

4  A.     Not that I can recall.

5  Q.     And did you testify, other than today, or is this the

6  first time you testified?

7  A.     This is the first time.

8  Q.     Okay.  And did you make any radio communications in

9  connection with this case?

10  A.     Yes.  Radio?  You said radio?

11  Q.     Yes.

12  A.     Yes.

13  Q.     You did?

14  A.     Yes.

15  Q.     On what channels?

16  A.     NSID op speed.

17        MS. PETRAS:  I don't believe I've received the radio run

18  in connection with this case, and I'm not sure I have the booking

19  form.  I would just ask that the government produce it within the

20  next couple of days, and if for some reason I need to reopen it

21  I'll ask to reopen it.

22        THE COURT:  Sure.

23        MR. COLE:  I will, Your Honor.

24  BY MS. PETRAS:

25  Q.     Okay.  When you were sitting in the car before you got

1    out of the car to chase Mr. Gibson, you -- and while Officer

2    Wright was talking to Mr. Gibson, you were in the front

3    passenger seat, correct?

4    **A.**    Yes.

5    **Q.**    And the entire time that Officer Wright was talking to

6    Mr. Gibson, you could see Mr. Gibson, correct?

7    **A.**    Yes.

8    **Q.**    Okay.  Now, you've reviewed your own body-worn camera

9    video, correct?

10   **A.**    Yes.

11   **Q.**    And you know from watching it that, because of the way

12   you were sitting in the car, you -- Mr. Gibson is not pictured

13   on your -- the video from your camera until after you got out of

14   the car, correct?

15   **A.**    Correct.

16   **Q.**    And have you reviewed Officer Wright's video?

17   **A.**    Brief beginning part of it.

18   **Q.**    Okay.  And the same is true of his video, because of the

19   way he situates himself in the car, his camera, also you cannot

20   see Mr. Gibson on the video while all of the officers are still

21   in the car, correct?

22   **A.**    Correct.

23   **Q.**    And Officer McCaw actually doesn't turn her body-worn

24   camera on until late, so you cannot see Mr. Gibson in her video

25   while all of the officers are in the car, correct?

**A.**     Correct.

**Q.**     Okay.  But you have now reviewed Officer Mancini's video, correct?

**A.**     Yes.

**Q.**     And you now know that on Officer Mancini's video, before the officers got out of the car, you could see Mr. Gibson for a bit of time, correct?

**A.**     Yes.

**Q.**     And you now know, from looking at the video, that you can see Mr. Gibson on the video holding both of his hands up like this (indicating) in response to Officer Wright saying, "Let me see your waistband"?

**A.**     You could see the one hand at the end.  And in the video we saw, it was hard to make out the second hand, but I can say that, yes, I could see the one -- the right hand, yes.

**Q.**     Well, in fact to what Officer Wright said, Mr. Gibson held up both of his hands, correct?

**A.**     Near the end of the conversation, yes.

**Q.**     He had both of his hands in the air, and as I'm holding my hands up, they're at right angles with the palms facing towards you, correct?

**A.**     Near the end of the interaction, yes.

**Q.**     That's how Mr. Gibson held up his hands in response to what Officer Wright said?

**A.**     Yes.

1    Q.    Okay.

2          THE COURT:  Is it -- do we have a clear --

3          MS. PETRAS:  I'm going to get there, Your Honor.

4          THE COURT:  Oh, sorry.  I'm sorry.

5          MS. PETRAS:  It's okay.

6    BY MS. PETRAS:

7    Q.    When you wrote the Gerstein in this report, that was

8    before you saw Officer Mancini's body-worn camera video,

9    correct?

10   A.    Correct.

11   Q.    And you swore to the Gerstein Report under oath, correct?

12   A.    Yes.

13   Q.    And, obviously, it's an important report because it's

14   what is -- constitutes probable cause in Superior Court,

15   correct?

16   A.    Correct.

17   Q.    And a person is detained on that, right?

18   A.    Yes.

19   Q.    So it's important to tell the truth, correct?

20   A.    Correct.

21   Q.    And in that report you said that Mr. Gibson was keeping

22   his hands in his pocket.

23         Do you remember saying that?

24   A.    Yes.

25   Q.    Okay.  And you didn't say anything this morning in

1   response to Mr. Cole with regard to him keeping his hands in his

2   pockets the whole time, correct?

3   **A.**    Initially he had his hands in his pocket, yes.

4   **Q.**    Right.

5          But that's not how the Gerstein is written, correct?

6   **A.**    How is it -- can you read it verbatim?

7   **Q.**    Okay.  Well, in the Gerstein --

8          MS. PETRAS:  And I'll mark this Defendant's Exhibit 1, and

9   I'll just hand a copy to the government.

10  BY MS. PETRAS:

11  **Q.**   What you say in the Gerstein Report -- and I'll just put

12  it on -- with the portion highlighted.

13         In the Gerstein what you say about what happened while

14  the officers were still in the car before Mr. Gibson ran --

15         And just to be clear for the record, it says on here

16  "Markice Joseph," but that's the name that Mr. Gibson gave you

17  after he was arrested, correct?

18  **A.**   Correct.

19  **Q.**   Okay.  So --

20         THE COURT:  What is that?

21         MS. PETRAS:  Pardon me?

22         THE COURT:  What is that, Joseph?

23         MS. PETRAS:  Yes, Markice Joseph.

24         THE COURT:  Okay.

25         MS. PETRAS:  Okay.

1    BY MS. PETRAS:

2    **Q.**    And this is -- what I've marked as Defense Exhibit 1 is

3    the Gerstein that I referred to that you swore to under oath in

4    connection with this case, correct?

5    **A.**    Yes.

6    **Q.**    Okay.  And in the Gerstein what you said was -- and I'm

7    looking at this line here (indicating) -- "Officer Wright asked

8    Mr. Joseph if he could see his waistband, and Mr. Joseph

9    repeated, 'I ain't got no guns, I ain't got no guns,' keeping

10   his hands in his pockets"?

11   **A.**    Yes.

12   **Q.**    And then the next sentence is, "Officer Wright pulled the

13   car up a little further, and Mr. Joseph turned back westbound

14   and broke into a full out sprint back towards 16th Street,"

15   correct?

16   **A.**    Yes.

17   **Q.**    And there's nothing in there about how Mr. Gibson had

18   held up his hands in response to Officer Wright, correct?

19   **A.**    No, there's nothing in there about holding the hands up,

20   correct.

21   **Q.**    Okay.  And, but we now know from watching the video that

22   he actually did, in fact, hold up his hands, correct?

23   **A.**    At some point during the conversation, yes, he held up

24   his hands.

25   **Q.**    Okay.  But you didn't report that in the Gerstein Report,

1    correct?

2    **A.**     Correct.

3    **Q.**     And it's not quite true that he kept his hands in his

4    pocket the entire time, correct?

5    **A.**     It is true for this part of the questioning, he had his

6    hands in his pocket, because then he says -- then if you go to

7    the next sentence, "Officer Wright pulled up the car a little

8    bit," and you watch the video, the car's creeping up, and he

9    kind of puts his hands up and then turns to run.

10   **Q.**     Okay.  But you don't say anything about that in the

11   Gerstein?

12   **A.**     Correct.  It's not in the Gerstein, yes.

13   **Q.**     And you also -- in the statement, which -- in the Cobalt

14   report, which I'll mark as Defense Exhibit Number 2 -- I'm going

15   to show you what is Defendant's Exhibit Number 2.

16          MS. PETRAS:  Do you need a copy?

17   BY MS. PETRAS:

18   **Q.**     It's marked as Defendant's Exhibit Number 2.

19          This is the Cobalt report that you filled out in

20   connection with the arrest of Mr. Gibson, correct?

21   **A.**     Like I said again, I don't know if I per se filled this

22   out.  It just has my name because, as you see at the top, it's

23   the arresting officer.

24   **Q.**     Okay.  So this is -- but this is the Cobalt report that

25   was prepared in connection with Mr. Gibson's arrest?

1    **A.**    Yes.

2    **Q.**    Okay.  And on page 2 of the report is a statement of

3    fact, correct?

4    **A.**    That's the Gerstein.  That's --

5    **Q.**    It's word for word the same, correct?

6    **A.**    Yes, yes.

7    **Q.**    Okay.  And it's fair -- and you said earlier that you

8    adopted this statement in connection with the police report as

9    well, correct?

10   **A.**    Yes.

11   **Q.**    And in that report as well you said nothing about

12   Mr. Gibson, how he had put his hands up in response to what

13   Officer Wright had told him to do, correct?

14   **A.**    Correct.

15   **Q.**    In between writing the -- swearing to the Gerstein and

16   reviewing the Cobalt report, you have seen Officer Mancini's

17   video, correct?

18   **A.**    Yes.

19   **Q.**    When did you first see it?

20   **A.**    Some time after -- I really -- I really don't know when

21   was the first time I saw it, but --

22   **Q.**    Recently?

23   **A.**    Yes.  I mean, I don't know the first time that I met with

24   AUSA Cole to -- it was within the past couple weeks.

25   **Q.**    Okay.  And that's the first time that you looked at

1    Officer Mancini's body-worn camera video, correct?

2    **A.**    Yes.

3    **Q.**    And until you looked at his video you had not reported

4    anywhere that Mr. Gibson had responded with his hands up,

5    correct?

6    **A.**    Correct.

7    **Q.**    Okay.  And just to show you the video again, I want to

8    play a portion what is Government's Exhibit Number 1-B.

9          And if you could -- I'm starting this at 1:27 -- 1 minute

10   and 27 seconds into the video.

11         (Videotape played.)

12   BY MS. PETRAS:

13   **Q.**    And that's Officer Mancini's body-worn camera video from

14   this -- from the rest of Mr. Gibson, correct?

15   **A.**    Correct.

16   **Q.**    And right now you see him turning on to Galla [sic]

17   Street, correct?

18   **A.**    Galen Street, yes.

19   **Q.**    Galen Street.

20         And at this point -- and I might have stopped it too

21   soon, but at least at 1 minute and 49 seconds you see

22   Mr. Gibson, correct?

23   **A.**    Yes.

24   **Q.**    Okay.  And then at 1 minute and 51 seconds you see his

25   hands go in the air, correct?  And can you see both of his hands

1    right there?  I'm stopping it at 1 minute and 52 seconds.

2          (Videotape paused.)

3          THE WITNESS:  Yes.

4    BY MS. PETRAS:

5    **Q.**    Okay.  So both of his hands are in the air as I was doing

6    earlier, correct?

7    **A.**    Correct.

8          THE COURT:  Wait a minute.  I'm sorry.  Maybe I'm the only

9    one who can't see it.

10          MS. PETRAS:  No.  I'm actually going to admit too -- I'm

11    going to finish playing this, and then I have what I'll admit as

12    Defense Exhibit Number 3, which is a version that plays it in

13    half time.

14          THE COURT:  Oh, okay.  Great.  Thanks.

15          (Videotape played.)

16    BY MS. PETRAS:

17    **Q.**    So, and you can see on that video that Mr. Gibson

18    actually took about four or five steps with his hands in the air

19    like this (indicating), correct?

20    **A.**    Correct.

21    **Q.**    And the car was keeping pace with him, the car, correct?

22    **A.**    Yes.

23    **Q.**    Okay.  And that's as Officer Wright was talking to

24    Mr. Gibson?

25    **A.**    Yes.

1    **Q.**    Okay.

2        (Videotape paused.)

3        MS. PETRAS:  Now, just for the Court to see -- and I

4    haven't put it on a separate disk, but I can and can submit it to

5    the Court and government counsel, but I will play what I will

6    mark as Defendant's Exhibit Number 3, which is --

7        (Videotape played.)

8        MS. PETRAS:  It's going already.  Wait -- which is

9    essentially that portion of the -- of Officer Mancini's video in

10   half time, half speed.  It makes it just a little easier to see

11   Mr. Gibson.

12       THE COURT:  I see.

13       MS. PETRAS:  Okay.

14   BY MS. PETRAS:

15   **Q.**    And so, Officer, you can see on that.  As it slowed down,

16   you can clearly see both hands in the air, correct?

17   **A.**    Yes.

18   **Q.**    And that's what occurred, correct?

19   **A.**    Yes.

20   **Q.**    Right.  And, but when you said earlier that you had only

21   seen one hand, was it because you only remembered one hand?

22   **A.**    In the video when it's played at full speed it's kind of

23   hard to see the left hand.

24   **Q.**    I know, but you were there.

25       You remember him having two hands in the air?

1    A.      I don't -- I don't remember.  I remember at the beginning

2    of the interaction he had his hands in his pockets.

3    Q.      Okay.  And it's fair to say that you go up to a lot of

4    people and have interactions with a lot of citizens, correct, as

5    a police officer?

6    A.      Every day, yes.

7    Q.      Every day.

8            And it's part of the gun -- you're part of the Gun

9    Recovery Unit, correct?

10   A.      Yes.

11   Q.      And as part of the Gun Recovery Unit, this is one of your

12   investigatory methods is to go up to people and try to see their

13   waistbands to try to recover guns, correct?

14   A.      Contact them and read body language and so forth and

15   so -- such, yes.

16   Q.      Okay.  So on every tour of duty, about how many people do

17   you go up to and try and see their waistband?

18   A.      It all varies.  Not everybody we ask to see their

19   waistbands, like I said again, based on -- but we can come in

20   contact anywhere 20, 30, 40 people a day, just come in contact,

21   but not asking to see their waistband, just talking to people.

22   Q.      Okay.  So between April 2nd, 2018 when you arrested

23   Mr. Gibson and today, about how many people do you think you

24   came into contact with in a similar manner?

25   A.      Uncountable.  I don't even want to try to ballpark that

1    for you.

2    **Q.**    Okay.

3    **A.**    Like, a lot.

4    **Q.**    And you worked with Officer Wright a lot?

5    **A.**    Yes.

6    **Q.**    Okay.  And so it's fair to say you've come into a lot of

7    contact with a lot of people with Officer Wright, correct?

8    **A.**    Correct.

9    **Q.**    And a lot of that involves trying to see people's

10   waistbands, correct?

11   **A.**    At times, yes.

12   **Q.**    Okay.  So it's fair to say it's hard to remember the

13   exact words that were used back in Mr. Gibson's arrest, correct?

14   **A.**    Correct.

15   **Q.**    Okay.

16       MS. PETRAS:  I'm going mark this as Defendant's Exhibit

17   Number 4.

18       THE COURT:  Would you play that again?

19       MS. PETRAS:  Yes.

20       THE COURT:  Did you say half time?

21       MS. PETRAS:  Yes.  So I'm playing Defendant's Exhibit

22   Number 3.

23       (Videotape played.)

24       THE COURT:  What is that officer doing?  What is he doing

25   with his hand, his right hand?

1          THE WITNESS:  It's his flashlight.  I don't -- I don't

2     know if he has it illuminated or not at that time.

3     BY MS. PETRAS:

4     Q.    He actually picks up his flashlight and points it in

5     Mr. Gibson's direction, correct?

6     A.    Yes.

7     Q.    Okay.

8          MS. PETRAS:  And then I'll mark as Defendant's Exhibit

9     Number 4 -- I'll provide a copy to the government.  I'm showing

10    you -- did the Court want to see that again before I do that?  I

11    don't know if this helps.

12    BY MS. PETRAS:

13    Q.    I'm showing you what is marked as Defendant's Exhibit

14    Number 4, and that is a screen shot from Officer Mancini's

15    body-worn camera, correct?

16    A.    That's what it appears to be, correct, yes.

17    Q.    And you can see up in this corner Mr. Gibson with both of

18    his hands in the air, correct?

19    A.    Correct.

20    Q.    Okay.  And just to be clear, the body-worn camera is

21    dated April 3rd, 2018, at 3:47 and some seconds, Zulu.

22    A.    Yes.

23    Q.    But it's in Zulu time, correct?

24    A.    I don't know what Zulu time means, but --

25    Q.    But Zulu time is set four hours ahead of D.C. time,

1    correct?

2    **A.**    I'm -- I'm not sure.

3    **Q.**    Okay.  All right.

4         Is this a fair and accurate representation of that image

5    on Officer Mancini's body-worn camera?

6    **A.**    Yes.

7         MS. PETRAS:  I would move to admit Defendant's Exhibit

8    Number 4.

9         MR. COLE:  I have no objection.

10        THE COURT:  All right.  It's admitted.

11        (Defendant's Exhibit 4 admitted into the record.)

12        MS. PETRAS:  And I would also move to admit Defendant's

13   Exhibit Number 3, which is the half speed of Officer Mancini's

14   body-worn camera that Mr. Gibson could be seen on.

15        THE COURT:  Any objection?

16        MR. COLE:  Is it just -- is it just a portion?

17        MS. PETRAS:  It is 19 seconds, and it includes --

18        MR. COLE:  Oh, 19 seconds?  I have no objection.

19        THE COURT:  All right.

20        (Defendant's Exhibit 3 admitted into the record.)

21   BY MS. PETRAS:

22   **Q.**    Okay.  This -- what is marked as Defendant's Number 4

23   is --

24        MS. PETRAS:  Is that the ELMO?  I want on the ELMO.  I

25   just hit the wrong button.  Sorry.

BY MS. PETRAS:

**Q.**    But what's marked as Defendant's Exhibit Number 4, that view is actually Mr. Gibson complying when Officer Wright says, "Let me see your waistband," correct?

**A.**    He's putting -- he's just putting his hands in the air. It's --

**Q.**    In response to Officer Wright saying, "Let me see your waistband"?

**A.**    I don't know if that's called -- like, I don't know how we'd say that's complying because he has a jacket on still.

**Q.**    Okay.  Well, his jacket -- I'll get to that, the second part of what you just said.

        But the first part, that is what he did in response to Officer Wright saying, "Let me see your waistband"?

**A.**    Like I said, I -- there's no audio to link up to exactly what we're seeing because our cameras have the two-minute playback.  I don't know at what point in the conversation between Officer Wright and the defendant this actually occurred, because as you see, there's a little bit before when we kind of roll like up to the defendant.

**Q.**    Okay.  And it's fair to say you just don't remember which came first?

**A.**    Which --

**Q.**    You just don't remember the context.

        Is that what you're saying?

```
1   A.      Yes.

2   Q.      Okay.  And this -- as I said, this procedure that you use

3   is part of the procedures designed for the Gun Recovery Unit to

4   get guns off the street, correct?

5   A.      It's one of the tools we use to assist us, yes.

6   Q.      And it's to investigate, correct?

7   A.      I would just say to -- it's like a tool that we use to

8   read body language, and also firearms are commonly kept in the

9   waistband area, so --

10  Q.      Right.  And it's all about investigating to --

11          MR. COLE:  Your Honor, may the witness --

12  BY MR. COLE:

13  Q.      -- find guns, correct?

14          THE COURT:  All right.  One at a time.

15          MR. COLE:  I'm sorry.  Yes, of course.

16          Your Honor, may the witness be allowed to finish his

17  answer before Mrs. Petras interrupts?

18          THE COURT:  Do you understand the question?

19          THE WITNESS:  Can you go with the question again, please?

20  BY MS. PETRAS:

21  Q.      This is just one method you use to investigate to find

22  guns, correct?

23  A.      Yes.

24  Q.      Okay.  And this technique of trying to see people's

25  waistbands is something not just the Gun Recovery Unit does but
```

1   other units in the MPD does as well, correct?

2   **A.**    I mean, I can only speak on behalf of the Gun Recovery

3   Unit, so...

4   **Q.**    Is the Gun Recovery Unit part of Seventh District?

5   **A.**    No.

6   **Q.**    Are you stationed at Seventh District?

7   **A.**    No.

8   **Q.**    Okay.  Do you ever work with those officers?

9   **A.**    Not that I can recall, no.

10  **Q.**    Okay.  Do they have the same training that you do?

11  **A.**    I don't know.

12  **Q.**    Okay.  When you first made contact with Mr. Gibson, there

13  were four officers in the car, right?

14  **A.**    Yes.

15  **Q.**    And Officer Wright had face-to-face contact with

16  Mr. Gibson, correct?

17  **A.**    From the vehicle, yes.

18  **Q.**    Yes.  And you're investigating to find guns, correct?

19  **A.**    Yes.

20  **Q.**    And yet none of the four officers turned on or activated

21  their body-worn cameras while you were in the car when you first

22  approached Mr. Gibson, correct?

23  **A.**    While we're in the car, no.

24  **Q.**    And that's actually a violation of the MPD regulations,

25  correct?

1   **A.**     I don't -- I don't -- what regulations?

2   **Q.**     Okay.  Well, and as we're doing this, by not activating

3   the body-worn cameras, all four of you knew that the

4   conversation between Officer Wright and Mr. Gibson would not be

5   recorded, correct?

6   **A.**     What do you mean?  We didn't do that intentionally.  We

7   would actually want that to be recorded.  It would probably help

8   us in these types of situations.

9   **Q.**     When you say --

10   **A.**     It's just that when we're on patrol things happen so

11   quick, and we try to do -- we turn it on as quickly as we can

12   sometimes.

13   **Q.**     Okay.  Okay.  But you knew by not having activated it,

14   the conversation would not be recorded, correct?

15   **A.**     Yes.

16   **Q.**     Okay.  And you're familiar -- supposed to be familiar

17   with the MPD regulations, correct?

18   **A.**     Correct.

19   **Q.**     And there's a specific regulation for body-worn camera

20   videos, correct?

21   **A.**     Yes.

22   **Q.**     And I think Mr. Cole showed you one particular directive,

23   but there's a whole set of general orders for body-worn camera

24   videos, correct?

25   **A.**     Correct.

1          MS. PETRAS:  And I'm going to show you what I'll mark

2     as -- what I will mark -- may I have the Court's indulgence?

3          THE COURT:  Sure.

4          MR. COLE:  Your Honor, while I'm looking, I do have a

5     slight objection.  One, on this line of questioning, Counsel

6     filed a motion and a response.  None of this was in violation of

7     MPD regulations.  And I'm not assuming that it is.  At some point

8     I think it's a little improper, because we had an opportunity to

9     respond fulsome in our response, and their motion did not -- did

10    not allege a failure to follow MPD rules as some type of

11    violation in the defendant's rights.

12         And the government, therefore, has not had an opportunity

13    to, one, address this issue, and it's -- and it shouldn't be done

14    at this time, because you have given us a schedule.  You've

15    extended and gave counsel a time to reply.  To do it this way is

16    a tad bit ambush-ish, and it did not address it.

17         I don't believe it has any, any issue towards whether or

18    not his Fourth Amendment right, the defendant's Fourth Amendment

19    right, was violated, or he was under arrest, and the items

20    recovered from him.  That's what the motion says.  The gun and

21    drugs were recovered from him, and the police did not have a

22    search warrant.

23         MS. PETRAS:  Your Honor --

24         MR. COLE:  To have these issues and these questions now,

25    respectfully, I object.  I believe it's improper, and it's that

1    ambush tactic that should not go on in this Court.  And I say

2    that respectfully.

3         MS. PETRAS:  Your Honor, it's cross-examination.  I'm

4    allowed to cross-examine with anything, and I do not have to give

5    opposing counsel notice of my cross-examination.

6         THE COURT:  It's relevant.  And, Counsel, look, at the end

7    of the hearing -- which may be today -- I'll certainly give the

8    government an opportunity to respond in writing to any arguments

9    that have come up during the cross of -- relevant

10   cross-examination, sure.

11        Counsel.

12        MS. PETRAS:  Okay.

13   BY MS. PETRAS:

14   Q.    I'm going to show you what I've marked as Defendant's --

15        THE COURT:  Let me just say, I have to be in Mr. Racine's

16   office at 5:00 today promptly.  And it won't take but a

17   five-minute walk to get there, but I just mention that.  So I may

18   have to bring everybody back tomorrow morning.  I don't know.

19        MS. PETRAS:  I actually have another hearing tomorrow

20   morning, so you might have to pick another day.

21        MR. COLE:  Your Honor, and Mrs. Litz is going to have to

22   leave at 4:00, just for the record, but I'm here as long as you

23   wish.

24        THE COURT:  All right.  Well, I'm going to keep her

25   here because she can -- you can leave at 4:00.

1        She has to leave at 4:00?  You have to leave at four?

2        MR. COLE:  Yes.

3        THE COURT:  All right.  That's -- I mean, that's -- she's

4   great at getting those, and I keep giving her credit because, I

5   mean, all the paralegals, they don't get the credit they deserve.

6        Are you going to be relying upon technology after 4:00?

7        MS. PETRAS:  I have my own technology.

8        THE COURT:  You have your own?

9        MS. PETRAS:  Yes.

10        THE COURT:  Okay.  All right.  We'll play it by ear

11   tomorrow.  I don't know if we'll finish by quarter to five or

12   not.  Can we?  I don't know.

13        MS. PETRAS:  I hope so.

14        THE COURT:  Yeah.  All right.  If we can we'll find time

15   tomorrow.

16        MS. PETRAS:  Actually, I'm doubting that we -- there's

17   another reason that we can't, but I can finish with Officer

18   Hiller.

19        THE COURT:  All right.  Okay.  Let's talk about tomorrow,

20   though, in the event that I have to bring you back tomorrow.

21        What's a good time?

22        MS. PETRAS:  I have another suppression hearing before

23   Judge Bates tomorrow and a hearing on a legal motion before Judge

24   Lamberth in the afternoon, so I can't do tomorrow.

25        THE COURT:  All right.  We'll figure out another date.  If

1    there's another day this week or next week or whatever, we'll do

2    it.  All right.

3        MS. PETRAS:  Okay.

4    BY MS. PETRAS:

5    Q.    I'm going to show you what I've mark as Defendant's

6    Exhibit Number 5.

7        MS. PETRAS:  And for the record, I would just move to

8    admit Defendant's Exhibit Number 5, which is a copy of the

9    body-worn camera general orders for the Metropolitan Police

10   Department.

11       THE COURT:  Any objection?

12       MR. COLE:  Consistent with my arguments, Your Honor, I

13   would.

14       THE COURT:  I think the scope of cross-examination is

15   relevant, and to the extent I need to keep the record open to

16   enable a party or both parties to respond to issues that come up

17   during the course of this hearing, I'll certainly do so.

18       MR. COLE:  Yes, Your Honor.  Thank you.

19       THE COURT:  Admitted.

20       (Defendant's Exhibit 5 admitted into the record.)

21       MS. PETRAS:  And this may be easier.  If I can approach

22   and give Officer Hiller a copy rather than paging through it?

23       THE COURT:  Sure.

24       MS. PETRAS:  Thank you.

25       THE COURT:  Is that a one page -- that's a multi-page

1    document?

2          MS. PETRAS:  Yes.

3          THE COURT:  Sure.

4          MS. PETRAS:  Thank you.

5    BY MR. COLE:

6    **Q.**    Officer, I'm handing you a copy of what I've marked as

7    Defendant's Exhibit Number 5.

8          That's the general order for the body-worn camera,

9    correct?

10   **A.**    Yes.

11   **Q.**    And you're required to followed these procedures,

12   correct?

13   **A.**    Yes.

14   **Q.**    And if you could turn to page 7 -- well, actually,

15   starting on page 6, Roman Numeral 5 indicates that that's the --

16   it's under the topic of procedures, correct?

17   **A.**    Yes.

18   **Q.**    And then on page 7 under 5A, A has -- A says, "Body-worn

19   camera equipped members."

20         MS. PETRAS:  Oh, I can do this for the Court.

21   BY MS. PETRAS:

22   **Q.**    A says, "Body-worn camera equipped members," and then it

23   has instructions, correct?

24   **A.**    Yes.

25   **Q.**    And number 4 says -- well, number 5 talks about turning

1    on and starting the body-worn camera recordings as soon as a

2    call is initiated via radio or communication, correct?

3    **A.**    Yes.

4    **Q.**    And then number 4 says, "In addition, members shall

5    activate their body-worn cameras for the following events," and

6    B is, "all contacts initiated pursuant to law enforcement

7    investigation, whether criminal or civil," correct?

8    **A.**    Yes.

9    **Q.**    Okay.  And then MPD general order --

10              THE COURT:  What's the date of this order?

11   BY MS. PETRAS:

12   **Q.**    These general orders went into effect on March 11th,

13   2016, correct?

14   **A.**    Yes.

15   **Q.**    And contacts are defined by the general orders as,

16   "Conduct by a member which places the sworn member in

17   face-to-face communication with a individual citizen under

18   circumstances in which the citizen is free not to respond and to

19   leave," correct?

20   **A.**    Yes.

21   **Q.**    That's what a contact is under MPD general order series

22   304, number 10, correct?

23   **A.**    Correct.

24   **Q.**    So between that general order that defines contacts and

25   the general order for body-worn cameras, you were required to

1    activate your body-worn camera when Officer Wright began his

2    face-to-face contact -- which you said earlier was for

3    investigation -- with Mr. Gibson, correct?

4    **A.**     That is correct.

5    **Q.**     Yet none of you turned on your body-worn cameras so that

6    we all could hear what the conversation was, correct?

7    **A.**     Correct.

8    **Q.**     Okay.  And you'll agree with me, won't you, that --

9         MS. PETRAS:  And for the record, Your Honor, I'll mark the

10   other general order as Defendant's Exhibit Number 6 and move to

11   admit it as part of the record.

12        THE COURT:  What's the date of that one?

13        MS. PETRAS:  It's dated August 30th, 2013.  It just

14   defines contact.

15        THE COURT:  All right.  Any objection?

16        MR. COLE:  Yes, Your Honor, I do object.  I was not aware

17   of this.  I believe there are new general orders that may pre- --

18   may lead after these.  I'm not prepared to say that now based on

19   what's happening now.

20        THE COURT:  I'll keep the record open.

21        MR. COLE:  I'm quite confident there are some differences

22   or changes that are made since 2013.

23        THE COURT:  All right.  I'll keep the record open,

24   Counsel.

25        MR. COLE:  Thank you, Judge.

1          MS. PETRAS:  And just so the record is clear, the 2013 one

2    is just a definition of when a contact is, which the officer

3    agreed that he was supposed to turn on the video or activate the

4    body-worn camera.

5          THE COURT:  It's admitted.

6          (Defendant's Exhibit 6 admitted into the record.)

7    BY MS. PETRAS:

8    Q.    Obviously you'll agree with me that the best evidence of

9    what was said between Officer Wright and Mr. Gibson would have

10   been an audio recording, correct?

11   A.    Correct.

12   Q.    Okay.  Officer McCaw actually didn't even activate hers

13   until you told her to during the middle of the stop, correct?

14   Do you remember that?

15   A.    No, I don't remember that.  If you want to play the video

16   and show me then I can --

17   Q.    Let me ask you this.  Is there -- when you --

18         THE COURT:  Wait a minute.  When you say -- you said, "In

19   the middle of the stop," that's kind of legalese.

20         MS. PETRAS:  I'll --

21         THE COURT:  Rephrase that question.

22         MS. PETRAS:  Yes.  Can I back up for a moment and ask?

23         THE COURT:  Yes.

24   BY MR. COLE:

25   Q.    When you're looking at another officer, can you tell

1  whether or not their body-worn camera has been activated?

2  **A.**    It's -- yes and no.  It depends.  I mean, it's kind of

3  hard sometimes.  It's like a little dot on the top that blinks,

4  and unless I'm close to you I really can't see it.

5  **Q.**    Okay.  Have you seen Officer McCaw's video?

6  **A.**    Just the very beginning part.

7  **Q.**    Okay.  And it doesn't start until the car is just about

8  backing up, correct?

9  **A.**    Yes.

10        MS. PETRAS:  Let me just show you this.  And I'll mark

11 this as Defendant's Exhibit Number 6, I think -- oh, I'm sorry,

12 Defendant's Exhibit Number 7, Officer McCaw's video, just so the

13 Court has that one as well.

14        (Defendant's Exhibit 7 marked for identification.)

15 BY MS. PETRAS:

16 **Q.**    Officer Hiller, if you could just let me know when you

17 recognize this to be Officer Hiller's [sic] MPD -- or body-worn

18 camera video from Mr. Gibson's arrest?

19 **A.**    This is not mine.

20 **Q.**    I'm asking if you can watch it to the point where you can

21 perhaps recognize it as Officer McCaw's video?

22 **A.**    Oh.  Yeah, I can recognize it now.

23 **Q.**    Okay.  And just to show you the very beginning of it, in

24 the very beginning of it, you can see right here (indicating)

25 officer -- that's Officer Wright, correct?

1   **A.**     Yes.

2   **Q.**     And in the beginning you can see officer -- just as --

3   and to be clear, there's no sound on this, and that's because

4   this is the two-minute buffer that was collected on Officer

5   McCaw's recording, correct?

6   **A.**     Yes.

7   **Q.**     Okay.  So it doesn't begin until this point, but you can

8   still see Officer Wright talking, correct?

9   **A.**     Yes.

10   **Q.**     Okay.  And then begins to back up to chase Mr. Gibson,

11   correct?

12   **A.**     Correct.

13   **Q.**     Okay.

14          MS. PETRAS:  I would move to admit Defendant's Exhibit

15   Number 7, which is Officer McCaw's video.

16          THE COURT:  Any objection?

17          MR. COLE:  No objection, Your Honor.

18          THE COURT:  Admitted.

19          (Defendant's Exhibit 7 admitted into the record.)

20   BY MR. COLE:

21   **Q.**     You had said -- okay.  So there's -- you had testified

22   earlier that there was a question that Officer Wright asked of

23   Mr. Gibson.  "Can I see your waistband," is what you testified

24   in response to Mr. Cole, correct?

25   **A.**     I said something to that effect, yes.

1   **Q.**    Okay.  But what the words actually were, were, "Let me

2   see your waistband," correct?

3   **A.**    No.  I wouldn't say correct to that.

4   **Q.**    Do you remember what the exact words were?

5   **A.**    I've never -- like, I've worked with Officer Wright for

6   three years.  I never heard him demand to see somebody's

7   waistband like that.  And I know that for a fact he wouldn't

8   have that night.  It's always, "Hey, man, do you mind showing me

9   your waistband," or, "Hey, can I see your waistband," something

10  along those lines.

11  **Q.**    Let me ask you this:  Do you recognize -- you're part of

12  the Gun Recovery Unit, correct?

13  **A.**    Yes.

14  **Q.**    And I'm going to show you what I'll mark as Defendant's

15  Exhibit Number 8.

16        Are you familiar with this?

17        MR. COLE:  Your Honor, I object.  I object and -- well,

18  maybe we should -- can the witness step out?

19        THE COURT:  Sure.

20        (Thereupon the witness left the courtroom.)

21        MR. COLE:  Your Honor, this is a photograph counsel wants

22  to show.  It doesn't show Officer Hiller.  Even if it goes beyond

23  propriety at this particular point, to try to sell --

24        THE COURT:  What is it?  I don't --

25        MR. COLE:  This is a photograph that was used.  Three's a

1    barrier.  There's been a police investigation about the

2    photographs and the banner that is depicted there.  This is

3    improper.  It doesn't involve Officer Wright.  He's not a part

4    of -- I mean Officer Hiller.  He's not a part of any -- he wasn't

5    a part of any investigation.  Most of this has been cleared by

6    Internal Affairs.

7         THE COURT:  I'm sorry.  It's a photo of some police

8    officers doing what?

9         MS. PETRAS:  If I can, Your Honor.  This is Officer

10   Hiller's unit.  This gentleman right there (indicating) is

11   Officer Wright.  I thought Officer Hiller was actually in it.

12   Mr. Cole's representing he's not.  I'd like to ask Officer

13   Hiller.  This banner has been the subject of an investigation

14   because it's, frankly, offensive.  The banner reads -- a close-up

15   of the banner, it has a skull with a bullet hole in it, guns, and

16   it has Gun Recovery Unit on it.  I'm sorry.  It has the Gun

17   Recovery Unit on it.  This was essentially their logo, and it

18   says, "Vest up one in the chamber," and it was the subject of

19   some investigation, and it ties into another photograph that I

20   have that I want to ask him about.

21        MR. COLE:  Your Honor, this was not Officer Hiller, and

22   he's not a part of any investigation.  This is far afield.  It's

23   irrelevant, and it's improper because counsel wants to now assail

24   his reputation.  It doesn't go -- and I'll repeat, Your Honor.

25   The government has an opportunity to have a fair opportunity.

1    Counsel's whole argument in a one sentence was that they, the

2    police officers, had arrested the defendant and searched him

3    illegally without a warrant.  That's what the government had.

4         Now counsel goes out -- I think my argument is even

5    stronger now to show that this is improper.  On the last three

6    sentences of counsel's initial motion said that Mr. -- the

7    defendant was arrested --

8         MS. PETRAS:  First of all, that's --

9         MR. COLE:  -- without a warrant.  How does this go to that

10   issue?

11        THE COURT:  Counsel, I don't -- I don't know whether it's

12   relevant or not.  This is nonjury.  If it's not relevant I can

13   disregard it.  The officer with the red dot, who is that?  Is

14   that the officer who was driving this car on this night?

15        MS. PETRAS:  Yes.

16        THE COURT:  All right.  I'll allow it.  I'll allow counsel

17   to question.  If it's irrelevant, I'll disregard it.

18        MS. PETRAS:  And just to be clear, Your Honor, we did put

19   in our motion that he was unlawfully seized.  Our position he was

20   seized when they demanded to see his waistband and he complied.

21        THE COURT:  That's what I thought.

22        MS. PETRAS:  Yes.

23        THE COURT:  All right.  All right.  I'll let you proceed.

24        MS. PETRAS:  And this goes to this particular unit's

25   tactics.

1          THE COURT:  Look, I'm not a lay jury.  I mean, if it's

2    irrelevant at some point I'll disregard it.

3          All right.  You can bring him back, Mark.

4          (Thereupon the witness entered the courtroom.)

5          THE COURT:  For the record, this is exhibit number what

6    Counsel?

7          MS. PETRAS:  This is Exhibit Number 8.

8          THE COURT:  All right.

9          (Defendant's Exhibit 8 marked for identification.)

10   BY MS. PETRAS:

11   **Q.**    Officer Hiller, I'm showing you what is marked as

12   Defendant's Exhibit Number 8.

13         Are you familiar with that photograph?

14   **A.**    Yes.

15   **Q.**    And you're familiar with it because it's a picture of the

16   guys in your Gun Recovery Unit, correct?

17   **A.**    Some of them, yes.

18   **Q.**    Okay.  Are you in the picture?

19   **A.**    No.

20   **Q.**    Officer Wright is in the picture, correct?

21   **A.**    Yes.

22   **Q.**    And Officer Wright is the gentleman, the second from the

23   left with the beard, correct?

24   **A.**    Yes.

25   **Q.**    And Officer McCaw is not in there, correct?

1    A.    No.

2    Q.    Is Officer Mancini in there?

3    A.    No.

4    Q.    Okay.  Were you there when that photograph was taken?

5    A.    No.

6    Q.    Are you familiar with the banner?

7    A.    Yes.

8    Q.    The banner is sort of the Gun Recovery Unit's logo,

9    correct?

10   A.    It's just a banner.

11   Q.    It's a logo that somebody in the Gun Recovery Unit

12   designed for the Gun Recovery Unit, correct?

13   A.    Yes.

14   Q.    I'll show you what I marked as Defendant's Exhibit

15   Number 9.  It's just a close-up of that banner.

16         It has the Gun Recovery Unit name on it, correct?

17   A.    Yes.

18   Q.    NSID, for Narcotics and Special Investigations Division,

19   correct?

20   A.    Yes.

21   Q.    It has a picture of a skull with a bullet hole, correct?

22   A.    Yes.

23   Q.    And it says, "Vest up one in the chamber," correct?

24   A.    Correct.

25   Q.    And did you own anything with that logo on it in?

1    **A.**    No.

2    **Q.**    Were you at all involved in designing that logo or

3    promoting it?

4         MR. COLE:  Objection, Your Honor.  He's answered that

5    question, and it's not relevant any further.

6         THE COURT:  All right.  Overruled.

7    BY MR. COLE:

8    **Q.**    Okay.  I'm going to show you what I marked as Defendant's

9    Exhibit Number 10 for identification.

10        Are you familiar with this T-shirt?

11        MR. COLE:  Your Honor, I respectfully object again.  This

12   is another matter that doesn't involve this officer or the unit

13   or anything else, and it definitely doesn't involve the arrest of

14   this defendant nor the Fourth Amendment all right. - --

15        MS. PETRAS:  If he can not speak in front of the witness

16   to such length because --

17        THE COURT:  I'll allow the questioning over objection.

18        MS. PETRAS:  Okay.

19   BY MS. PETRAS:

20   **Q.**    I'll show you what I've marked as Defendant's

21   Exhibit Number 10 for identification.

22        Have you seen that T-shirt before?

23   **A.**    From the news, yes.

24   **Q.**    Okay.  And that is a T-shirt worn by a fellow member of

25   the Metropolitan Police Department, correct?

```
1    A.     Yes.

2           MR. COLE:  Objection, relevance, Your Honor.

3           THE COURT:  All right.  This is the Seventh District,

4    which I understand from this officer's testimony that the Gun

5    Recovery Unit was not a part of the Seventh District; is that

6    right?

7           THE WITNESS:  We're city-wide.  We're not -- we're not --

8    no, we're part of NSID, Narcotics and Special Investigations

9    Division.

10          THE COURT:  All right.  All right.  I'll allow it.

11   BY MS. PETRAS:

12   Q.     But the police use the same tactics, correct?

13   A.     And --

14   Q.     All police officers use the same tactics, correct?

15          MR. COLE:  Your Honor, what tactics?  At what point?

16          MS. PETRAS:  Let me -- let me --

17          THE COURT:  Yeah.  Rephrase the question, Counsel.

18   BY MS. PETRAS:

19   Q.     Do you see on that T-shirt where it says, "Let me see

20   that waistband, Jo"?

21   A.     Yes.

22   Q.     Okay.  And that's the method the police officers use to

23   try to see people's waistbands, correct?

24   A.     It's not a method we use.  It's not a method I use.  It's

25   not a method that any of my partners use.  We always ask
```

1     questions.

2     Q.    And you're saying that you always ask questions because

3     you know that in order for --

4         MS. PETRAS:  Your Honor, for the record, I would move to

5     admit Defendant's Exhibits Numbers 8, 9 and 10.

6         MR. COLE:  Your Honor, I would object for the same reasons

7     I have stated --

8         THE COURT:  Over objection, admitted.

9         MR. COLE:  -- respectfully.

10        THE COURT:  All right.

11        (Defendant's Exhibit 8, 9, and 10 admitted into the

12    record.)

13    BY MS. PETRAS:

14    Q.    You're saving it as a question because you know that if

15    you say that, "We told him to show us our waistband," that it

16    would be an unlawful search, correct?

17        MR. COLE:  Objection, Your Honor.  Argumentative at this

18    time.

19        THE COURT:  Calls for a legal conclusion, too.

20    BY MS. PETRAS:

21    Q.    When -- I'm just going to change the subject just for one

22    moment.

23        When you testified earlier, you said and you saw it on

24    the video that the gun fell off of Mr. Gibson when he fell,

25    correct?

| | |
|---|---|
| 1 | **A.**     Yes. |
| 2 | **Q.**     And that's what happened, right? |
| 3 | **A.**     It came -- we saw it come from his body, yes. |
| 4 | **Q.**     It fell off of him? |
| 5 | **A.**     It came from his body, yes. |
| 6 | **Q.**     Okay.  I asked that because Mr. Cole had asked the |
| 7 | question and said he threw it, but you didn't see him throw it, |
| 8 | correct? |
| 9 | **A.**     Correct.  I said I saw it come from him. |
| 10 | **Q.**     Yes.  And you testified earlier, too, about Mr. Cole was |
| 11 | showing you part of one of the videos where Officer Wright was |
| 12 | asking Mr. Gibson questions. |
| 13 |      Those questions he was asking after Mr. Gibson was |
| 14 | arrested, correct? |
| 15 | **A.**     Correct. |
| 16 | **Q.**     And no one had read him his *Miranda* rights before they |
| 17 | asked him those questions, correct? |
| 18 | **A.**     Correct. |
| 19 | **Q.**     And I also want to show you, is Officer Wayne Seaward is |
| 20 | one of the officers that responded, correct? |
| 21 | **A.**     Yes. |
| 22 |      MS. PETRAS:  And I'm going to show you a video that I'll |
| 23 | mark as Defendant's Exhibit Number 11. |
| 24 |      (Defendant's Exhibit 11 marked for identification.) |
| 25 | BY MS. PETRAS: |

1   Q.    And can you recognize this as a video -- you may not -- I

2   don't know if you'll be able to recognize what officer it is,

3   but one of the body-worn cameras from another officer in

4   relation to Mr. Gibson -- I'm sorry.  I'll say it again.

5         I'm going to play this video that I've marked as

6   Defendant's Exhibit Number 11, and can you tell me if you

7   recognize it to be one of the videos from the arrest of

8   Mr. Gibson?  And I'm right now playing it beginning at 2 minutes

9   and 8 seconds when the audio starts.

10        (Videotape played.)

11  BY MS. PETRAS:

12  Q.    Okay.  So do you recognize that as a video from the

13  body-worn camera of another officer in relation to the arrest of

14  Mr. Gibson?

15  A.    Yes.

16  Q.    Okay.  And I just want to play at -- I'll start it at 2

17  minutes and 58 seconds.

18        (Videotape played.)

19  BY MS. PETRAS:

20  Q.    And I'll just stop it right there.

21        Is that a fair and accurate view of the jacket that

22  Mr. Gibson was wearing on the night of his arrest?

23  A.    Yes.

24  Q.    And the clothing that he was wearing?

25  A.    Yes.

1    **Q.**    Okay.

2         MS. PETRAS:  And I would move to admit Defendant's Exhibit

3    Number 11.

4         THE COURT:  Any objection?

5         MR. COLE:  No objection.

6         THE COURT:  Admitted.

7         (Defendant's Exhibit 11 admitted into the record.)

8         MS. PETRAS:  It's Officer Wayne Seaward's video, Officer

9    Wayne Seaward as Defendant's Exhibit Number 11.

10   BY MS. PETRAS:

11   **Q.**    Officer, just to go back a minute ago when we were -- you

12   were -- we were talking earlier about the statement you made

13   about his hands in his pocket.

14        When you made those statements, that was actually -- the

15   other officers were making similar statements as well, correct?

16   **A.**    I'm sorry.  I'm confused by that question.

17   **Q.**    Were you at the preliminary hearing --

18   **A.**    No.

19   **Q.**    -- in this case?

20        Were you aware of what Officer McCaw testified to in the

21   preliminary hearing?

22   **A.**    No.

23   **Q.**    Okay.

24        MS. PETRAS:  I'm going to mark as Defendant's Exhibit

25   Number 12 the transcript of the preliminary hearing, and I would

1    move to admitted it.

2         MR. COLE:  I object, Your Honor.  That's not the way to

3    admit it.  He wasn't there, and it -- I don't know how counsel

4    can -- I object.  It's improper admission request.

5         MS. PETRAS:  It's a motions hearing.  It's a transcript

6    that the government provided of prior testimony that the

7    government presented.

8         THE COURT:  Hearsay can come in; prior testimony can come

9    in for whatever weight.

10        MR. COLE:  All right.

11        THE COURT:  Really, whatever weight the Court, if any,

12   wants to give it, so I'll admit it over objection.

13        MS. PETRAS:  Okay.  That would be Defendant's Exhibit

14   Number 12.

15        (Defendant's Exhibit 12 admitted into the record.)

16   BY MS. PETRAS:

17   **Q.**    And, finally, Officer Hiller, you're actually the -- have

18   a number of pending complaints against you, correct?

19   **A.**    Yes.

20   **Q.**    I think there are four complaints, and three of those

21   arose out of claims of improper search and seizure, correct?

22        MR. COLE:  I object to this at this point.

23        May the witness step out just for a moment?

24        THE COURT:  Sure.

25        (Thereupon the witness left the courtroom. )

1        MR. COLE:  Your Honor, I hesitate to object at all when

2   counsel is, I think, questioning properly.  This is unfair.

3   Counsel is aware.  We've turned over all of his information.  It

4   is unfounded or there was no police action against him.  Asking

5   these questions is a way to sully his credibility or reputation

6   before the Court.

7        THE COURT:  Have those complaints been resolved?

8        MR. COLE:  Yes, Your Honor.  Counsel knows that.

9        MS. PETRAS:  No.  No, no, no.

10       MR. COLE:  If there was an issue --

11       THE COURT:  Wait a minute.  Let me get a proffer from

12   defense counsel, and then you can respond to that.

13       MR. COLE:  All right.

14       MS. PETRAS:  The government gave me this data, and it

15   lists four open complaints.  It lists a number of other closed

16   complaints.  I wasn't trying to get into the closed complaints.

17   It lists four open complaints.  And I just asked him if he has

18   four pending complaints, and he said yes.  So they're all still

19   pending.  They all go to bias.  And they all go to the

20   credibility of this officer who wants you to believe that he

21   certainly asked a question as the officer --

22       THE COURT:  Those were all open?

23       MS. PETRAS:  Yes.  They're all pending.

24       THE COURT:  Do you have the dates?  Maybe --

25       MS. PETRAS:  Yes.

1          THE COURT:  Maybe that will help Mr. Cole.

2          MS. PETRAS:  There was -- I have the incident dates.

3    There's one from an incident on August 23rd, 2017 that's pending.

4    There is one from October 25th, 2017 that is pending.  There was

5    one from August 7th of this year that is pending.  And there is

6    one that's on June 13th of this year that is pending.

7          THE COURT:  Mr. Cole?

8          MR. COLE:  This is what I would ask:  Is that on items

9    like this, it's -- one of the ones I believe counsel wrote is a

10   lack of police service.  It's not involving his credibility on

11   issues.  It's not for assault or making up testimony or evidence.

12   These are what can be characterized as minor, indeed.

13         There's a protective order in these matters generally --

14   and I believe I filed it with the Court, or at least I gave

15   counsel notice before this was brought up -- that we could have

16   an opportunity to flesh it out before his credibility as an

17   officer is impugned in open court.

18         Counsel knows what these are about, and I would submit to

19   you, Your Honor --

20         THE COURT:  No, I can seal -- I can seal this portion of

21   the transcript that deals with it, but if they're open, I assume

22   that counsel's offering --

23         MR. COLE:  We gave them -- I'm sorry, Your Honor.

24         THE COURT:  I assume counsel's offering them to show that

25   on often -- that on occasion he's not complied with rules and

1    regulations, I assume?

2          MS. PETRAS:  And it also goes to bias because he has

3    pending complaints and pending investigations.

4          And for the record, the government never filed a

5    protective order for this information in this case, so there is

6    no -- there's no limits on me using evidence that's clearly

7    evidence of bias when he has pending allegations.

8          THE COURT:  All right.  I'll allow it over objection.

9          MR. COLE:  Your Honor, just one final note, not to belabor

10   the point.  Counsel has given you the dates of these.  They're

11   2007.  They predate contact with this defendant who was found --

12         THE COURT:  Well, that's highly relevant, isn't it?

13         MR. COLE:  No -- I'm sorry, Your Honor?

14         THE COURT:  Isn't that a highly relevant element?

15         MR. COLE:  But the actual claim is -- on redirect I'll put

16   the actual claim in, Your Honor.

17         THE COURT:  All right.  All right.

18         MS. PETRAS:  And to be clear, there's two that predate it

19   and two that post date it.

20         THE COURT:  All right.  I'll allow it.

21         (Witness entered the courtroom.)

22         THE COURT:  All right.  You may proceed, Counsel.

23         MS. PETRAS:  Okay.

24   BY MS. PETRAS:

25   Q.    Officer Hiller, so you have four pending complaints

1    against you, correct?

2    **A.**    I only knew of three.

3    **Q.**    Okay.  Well, there's one pending complaint from an

4    allegation that occurred on August 23rd, 2017, alleging that you

5    mishandled property and that money wasn't returned, correct?

6    **A.**    Yes.

7    **Q.**    And that's still pending?

8    **A.**    Still pending.

9    **Q.**    Okay.  And then there's one pending complaint from

10   October 25th, 2017, alleging harassment in relation to an

11   extended traffic stop, correct?

12   **A.**    I thought that was closed, but --

13   **Q.**    I think there was a recommendation that you receive

14   additional training?

15   **A.**    Yes.

16   **Q.**    Okay.  It's still listed as open, but --

17   **A.**    I mean, I signed and went and got the training, so --

18   **Q.**    Okay.  When did you get the training?

19   **A.**    Some time over the summer, July or June or something like

20   that.

21   **Q.**    Of this year, 2018?

22   **A.**    Yes.

23   **Q.**    So you got additional training after the arrest of

24   Mr. Gibson?

25   **A.**    Yes.

1    Q.    Okay.  And there's a pending complaint from August 7th of

2    2018 alleging you used demeaning language, conduct and harassing

3    individuals in relation to a traffic stop, and alleging that you

4    searched a car when an occupant explicitly refused consent,

5    correct?

6    A.    Yes.

7    Q.    And then there's a complaint pending from June -- an

8    incident that occurred on June 13th of this year, 2018, alleging

9    that you and Gun Recovery Unit -- Gun Recovery Unit members

10   conducted improper stops and frisks of a number of individuals

11   who were sitting in front of a barbershop, correct?

12   A.    Oh, I'm not included in that.

13   Q.    Okay.

14   A.    My name's on there by accident, but I wasn't on-scene for

15   that.

16   Q.    You weren't there?

17   A.    I wasn't there, no.

18   Q.    Okay.  And that's the incident that was pretty

19   well-publicized.  There were a number of videos on --

20   A.    Correct.  I was never there.

21   Q.    Okay.  So the videos went sort of viral, and -- but you

22   weren't one -- those are the officers you work with, but you

23   weren't there?

24         MR. COLE:  Objection, relevance, Your Honor.

25         THE COURT:  Well, counsel's trying to determine whether

1     he's the subject of that complaint.

2          THE WITNESS:  I believe myself and Officer McCaw, Wright

3     and Mancini were not there that day.

4     BY MS. PETRAS:

5     Q.    None of the four officers were there?

6     A.    Correct.

7     Q.    But it was the Gun Recovery Unit?

8     A.    Yes.

9     Q.    Okay.

10         MS. PETRAS:  May I have the Court's indulgence to talk to

11    Ms. Roland?  I think I may be done.

12         THE COURT:  Sure.

13         MS. PETRAS:  I think that's all the questions I have for

14    Officer Hiller.

15         THE COURT:  All right.  Your paralegal has to leave at

16    four, Counsel.  Is that going to impede your ability to do

17    redirect?

18         MR. COLE:  No, Judge, it will not.  I'll be able to do it.

19    May she be permitted to leave?

20         THE COURT:  Sure, sure.  Have a nice evening.

21         MS. LITZ:  Thank you.

22         THE COURT:  You're welcome.

23         MR. COLE:  Court's indulgence while she leaves.

24         THE COURT:  Sure.  See you next time.

25         (Brief pause in proceedings.)

1      MR. COLE:  If it pleases the Court.  May I proceed, Your

2 Honor?

3      THE COURT:  Sure.

4      MR. COLE:  Thank you.

5           REDIRECT EXAMINATION OF MATTHEW HILLER

6 BY MR. COLE:

7 Q.    And good afternoon, Officer Hiller.  I want to ask you

8 just a couple of questions on redirect.  Mrs. Petras had asked

9 you about the Gerstein, and she had shown you a portion that

10 said that -- that said that, "I ain't got no guns.  I ain't got

11 no guns.  Keeping his hands in his jacket pockets."

12      What further information, based on your recollection and

13 based on what happened, what happened at that point as it

14 relates to the point where the defendant raised his hand?

15 A.    I'm sorry?

16 Q.    Do you understand my question?

17 A.    No.

18 Q.    All right.  You've indicated that at some point you saw

19 the defendant's hands in his pockets?

20 A.    Yes.

21 Q.    And at some point on the video he had his hands up?

22 A.    Yes.

23 Q.    Tell us what's going on from the hands in the pockets to

24 the hands up?

25 A.    Officer Wright contacting Mr. Gibson.

1    Q.    And by contacting, what did he say?

2    A.    Something to the effect of, "Hey, man, police, no guns."

3    Q.    And is the Gerstein -- are you required to put every

4    detail in the Gerstein, every fact?

5    A.    As best as you can, yes.

6    Q.    But is it sufficient for -- just for probable cause?

7    A.    Yes.

8    Q.    The fact that he had a red jacket on, were you required

9    to put that in the Gerstein?

10   A.    No.

11   Q.    Or blue jeans, were you required to put that in?

12   A.    No.

13   Q.    Or the make and model of his tennis shoes, were you

14   required to put that in?

15   A.    No.

16   Q.    Or whether or not he had a hat on?

17   A.    No.

18   Q.    The main purpose of the Gerstein is to what?

19   A.    To memorialize the facts of the case that show probable

20   cause for that evening.

21   Q.    And for the arrest of the defendant; is that right?

22   A.    Yes.

23   Q.    So that the Court will know and the record is clear, the

24   Cobalt report is the factual basis, and Gerstein are the exact

25   same thing; is that right?

1   **A.**      Yes, the same exact thing.

2   **Q.**      All right.  It's cut and paste from one document to

3   another, in essence?

4   **A.**      Yes.

5   **Q.**      Would that be fair to say?

6   **A.**      Cobalt creates the actual Gerstein from that paragraph,

7   if that make any sense.

8   **Q.**      I understand.

9        And as a matter of fact, the Cobalt was the old police

10  163 form.  It is the first couple pages of the Cobalt report?

11  **A.**      Yes.

12  **Q.**      All right.  And that factual pattern is transferred over

13  to the Gerstein; is that right?

14  **A.**      Correct.

15  **Q.**      All right.  Now, were you able -- were you required on

16  the Gerstein to put who actually ran after the defendant first,

17  who ran after second?

18  **A.**      Not required, no.

19  **Q.**      And would that matter as it relates to the issue of

20  probable cause?

21  **A.**      No.

22  **Q.**      At that time, when you were before the Superior Court

23  judge, the main purpose was to establish probable cause for the

24  arrest and/or detention of the defendant; is that right?

25  **A.**      Correct.

1    **Q.**     Now, you've mentioned further that at the detention

2    hearing in Superior Court, you were not there?

3    **A.**     Correct.

4    **Q.**     You didn't testify?

5    **A.**     Correct.

6    **Q.**     And you've also -- you didn't testify at the grand jury

7    in this case; is that right?

8    **A.**     Correct.

9    **Q.**     And who testified in the grand jury, based on your review

10   with me?

11   **A.**     Officer McCaw.

12          MR. COLE:  And for the record, Your Honor, I gave defense

13   counsel a copy of the grand jury for Officer McCaw prior to this

14   case starting.

15          THE COURT:  What about the detention hearing?  Is there a

16   transcript available of that?

17          MS. PETRAS:  No officer testified at the detention hearing

18   because he's been indicted.

19          THE COURT:  Because what?

20          MR. COLE:  He had been indicted.

21          MS. PETRAS:  He had been indicted.

22          MR. COLE:  I guess it was a proffer, Your Honor.

23          THE COURT:  Oh, I see.

24          MR. COLE:  A proffer.

25          THE COURT:  All right.

1          MR. COLE:  But I just wanted the record to reflect, prior

2    to this hearing today, I did give the grand jury transcript to

3    Mrs. Petras --

4          THE COURT:  All right.

5          MR. COLE:  -- of Officer McCaw.

6          THE COURT:  That's fine.

7    BY MR. COLE:

8    **Q.**    Now, at the time that the defendant placed his hands up,

9    do you recall looking at the video?  Was your car, the car that

10   you were in, ahead of the defendant in distance, feet wise?

11   **A.**    Just based on the video --

12   **Q.**    Right.

13   **A.**    -- it looked like he was a little ahead of us, and then

14   we kind of got parallel with him.

15   **Q.**    Did anyone in that vehicle -- officers, not vehicle --

16   ever change their demeanor towards the defendant?

17   **A.**    No.

18   **Q.**    Show of force, guns, sticks or anything like that --

19   **A.**    No.

20   **Q.**    -- to the defendant prior to him running?

21   **A.**    No.

22   **Q.**    At its core, did Officer Wright ever suggest or say

23   anything that you determined that the defendant should run?

24   **A.**    No.

25   **Q.**    And your interactions with the defendant, even after he

1   ran, how would you describe them?

2   **A.**     In a conversational manner.

3   **Q.**     Now, earlier we had shown you -- you had talked about the

4   waistband, and I want to draw you to that -- draw your attention

5   to that portion.

6          You've indicated Officer Wright said, "Well, can I see

7   your waistband," or words to that effect in a questioned tone;

8   is that right?

9   **A.**     Yes.

10  **Q.**     Do you recall -- in looking at the video, do you recall

11  whether or not the defendant's jacket -- the defendant's jacket

12  was closed or open?

13  **A.**     It was closed.

14  **Q.**     And by closed, what do you -- just for the record --

15  **A.**     Zipped up.

16  **Q.**     All right.  For the record you said what?

17  **A.**     Zipped up.

18  **Q.**     And could you see the defendant's waistband prior to the

19  defendant's fleeing?

20  **A.**     I could not.

21  **Q.**     And at that time did you know whether or not the

22  defendant possessed any firearms at that time?

23  **A.**     I did not know.

24  **Q.**     Did you know why the defendant was running?

25  **A.**     I have --

1    **Q.**     Not that you suspect.

2            Did you know why the defendant was running?

3    **A.**     No.

4    **Q.**     And I mentioned a conversational tone.  Mrs. Petras

5    showed you a couple of photographs of -- and I just want to show

6    you --

7            MR. COLE:  With the ELMO, please.  Thank you, Mr. Coates.

8    BY MR. COLE:

9    **Q.**     -- this particular photograph where there's a group of

10   officers.

11           You indicated Officer Wright was there?

12   **A.**     Yes.

13   **Q.**     Did that have anything to do with this defendant's

14   arrest?

15   **A.**     No.

16   **Q.**     Were you there at any point at the time of this picture?

17   **A.**     No.

18   **Q.**     Mrs. Petras had highlighted a portion.

19           Did you have anything to do with the making of this NSID

20   Washington D.C. form?

21   **A.**     No.

22   **Q.**     The cover, did you have anything to do with that?

23   **A.**     No.

24   **Q.**     Does that have anything to do with the defendant's

25   arrest?

1    **A.**      No.

2    **Q.**      Did you wear that?

3    **A.**      No.

4    **Q.**      And what does NSID stand for?

5    **A.**      Narcotics and Special Investigations --

6    **Q.**      And then it says Gun Recovery Unit, right?

7    **A.**      Yes.

8    **Q.**      Do you know when this was made?

9    **A.**      Two years, two-and-a-half years ago, something like that.

10   **Q.**      I mean, and you have been in the Gun Recovery Unit for

11   three years, is that right, about up until today?

12   **A.**      Yes.

13   **Q.**      Did this have anything to do with you or your contact

14   with the defendant?

15   **A.**      No.

16   **Q.**      Counsel had asked about this other photograph that shows

17   someone wearing -- is that you wearing that Powershift jacket?

18   Is that you?

19   **A.**      No.

20   **Q.**      Did you have anything to do with that jacket, the making

21   of it or the wearing of that jacket?

22   **A.**      No.

23   **Q.**      Do you know who is wearing that -- I mean, that T-shirt.

24   I said jacket.  I mean it's a T-shirt.

25           Did you have anything to do with that T-shirt?

1    **A.**     No.

2    **Q.**     Did you tell this person to wear this T-shirt?

3    **A.**     No.

4    **Q.**     Do you know who this person is that's wearing this

5    T-shirt?

6    **A.**     No.

7    **Q.**     Did you have anything to do with this T-shirt?

8    **A.**     No.

9    **Q.**     Now, I want to just focus in on the Seventh District.

10   Now, you've indicated that the Gun Recovery Unit is a city-wide

11   unit.  So, therefore, I guess you go into the Seventh District

12   sometimes.

13        Would that be fair to say?

14   **A.**     Yes.

15   **Q.**     You go into the First through Sixth -- First through

16   Seventh Districts?

17   **A.**     Yes.

18   **Q.**     During the course of your duties?

19   **A.**     Yes.

20   **Q.**     And --

21        THE COURT:  Could you leave that back on just for a

22   second.

23        MR. COLE:  Yes, Your Honor.

24        THE COURT:  What does that mean, Counsel?  What does

25   Powershift mean?

1          MR. COLE:  Okay.

2    BY MR. COLE:

3    **Q.**     Did you know what Powershift means?

4    **A.**     Powershift is -- it's a -- it's a unit that doesn't

5    really -- it doesn't handle the radio, but it patrols -- I don't

6    know how else -- and they stay in the Seventh District.  It's

7    like, they don't answer radio runs.  They focus more on violent

8    crimes and drugs.

9          THE COURT:  And the saying there, "Let me see that

10   waistband, Jo," what does that refer to?

11         THE WITNESS:  I guess it's saying, like, let me see your

12   waistband.

13         THE COURT:  I mean, is that --

14         THE WITNESS:  And I guess Jo's -- I don't -- I want to say

15   Jo's -- I don't --

16   BY MR. COLE:

17   **Q.**     Who is Jo?

18   **A.**     I really don't know.

19   **Q.**     Did you have anything to do with this?

20   **A.**     No.

21   **Q.**     Prior to --

22         THE COURT:  Have you heard that saying before, "Let me see

23   that waistband, Jo"?

24         THE WITNESS:  From, like, the news and stuff with that --

25   surrounding this T-shirt, yes.

BY MR. COLE:

**Q.**    I want to follow up on that, to His Honor's question.

There was a -- 


**Q.**    I want to follow up on that, to His Honor's question.

The first time you became aware of this T-shirt was from the news; is that right?

**A.**    I don't know if it was the news or just talk amongst the office.  I don't remember, but --

**Q.**    All right.  Let me follow up.

There was a --

THE COURT:  Do you have one of these T-shirts?

THE WITNESS:  No, Your Honor.

THE COURT:  Have you ever had one?

THE WITNESS:  No, Your Honor.

BY MR. COLE:

**Q.**    Had you ever had anything to do with this T-shirt?

**A.**    No.

**Q.**    And do you know -- other than this particular officer, have you seen anyone else wear this T-shirt, if you know?

**A.**    I've never actually seen anyone wear that the shirt in person.  I've only ever seen this picture.

**Q.**    Okay.

THE COURT:  Let me ask you this.  In an effort to see what people may have in their waistband, are members of the Recovery Unit instructed to approach individuals and say, "Let me see that waistband"?

THE WITNESS:  No, we are not instructed to do that.

1          THE COURT:  Do they do that more often than not?

2          THE WITNESS:  I can speak for myself and the people I work

3     directly with, Officer Wright, Officer McCaw, Officer Mancini.

4     And every time we direct that question -- every time we say that,

5     it's directed in question form.  We never say, "Stop, let me see

6     your waistband."  It's, "do you mind showing me," "Hey, can I

7     see," along those lines.

8          THE COURT:  You never say, "Let me see your waistband"?

9          THE WITNESS:  I cannot recall the time that we've ever --

10    we -- like I said, our -- my car, our partners ever using it like

11    that.

12    BY MR. COLE:

13    Q.    I want to just -- counsel had shown you some general

14    orders from, I guess, the police department dated August 30th,

15    2013, and she had asked some questions about contact.  I want to

16    ask that you follow these procedures with Mr. Gibson.

17         The first one is, "Contacts may be initiated by an

18    officer when he or she reasonably believes that some

19    investigating inquiry into a situation is warranted."

20         Do you recall -- is that true?

21         THE COURT:  I'm sorry.  Which exhibit is this?

22         MR. COLE:  I'm sorry, Your Honor.  This is the -- let me

23    get the order.  Which number is this, Mrs. Petras?

24         MS. PETRAS:  6.

25         MR. COLE:  6.

1          THE COURT:  All right.

2          MR. COLE:  Defendant's Exhibit 6, and I'll put a checkmark

3     by it.

4     BY MR. COLE:

5     **Q.**     Based on your Gun Recovery Unit activities, is that a

6     requirement for you to -- is that -- is that, during the course

7     of your procedure, to have contacts with individuals on the

8     street?

9     **A.**     I'm sorry.  Can you --

10    **Q.**     Is it your -- a part of your procedure to have contacts

11    with individuals on the street?

12    **A.**     Yes.

13    **Q.**     And that's -- and that's something you do every day?

14    **A.**     Every day.

15    **Q.**     And number 2 states, "Since a contact involves solely the

16    voluntary cooperation of a citizen who is free, not to respond

17    and to leave."

18          Prior to the defendant running, even before he ran, was

19    he free to leave and it was voluntary?  Do you agree with that?

20    **A.**     Yes.

21    **Q.**     As a matter of fact, had the defendant not ran and he

22    said, "Hey, I don't want to talk to you," and kept walking,

23    could he have done that?

24          MS. PETRAS:  Objection, speculation.

25          MR. COLE:  This is redirect.

1              THE COURT:  I'll allow it.

2              MR. COLE:  Thank you.

3    BY MR. COLE:

4    **Q.**     Could he have done that?

5    **A.**     Yes.

6    **Q.**     And what would you all have done?

7    **A.**     If we did not --

8    **Q.**     If he refused to talk to you and kept walking.

9    **A.**     If it was just that he refused to talk to us, and we did

10   not observe any bulges or any other type of body language -- I

11   mean, there's been a lot of times where, you know, we're not the

12   biggest fans of citizens, and they'll tell us to go kick rocks

13   or whatever, and if we don't have any other surrounding factors

14   or characteristics, a lot of times we just go about --

15   **Q.**     You go kick rocks?

16   **A.**     Kick rocks.

17   **Q.**     And by moving on?

18   **A.**     Yes.

19   **Q.**     Number 3 says, "While an officer may initiate a contact

20   for any legitimate police-related purpose, contacts shall not be

21   conducted in a hostile or aggressive manner in the means of

22   harassing a citizen or attempting to coerce a citizen to leave

23   an area merely because the person is hanging around and/or

24   luting."

25             Did you abide by that order as well?

**A.**    Yes.

**Q.**    Was there any -- did you harass the defendant or have any contact with him that was hostile or aggressive?

**A.**    I don't believe so.

THE COURT:  What was the reason for the contact to initiate -- what was the reason for the contact -- what was the reason for initiating contact with Mr. Gibson?

THE WITNESS:  The initial reason was when we first saw Mr. Gibson, it appeared that he began to walk at a quicker pace, and then as we drove he kept looking over his shoulder at us.

BY MR. COLE:

**Q.**    Towards your direction?

**A.**    Yeah, at our police vehicle, yes.

**Q.**    And what, if anything, did you gather from that based on your police experience, at least his demeanor, whether or not it changed, from when you first saw him to looking back and walking faster?

**A.**    That he could possibly be nervous by our presence, and there might be a reason for that.

**Q.**    All right.  And just a couple of last ones.  It says, "Initiating contact.  An officer may initiate a contact with a person in any place in which the officer has a right to be."

Did you have a right to be on that public street and place?

**A.**    Yes.

1    Q.    And did you do so and follow the police procedures as

2    outlined in this document?

3    A.    Yes.

4    Q.    All right.  Now I want to show you -- counsel had

5    mentioned -- the defendant had mentioned code -- conduct of

6    contacts, and I just want to just read the first sentence of

7    them.  "A, persons contacted may not be detained in any manner."

8          In this case was Mr. Gibson detained in any manner at all

9    prior to you seeing the weapon not come from his area?

10   A.    No.

11   Q.    "B, officer must constantly keep in mind the distinction

12   between a contact and a stop."

13         Was the defendant contacted at all prior to the weapon

14   being out of his person or stopped prior to that time?

15   A.    Initially contacted.  He initially was contacted prior to

16   the presence of the weapon --

17   Q.    But was he --

18   A.    -- but in the presence of the weapon, Mr. Gibson was then

19   stopped and detained.

20   Q.    And was he stopped in the police term prior to his

21   running, or was that just a conversation between you and Officer

22   Wright and he?

23   A.    It was just a conversation at that point.

24   Q.    Now, just the last three, "Officer should avoid short

25   responses which could be misunderstood or requests that sound as

1     commands."

2         Was this procedure followed?

3     **A.**    Yes.

4     **Q.**    And so that I am correct, during the time of the initial

5     contact with this defendant on that street, it was only one

6     officer who had actual verbal contact with him.

7         Would that be fair to say, before he ran?

8     **A.**    Before he ran, yes.

9     **Q.**    And that would be who?

10    **A.**    Officer Wright.

11    **Q.**    The next one, "D, during the duration, the contact should

12    be as brief as possible."

13        Did that happen in this case prior to the defendant

14    running?

15    **A.**    It was a matter of seconds.

16    **Q.**    "E, if during the contact citizen should ask whether they

17    must respond or give impression or feeling compelled to respond,

18    the officer shall immediately inform them of their right to

19    refuse as well as their right to leave."

20        Had the defendant asked that, refused and asked to leave,

21    would you have -- you and Officer Wright and the other two have

22    granted that?

23    **A.**    Again, going back to nothing more than -- yes, nothing

24    more than him just walking, and we didn't see any --

25    **Q.**    Right.

1    **A.**     Yes.

2    **Q.**     And you would have pound rocks and left, as you

3    testified?

4    **A.**     Yes.

5    **Q.**     All right.  And pounding rocks meaning just to leave?

6    **A.**     Yes.

7    **Q.**     The last one I want to draw your attention to, "When a

8    citizen refuses or seizes to cooperate during a brief contact,

9    they must be permitted to go on their way, and the refusal to

10   cooperate or silence cannot itself be used as a basis to

11   escalate the encounter into a stop."

12         Did you and the other three officers there follow that

13   pronouncement?

14   **A.**     Yes.

15   **Q.**     All right.  And the video shows that; is that correct?

16   **A.**     Correct.

17         MR. COLE:  Your Honor, may I just approach for a moment?

18   I want to ask a question and just show the officer some of the

19   personnel matters.  I think it'll be quicker and for his privacy.

20   BY MR. COLE:

21   **Q.**     I just want to -- counsel had shown you -- if I may just

22   pull this forward.

23         Counsel showed you --

24         MR. COLE:  Might I just stay here for just a moment, Your

25   Honor?

1           THE COURT:  Sure.

2           MR. COLE:  I'm almost finish.

3           THE COURT:  Yeah.

4     BY MR. COLE:

5     **Q.**    Counsel had showed you something in PPMS.  You know those

6     are the disclosures we provide.

7           MS. PETRAS:  Your Honor.

8     BY MR. COLE:

9     **Q.**    You're aware that, right?  Is that correct?

10    **A.**    Correct.

11          THE COURT:  I'm sorry?

12          MS. PETRAS:  I actually didn't admit that.

13          MR. COLE:  Oh, you didn't admit it?

14          MS. PETRAS:  Are you going to?

15          MR. COLE:  I am not going to admit this document.  I just

16    wanted to show it to him to refresh his recollection exactly what

17    counsel had questioned him on.

18          THE COURT:  Well, you can use anything to refresh his

19    recollection.  What are you trying to refresh his --

20          MR. COLE:  I just don't want --

21          MS. PETRAS:  He didn't say he didn't remember anything.

22    If he's going to use -- if he wants to admit it, I don't have an

23    objection.

24          THE COURT:  All right.  If you are trying to use it to

25    refresh recollection --

1        MR. COLE:  Let me step back, Your Honor.

2        Counsel had asked certain questions, and I believe these

3   are -- there are privacy interests here.  Counsel asked certain

4   questions.  I don't want to expand the exposure on the record

5   more than what counsel has already done over my objection.

6        MS. PETRAS:  Then he shouldn't use the document.  If he

7   wants to use the document, he needs to mark it and admit it.

8        MR. COLE:  I know how to do it, Your Honor.

9        MS. PETRAS:  If he's using --

10       MR. COLE:  I will do it this way.

11       THE COURT:  Why don't you just go ahead and admit it,

12   Counsel, and I'll give it whatever relevance.

13       MR. COLE:  No, no -- okay.  I won't admit it, Your Honor.

14   I'll ask the question.

15  BY MR. COLE:

16  Q.    Mrs. Petras said that there was a pending investigation

17  against you on 10-25-17.

18       And do you recall whether or not the case was "dismissed

19  against one officer after OPC could find no adequate evidence to

20  sustain the allegation of police misconduct, closure letter

21  attached"?

22       And OPC is the investigating division; is that right?

23  A.    Yes.

24  Q.    And they were recommending policy training for you and a

25  couple other officers; is that right?

1    **A.**    Yes.

2    **Q.**    And you've indicated, was that the one that you've

3    already --

4        MS. PETRAS:  Objection, leading as well, Your Honor.

5        THE COURT:  I agree with that.

6    BY MR. COLE:

7    **Q.**    Do you recall what happened to that particular

8    investigation?

9    **A.**    I thought it was closed.  I didn't -- because I went -- I

10   signed that I went and received the training.

11   **Q.**    Okay.

12   **A.**    I didn't -- that's why I said I only thought I had three

13   and not four.

14   **Q.**    Did that -- did that have anything to do with the arrest

15   of this defendant?

16   **A.**    No.

17   **Q.**    Counsel had also asked you about another item, and I just

18   wanted to follow it through and just clear the record on that.

19       MR. COLE:  Just one brief moment, Your Honor.

20       THE COURT:  That's fine.

21       MR. COLE:  I'm coming to a close.  Just let me get the

22   right one.

23   BY MR. COLE:

24   **Q.**    I can't find the other one that I wanted to address your

25   attention to -- direct your attention to, but let me just ask

1   this question respectfully.

2          Did any of those impact any decision you made in the

3   arrest of the defendant?

4   **A.**    No.

5   **Q.**    Now, I want to just draw your attention to the -- counsel

6   had shown you, I guess, the detention hearing before Magistrate

7   Staples had introduced a copy of this detention hearing in

8   Superior Court.

9          Did you have anything to do with that?

10  **A.**    Not that I re- -- no, I don't think so.

11  **Q.**    Do you recall whether or not Officer McCaw testified

12  there and in the grand jury?

13  **A.**    I know officer -- I know for sure Officer McCaw testified

14  in the grand jury.

15  **Q.**    Let me just show --

16  **A.**    I don't know who did the preliminary hearing.

17  **Q.**    All right.  Let me just show you something.

18         MR. COLE:  If I may approach, Your Honor.  This is your

19  number --

20         MS. PETRAS:  Oh, 12.

21         MR. COLE:  12?  Okay.

22         May I approach, Your Honor?

23         THE COURT:  Sure.

24         MS. PETRAS:  That's the April 6th transcript?

25         MR. COLE:  April 6th.

1          MS. PETRAS:  Yes.

2     BY MR. COLE:

3     Q.     This is a transcript, April the 6th, in Superior Court;

4     is that right?

5     A.     Yes.

6     Q.     And it's involving this case?

7     A.     Yes.

8     Q.     And the officer who testified was who?

9     A.     Merissa McCaw.

10    Q.     Now, counsel for the defendant has shown you the

11    Gerstein.  I just want to go back to that.

12          There was a name at the top of the Gerstein that wasn't

13    Mark Gibson; is that right?

14    A.     Yes.

15    Q.     And why was that?

16    A.     Mr. Gibson gave me a false name when I filled out the

17    quick booking form.

18    Q.     How was it determined he was Mark Gibson and not

19    Mr. Markice Joseph?

20    A.     I believe it was later found when he was -- when they do

21    a live scan, I think -- don't ask me how, but like what the -- I

22    believe it's fingerprint scanning, but at the time we believed

23    him to be Markice Joseph.

24    Q.     For the benefit of His Honor, when you were had -- when

25    you were seen on video and you had that pad out with the metal

1    pad, you were writing on it, you called it a quick what?

2    **A.**    Quick booking form.

3    **Q.**    Is that the name that he gave you on that form?

4    **A.**    Yes.

5    **Q.**    All right.  On the scene?

6    **A.**    Yes.

7    **Q.**    All right.  Now, lastly, I have just a couple more

8    questions.  Counsel had shown you what has been marked as the

9    general orders from 2016.

10             MR. COLE:  Which number?

11             MS. PETRAS:  5.

12             MR. COLE:  5.  Okay.

13   BY MR. COLE:

14   **Q.**    I'll show you Defendant's Exhibit Number 5.  Counsel has

15   shown you those general orders, and I'm going to just ask you

16   specifically about when you make -- of all the -- when you make

17   contacts with citizens, every time you make a contact, if you

18   say hello to a citizen, do you have to put on your body-worn

19   camera?  I mean, did you have to press activation?

20   **A.**    No.

21   **Q.**    If you go to McDonald's and you eat and you meet somebody

22   in the line, do you have to put on your activation?

23   **A.**    No.

24   **Q.**    During the course of your work here with the Gun Recovery

25   Unit, are there times when you speak to citizens and you don't

1  put on your body-worn camera saying, "Hello, Mrs. Jones," or

2  something like that?

3  **A.**      There are times, yes.

4  **Q.**      And are there times when you come up to someone and you

5  recognize them and there's no police activity, you just say,

6  "Hi, so-and-so," and you move on?

7          MS. PETRAS:  Objection.  Asked and answered and

8  irrelevant.

9          MR. COLE:  I think this is a different --

10          THE COURT:  All right.  I'll allow it over objection.

11  BY MR. COLE:

12  **Q.**      You can answer that.

13  **A.**      Yes.

14          THE COURT:  So I think you've made your point, Counsel.

15          MR. COLE:  All right.

16  BY MR. COLE:

17  **Q.**      Counsel asked you, finally --

18          MR. COLE:  And I think I'm finished, Your Honor.  Thank

19  you for your kindness, Your Honor.

20          THE COURT:  Sure.

21  BY MR. COLE:

22  **Q.**      Counsel asked you certain questions regarding the general

23  orders from March 2016.

24          Your contact with the defendant, your contact, Officer

25  Wright's contact, was that consistent with the procedures and

1    proper practices of the Metropolitan Police Department?

2    **A.**     To the best of my knowledge, yes.

3    **Q.**     And when counsel had shown you the general orders -- I

4    just wanted to focus in.  Counsel had shown you number 3 on page

5    7 and E.

6           Do you recall that?

7    **A.**     Yes.

8           MS. PETRAS:  Huh-uh, 4-B.

9           MR. COLE:  I'm sorry.

10   BY MR. COLE:

11   **Q.**     I'm sorry, 3 and 4, A thru E.

12          Do you recall that on page 7?

13   **A.**     Yes.

14          MR. COLE:  Mrs. Petras, did you have a question?

15          (Discussion had off the record.)

16          MR. COLE:  We were just -- counsel said she showed 4-B,

17   but since she introduced it all, Your Honor, now that -- I'm

18   proper to go through it all, relevant portions for redirect.

19          THE COURT:  You can.  I'll allow it.

20          MR. COLE:  Thank you.  And thank you, Mrs. Petras.

21   BY MR. COLE:

22   **Q.**     I want to just ask a couple of questions.  It says B,

23   Counsel -- let's go to, "A, all dispatched or self-initiated

24   calls for service."

25          Were you in a call for service or self dispatch at that

1    time, at the time of this arrest?

2    **A.**    For -- like, at -- yes, it was an arrest.

3    **Q.**    I'm sorry.  But that's all dispatch --

4    **A.**    I get confused.

5    **Q.**    When you get a call from the dispatch --

6    **A.**    Oh, no, no.  We didn't get a radio run or anything like

7    that.

8    **Q.**    Okay.  And this was not a call for service.

9          You agree with that?

10   **A.**    No.

11   **Q.**    All right.  And then, "4-B, all contacts initiated

12   pursuant to a law enforcement investigation, whether criminal or

13   civil."

14         Did you know this -- whether or not this contact with the

15   defendant initially, for the few seconds initially, was going to

16   be a criminal investigation or a civil investigation?  Did you

17   know that?

18   **A.**    No.

19   **Q.**    "C, all stops, traffic, pedestrian, bicycle and frisks."

20         Was this a traffic stop, a pedestrian stop, in the police

21   term for an arrest or a bicycle stop?

22   **A.**    Initially it was a contact, but it turned into a stop

23   which resulted in an arrest.

24   **Q.**    But that was after he ran.  I'm talking about prior to

25   the defendant running.

1   **A.**     No.

2   **Q.**     All right.  And lastly, this was not a vehicle or foot

3   pursuit at the time you first saw the defendant on that scene.

4          Would that be fair to say?

5   **A.**     Correct.

6   **Q.**     And this was not a traffic crash scene.

7          Would that be fair to say?

8   **A.**     Correct.

9   **Q.**     Now, during the course of your time on the Gun Recovery

10  Unit, and during the time that you had participated in the

11  contacts with members on the street, have you -- did this

12  interaction, was it consistent with all the other interactions

13  you've had, you along with Officer Wright and any other person

14  in your contact, the way you've outlined it for His Honor?

15         MS. PETRAS:  Objection, relevance.

16         THE COURT:  Again, I can separate the relevance from

17  irrelevant.  I'll allow the question to be answered.

18         THE WITNESS:  One more time, please.

19  BY MR. COLE:

20  **Q.**     Is this -- was this consistent with your procedures as

21  you've done during your investigation with Officer Wright and

22  any other member of the Gun Recovery Unit?

23  **A.**     Yes.

24  **Q.**     This particular stop?

25  **A.**     Yes.

1     MR. COLE:  Your Honor, may I just have one moment and let

2  me just review --

3     THE COURT:  Sure.  I just have a question.  Exhibit --

4  Government's Exhibit Number 2 is dated August the 20th of this

5  year.

6     What's the relevance of that?

7     MR. COLE:  Your Honor, it's just -- it defined and totaled

8  the two-minute loop.  It put into a general order the two-minute

9  loop that is not recorded.  That's all.

10    THE COURT:  Right.  So was that not in existence in some

11 form prior to August 20th?

12    MR. COLE:  It was a operational form of the body-worn

13 camera, Your Honor.  I believe this general order --

14    THE COURT:  I mean, this is not really relevant, though,

15 August 20th, right?

16    MR. COLE:  Well, I think it's relevant to show that the

17 body camera buffering two minutes was in effect on the date of

18 August -- April 2nd, in our case.  I think that could have been

19 put into writing.

20    THE COURT:  How could I read that into it?  I mean, making

21 this --

22    MR. COLE:  No.  That's what -- that's what the witness

23 testified about.  That is not in dispute.

24    THE COURT:  I mean, his testimony is -- but putting this

25 order in is irrelevant, though.

1          MR. COLE:  Okay.  That's fine, Your Honor.  I'm not going

2     to sweat that.

3          THE COURT:  All right.

4          MR. COLE:  I thought it would be helpful at least to just

5     memorialized the actual fact --

6          THE COURT:  All right.

7          MR. COLE:  -- that's why I --

8          THE COURT:  As of August the 20th?

9          MR. COLE:  Right.

10         THE COURT:  Okay.

11         MR. COLE:  In fact, for April the 2nd when they came in

12    contact with, it's now been memorialized in a -- in an order.

13         THE COURT:  All right.

14         MR. COLE:  So he was -- it was consistent with -- it

15    didn't change from April 2nd until August.  That's the point,

16    Your Honor.

17         THE COURT:  Is that right?

18         THE WITNESS:  That's correct.  I don't -- I don't know

19    when it --

20         MR. COLE:  I can show you.

21         THE WITNESS:  -- when it actually came into affect, Your

22    Honor, but when I first got the body camera, it was only a

23    30-second loop, and then shortly after that it changed to a

24    two-minute loop.

25         THE COURT:  All right.

BY MR. COLE:

**Q.**    And it was a two-minute loop at the time of the

defendant's arrest; is that right?

**A.**    Correct.

**Q.**    And the executive order I showed you memorialized, puts

in writing that two-minute loop?

**A.**    Correct.

**Q.**    All right.

        MR. COLE:  And now, Your Honor, may I just have a minute?

        THE COURT:  Yeah.  Sure, of course.

        MR. COLE:  If you'll just give me a minute, I think I'm

done.

        THE COURT:  Sure.  This matter's nonjury.

        Did you have any other questions, Counsel?

        MS. PETRAS:  I believe, Your Honor.

        THE COURT:  It's only fair.  It's the government's

witness, so I'll give the government a chance to close.

        MS. PETRAS:  Thank you, Your Honor.

        MR. COLE:  Your Honor, I said if I could have a moment

then --

        THE COURT:  Oh, yeah.  Sure.

        MR. COLE:  I said if I could have a moment --

        THE COURT:  That's only fair.

        MR. COLE:  -- to review my notes.

        THE COURT:  Sure, of course.

```
1        MR. COLE:  Thank you, Judge.

2        THE COURT:  Sure.  And while we're waiting, you should

3   think about -- if we can do two things at one time, think about

4   further proceedings tomorrow or the next day.  I actually have a

5   lot of flexibility on Wednesday as well.

6        (Brief pause in proceedings.)

7        MS. PETRAS:  Your Honor, could we do it Thursday or Friday

8   afternoon?

9        MR. COLE:  I have no further questions, Your Honor.  Thank

10  you.

11       THE COURT:  All right.  Wednesday's not good?

12       MS. PETRAS:  No, I'm sorry.  It's not good for Ms. Roland

13  or me.

14       THE COURT:  I'm sorry.  I couldn't hear you.

15       MS. PETRAS:  It's not good for the defense.  Sorry.

16       THE COURT:  Thursday's fine.  I have some flexibility

17  Thursday.

18       MR. COLE:  I'm sorry.  What day, sir?  Wednesday, Thursday

19  next week?

20       THE COURT:  Or this week for argument, maybe Thursday.  If

21  you want to do Thursday, that's fine.

22       MR. COLE:  Your Honor, I have some matters in the grand

23  jury for a grand jury return.  If we could do it in the afternoon

24  on Thursday, that would be best for me.

25       THE COURT:  2:00 on Thursday?
```

1    MS. PETRAS:  What time?

2    THE COURT:  2:00.

3    MS. PETRAS:  May I have the Court's indulgence?

4    MR. COLE:  That would be fine with me.

5    THE COURT:  Sure.

6    MS. PETRAS:  2:00 is fine with me.

7    THE COURT:  You sure?

8    MR. COLE:  Yes, Your Honor.  Thank you.

9    THE COURT:  Sure.

10    (Brief pause in proceedings.)

11    THE COURT:  All right.  2:00 on Thursday?

12    MS. PETRAS:  Yes, Your Honor.

13    THE COURT:  All right.

14    MS. PETRAS:  And just so the Court knows, I expect to have

15   a witness.

16    THE COURT:  Oh, I'm sorry.  I thought we were finished

17   with testimony.  If you want to call a witness, that's fine.

18    MS. PETRAS:  Yes.

19    THE COURT:  All right.

20    MS. PETRAS:  Okay.

21    MR. COLE:  Your Honor, we didn't get any notice of that.

22    THE COURT:  Does she have to?

23    MR. COLE:  No, but I did -- out of professional courtesy,

24   Your Honor, I asked Mrs. Petras this morning --

25    MS. PETRAS:  And I told him I don't have any civilian

1    witnesses.

2         THE COURT:  She's being courteous now, yeah.

3         MS. PETRAS:  You're going to have time.

4         MR. COLE:  No, I'm not worried about it.

5         THE COURT:  Give me a proffer.

6         MR. COLE:  I asked her as professional to another, did she

7    have any witnesses --

8         THE COURT:  All right.

9         MR. COLE:  -- and the answer was no.

10         MS. PETRAS:  The answer was --

11         THE COURT:  Both of you --

12         MS. PETRAS:  -- I have no civilian witnesses.

13         THE COURT:  All of the three of you are extremely

14    professional.  What --

15         MS. PETRAS:  Thank you.

16         THE COURT:  I'm going to let her call a witness.

17         How long do -- just give me a proffer as to how long you

18    need for the witnesses.  How long do you think for your direct.

19         MS. PETRAS:  15 minutes.

20         THE COURT:  Yeah.  All right.  Fine.  That's only fair.

21         MS. PETRAS:  Thank you.

22              RECROSS-EXAMINATION OF MATTHEW HILLER

23    BY MS. PETRAS:

24    Q.   You testified about training that you received this

25    summer in response to that one particular complaint.

1           What was the training on?

2    **A.**     Traffic stops and calling for K-9.

3    **Q.**     And you testified about, according to you, Mr. Gibson

4    looked over his shoulder several times at the police car,

5    correct?

6    **A.**     Yes.

7    **Q.**     It wasn't a police car, though, it was an unmarked car,

8    correct?

9    **A.**     Yes.

10   **Q.**     And nothing on the outside of it signaled that it was

11   police, correct?

12   **A.**     That's correct.

13   **Q.**     Okay.  And you testified in response to Mr. Cole's

14   questions, I just want to clarify, with regard to the general

15   orders, he was asking you if you followed the procedure, but

16   you're not changing your testimony from when I asked you.

17          You agree that you did not follow the procedure that

18   requires you to activate the body-worn camera when you have

19   contact with an individual, correct?

20   **A.**     I agree that I activated as soon as I felt reasonably

21   possible.

22   **Q.**     Yeah, but you -- you agree that the general order

23   requires you to activate it whenever you have contact for

24   investigation, correct?

25   **A.**     I need to review this general order more thoroughly

1    before I answer a question like that.

2    **Q.**    Well, if you have it in front of you, can you turn to

3    page 7?

4    **A.**    (Witness complied.)

5    **Q.**    And before we go there, you agreed with me Mr. -- I mean,

6    that Officer Wright had face-to-face contact with Mr. Gibson,

7    correct?

8    **A.**    He was in the vehicle.

9    **Q.**    Face-to-face contact with Mr. Gibson, talking to

10   Mr. Gibson, correct?

11   **A.**    He was talking to Mr. Gibson from the vehicle, correct.

12   **Q.**    Yes.  And that you testified earlier that was for

13   investigation, correct?

14   **A.**    That was.

15        MR. COLE:  Your Honor, I object.  The witness said he

16   needs an opportunity to review.

17        MS. PETRAS:  I'm not asking him about the general order,

18   I'm --

19        THE COURT:  I'll give him a chance to review, but those

20   questions are appropriate.

21        MS. PETRAS:  Yes.

22   BY MS. PETRAS:

23   **Q.**    You agree with me it was for investigation, right?

24   **A.**    To initiate it.  It was to initiate contact, yes.

25   **Q.**    Initiate contact for investigation.  It wasn't a stop.

1        It was just a contact for investigation, correct?

2   **A.**    I would just say for a contact.

3   **Q.**    Well, you said earlier it was for investigation, correct,

4   when I asked you earlier?

5   **A.**    It started as a contact.

6   **Q.**    I understand it was started as a contact, but when I

7   asked you earlier, you agreed with me you were investigating,

8   correct?

9   **A.**    Correct.

10  **Q.**    Right.  So you had face-to-face contact with Mr. Gibson

11  to investigate, correct?

12  **A.**    We contacted Mr. Gibson from the vehicle.  I wouldn't say

13  face to face.

14  **Q.**    Well --

15  **A.**    I don't -- I don't --

16  **Q.**    -- Officer Wright was looking at Mr. Gibson and talking

17  to Mr. Gibson, correct?

18        MR. COLE:  Objection, Your Honor.  This has been asked and

19  answered three times.

20        MS. PETRAS:  Well, the officer's trying --

21        THE COURT:  I'm just trying to -- it's kind of murky.  I'm

22  just trying to get a clarification also, so --

23        THE WITNESS:  What are you trying to get clarif- -- what

24  is the question?  I'm sorry.

25  BY MS. PETRAS:

1    Q.      I'm trying to understand.  Before you saw the general

2    order, you agreed with me, correct, that it was Officer Wright

3    looking at Mr. Gibson.

4            You called that face-to-face contact, right?

5            MR. COLE:  Objection, Your Honor.  That's not his

6    testimony.  In face to face --

7            MS. PETRAS:  It is his testimony.

8            THE COURT:  First of all, he can answer the question.

9            THE WITNESS:  I don't -- I wouldn't consider that face to

10   face.  I don't know.  That's -- we're in a vehicle.  You're on a

11   sidewalk.

12   BY MS. PETRAS:

13   Q.      So it's not face to face?

14           THE COURT:  What would you consider it?

15           THE WITNESS:  That you're -- you're talk -- I don't know.

16   I just wouldn't consider it face to face.  Like, when we're

17   talking --

18           THE COURT:  Is it back to back?

19           THE WITNESS:  No, Your Honor.

20   BY MS. PETRAS:

21   Q.      Is your concern about face to face because now you know

22   that the general order says that you were supposed to turn it on

23   when you had face-to-face contact?

24           MR. COLE:  Objection, argumentative, Your Honor,

25   respectfully.

1          THE COURT:  I'll allow the question to be answered.

2          THE WITNESS:  I'm sorry.  One more time.

3    BY MS. PETRAS:

4    Q.    Is your concern now that you don't want to agree that it

5    was face to face, even though you did a half an hour ago,

6    because you're concerned that you weren't, in fact, following

7    the orders, the general orders, correct?

8    A.    I just -- no, it's not because I'm concerned about the

9    general orders.  I just thought from -- originally I kept saying

10   the original contact was from the vehicle.

11         THE COURT:  Yeah, but if it's not face to face what is it?

12   How would you characterize this particular encounter?  If it

13   wasn't face to face and it wasn't back to back, what was it?

14         THE WITNESS:  I guess the best way to characterize it is

15   face to face.  I just -- when I think face to face, I think two

16   people standing there talking face to face like that.

17   BY MS. PETRAS:

18   Q.    Well, it's no different if one person's walking along and

19   the other person's following along in a car.

20         You're still looking at other, correct?

21         MR. COLE:  Objection, Your Honor.  Counsel is testifying.

22         THE COURT:  I think -- is there a difference between them?

23   I mean, you and I are talking face to face now.  If I were in a

24   car and we're talking, would that still be face to face?

25         THE WITNESS:  Yes.

BY MS. PETRAS:

**Q.**     All right.  Okay.

So the general -- if you could look at page 7 of the general orders that's in front of you, which is Defendant's Exhibit Number 5.

**A.**     (Witness complied.)

**Q.**     Number 4-B requires -- and it doesn't say "may," it says, "Members shall activate their body-worn cameras for all contacts initiated pursuant to law enforcement investigation, whether criminal or civil," correct?

**A.**     Correct.

**Q.**     So Mr. Cole's question about whether you knew this was civil or criminal doesn't really matter.

You were supposed to activate your body-worn camera when you started the contact with Mr. Gibson, correct?

MR. COLE:  Asked and answered, Your Honor.  I respectfully object.

THE COURT:  There's been a lot -- it's been a lot of back and forth.  I'm just now getting clarification, so go ahead and answer the question if you understand the question.

BY MS. PETRAS:

**Q.**     According to the generally order, you should have activated your body-worn camera when you began the contact with Mr. Gibson, correct?

**A.**     According to this little part of the general order, yes.

1    Like I said, I need a little more time to really go over the

2    entire general order, but yes, according to 4-B right here, yes.

3    **Q.**     Okay.  And none of the four officers in the car did that?

4    **A.**     Correct.

5    **Q.**     Preventing all of us from having an audio of what

6    happened in the -- what the conversation actually was, correct?

7         MR. COLE:  Objection, Your Honor, respectfully.  That's

8    argumentative.

9         THE COURT:  Well, it's also a reasonable inference too,

10   but it is argumentative.

11        Anything further?

12        MS. PETRAS:  I do have a couple more questions.  I'm

13   sorry.

14   BY MS. PETRAS:

15   **Q.**     This T-shirt that the government counsel asked you about,

16   this Jo --

17        MR. COLE:  Your Honor, I hate to object, but this is

18   redirect, and I have asked the questions --

19        THE COURT:  And it's nonjury, and like I said, it's your

20   witness.  I'll give you a chance to close, but all of this, I can

21   ferret out relevance and irrelevance, but it is nonjury, so I'll

22   allow counsel to do it.

23   BY MS. PETRAS:

24   **Q.**     First of all, the, "Let me see that waistband, Jo" on

25   there, the "Jo" you started to say but I think you got caught

1 off.

2   Jo's slang, essentially, for, like, dude or something

3 like that, correct?

4   THE COURT:  I'm sorry.  What's the last part of that?

5 BY MS. PETRAS:

6 **Q.** "Jo" is slang, similar to calling somebody dude or

7 something like that?

8 **A.** I -- like I said, I started, and then I realize, like, I

9 really don't know what "Jo" means.

10 **Q.** Have you ever --

11 **A.** I don't call people Jo or anything like that.

12 **Q.** I'm not saying you call people Jo, but have you ever

13 heard somebody use the term "Jo"?

14 **A.** Yes.

15 **Q.** And they use it like they use the word "dude," correct?

16 **A.** Are you telling me?  Like, I --

17 **Q.** I'm asking you if that's how you used it?

18 **A.** I don't use it, so I don't know.  Like, I -- I'm sorry.

19 **Q.** So you've never heard anybody use it and thought about

20 what it means or in what context?

21 **A.** No.

22   MR. COLE:  Your Honor, this is asked and answered.  I

23 respectfully object.

24   THE COURT:  I think he has.  I haven't heard it either,

25 other than "Morning Joe" or something.

1          MS. PETRAS:  What?

2          THE COURT:  "Morning Joe."

3          MS. PETRAS:  "Morning Joe," okay.

4          MR. COLE:  That's coffee, Your Honor.

5          MS. PETRAS:  I think that's a different Joe.

6          THE COURT:  The show.  It's a TV news show.

7    BY MS. PETRAS:

8    Q.    And just to be clear, the Powershift on there, when you

9    said that they don't answer radio calls, they essentially do

10   within the Seventh District what the Gun Recovery Unit does

11   city-wide, correct?

12   A.    The -- they do -- yes, they do go after legal firearms,

13   but they also focus on narcotics and other violent felonies,

14   like problem areas or robberies and such -- stuff like that.

15   Like I said, I've never been a Powershift unit.  This is all

16   hearsay, like, what I've heard that they focus on, so --

17   Q.    Hearsay's okay here, so it's all right.

18          THE COURT:  You said?

19          MS. PETRAS:  I said, "Hearsay's okay here, so it's all

20   right."

21          THE COURT:  Touche.  That's true.

22   BY MS. PETRAS:

23   Q.    You said that if Mr. Gibson had not -- I think you put it

24   more generally than that.

25          If people don't show you the waistband when you all want

1    to see their waistband, you indicated that they're just then

2    free to leave and that's what happens?

3    **A.**    I said if there's no other surrounding characteristics or

4    body language or anything else, if it's just somebody walking

5    down and we have no other reason to continue to talk to them,

6    and they tell us, you know, "Leave me alone," whatever, and it's

7    as simple as that.  We will just keep going.

8    **Q.**    And when you say "we," you mean the Gun Recovery Unit,

9    correct?

10   **A.**    I'm talking strictly about the people in my -- in the

11   car, my car.  I worked with Officer Wright for three years, and

12   Officer McCaw and Mancini are relatively new, but -- in those

13   three years I worked with him, like, I don't take this stuff

14   personal.  I really don't, so --

15   **Q.**    Okay.  But you're all Gun Recovery Unit, correct?

16   **A.**    Yes.

17   **Q.**    And the fact of the matter is, there's instances when the

18   Gun Recovery Unit tries to see people's waistband, and even

19   without a reason then has patted them down?

20       MR. COLE:  Objection, Your Honor.  This has gone too far,

21   I think.

22       THE COURT:  I'll allow it.  I'll allow it.

23       THE WITNESS:  If that's -- if -- I cannot say that I've

24   ever done that or, like, I said, my partners.  If people have

25   told us no, and we've had other reasons to believe, we would then

1  create a stop and frisk report, and we'd describe in the report

2  why we did what we did.

3  BY MS. PETRAS:

4  **Q.**    And you -- the gun -- the Gun Recovery Unit incident that

5  occurred at the barbershop that we were talking about earlier

6  today, that involved people complaining that they tried to

7  refuse and --

8         MR. COLE:  Objection, Your Honor.  At some point -- we're

9  far afield here.

10        THE COURT:  I know.  It's just -- I'll let that question

11 be answered.  Go ahead and finish your question.

12 BY MS. PETRAS:

13 **Q.**    That involved allegations that other members of the Gun

14 Recovery Unit went ahead and frisked people when they were

15 saying no to let see the waist- --

16        MR. COLE:  Your Honor --

17        THE COURT:  I'm going to sustain that one.  All right.

18        MS. PETRAS:  I think that's it.

19        THE COURT:  Anything else?

20        MS. PETRAS:  That's it for this officer, but I have

21 something I want to move to admit.

22        THE COURT:  You want to move to admit what?

23        MS. PETRAS:  I have -- and I can mark it as an exhibit --

24 videos with regard to the barbershop incident, which I understand

25 this officer wasn't there, but I think it's relevant to something

1     else.  I'm going to move to admit it, but we don't --

2          THE COURT:  It may or may not be relevant.  I'll take a

3     look at it.  If it's not relevant I'm going to disregard it.

4     Over objection, I'll admitted it.

5          MR. COLE:  Your Honor -- and let me just state for the

6     record, Your Honor --

7          MS. PETRAS:  I'll mark it Defendant's 13.

8          MR. COLE:  I want it stated for the record that's my

9     objection, so there's no dispute.

10         THE COURT:  Right.

11         MR. COLE:  And I say it respectfully.  Counsel now wants

12    to show you something that these officers were not involved with,

13    and I'll stand -- if you want me to, I'll stand, Your Honor.  I

14    don't want it right now.

15         THE COURT:  I haven't seen it.  I mean, I'll take a look

16    at it --

17         MR. COLE:  Can I just ask you something?  Can I just put

18    something on the record, Your Honor?  Let's say we were doing a

19    homicide case, and counsel now wants to show you something that

20    happened several years ago on another homicide case that has no

21    bearing, no allegation of impropriety on these officers, so it

22    goes beyond whether or not --

23         THE COURT:  The luxury of this proceeding, nonjury, before

24    a judge with experience, is that I can let it in provisionally,

25    take a look at it, if it's not relevant I can disregard it, as

1    opposed to making a decision in a vacuum.  I've not seen it.

2         MR. COLE:  Your Honor, but I know you were one of the most

3    senior gifted jurists in the country, but even you should not --

4         THE COURT:  I'm sorry.  What is that again?

5         MR. COLE:  Most senior gifted jurists in the country.

6         THE COURT:  Why do I have to be the most senior?  How

7    about just most gifted?

8         MR. COLE:  Well, okay.  Well, senior, as opposed to --

9         THE COURT:  By the way, I'm not one of the most senior.

10        MR. COLE:  No, of some of the newer judges that -- I was

11   only -- in relationship to some of the newer judges.  Let's just

12   say gifted.

13        Your Honor, in this case, I will strongly ask you to

14   rethink that because it has no bearing.  For example, if I can

15   just make my record, and I'll be very brief.

16        MS. PETRAS:  I think -- can I say something for one

17   second?  I think we can let Officer Hiller go if this is

18   argument.

19        THE COURT:  I have one other question to ask, but go

20   ahead.  Let me hear your objection.

21        MR. COLE:  But here's my objection, Your Honor.  You're

22   going to -- you're requesting to see something that doesn't

23   involve these officers and --

24        THE COURT:  This was a video of a barbershop?  This was a

25   video taken of that picture and circumstances surrounding that

1   picture in front of a barbershop?

2          MS. PETRAS:  No, Your Honor.

3          MR. COLE:  No, Your Honor.

4          THE COURT:  Oh, okay.

5          MS. PETRAS:  It's another incident, and I can let

6   Ms. Roland addresses it in our argument and how it plays into our

7   argument, but --

8          THE COURT:  All right.  Let me do this.  I've got to be at

9   Racine's office, so I've read the riot act to everyone else being

10  in by 5:00, and I can't be late.  Let me hold off on this.  I'll

11  give you a chance on -- I'm not going to take a look at this

12  between now and Thursday anyway.

13         MR. COLE:  All right.  That's fine, Your Honor.  We can

14  talk about it further, and I can outline further my objection.

15         THE COURT:  All right.  Let me inquire of the officer.  If

16  you know the answer to this question, I'm interested.

17         You did see Mr. Gibson with his hands in the air, correct?

18         THE WITNESS:  Yes.

19         THE COURT:  Do you recall at that -- do you recall seeing

20  his hands in the air on the day of this incident?

21         THE WITNESS:  I don't remember.

22         THE COURT:  All right.  Because my question would have

23  been:  At that time when his hands were in the air, could you see

24  his waistband?

25         THE WITNESS:  I don't -- I don't remember, Your Honor.

1    MR. COLE:  You didn't see any contraband or weapon in his

2  person while he was on the sidewalk?

3    MS. PETRAS:  He's leading.

4    THE COURT:  What, if anything, did you see?

5    THE WITNESS:  I didn't see -- I just saw Mr. --

6    THE COURT:  Because you were sitting next to the officer

7  with the flashlight?

8    THE WITNESS:  Yes.

9    THE COURT:  Was he impeding your vision?

10    THE WITNESS:  I just remember I see Mr. -- I don't even

11  remember if I saw Mr. Gibson turn around.  I just remember

12  Officer Mancini got out, and that's why I got out with him.  And

13  then once I got out, I saw him running.

14    MR. COLE:  All right.  I have nothing further, Your Honor.

15    THE COURT:  All right.

16    MR. COLE:  Thank you.

17    THE COURT:  All right.  So 2:00 on Thursday?

18    MR. COLE:  On Thursday, Your Honor.

19    MS. PETRAS:  Yes, Your Honor.

20    THE COURT:  All right.  Let me do this.  I'm still going

21  to be late, but I want to talk to my staff for five minutes

22  because I don't want to bring this officer back unless he plans

23  to be here.

24    MR. COLE:  Well, I'll bring him back.

25    THE COURT:  All right.  Good.  Good.  We'll see you at

1    2:30 on Thursday.

2         MR. COLE:  Yeah.  2:00, Your Honor, Thursday?

3         THE COURT:  2:00.  I may have some other questions.

4         MR. COLE:  Oh, okay.

5         THE COURT:  All right.

6         MR. COLE:  Yes, Your Honor, I'll bring him.  I can, Your

7    Honor.

8         THE COURT:  All right.  Thank you.  Officer, take care,

9    and I'd ask that you not discuss your testimony with anyone.

10   Okay?

11        THE WITNESS:  Yes, Your Honor.

12        THE COURT:  Anything further?

13        MR. COLE:  Not from the United States, Your Honor.

14        MS. PETRAS:  Not from the defense.

15        THE COURT:  2:00 on Thursday.  Okay.  Thank you.

16        MR. COLE:  Have a wonderful day.

17        THE COURT:  Great.  Thanks.

18        (Proceedings adjourned at 4:51 p.m.)

19
                    **C E R T I F I C A T E**
20

21             I, Scott L. Wallace, RDR-CRR, certify that
          the foregoing is a correct transcript from the record of
22        proceedings in the above-entitled matter.

23
          /s/ Scott L. Wallace
24        ---------------------------        ----------------
          **Scott L. Wallace, RDR, CRR**            **Date**
25          **Official Court Reporter**