**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **Plaintiff,** | : | Criminal Action |
| | : | No. 18-108 |
| **v.** | : | |
| | : | |
| **MARK GIBSON,** | : | September 20, 2018 |
| | : | 2:25 p.m. |
| | : | |
| | : | |
| **Defendant.** | : | Washington, D.C. |
| | : | |
| .............................. | : | |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the United States:      **Emory Vaughan Cole, Assistant U.S.
                            Attorney**
                            U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
                            Washington, DC 20530
                            (202) 252-7692
                            Fax: (202) 616-2296
                            Email: Emory.Cole@usdoj.gov

For the Defendant:          **Mary Manning Petras, Assistant
                            Federal Public Defender**
                            FEDERAL PUBLIC DEFENDER FOR THE
                            DISTRICT OF COLUMBIA
                            625 Indiana Avenue, NW
                            Suite 550
                            Washington, DC 20004
                            (202) 208-7500 Ext. 109
                            Fax: (202) 208-7515
                            Email: Mary_petras@fd.org

APPEARANCES:  Cont.

For the Defendant:          **Sandra Roland, Assistant Federal**
                            **Public Defender**
                            FEDERAL PUBLIC DEFENDER FOR THE
                            DISTRICT OF COLUMBIA
                            625 Indiana Avenue, NW
                            Suite 550
                            Washington, DC 20004
                            (202) 208-7500
                            Email:  Sandra_roland@fd.org

Court Reporter:             **Scott L. Wallace, RDR, CRR**
                            Official Court Reporter
                            Room 6503, U.S. Courthouse
                            Washington, D.C. 20001
                            202.354.3196
                            scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

**EXAMINATIONS**                                                    **Page**

FURTHER REDIRECT EXAMINATION OF MATTHEW HILLER        17
BY MR. COLE:
FURTHER RECROSS-EXAMINATION OF MATTHEW HILLER        29
BY MS. PETRAS:
FURTHER REDIRECT EXAMINATION OF MATTHEW HILLER        37
BY MR. COLE:

DIRECT EXAMINATION OF MARK GIBSON                    43
BY MS. PETRAS:
CROSS-EXAMINATION OF MARK GIBSON                     53
BY MR. COLE:
REDIRECT EXAMINATION OF MARK GIBSON                  83
BY MS. PETRAS:
RECROSS-EXAMINATION OF MARK GIBSON                   89
BY MR. COLE:

## E X H I B I T S

**DESCRIPTION**                                                    **Page**

1          **AFTERNOON SESSION, SEPTEMBER 20, 2018**

2     (2:25 p.m.)

3          THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4     18-108, *United States of America versus Mark Gibson*.  Will

5     parties please come forward to this lectern and identify

6     yourselves for the record.

7          MR. COLE:  If it pleases the Court, Your Honor, as always,

8     it's indeed an honor and privilege to appear before you.  I am

9     Emory V. Cole.  I'm representing the United States in this

10    matter.  I have with me my paralegal extraordinaire,

11    Mrs. Jeanette Litz.

12         THE COURT:  All right.  Good afternoon to you both.

13         MS. PETRAS:  Good afternoon, Your Honor.  Mary Petras and

14    Sandra Roland on behalf of the defendant.

15         THE COURT:  So, is it an honor, pleasure and privilege?

16         MS. PETRAS:  It always is.  I'm just not good at that sort

17    of thing, but you know I mean it.

18         THE COURT:  That's why I thought I'd have to lead you, you

19    know.  So good afternoon to you both.

20         Mr. Gibson, how are you?

21         THE DEFENDANT:  Doing good.

22         THE COURT:  Doing okay?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Who's got the burden of proof?

25         MS. PETRAS:  When there's no warrant, the government has

1   the burden of proving that they acted --

2          THE COURT:  I think that's right, but I -- you know, in

3   Superior Court we'd know this because we do it every day, but we

4   rarely -- I rarely preside over suppression hearings.  I think

5   you're right.

6          Mr. Cole?

7          MR. COLE:  I don't disagree with that, Your Honor.  We

8   have a right to show, based on the motion that counsel filed.

9          And before we start, Your Honor, I just wanted to address

10  a couple of matters.

11         THE COURT:  All right.  So you'd agree the government has

12  the burden of proof?

13         MR. COLE:  Yes.  Yes, yes.

14         THE COURT:  The government has the burden of proof to show

15  what?

16         MR. COLE:  What was -- what was filed in the motion to

17  suppress.  And as you know, Your Honor, in the two sentences --

18         THE COURT:  Wait a minute.  The government has the burden

19  of proof to show that there was not an illegal seizure?

20         MR. COLE:  Well, no, Judge -- yes and no.

21         THE COURT:  All right.

22         MR. COLE:  But the no goes first.  If I may -- may just

23  have a moment.  The written two-sentence suppression motion was,

24  according to the officers, as a result of the stop, arrest and

25  search of Mr. Gibson, the officers found cocaine and a gun.

1    That's on the first page.  Three sentences.  The officers did not

2    have probable cause to arrest or search Mr. Gibson.  And I wanted

3    to highlight that for you just for a moment.  That's what the

4    government responded to.

5         As a matter of fact, Your Honor, you asked defense to give

6    a reply.  And in the reply motion, which is two sentences, at the

7    bottom of page 1, Ms. Petras wrote, "The officers seized

8    Mr. Gibson and searched him based only on the facts that he was

9    walking down the street and turned to look at the officers who

10   were following him in an unmarked car.  The officers' conduct

11   would have led a reasonable person to believe that he or she was

12   not free to leave."

13        Now, our response was, I believe, fulsome, and it

14   addressed all the issues in writing that Ms. Petras had brought

15   up.  Because we had determined and we have shown to you beyond

16   any doubt -- there's no doubt now on both sides -- that

17   Mr. Gibson was never under arrest prior to the firearm.

18        THE COURT:  So the government has the burden of proof to

19   prove by a preponderance that Mr. Gibson was not seized and

20   searched in violation of the Fourth Amendment, correct?

21        MR. COLE:  Yes.  That's correct, Your Honor.  And we have

22   responded, based on the written motion, that -- and I know this

23   hearing has expanded far -- over my vigorous objections, but what

24   Ms. Petras said is that --

25        THE COURT:  Expanded to what, though?

1    MR. COLE:  Well --

2    THE COURT:  We're still focusing on what happened --

3    MR. COLE:  Okay.  Well, yes, Your Honor.

4    THE COURT:  -- that evening.

5    MR. COLE:  But I wanted to say one thing.  Ms. Petras said

6    he was under arrest and searched.  One thing happened, and then

7    he was searched.  And I'm not making this up.  She says it in her

8    submission.  He was under arrest, and during the search incident

9    to that unlawful arrest, allegedly, a gun and drugs were found.

10   That's what the government responded to quite -- quite fully, and

11   so it is our responsibility to show that.  And the video shows

12   that without any question.

13   So we're in a position now, -- I think defense might want

14   to move the goalpost, but we have been in the position.  We have

15   passed the goalpost at this particular point, and we have made

16   the case, since it's our burden about, that he was not under

17   arrest until the defendant discarded that firearm.

18   THE COURT:  That's your argument.  But their argument is

19   that at the time that he was stopped an unlawful seizure occurred

20   at that point, if I understand their argument.

21   MR. COLE:  No.  No, Judge.  That's not what she said.  And

22   I think we have to go with what Ms. Petras said.  The officers

23   can -- I'm sorry.

24   The first sentence, "The officer seized Mr. Gibson and

25   searched him based only on the fact that he was walking down the

1    street and turned at the officer's -- turned to look at the

2    officers, who were following a marked car.  The conduct -- the

3    officers' conduct would lead a reasonable person to believe that

4    he or she was not free to leave."

5         THE COURT:  But their -- but her argument is at the top of

6    page 2, "Mr. Gibson was arrested at the point that the police

7    officers stopped him."  And I may be wrong.  I --

8         MR. COLE:  The physical stop, Your Honor.  The physical

9    touching stop, not walking on the sidewalk.

10        THE COURT:  Well, I -- I mean, as a matter of

11   constitutional law, though, the stop would be at a point when a

12   reasonable person objectively thought that he was not free to

13   leave.  That's your argument, isn't it?

14        MS. PETRAS:  Exactly, Your Honor.

15        MR. COLE:  But there must be a little bit more.  I'm

16   saying that's not the stop on the sidewalk, Your Honor, based on

17   her -- based on her following and her one- or two-sentence

18   submissions.

19        This is what I want to say, Your Honor.  In the -- in

20   her -- in the first page of her motion, accordingly, the

21   officers, as a result of the stop, arrest and search of

22   Mr. Gibson, the officers found cocaine and a gun.  That's not

23   what happened.  Quite naturally, the stop wasn't at the location

24   until the defendant ran.

25        THE COURT:  But that's a question for the Court to

1 | determine.

2 |     MR. COLE:  Right.  But they didn't find a gun.

3 |     My point is, we have responded fully with what she had

4 | here.

5 |     THE COURT:  Right.  Their argument --

6 |     MR. COLE:  The video now --

7 |     THE COURT:  Their argument -- her argument must be that

8 | had he not been stopped at a time when, I assume, his hands were

9 | in the air and the flashlight was in his face, then nothing else

10 | would have happened.

11 |     MR. COLE:  I have -- I have something for, Your Honor,

12 | that I've submitted, and hopefully you got it.

13 |     THE COURT:  You have the -- you have the audio from the --

14 | from the -- from the film?

15 |     MR. COLE:  No, that's not --

16 |     THE COURT:  But that's right.  They weren't turned over.

17 |     MR. COLE:  But that's not germane, Your Honor, to your

18 | consideration, and I'll tell you why:  Your calculus.  I have

19 | been fortunate to do a lot of research in this case.

20 |     THE COURT:  I know, thank you for your supplemental memo.

21 |     MR. COLE:  *Gross* is on all fours, the circuit from --

22 |     THE COURT:  I was wondering when you were going to --

23 | brought up *Gross*, but you know, I mean --

24 |     MR. COLE:  But I have, and I've researched it even

25 | further.

1        THE COURT:  We have the attorney who argued *Gross*, right?

2        MR. COLE:  We do.  But in that particular case the circuit

3   disagreed.  If there ever had been a case that was --

4        THE COURT:  The facts may have been a little bit

5   different.

6        MR. COLE:  No.  They were quite similar, Your Honor, in --

7        THE COURT:  Is the witness in court?

8        MR. COLE:  No, Your Honor, he's not.

9        THE COURT:  Okay.

10        MR. COLE:  He's outside.

11        THE COURT:  He's here, right?

12        MR. COLE:  He's here outside.  He's sitting outside.

13        MS. PETRAS:  Your Honor, may I interrupt for just one

14   moment?

15        THE COURT:  I don't want to make your -- I'm doing a lot

16   of work here --

17        MS. PETRAS:  You are doing a lot of work there.

18        THE COURT:  -- and I don't want to make your argument.  I

19   may be all wrong.

20        MS. PETRAS:  I -- well, I say this only because -- and I

21   apologize for this, but I forgot when I set this that I have a

22   personal matter.  I need to leave at 4:30.  We've already got

23   into argument, but I don't know if the government's finished

24   presenting evidence and we have evidence to present.

25        THE COURT:  I know.  I know.  You know what, you have to

1  leave at 4:30?

2       MS. PETRAS:  Yes.

3       THE COURT:  All right.  That's fine.  We have to come back

4  tomorrow.  Let's talk -- let's talk about tomorrow anyway.

5       What's your calendar like tomorrow?

6       MR. COLE:  I'm available, Your Honor.

7       THE COURT:  I have a 10:30 meeting with the chief judge

8  about erroneous releases.

9       MR. COLE:  Your Honor, that might be appropriate, because

10  I would want you to have a full opportunity to read the case law.

11  *Gross*, I submit to you, is spot on.

12       THE COURT:  I've read it.  I read *Gross*.  I've read *Gross*.

13       MS. PETRAS:  If we could just finish presenting the

14  evidence today.

15       THE COURT:  Yeah.  You have a witness, right?

16       MS. PETRAS:  Yes.

17       THE COURT:  Is your witness in the courtroom?

18       MS. PETRAS:  Yes.

19       THE COURT:  So you're going to call your client?

20       MS. PETRAS:  Yes.

21       THE COURT:  Oh, okay.  All right.  That's fine.  Okay.

22  I'm sorry.  I just -- all right.  I thought you had -- that's

23  fine.

24       You're under no obligation to testify, you know that,

25  right?  Okay.  All right.  We'll talk.  I'll have a colloquy --

1    I'll have a discussion with you in a few minutes.  You certainly

2    can testify, but you don't have to.

3         Do you understand that?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Okay.  That's fine.

6         MR. COLE:  Your Honor, I'll need --

7         THE COURT:  Yeah, I just put that out there.

8         MR. COLE:  Since we're going to come back, I just think

9    that *Gross* is -- they asked about -- it couldn't have been more

10   on all fours in the government's respectful opinion than it is

11   now.  And I would ask you to look at that one and the other

12   Supreme Court cases that we have outlined.

13        And lastly, the Supreme Court has said once a person takes

14   off in a head-long run, that fact in a high-crime area, that fact

15   alone would give officers reasonable suspicion to stop and

16   search, but in this case, he threw the gun away.

17        THE COURT:  All right.  But then -- I mean, we're getting

18   into argument.

19        MR. COLE:  All right.

20        THE COURT:  That assumes a lot, that the run could have

21   occurred after the seizure, though.

22        But, anyway, we'll ferret through all of that.  I've read

23   *Gross*.  It's a very interesting case.

24        MR. COLE:  Okay.  Do you have a copy?  Would you want a

25   copy?

1        THE COURT:  No.  I've got it.  I've got a copy of it.

2        MR. COLE:  And *Drayton* and the one from Michigan --

3        THE COURT:  Actually, I complimented Judge Brown on -- I

4   thought it was a dissent.  I normally don't compliment circuit

5   judges on their opinions, but I saw her after that.  It was not

6   my case.  And I said, "That was a great dissent you wrote," and

7   she reminded me it was a concurrent.  It was a very interesting

8   concurrent opinion that she wrote there.

9        MR. COLE:  Right.  And I had the good fortune, Judge --

10        THE COURT:  {Indiscernible} dissent, but anyway...

11        MR. COLE:  I had the good fortune this Friday that issue

12   came up at the circuit as well, and *Gross* appears to be well on

13   good standing.

14        THE COURT:  All right.

15        MR. COLE:  And that was 2015, Your Honor.

16        THE COURT:  Right.  Okay.  Okay.  So, anyway, I just

17   wanted to throw that question out there about the burden of

18   proof.  I think everyone agrees the government has the burden of

19   proof.  That's fine.

20        I think -- my recollection is we were in redirect.  I'm

21   not sure if the government had finished redirect of your officer.

22        Did you?

23        MR. COLE:  I had not, Your Honor.  I have one -- one

24   missed area I wanted to go through.

25        THE COURT:  Sure.  Okay.  And I have a few questions to

1    ask him as well.  I'll certainly give Ms. Petras an opportunity

2    to ask whatever additional questions she has.

3         Counsel, did you want to keep the record open and file

4    something in writing in response to the government's submission

5    today?  I mean, I've read it.  There's nothing new.  I knew about

6    *Gross* and the other cases.  It's up to you if you want to.  I'm

7    certainly not going to --

8         MS. PETRAS:  I think we could finish presenting all of the

9    evidence, and then Ms. Roland is actually going to argue, so I

10   don't know --

11        THE COURT:  All right.

12        MS. PETRAS:  -- if you will -- whatever you --

13        THE COURT:  All right.  I may hear argument and then ask

14   you to file something.  I don't know.

15        MS. PETRAS:  Okay.

16        THE COURT:  I don't know, but I'll keep it open.

17        MR. COLE:  We're going to stand on *Gross* and the other

18   Supreme Court cases that we cited, Your Honor.

19        THE COURT:  All right.

20        MR. COLE:  Thank you for that opportunity.

21        THE COURT:  You're going to call -- you're going to recall

22   your officer?

23        MR. COLE:  Yes, sir.

24        THE COURT:  Sure.  You have to leave at 4:30, or you have

25   to be somewhere at 4:30?

1      MS. PETRAS:  I need to leave here no later than 4:30.

2      THE COURT:  All right.

3      MR. COLE:  Can we talk about time, because I don't have a

4  problem with us coming back.  Because I don't want to -- out of

5  dignity and respect, I don't want Mrs. Petras to feel rushed,

6  because I don't know how long the cross-examination is going to

7  be of the defendant.

8      THE COURT:  Somebody told me y'all were going at it a

9  little while ago.

10      MR. COLE:  Sometimes there's a dog whistle that comes out

11  and you need to address.

12      THE COURT:  Dog whistle?  In this day and age?

13      MR. COLE:  I felt it.

14      MS. PETRAS:  I don't even know what that means.

15      MR. COLE:  I know what it means.

16      THE COURT:  A dog whistle?

17      Anyway, Let us know.  How long do you anticipate the

18  direct to be of your client?

19      MS. PETRAS:  15 minutes.

20      THE COURT:  Okay.  Sure.  If you want to come back

21  tomorrow and argue, that's fine as well, or if you want to use

22  the time between now and 4:30, that's fine.  I'm not pressed.

23      (Discussion had off the record.)

24      THE COURT:  It's a slang term for getting the attention of

25  someone, you know.  I don't know if it's a derogatory term.  I

1    don't know.  I don't know.  I wouldn't use it, you know.

2         So, anyway, how are you today?

3         THE WITNESS:  Fine.

4         THE COURT:  You're still under oath.  Okay?

5         THE WITNESS:  All right.

6         THE COURT:  Redirect.

7         MR. COLE:  Thank you, Your Honor.

8         THE COURT:  Someone says something, and then someone says,

9    "That's just a dog whistle to his bait," and that's where it

10   started from.

11        MR. COLE:  Your Honor, there was something about -- well,

12   I'll just leave it out for the record.  But it was just wrong and

13   inappropriate, and I let Ms. Petras know that that was -- it came

14   off to me as offensive, and --

15        THE COURT:  All right.

16        MR. COLE:  -- I think what she said --

17        THE COURT:  But that has nothing to do with the record in

18   this case?

19        MR. COLE:  Oh, no, no.  No, no.  Nothing to do with the

20   record.

21        THE COURT:  All right.

22        MR. COLE:  Because I treat everyone with dignity and

23   respect.  That's my hallmark, Your Honor.  That's the underbelly

24   that puts fire in me to do what's right.

25        THE COURT:  Right.  You learned that at Howard, right?

1          MR. COLE:  I did.  Thank you, Judge.

2          THE COURT:  All right.

3              FURTHER REDIRECT EXAMINATION OF MATTHEW HILLER

4     BY MR. COLE:

5     Q.    State your name and spell your first and last name.

6          THE COURT:  There are no benefits because you went to

7     Howard, now.  You know that, so...

8          MR. COLE:  Come on.  I know that, Judge.  I've appeared

9     before you 15, 20 years, but I think -- there's no offense.

10    Thank you, Judge.

11    BY MR. COLE:

12    Q.    Officer, state your name, spell your first and last name

13    for the record, please.

14    A.    Matthew Hiller, M-A-T-T-H-E-W H-I-L-L-E-R.

15    Q.    Officer Hiller, I just want to state for the record,

16    you're still under oath, and I just have one follow-up question.

17          During the time you placed -- you activated your

18    body-worn camera, there are two minutes or so that were picked

19    up on the loop; is that right?

20    A.    Yes.

21    Q.    And I just wanted to show you a portion of that -- of

22    that loop part because I want to ask a question.

23          Do you recall, was -- there someone else prior to

24    Mr. Gibson that you all talked to, and it turned out to be

25    nothing, and you kept on going.  I'm going to play that for you.

1     And was that picked up on the body-worn camera within the

2  two-minute loop?

3         MS. PETRAS:  Can I have what exhibit number this is?

4         MR. COLE:  This is exhibit -- thank you, Ms. Petras.  This

5  is 1-B.

6         THE COURT:  All right.

7         MR. COLE:  This is Officer Mancini's body-worn camera.

8         (Videotape played.)

9  BY MR. COLE:

10  **Q.**    At this point, this is before Mr. Gibson; is that right?

11  **A.**    Yes.

12  **Q.**    And this is the body-worn camera of who?

13         THE COURT:  Where's the footage on here?  3:46?

14         MR. COLE:  I'm sorry?

15         THE COURT:  3 minutes and 46 seconds into it?

16         MR. COLE:  Yes.  Hold on.

17         (Videotape paused.)

18         MR. COLE:  Yes, Your Honor.

19  BY MR. COLE:

20  **Q.**    Officer Wright is talking to someone else, right?

21  **A.**    It appears that way.

22         MR. COLE:  We'll play it all --

23         MS. PETRAS:  Objection to leading.

24         THE COURT:  Yes.

25         MR. COLE:  We'll play it all for --

1          THE COURT:  Sustained.

2          MR. COLE:  We'll play it all for you.

3          THE COURT:  Where are you now?  Mancini's driving the car,

4   right?

5          MR. COLE:  No, Your Honor.

6          THE WITNESS:  No, Your Honor.

7   BY MR. COLE:

8   **Q.**    For the Judge's review, please tell us where everybody is

9   in the car.

10  **A.**    Officer Wright's driving the car.  This camera is from

11  Officer Mancini.  I'm directly seated in front of him, and

12  Officer McCaw's seated to his left.

13         THE COURT:  All right.

14  BY MR. COLE:

15  **Q.**    So you're in --

16         THE COURT:  So he's directly behind you then, correct?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  All right.  And you're in the front right

19  seat, the shotgun seat, right?

20         THE WITNESS:  Shotgun, yes, Your Honor.

21         THE COURT:  All right.  Okay.

22  BY MR. COLE:

23  **Q.**    We're going to play it, and then I'm going to ask you

24  some questions.  Just look at it carefully.

25         (Videotape played.)

1    BY MR. COLE:

2    **Q.**     And the car was stopped for a period time; is that right?

3    **A.**     Yes.

4    **Q.**     What was going on there?

5    **A.**     Just based on this video, it appears Officer Wright is

6    talking to somebody, has a brief conversation with them, begins

7    to drive, looks one more time back at him and continues to go.

8    **Q.**     All right.  And then, as you said, it's the latter point

9    where you came in contact with Mr. Gibson; is that right?

10   **A.**     Yes.

11   **Q.**     All right.  At this particular encounter did anything

12   happen that was noteworthy or you kept driving?  Tell us.

13   **A.**     No.

14   **Q.**     All right.

15   **A.**     Not that I remember, no.

16   **Q.**     But you kept driving?

17   **A.**     Yes.

18   **Q.**     All right.  And did any of you four get out of the

19   vehicle during this particular stop?

20   **A.**     No.

21   **Q.**     All right.  Thank you.

22           (Videotape paused.)

23           MR. COLE:  That's all I have, Your Honor.

24           THE COURT:  All right.  Did you have any other -- I had a

25   few questions.  Do you have anything?  Well, let me ask a few

1  questions.  You may want to respond, and then the government may

2  have some questions as well.

3       That's 1-B, correct, exhibit?

4       MR. COLE:  Yes, Your Honor, 1-B.

5       THE COURT:  All right.  In about 15 to 30 second in -- and

6  I guess we could roll that back a little bit.  It started at

7  maybe 15 or so, Officer Wright appears to be speaking to someone.

8       Do you recall -- I think you probably answered this

9  already, but do you recall who he was speaking to?

10      THE WITNESS:  No, Your Honor.

11      THE COURT:  All right.  Do you recall what he said?

12      THE WITNESS:  No, Your Honor.

13      THE COURT:  Okay.  In Government's Exhibit 1-A you appear

14 to have something in your hand -- I don't know if I have 1-A or

15 not -- at around 1 minute and 15 second in.

16      Can we bring that up?

17      MR. COLE:  Yes, Your Honor.

18      THE COURT:  And I guess the question is:  Do you recall

19 what was in your hand?  Before you answer, why don't you take a

20 look at it.

21      (Videotape played.)

22      MS. LITZ:  Do you just want to tell me where to stop it,

23 or --

24      THE COURT:  Well, it was about at around 1 minute and --

25 probably around 75 seconds, if you -- 1 minute, 15 second.  Yeah,

```
 1    you have to roll it back a little bit.
 2          Is that -- it appears to be at 3:46 now.  I think it's
 3    going forward, yeah.
 4          MR. COLE:  Do you want us to go backwards or forward?
 5          THE COURT:  Yeah.  It's about 1 minute and 15 seconds in.
 6          MS. LITZ:  Okay.
 7          THE WITNESS:  That's my flashlight, Your Honor.
 8          THE COURT:  Oh, it is?
 9          THE WITNESS:  Yes.
10          THE COURT:  All right.  Can you see it?
11          MR. COLE:  We're going to go back, Your Honor, and stop it
12    for the Court briefly.
13          THE COURT:  All right.
14          THE WITNESS:  If you go a little bit forward, you'll be
15    able to see it better.  Right there (indicating).
16          THE COURT:  That's your flashlight?
17          THE WITNESS:  Yes, Your Honor.
18          (Videotape paused.)
19          THE COURT:  So what is it -- I'm trying to understand what
20    you were doing with that.  What are you doing with the
21    flashlight?
22          THE WITNESS:  I just had it out in my hands.
23          THE COURT:  I mean, up or, you know, across the -- across
24    your body or --
25          THE WITNESS:  It wasn't on.  I was just, I guess, playing
```

1    with it at that -- this part of the video.  I'm not doing

2    anything with it, other than holding it.

3          THE COURT:  Okay.  All right.  It also appears that

4    Officer Wright was shining a flashlight at Mr. Gibson while he

5    was speaking to him.

6          Is that a typical MPD practice, and if so, what's the

7    regulation that controls that?

8          THE WITNESS:  I mean, once Mr. -- once Officer Wright

9    started speaking with Mr. Gibson, he put his flashlight on to

10   better see Mr. Gibson.

11         THE COURT:  All right.

12         (Videotape played.)

13         THE COURT:  And then can you tell from the film where the

14   flashlight was shining on Mr. Gibson's body?

15         THE WITNESS:  If you -- it's kind of hard from the video

16   to see.  At that time you only see like the top part of Mr. --

17         (Videotape paused.)

18         THE COURT:  I don't know.  Can we pull that up, the

19   flashlight scene?  Is that 1-A?

20         MR. COLE:  It's 1-B.

21         THE COURT:  1-B, all right.

22         MR. COLE:  Yes.  We'll pull it up for Your Honor.  Thank

23   you.

24         THE COURT:  You don't have that flashlight with you today,

25   do you, or something similar to it?

1          THE WITNESS:  No, Your Honor.  I can describe it to you,

2     if you'd like.

3          THE COURT:  Yeah, it seemed awfully bright.  What are

4     they -- what's the -- yeah, go ahead and describe it.

5          THE WITNESS:  My flashlight or Officer Wright's?  We had

6     two.

7          THE COURT:  His, yeah.

8          THE WITNESS:  Oh, I'm not familiar with his.  It's about

9     like (indicating).

10          THE COURT:  Yeah.  The flash seemed to be awfully bright.

11          THE WITNESS:  I don't -- I'm not too -- I don't -- I don't

12     have the same one as Officer Wright, Your Honor.

13          THE COURT:  Okay.  Well, what kind did he have?

14          THE WITNESS:  He has like a yellow and -- I believe yellow

15     and black flashlight he usually carries.  I'm not sure if it's

16     the same in this video, but I can tell you once I see.

17          THE COURT:  I guess the reference -- my reference of the

18     3:46 don't mean anything because that number never changes, does

19     it, 3:46, 3:46.  It's on --

20          MS. LITZ:  It's on 3:47 now.

21          MR. COLE:  It's on 3:47, Your Honor.  That's the time

22     that's marked.  I believe it's the Zulu time on the stamp.

23     That's a timestamp.  All right.  You got it.

24          (Videotape played.)

25          THE COURT:  Okay.  So is that -- the flashlight in his

1   hand, is that it (indicating) that I'm pointing to?

2        THE WITNESS:  Yes.  Yes, Your Honor.

3        THE COURT:  Okay.

4        THE WITNESS:  I can't tell -- it's hard to tell from this

5   video if it's on -- and if it is on, what part of Mr. Gibson it's

6   pointing at.

7        THE COURT:  So you see him take it out, and that's Gibson

8   to the far left with his hands up, right?

9        THE WITNESS:  Yes, Your Honor.

10       (Videotape paused.)

11       THE COURT:  Can you roll that back, please, maybe to the

12  point where he's pulling the flashlight out and the hands go up.

13       (Videotape played.)

14       THE COURT:  All right.  I don't know if I can draw -- is

15  that -- no, I can't draw.

16       The object depicted on the far -- is that -- is that

17  Mr. Gibson?

18       MR. COLE:  Yes, Your Honor.

19       THE WITNESS:  Yes, Your Honor.

20       (Videotape paused.)

21       THE COURT:  All right.  Okay.  Can you slow motion it for

22  us?

23       MS. LITZ:  I cannot, no.

24       THE COURT:  You can't?

25       MR. COLE:  We don't have --

1          MS. LITZ:  Not with the software we have.

2          THE COURT:  Okay.

3          MS. PETRAS:  Your Honor, we did submit it in slow motion.

4   That's our exhibit number --

5          THE COURT:  Right.  You can.

6          MS. PETRAS:  We have already.  We submitted it in slow

7   motion as exhibit number --

8          THE COURT:  All right.  Okay.

9          MS. PETRAS:  -- 3 --

10         THE COURT:  We'll take a look at that.

11         MS. PETRAS:  -- which I --

12         THE COURT:  All right.  If you can just let it advance

13  forward then in whatever motion that's depicted here.  That's

14  fine.

15         MR. COLE:  You wanted it to advance forward?

16         THE COURT:  Yeah, just --

17         MR. COLE:  Oh, yes.

18         THE COURT:  -- let it continue, right.

19         MS. LITZ:  Okay.

20         MR. COLE:  Just one moment.

21         THE COURT:  Okay.

22         (Videotape played.)

23         THE COURT:  All right.  Thank you.

24         Now all of the four officers in the -- that's fine.  Thank

25  you very much.  Thank you.

1          (Videotape paused.)

2          THE COURT:  All the officers were armed that evening,

3     correct?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  All right.  Do you have a recollection as to

6     whether -- this is somewhat argumentative, but I'll ask the

7     question.

8          Do you have a recollection as to whether, in your opinion,

9     any weapons were visible to people outside the car?

10          THE WITNESS:  All our weapons -- you mean our firearms?

11          THE COURT:  Yeah.

12          THE WITNESS:  Our firearms, some of us have them on our

13     thighs and others have them on their waist.

14          THE COURT:  Okay.

15          THE WITNESS:  I doubt that they'd be visible unless you're

16     standing up on the car looking down into it.

17          THE COURT:  All right.  But no one had his or her weapon

18     pulled --

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  -- at that point while in the car?

21          THE WITNESS:  No, Your Honor.

22          THE COURT:  Okay.  How long would you estimate the entire

23     encounter lasted before Mr. Gibson started to run?

24          THE WITNESS:  From the time Officer Wright greeted him to

25     the time he began to run?

1        THE COURT:  Right.

2        THE WITNESS:  Um, I would say five to ten seconds,

3   approximately.

4        THE COURT:  How close would you estimate the vehicle was

5   to Mr. Gibson at the time of the encounter?

6        THE WITNESS:  Maybe 20 to 30 feet.

7        THE COURT:  Okay.  Was the vehicle parallel to him, or was

8   it proceeding in a direction to block his ability to run in any

9   direction or --

10        THE WITNESS:  No.  It was parallel to him.

11        THE COURT:  Okay.  He was on the sidewalk, and the vehicle

12   was in the street?

13        THE WITNESS:  Yes, Your Honor.

14        THE COURT:  You testified that Officer Wright spoke to

15   Mr. Gibson in a conversational tone.

16        And that tone, is it similar to my tone now?

17        THE WITNESS:  Yes, Your Honor.

18        THE COURT:  Do you recall whether any officer in the car,

19   in the vehicle, accused Mr. Gibson of possessing a gun before he

20   ran away?

21        THE WITNESS:  Not to my knowledge, no.

22        THE COURT:  All right.  Any questions?

23        MS. PETRAS:  I do have a couple of question.

24        THE COURT:  Okay.

25

1        <u>FURTHER RECROSS-EXAMINATION OF MATTHEW HILLER</u>

2    <u>BY MS. PETRAS:</u>

3    **Q.**    Officer, Mr. Cole showed you Officer Mancini's video, and

4    you pointed out where you would talk to somebody else before

5    talking to Mr. Gibson.

6        Do you remember that?

7    **A.**    I said it appeared from the video.  I can't recall from

8    that.

9    **Q.**    So you have no memory of that?

10   **A.**    No, I don't have a memory of that.  Like I said, I -- it

11   appeared from the video, yes.

12   **Q.**    Okay.  So the only thing you know about that is what's on

13   the video.

14       You can't remember anything else about that?

15   **A.**    That's correct.

16   **Q.**    Okay.  And that's -- it's fair to say that -- well, the

17   Gun Recovery Unit travels through the same neighborhoods

18   frequently, correct?

19   **A.**    We go to the -- we go wherever we're told to go, for the

20   most part.  We're usually assigned a district before we leave

21   the office of where they want us to go.

22   **Q.**    And you frequently go to the same areas, correct?

23   **A.**    We go to the entire district for the most part, yes.

24   **Q.**    Okay.  Well, you go to the same areas frequently,

25   correct?

1    **A.**     If we're in that district, we -- like --

2    **Q.**     Well, do you patrol -- do you go around Georgetown asking

3    to see people's waistbands?

4    **A.**     We're not asked to go to Georgetown, so if we're asked to

5    go to the Seventh District, we usually go through the entire

6    Seventh District.

7    **Q.**     Okay.  So you've never been asked to go to Georgetown and

8    asked to try and see people's waistbands, correct?

9    **A.**     Since I've been on the Gun Recovery Unit, no.

10   **Q.**     Okay.  And you -- and the three years you've been doing

11   this, you literally talked to hundreds of people, correct?

12   **A.**     Yes.

13   **Q.**     And it's all -- and usually you use about the same

14   approach, correct?

15   **A.**     Yes.

16   **Q.**     And you made lots of arrests?

17   **A.**     Yes.

18   **Q.**     And lots of stops?

19   **A.**     Yes.

20   **Q.**     That don't result in arrests?

21   **A.**     I wouldn't say lots of stops that don't result in

22   arrests, no.

23   **Q.**     Okay.  Lots of contacts that don't result in arrests?

24   **A.**     Yes.

25   **Q.**     And sometimes you just ask people to see -- if they have

1    any guns, they just automatically show you their waistbands

2    without you even having to try and see their waistbands,

3    correct?

4    **A.**    Sometimes people do that without -- without us even

5    saying anything.

6    **Q.**    And it's fair to say that's because this practice has

7    been going on so long that there are a lot of people in those

8    neighborhoods that just know that that's what you want to see,

9    correct?

10         MR. COLE:  Objection to that, Your Honor.

11         THE COURT:  That's argumentative.  I don't know.  You can

12    answer it.

13         THE WITNESS:  One more time, please.

14         THE COURT:  It's nonjury.  I can disregard information

15    that's not relevant.

16    BY MS. PETRAS:

17    **Q.**    It's fair to say because the Gun Recovery Unit and other

18    units are doing this frequently, that if you ask if somebody has

19    a gun, they know that what you want is to see their waistbands

20    so they show you, correct?

21    **A.**    I take it as they just want us to keep it moving, not --

22    so they just -- they know that's, I guess, what we want to see.

23    **Q.**    Okay.  And you -- oh, wait.

24         Judge Sullivan asked you about the flashlights.  I only

25    know this because my family has police in it.

1    There's a certain kind of flashlight that police officers

2  use, correct?

3  **A.**    I'm not aware of that.  I -- the flashlights I have I

4  bought.  I mean, I wasn't told I had to buy a certain

5  flashlight.

6  **Q.**    But there are certain kinds of flashlight that have a

7  particularly bright light, correct?

8    MR. COLE:  Objection, Your Honor, calls for speculation.

9    THE COURT:  Well, if he knows he can answer it.

10  BY MS. PETRAS:

11  **Q.**    What kind of flashlight do you own?

12  **A.**    I called -- I think it's called SureFire.  That's the

13  brand.

14  **Q.**    Okay.  And did you get it from like a police Website?

15  **A.**    I got it on Amazon.  It was one of the cheaper ones.

16  **Q.**    Okay.  All right.

17    And then yesterday you said that you work with Officer

18  Hiller [sic], Officer Wright and McCaw and Mancini -- Oh, you

19  are Officer Hiller.  I'm sorry about that.

20  **A.**    That's fine.

21  **Q.**    Officer Wright, Officer McCaw and Mancini, correct?

22  **A.**    Yes.

23  **Q.**    But you also work with the entire Gun Recovery Unit,

24  correct?

25  **A.**    Yes.

1    **Q.**    And throughout the years you have worked with a number of

2    different officers from the Gun Recovery Unit, correct?

3    **A.**    Yes.

4        MS. PETRAS:  And I'm going to show you what I've marked as

5    Defendant's Exhibit Number 15, which I previously provided to the

6    government.

7        MR. COLE:  Your Honor, I was provided, I'm sorry, today,

8    moments ago.  I object.  It's beyond redirect, and I have

9    further --

10        THE COURT:  Yeah.  What's the -- I don't even know what it

11    is.  If it's on the screen I can see.

12        MS. PETRAS:  I was going to ask the officer about it.  I

13    was otherwise just admit it as an exhibit.  It is a --

14        THE COURT:  Just tell me what it is, then.

15        MS. PETRAS:  It's a nine of the many Gersteins that's

16    submitted in Superior Court that Officer Hiller was part of the

17    arrest from the Gun Recovery Unit.

18        THE COURT:  That's for this case?

19        MS. PETRAS:  No.  Nine other cases that Officer Hiller and

20    officer --

21        THE COURT:  What's the relevance?

22        MS. PETRAS:  Well, one, it demonstrates that Officer

23    Hiller does not just work with the officers that he was vouching

24    for the other day, but he works with all the Gun Recovery Unit,

25    including --

1      THE COURT:  I thought he said that.  He already said that,

2 didn't he?

3      MS. PETRAS:  Including some of the officers that were

4 involved in the flag, for instance, exhibit that we submitted and

5 the barbershop incident that we submitted.

6      MR. COLE:  Your Honor, I respectfully object under --

7      THE COURT:  I'll let it in for that reason -- that reason

8 only?

9      MR. COLE:  No --

10      MS. PETRAS:  There's two in there that demonstrate people

11 just showing their waistbands without even having to be asked.

12      MR. COLE:  Your Honor, the -- Officer Hiller has said --

13      THE COURT:  Are these the Gersteins that this officer

14 prepared?

15      MS. PETRAS:  Some of them are -- this officer prepared;

16 some of them are that Officer Wright prepared.

17      THE COURT:  I'll let it in and then ferret out.  Over the

18 government's objection, I'll let it in.  It may be relevant or it

19 may not be.  I'll let it in.

20      MS. PETRAS:  Okay.

21      MR. COLE:  Your Honor, I would just also -- not just --

22 but this is redirect.

23      THE COURT:  Well, I asked --

24      MR. COLE:  And I object under that ground as well.

25      THE COURT:  I asked some questions also, so I'm going to

1  be fair to both sides.

2  BY MS. PETRAS:

3  **Q.**     You also work with Officer Delpo, correct?

4  **A.**     Detective Delpo, yes.

5  **Q.**     Detective Delpo.

6         Is he in a supervisor capacity in the Gun Recovery Unit?

7  **A.**     He's a detective, like, a senior detective with the unit.

8  **Q.**     With the unit.  All right.

9         And he was involved both in that flag picture and the

10  barbershop incident that we talked about, correct?

11  **A.**     I would have to see the flag picture again.  I don't -- I

12  don't have it memorized.

13         MR. COLE:  Your Honor, may I just at this point -- and I

14  hate to object.  I've never done it this way before.

15         THE COURT:  That's all right.  Your objection --

16         MR. COLE:  But the barbershop, Exhibit Number 13 that they

17  submitted to you --

18         THE COURT:  Your objection's noted.  It's over objection

19  I'll let counsel --

20         MR. COLE:  Your Honor, Exhibit Number 13 is a video of

21  that.  You have not admitted that.  You were going to give the

22  government an opportunity to have further argument before the

23  admission of that even before it was sent to you.  He's being

24  cross-examined on something now that you haven't given me a full

25  opportunity to argue about.  Not this photograph, it's the video

1    that she submitted as Defense Exhibit Number 13.  I haven't had a

2    full and fair opportunity to respond, respectfully.

3         THE COURT:  All right.

4    BY MS. PETRAS:

5    **Q.**    Officer, I'm showing you now what's been marked as

6    Defendant's Exhibit Number 8.

7         That is Officer Delpo or Detective Delpo (indicating),

8    correct?

9    **A.**    Yes.

10   **Q.**    Okay.  And if any -- is Officer Ashley in that

11   photograph?

12   **A.**    Yes.

13   **Q.**    Is Officer Anderson in that photograph?

14   **A.**    Yes.

15   **Q.**    Hodges in that photograph?

16   **A.**    No.

17   **Q.**    Ledesma in that photograph?

18   **A.**    Yes.

19   **Q.**    Officer Greene (phonetic) in the photograph?

20   **A.**    No.

21        MR. COLE:  Your Honor, I object to this.

22   BY MS. PETRAS:

23   **Q.**    Is officer --

24        MR. COLE:  It's not relevant.

25        THE COURT:  Your objection's noted.  All right.  If I rely

1    on the photos for any reason, I'll let everyone know and let

2    everyone know the reasons why.  And if I don't mention it, then I

3    didn't rely upon it.

4    BY MS. PETRAS:

5    **Q.**    Is Officer Mickey in the photograph?

6    **A.**    Yes.

7    **Q.**    Is Officer Morrell more in the photograph?

8    **A.**    No.

9    **Q.**    And is Officer Rogers in the photograph?

10   **A.**    Yes.

11   **Q.**    And these are all officers -- I'm sorry.  One more.

12           Is Officer -- I apologize -- Jaquez, J-A-Q-U-E-Z?

13   **A.**    Jaquez, yes.

14   **Q.**    Okay.  And all of these are officers that you've worked

15   with, correct?

16   **A.**    Yes.

17           MS. PETRAS:  I have no further questions, Your Honor.

18           THE COURT:  All right.

19           MR. COLE:  Just a brief follow-up.

20           THE COURT:  Mr. Cole.

21           MR. COLE:  Thank you.  If it pleases the Court.

22           <u>FURTHER REDIRECT EXAMINATION OF MATTHEW HILLER</u>

23   <u>BY MR. COLE:</u>

24   **Q.**    Was Officer Jaquez involved in the arrest of this

25   defendant?

1    **A.**    No, he -- no, he was not.

2    **Q.**    Was Officer Rogers involved in the arrest of this

3    defendant?

4    **A.**    No, he was not.

5    **Q.**    Was Officer Morrell involved in the arrest of this

6    defendant?

7    **A.**    No, he was not.

8    **Q.**    Officer Morrell, was he involved in the arrest of this

9    defendant?

10    **A.**    No.

11    **Q.**    I think it was Markice or Marquis.

12            Anybody else in --

13    **A.**    I don't -- I don't --

14    **Q.**    I must have misspelled the name.

15            Ladonna, was he involved?

16    **A.**    Ledesma?

17    **Q.**    Ledesma.

18    **A.**    No.

19    **Q.**    All right.  Hughes -- Hodges?

20    **A.**    Hodges, no.

21    **Q.**    Anderson, was he involved in this arrest?

22    **A.**    No, but let me back up.

23    **Q.**    Okay.

24    **A.**    I don't know if they prepared any paperwork.

25    **Q.**    No, no, that's --

1    **A.**     They weren't involved -- they weren't on the street.

2    **Q.**     On the street in the -- in the initial contact, the

3    intersection, on the street, were they -- any of those officers

4    involved?

5    **A.**     No.

6    **Q.**     Was Detective Delpo on the street any way involved in the

7    arrest of this defendant?

8    **A.**     Yes.  He arrived, I believe, later on scene, and I

9    didn't -- I'm not -- I don't remember if he conducted the

10   interview or not.

11   **Q.**     But to the extent the defendant, was he under arrest and

12   in handcuffs before Detective Delpo came?

13   **A.**     Yes.

14   **Q.**     All right.  And in this particular case, the Court is

15   going to review -- may review some Gersteins.

16          You don't know if you prepared any of these Gersteins, do

17   you?

18   **A.**     I would have to look at them.

19   **Q.**     You don't know -- do you know what case it was about?  If

20   the answer is you haven't seen them, the answer would be no,

21   right?

22   **A.**     No.

23   **Q.**     All right.  And do you know the circumstances of it,

24   whether or not the defendant's pled guilty or agreed you treated

25   them fine?  Do you know any of that?

1    **A.**    No, I don't even -- I don't know what cases.

2    **Q.**    Has there ever been in a case in this court where you

3    were found -- no, strike that.

4         The Gerstein in this particular matter that counsel

5    showed you a part of, you don't know anything about them, do

6    you?

7    **A.**    Correct.

8    **Q.**    Did counsel give you a copy of them that you could review

9    them and have a more fulsome knowledge of what these cases were

10   about?

11   **A.**    No.

12   **Q.**    Now, when counsel asked you about whether or not you

13   worked with these other individuals, you've worked with other

14   officers other than the three in this particular case; is that

15   right?

16   **A.**    Yes.

17   **Q.**    Now, would it be fair to say your jurisdiction is the

18   whole Washington, D.C. area; is that right?

19   **A.**    Correct.

20   **Q.**    Now, counsel had brought up whether or not you went to

21   Georgetown to ask anyone.

22        Have you gone into areas for which your commanders have

23   told you to go help eradicate the proliferation of firearms?

24   **A.**    We only go where we're told to go.  We don't have --

25   we're not allowed to just go anywhere in the city.  We have to

1    go where we're told.

2    **Q.**    But if you were told to go to Georgetown, would you go to

3    Georgetown?

4    **A.**    Yes.

5    **Q.**    And if you were told to go to U Street, would you go to

6    U Street?

7    **A.**    Yes.

8    **Q.**    What about upper northwest, you know, that -- would

9    you -- would you go to upper northwest if you were told to go

10   there by your supervisors?

11   **A.**    Yes.

12   **Q.**    All right.  And my last question is, sir, can you on your

13   own decide where you want to go and where you want to patrol?

14   Can you tell His Honor whether or not you can just say, "Hey,

15   let's just go over here"?

16   **A.**    No.

17        MR. COLE:  With that, Your Honor, I respectfully have no

18   further questions of Officer Hiller.  I thank you so very much.

19        THE COURT:  All right.

20        MR. COLE:  May he be excused?

21        THE COURT:  Anything else?

22        MS. PETRAS:  No, Your Honor.

23        THE COURT:  All right.  Thank you, sir.  You may be

24   excused.

25        THE WITNESS:  Thank you, Your Honor.

1          THE COURT:  You're welcome.

2          Any additional witnesses, Counsel?

3          MR. COLE:  Can I just sign him out right quick, Your

4     Honor?

5          (Brief pause in proceedings.)

6          THE COURT:  Any other witnesses?

7          MR. COLE:  I do not, Your Honor.  Based on the motion,

8     we're going to rest on that.

9          THE COURT:  All right.  Ms. Petras, Ms. Roland?

10         MS. PETRAS:  Your Honor, the defense calls Mark Gibson.

11         THE COURT:  All right.

12         MS. PETRAS:  Can I have him --

13         THE COURT:  All right.  Mr. Gibson, why don't you join

14     your attorney at the microphone.  I just have a couple of

15     questions to ask you.

16         First of all, you're under no obligation to testify.

17         Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Okay.  Your attorney's told me that she

20     wanted -- that you wish to testify.  That's fine.  My job is to

21     tell you that you're not compelled to.  You're not under any

22     obligation to do so, but you prefer to testify, though, correct?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay.  Great.  That's fine.  Just step over to

25     your left and raise your right hand.

1          (MARK GIBSON, DEFENDANT IN THE CASE, SWORN)

2          THE COURT:  How are you today?

3          THE WITNESS:  Good.

4          THE COURT:  Good.  Counsel.

5                 DIRECT EXAMINATION OF MARK GIBSON

6     BY MS. PETRAS:

7     Q.    Can you please state your full name for the record?

8     A.    Mark Gibson.

9     Q.    And is that your true name?

10    A.    Yes.

11    Q.    Is that the name that you gave the officers that arrested

12    you on April 2nd, 2018?

13    A.    No.

14    Q.    Okay.  What name did you give them?

15    A.    Markice Joseph.

16    Q.    And why did you give them that name when they arrested

17    you?

18    A.    I was -- I was scared.  I was on parole.  I didn't want

19    to be found out.

20    Q.    All right.  Where were you born?

21    A.    Cheverly, Maryland.

22    Q.    And how --

23          THE REPORTER:  Say it again.

24          THE WITNESS:  Cheverly, Maryland.

25    BY MS. PETRAS:

1   **Q.**    How long did you live in Maryland?

2   **A.**    For about 15 years.

3   **Q.**    Okay.  And after living in Maryland, where did you move

4   to?

5   **A.**    Northeast D.C. with my mother.

6   **Q.**    Okay.  And did there come a time in 2017 when you no

7   longer were living with your mother?

8   **A.**    Yes.

9   **Q.**    And why was that?

10  **A.**    She moved to Indiana.

11  **Q.**    Okay.  And when your mom moved to Indiana, where did you

12  move to?

13  **A.**    On Galen Street with my aunt.

14  **Q.**    Okay.  And what's your aunt's address on Galen Street?

15  **A.**    1747 Galen Street Southeast.

16  **Q.**    Okay.  Are you the same Mark Gibson that was convicted of

17  a robbery in 2011?

18  **A.**    Yes.

19  **Q.**    And did you testify in that case?

20  **A.**    No.

21  **Q.**    How did you plead in that case?

22  **A.**    Guilty.

23  **Q.**    Okay.  And are you the same Mark Gibson that was

24  convicted of possession of liquid PCP in 2013?

25  **A.**    Yes.

1    **Q.**    Did you testify in that case?

2    **A.**    No.

3    **Q.**    And how did you plead in that case?

4    **A.**    Guilty.

5    **Q.**    Okay.  And are you the same Mark Gibson that was

6    convicted of a prison breach in 2014?

7    **A.**    Yes.

8    **Q.**    And the prison breach, what was -- what was that?

9    **A.**    I left the halfway house that day and never returned.

10   **Q.**    Okay.  And did you testify in that case?

11   **A.**    No.

12   **Q.**    And how did you plead in that case?

13   **A.**    Guilty.

14   **Q.**    Okay.  Have you ever testified before?

15   **A.**    No.

16   **Q.**    Okay.  I want to direct your attention to Monday, April

17   2nd, 2018 at about 11:45 p.m.

18        Do you remember where you were?

19   **A.**    Yes.

20   **Q.**    And where were you?

21   **A.**    I was walking home on Galen Street.

22   **Q.**    Okay.  And where were you coming from?

23   **A.**    From my friend's house.

24   **Q.**    Okay.  And where does your friend live?

25   **A.**    By Anacostia metro station.

**Q.**   Okay.  And how did you get home from your friend's?

**A.**   The bus.

**Q.**   Which bus?

**A.**   The B2.

**Q.**   And what bus stop did you get off at?

**A.**   The corner of W and 16th Street.

**Q.**   Okay.  And what did you do after you got off the bus stop?

**A.**   I made a right onto 16th Street and made a left onto Galen Street.

**Q.**   Okay.  I'm going to show you what I've marked as Defendant's Exhibit 14.  I've previously provided the government with a copy.

Can you see that, Mr. Gibson?

**A.**   Yes.

**Q.**   Okay.  And what is that?

**A.**   It's a map of the area that I was in that night.

**Q.**   Okay.  And can you point out where your aunt's house is?

**A.**   (Witness complied.)

**Q.**   Okay.  And for the record, you're circling the red dot in the lower half -- lower right half portion of Defendant's Exhibit 14?

**A.**   Yes.

**Q.**   Okay.  And can you point out where the bus stop was that you got off of?

```
 1    A.      (Witness complied.)

 2    Q.      Okay.  And for the record, you're circle -- circling a

 3    blue dot on the corner of W and 16th Street, and that's marked

 4    on Defendant's Exhibit 14, correct?

 5    A.      Yes.

 6    Q.      Okay.  And can you just draw a line on the path that you

 7    took to walk home that night?

 8    A.      (Witness complied.)

 9    Q.      Okay.  And the line -- I'm going to leave that there for

10    a moment but ask you a couple other questions.

11            How were you walking when you were walking from the bus

12    stop home?

13    A.      I was -- I was walking kind of fast.

14    Q.      Okay.  And why were you walking fast?

15    A.      I was trying to get home to a meal my aunt prepared that

16    night.

17    Q.      Okay.  And had somebody -- why were you trying to hurry

18    to get three to that?

19    A.      So none of my family members would eat it before I get

20    there.

21    Q.      Okay.  And had somebody put something aside for you?

22    A.      Yes.

23    Q.      Who did that?

24    A.      My aunt.

25    Q.      Okay.  And where were your hands when you were walking?
```

| | |
|---|---|
| 1 | **A.**   In my jacket pocket. |
| 2 | **Q.**   And why's that? |
| 3 | **A.**   It was kind of cold that night, a little bit. |
| 4 | **Q.**   Okay.  Do you remember about how cold it was that night? |
| 5 | **A.**   I don't remember how cold, but it was kind of cold. |
| 6 | **Q.**   Okay.  Did there come a time when you were walking on |
| 7 | Galen Street and you noticed a car? |
| 8 | **A.**   Yes. |
| 9 | **Q.**   And what did you first notice? |
| 10 | **A.**   I first noticed the car coming up slowly beside me on my |
| 11 | right-hand side. |
| 12 | **Q.**   Okay.  And did you turn to look at the car? |
| 13 | **A.**   Yes. |
| 14 | **Q.**   Okay.  And why did you turn to look at the car? |
| 15 | **A.**   Because they had -- there was a flashlight pointing out |
| 16 | the car. |
| 17 | **Q.**   Okay.  And before -- before you saw the flashlight, did |
| 18 | you turn to look at the car? |
| 19 | **A.**   Yes. |
| 20 | **Q.**   Okay.  And why? |
| 21 | **A.**   Because I heard it come -- I heard a car coming up very |
| 22 | slowly beside me. |
| 23 | **Q.**   And did it cause you any concern? |
| 24 | **A.**   Yes. |
| 25 | **Q.**   Why? |

1  **A.**    Because it's late at night, and I just wanted to see who

2  it was.

3  **Q.**    Okay.  And did that car pull up beside you?

4  **A.**    Yes.

5  **Q.**    Okay.  And you mentioned a flashlight.

6        Where was the flashlight?

7  **A.**    It was -- it was in the driver's side of the car.

8  **Q.**    Okay.  And was --

9  **A.**    The window.

10 **Q.**    -- who was holding the flashlight?

11 **A.**    The driver.

12 **Q.**    Okay.  And at that point, did you -- when you first

13 turned and saw the car, did you know who was in the car before

14 the flashlight?

15 **A.**    No.

16 **Q.**    Okay.  And was it a police car?

17 **A.**    No.

18 **Q.**    Okay.  And when you saw the flashlight, could you tell

19 who was in the car?

20 **A.**    I just assumed it was the police, but I didn't know for

21 sure.

22 **Q.**    Okay.  Why did you think it was the police?

23 **A.**    It was just natural instinct that I just had.  I just

24 assumed it was the police because of the flashlight.

25 **Q.**    Okay.  And did the police say anything to you?

```
 1   A.    Yes.

 2   Q.    What did they say?

 3   A.    They said, "How you doing tonight, sir?"

 4   Q.    And what did you say?

 5   A.    I said, "Good."

 6   Q.    And did they say anything else?

 7   A.    Yes.

 8   Q.    What did they say?

 9   A.    They said, "Do you have any guns or weapons on you?"

10   Q.    And what did you say?

11   A.    I said, "No."

12   Q.    Okay.  And did they say anything else to you?

13   A.    Yes.

14   Q.    What'd they say?

15   A.    They said, "Let me see your waistband."

16   Q.    And when they said, "Let me see your waistband," what did

17   you do?

18   A.    I held up my hands like this (indicating).

19   Q.    Okay.  And for the record, you're holding your palms

20   facing me with -- and your both arms in the air in right angles,

21   correct?

22   A.    Yes.

23   Q.    Okay.

24   A.    Yes.

25   Q.    And why did you do that?
```

1    **A.**     Because I knew that if I do that, that my jacket will

2    raise enough that they could see the waist of my -- of my jeans.

3    **Q.**     Okay.  And why did you do that?

4    **A.**     Because they told me to let them see my waistband.

5    **Q.**     Okay.  And did they ask you or did they tell you to do

6    it?

7    **A.**     They told me.

8    **Q.**     Okay.  Then what happened?

9    **A.**     Then they -- they said, "Lift your jacket."  Then I

10   turned around and ran the opposite way.

11          THE COURT:  I'm sorry.  What was your answer, the first

12   part of your answer?  I couldn't hear you.

13          MS. PETRAS:  He said they --

14   BY MS. PETRAS:

15   **Q.**     Did you say then they said lift my -- you said, "Lift

16   your jacket," or what did --

17          MR. COLE:  He said he lifted his jacket.

18          THE COURT:  No, I heard that part.

19          MS. PETRAS:  No.

20   BY MS. PETRAS:

21   **Q.**     Did you say --

22          THE COURT:  Let me ask the court reporter.  What was the

23   answer?  I couldn't hear it, Scott.

24          THE WITNESS:  Can you repeat it again?

25          THE COURT:  Yes.

1          MS. PETRAS:  He's going to repeat it.

2          (Court reporter read back the last question as requested.)

3   BY MS. PETRAS:

4   **Q.**     And why did you run?

5   **A.**     Because I was -- I was just nervous and scared.

6   **Q.**     Okay.  What happened when you ran?

7   **A.**     I lost balance, and the gun fell out of my waistband.

8   **Q.**     Okay.  And then what happened?

9   **A.**     The police caught me shortly after.

10  **Q.**     Okay.  And did they search you?

11  **A.**     Yes.

12  **Q.**     Did they find anything on you?

13  **A.**     Yes.

14  **Q.**     What'd they find on you?

15  **A.**     They found some cocaine in my right pocket.

16  **Q.**     Okay.  All right.

17         Other than this night, have you had any experiences with

18  police officers wanting to see your waistband?

19  **A.**     Yes.

20         MR. COLE:  Objection, Your Honor, relevance.

21         THE COURT:  It's overruled.

22         THE WITNESS:  Yes.

23  BY MS. PETRAS:

24  **Q.**     About how many times?

25  **A.**     I know -- I remember two times, but I'm pretty sure it

1    was more than that.  It was two or more.

2    **Q.**    Okay.  And have you ever refused to see -- to show them

3    your waistband?

4    **A.**    No.

5    **Q.**    Have you seen them ask or tell other people they wanted

6    to see their waistband?

7    **A.**    Yes.

8         MR. COLE:  Objection, Your Honor, relevance, other people.

9         THE COURT:  I'll allow it.

10   BY MS. PETRAS:

11   **Q.**    And when you seen this happening, did you feel like you

12   had a choice as to whether or not to show your waistband?

13   **A.**    No.

14   **Q.**    And why is that?

15   **A.**    Because it's the police, and I just thought to do what

16   they say.

17   **Q.**    Okay.

18        MS. PETRAS:  I have no further questions.

19        THE COURT:  All right.  Cross-examination?

20        MR. COLE:  Yes, Your Honor.  If it pleases the Court, may

21   I proceed at this time?

22        THE COURT:  Sure.

23              CROSS-EXAMINATION OF MARK GIBSON

24   BY MR. COLE:

25   **Q.**    Sir, you had had that firearm for some time; is that

1    correct?

2         MS. PETRAS:  Objection, relevance.

3         THE COURT:  Just a minute.  Let me think about this.  I'm

4    not going to allow that.  Objection's sustained.  That's

5    irrelevant.

6         MR. COLE:  Your Honor, I think --

7         THE COURT:  Let's just focus on what happened that day.

8         MR. COLE:  Yes, Your Honor.  Can I have just one moment?

9    BY MR. COLE:

10   Q.    Sir, the gun that you had, did you load it?

11        MS. PETRAS:  Objection, relevance.

12        THE COURT:  Sustained.

13   BY MR. COLE:

14   Q.    How many bullets were in the gun that you had that fell

15   out of your pants?

16        MS. PETRAS:  Objection, relevance.

17        THE COURT:  Let's focus on the subject of this hearing,

18   which is suppression.  Sustained.

19        MR. COLE:  All right, Your Honor.  If it pleases the

20   Court.

21   BY MR. COLE:

22   Q.    Sir, when you were walking down, you were on the street

23   by yourself; is that right?

24   A.    Yes.

25   Q.    Now, as Ms. Petras has asked you on a couple of

1  occasions, you've had numerous contact with the police; is that

2  right?

3  **A.**    Yes.

4  **Q.**    In your lifetime -- in your lifetime; is that right?

5  **A.**    Yes.

6  **Q.**    And you've had many arrests in your lifetime.

7        Is that fair to say?

8  **A.**    I don't know how many is -- how many -- what's many?

9  **Q.**    Well, you've had several?

10  **A.**    Yes.

11  **Q.**    Your contact -- you knew if you didn't want to do

12  something the police wanted you to do, you have a right to say,

13  "No, I don't want to do that."

14        You know that, don't you?  Don't you?

15  **A.**    No.

16  **Q.**    Sir, in the times that you were arrested, Ms. Petras

17  asked you, did you ever -- that you've pled guilty in those

18  matters; is that right?  You didn't testify.

19        Do you remember that question?

20  **A.**    Yes.

21  **Q.**    But, sir, in those cases police asked you questions

22  during the time of your arrest, would that be fair to say?  The

23  ones that she mentioned, that would be fair to say, they asked

24  you questions, right?

25  **A.**    I don't remember.

1    Q.     All right.  The arrest that Ms. Petras just asked you

2    about, you don't remember whether or not you gave a statement

3    admitting to all the actions that you were arrested for?  You

4    don't remember that?

5         MS. PETRAS:  Objection to the relevance of what statements

6    in other cases.

7         THE COURT:  Yeah.  I'm not so sure it's relevant.  I'll

8    let him answer that question.  I'm not so sure it's relevant,

9    though.

10        THE WITNESS:  Can you repeat it again?

11   BY MR. COLE:

12   Q.     In your contact with law enforcement at the time on the

13   arrest that Mrs. Petras has asked you about, those all happened

14   with the Metropolitan Police Department.

15        Would that be fair to say?

16   A.     Yes.

17   Q.     And during the course of those arrests, sir, Ms. Petras

18   asked you whether or not you testified or you pled guilty in

19   that case, and this was your first time testifying.

20        You remember you just testified about that?

21   A.     Yes.

22   Q.     You knew you had a right when you came into contact with

23   these officers, if you didn't want to show your waistband, you

24   could just say, "Hey, move on."

25        You knew that, right?

1    **A.**     No.

2    **Q.**     And based on the times that you had had contact with law

3    enforcement, you knew, for example, if -- that if you felt they

4    had did something wrong, you would have been able to make a

5    complaint against them.

6          You're aware of that, aren't you?

7    **A.**     No.

8    **Q.**     You're aware, sir, when you ran, you asked Officer

9    Mancini whether or not -- who was the one that caught you,

10   because you were a little surprised that an officer caught you.

11         You remember that, don't you?

12   **A.**     Yes.

13   **Q.**     And as a matter of fact, you remember not hurt, were you?

14   **A.**     No.

15   **Q.**     You were not punched, beat or otherwise affected

16   negatively by law enforcement on that night, were you?

17   **A.**     No.

18   **Q.**     They treated you with dignity and respect, didn't they?

19   **A.**     I don't -- I don't know, sir, what dignity means.

20   **Q.**     They treated you fairly.  They didn't beat you, punch

21   you, kick you, curse at you or anything like that.

22         That would be fair to say, right?

23         MS. PETRAS:  Object to the compound question.

24         THE COURT:  It is.  It is.

25         MR. COLE:  All right.  I'll rephrase, Your Honor.

1    BY MR. COLE:

2    **Q.**    Sir, did they curse you?

3    **A.**    No.

4    **Q.**    Did they punch you?

5    **A.**    No.

6    **Q.**    Did they beat you?

7    **A.**    No.

8    **Q.**    Did they throw you to the ground?

9    **A.**    No.

10   **Q.**    Did they twist your arm?

11   **A.**    No.

12   **Q.**    Did anyone ask you to ask Officer Mancini, "Who was that

13   one that caught me?"

14          Did anyone tell you to say that?

15   **A.**    No.

16   **Q.**    And by the way, sir, when you told Officer Mancini he was

17   "fast as shh" -- S-H, two letters -- no one forced you to say

18   that, did they?

19   **A.**    No.

20   **Q.**    You ran on your own, didn't you?  Didn't you, sir?

21   **A.**    Yes.

22   **Q.**    As a matter of fact, sir, it was late at night, and the

23   officers were Caucasian.

24          That would be fair to say, right, Caucasian, white,

25   right?

1  A.     Yes.

2  Q.     And you saw Officer Wright, the first officer and the

3  only one that talked to you, he was like, "Hey, man, police."

4         You remember him saying that, don't you?

5  A.     No.

6  Q.     You saw his police vest, didn't you?

7  A.     No.

8  Q.     But didn't you say you thought -- when Ms. Petras asked

9  you, you thought they were the police, right?

10  A.    Yes.

11  Q.    And when they were asking you questions, they were asking

12  you police type questions, correct?

13  A.    Yes.

14  Q.    And it would be fair to say nobody raised their voice

15  when they asked you, sir -- Ms. Petras asked you -- they said,

16  "Do you have a gun?"  That's what you just testified to a moment

17  ago.

18         You remember that?

19  A.    Yes.

20  Q.    And they asked you in a calm voice, conversational voice,

21  didn't they?

22  A.    No.

23  Q.    The voice that they made, sir, was a voice, "Hey, can I

24  talk to you?"

25         Would that be fair to say?

1    **A.**     They didn't say, "Hey, can I talk to you?"

2    **Q.**     Okay.  Well, "Do you have a firearm on you" -- "Do you

3    have a gun or weapon on you?"

4          At that time, sir, you knew that they were police upon

5    that question, in your view of them; is that right?

6    **A.**     Yes.

7    **Q.**     All right.  I just want to make clear of that.  Let me

8    just ask again to make sure I have it correct.

9          When Officer Wright -- it wasn't "they" because it was

10   only Officer Wright who had a conversation with you prior to you

11   running.

12         Would that be fair to say?

13   **A.**     Yes.

14   **Q.**     All right.  So Officer Wright has been identified as the

15   driver.

16         Would that be fair to say?

17   **A.**     Yes.

18   **Q.**     Nobody else had any verbal contact with you prior to you

19   running, other than Officer Wright, the driver.

20         Would that be fair to say?

21   **A.**     Yes.

22   **Q.**     All right.  And Officer Wright says, "Do you have a gun

23   or a firearm?"

24         And that's what he said, right?

25   **A.**     Yes.

1   **Q.**    Now, at that time, you knew he was a police officer,

2   right?

3   **A.**    Yes.

4   **Q.**    All right.  And he didn't get out of the car, did he?

5   **A.**    No.

6   **Q.**    He didn't show his firearm, did he?

7   **A.**    No.

8   **Q.**    As a matter of fact -- so we can be clear, I'll just ask

9   one question -- nobody showed you a firearm prior to you

10  running.  You didn't even know if they had a weapon.

11        That would be fair to say, right?

12  **A.**    Yes.

13  **Q.**    And also, sir, when Officer Wright said, "Do you have a

14  weapon," you knew he was an officer, and your response was what?

15  **A.**    I said, "No."

16  **Q.**    All right.  And based on your testimony and Mrs. Petras',

17  you indicated that Officer Wright said, "Let me see your

18  waistband," right?

19  **A.**    Yes.

20  **Q.**    And he said that in a voice that you could hear; is that

21  right?

22  **A.**    Yes.

23  **Q.**    And based on what you told Ms. Petras, "Let me see your

24  waistband," would it be possible -- you agree, you don't

25  remember every word that Officer Wright said to you that night.

1        That'd be fair to say, right?

2   **A.**    No, I do.

3   **Q.**    You didn't write it down, did you?

4   **A.**    No.

5   **Q.**    And if he had said, "Can I see your waistband," that's

6   possible, isn't it?

7   **A.**    No, he didn't.

8   **Q.**    All right.  And once he said, "Let me see your

9   waistband," you raised your hands to about your head size; is

10  that right, your head level, right?

11  **A.**    Yes.

12  **Q.**    Now -- now, when you raised your hands to your hand [sic]

13  level, your jacket didn't go up to your waist, did it?  Just

14  like mine, it didn't go up, did it?

15  **A.**    Yes.

16  **Q.**    Didn't it?  As a matter of fact, sir, when you raised

17  your hands above your head, that's when the jacket goes up.  You

18  knew that, didn't you?  Didn't you?  That's a difference, sir.

19  You knew the difference, didn't you?

20       THE COURT:  I'm sorry.  Difference between what?

21       MR. COLE:  I'll ask the question.

22  BY MR. COLE:

23  **Q.**    Sir, you've indicated you raised your hands -- it's on

24  video -- about to your head level, right above the shoulders,

25  right?

**A.**     Yes.

**Q.**     And before you raised your hand, you, in fact, had your hands in your pocket, your jacket pocket, right?

**A.**     Yes.

**Q.**     That's what Officer Hiller testified to, you had your hands in your pocket when they pulled up; isn't that right?

**A.**     Yes.

**Q.**     So that was correct by what Officer Hiller testified to, isn't it?

**A.**     Yes.

**Q.**     All right.  And at some point, at the time, "Let me see your waistband," you've indicated you showed your hands right above your shoulders to your ear level there about, whatever the video says, right?

**A.**     Yes.

**Q.**     And it was shortly after you did that -- seconds, one or two seconds -- you knew what was in your waistband, didn't you?

**A.**     Yes.

**Q.**     And the reason -- there was a reason that you didn't raise your hands fully, as I'm saying.  For the record, my hands are raised extended above my head, all the way to the heavens.

You didn't raise your hands that high, did you?  Did you?

**A.**     No, I didn't.

**Q.**     And there's a reason why you didn't do that, because had you done that, sir, then that gun would have been exposed,

```
 1   wouldn't it?  Wouldn't it?

 2   A.    (No response.)

 3   Q.    If you did this (indicating), sir, raised your hands to

 4   the heaven, the gun would have been exposed, wouldn't it?

 5   A.    Yeah, it might have been.

 6   Q.    That's a fair question.

 7         You agree with me, right?  You agree with me, right?

 8   A.    Yeah.

 9   Q.    Okay.  And it was a second or two after you did that,

10   that you took off running, right?

11   A.    Right.

12   Q.    Isn't that true?

13   A.    Yes.

14   Q.    All right.  Now let me just get one question in context.

15         At no time did Officer Wright, Hiller, McCaw or Mancini

16   ever exit that car prior to you running, right?

17   A.    Right.

18   Q.    Okay.  And at no time, sir, did Officer Mancini, Wright,

19   McCaw, Hiller, show any weapons to you at any time, right?

20   A.    Right.

21   Q.    And you're pretty smart.  You knew that once you raised

22   your hands up above your head, it was going to be on, right?

23   Man, the police were going to see that weapon, right?

24   A.    (No response.)

25   Q.    That's true, isn't it?  Isn't it?  That's true, right?
```

1   **A.**     Yeah.

2   **Q.**     Okay.  And, sir, you ran because your mind knew that you

3   had two items of contraband that was arrestable, right, a

4   firearm and drugs?  That'd be fair to say, right?

5   **A.**     Yes.

6   **Q.**     And at no time, at no time did Officer Wright, who was

7   driving, jump over the sidewalk with the car and try to cut off

8   your view before -- cut off your route before you ran.

9        That'd be fair to say, right?

10  **A.**     Yes.

11  **Q.**     And at no time did anyone jump out before you ran to have

12  any negative police authority contact with you before you ran,

13  right?

14  **A.**     Yes.

15  **Q.**     And it'd be also fair to say, sir, that once you ran, you

16  believed that you were going to be able to outrun any officer.

17  That's why you asked the question.

18       That'd be fair to say, wouldn't it?

19  **A.**     No.

20  **Q.**     You were running to escape, weren't you?

21  **A.**     Yes.

22  **Q.**     And you thought looking at those officers on that day,

23  that you could make good your escape.

24       That would be fair to say, right?

25  **A.**     No.

1    **Q.**    Well, you didn't say, "Hey, you got me."

2          You didn't say that, did you?  You didn't say that, did

3    you?

4    **A.**    No, I didn't.

5    **Q.**    You didn't say, "Oops, I'm going to trip myself up on the

6    ground, my gun is going to come out, and then you're going to

7    catch me."

8          You didn't do that, did you?  You didn't willingly get

9    caught.  Would that be fair to say?

10   **A.**    No.

11   **Q.**    It'd be fair to say you were trying to make good your

12   escape so you would not be arrested by the officers who had

13   asked you questions?

14         MS. PETRAS:  Asked and answered at this point, Your Honor.

15         THE COURT:  Yeah, I think he has as well.  I think it's

16   clear.

17         MR. COLE:  May I have just one moment, Your Honor?  I have

18   some more questions.  Let me just --

19         THE COURT:  Sure.

20   BY MR. COLE:

21   **Q.**    Sir, when answering Mrs. Petras' question, you said you

22   lifted up your jacket and then you ran -- turned and ran away.

23         It wouldn't be fair to say you lifted up your jacket.

24   That would be true, right?

25         MS. PETRAS:  Misstates the evidence, Your Honor.  That's

1    not --

2         MR. COLE:  This is cross-examination.

3         MS. PETRAS:  -- what was read back.  It was --

4         MR. COLE:  It's cross-examination now.

5         THE COURT:  I think he's already answered and gave the

6    reason.  Restate that question, Counsel.

7         MR. COLE:  All right.  Well, I'll withdraw it, Your Honor.

8         THE COURT:  All right.

9         MR. COLE:  And I'll rephrase, with the Court's permission

10   respectfully.

11   BY MR. COLE:

12   Q.    Isn't it true, sir, you had on a long john white T-shirt

13   or a shirt underneath that red jacket?  That would be true,

14   right?

15   A.    Yes.

16   Q.    And that jacket -- that white material was all the way

17   down below your waist; is that right?

18   A.    What, the shirt?

19   Q.    Yes.

20   A.    No.

21   Q.    All right.

22        MR. COLE:  Let's just take a look at it if that's fine.

23   With the Court's permission.

24        THE COURT:  Sure.

25        (Videotape played.)

1        MR. COLE:  Okay.

2        (Videotape paused.)

3   BY MR. COLE:

4   **Q.**    And you've looked at a portion of this with Officer

5   Mancini's body-worn camera.

6        This is the part where they're Handcuffing you, right?

7   **A.**    Yes.

8   **Q.**    And they talked to you nicely; is that correct?  They

9   didn't yell.  There's no yelling on the body-worn camera, right?

10  **A.**    Right.

11  **Q.**    And when I said they treated you with dignity and

12  respect, they did not yank you, choke you, beat you, nothing

13  like that, right?

14  **A.**    Right.

15  **Q.**    As a matter of fact, you smiled and interacted with them

16  by having a conversation with them and asking questions.

17       Would that be right?

18  **A.**    No.  I wasn't smiling.  I didn't smile.

19  **Q.**    All right.

20       MR. COLE:  We'll play just a couple of minutes, and then I

21  have a question.

22       (Videotape played.)

23       MR. COLE:  Okay.

24       (Videotape paused.)

25  BY MR. COLE:

1    **Q.**    Sir, you just stated, "Might as well.  I'm already locked

2    up.  You already got me."

3         You recall that, right?

4    **A.**    Yes.

5    **Q.**    And they talked to you nicely, correct, the officers.

6    It's right there.  You want me to play it again?

7         THE COURT:  I think that's been established, Counsel.

8    BY MR. COLE:

9    **Q.**    And -- all right.

10        MR. COLE:  Continue, Ms. Litz.

11        (Videotape played.)

12        MR. COLE:  Thank you.

13        (Videotape paused.)

14   BY MR. COLE:

15   **Q.**    I want to ask you a question, sir.  You've even

16   acknowledged, this particular portion that was just played, you

17   were talking to the officers in a conversational voice, weren't

18   you?  You weren't raised, shouting, anything like that, right?

19   Just what was played right now at 3:49:20.

20        THE COURT:  I think he answered that before, his

21   conversation.

22   BY MR. COLE:

23   **Q.**    Not at this --

24        THE COURT:  Go ahead.

25        MR. COLE:  I've asked at different points, Your Honor.

1          THE COURT:  All right.  That's fine.  Go ahead.

2   BY MR. COLE:

3   **Q.**    At this time, do you recall that?  This is a

4   conversation --

5   **A.**    We weren't having a conversation, though.

6   **Q.**    All right.

7          MR. COLE:  Let's go back 30 seconds.  And I'm going do ask

8   you again.

9          (Videotape played.)

10          MR. COLE:  All right.  Right there, Mrs. Litz.

11          (Videotape paused.)

12   BY MR. COLE:

13   **Q.**    Now, you agree the statements you made to the police was

14   just in a regular voice; is that right?

15   **A.**    Yes.

16   **Q.**    And you've indicated from your voice that they pulled up

17   "fast as S-H, blank, blank."

18          You admit that, right?

19   **A.**    Yes.

20   **Q.**    And you never said anything that the police forced or

21   coerced you in any way prior to you running, to run, you never

22   said that, did you?

23   **A.**    (No response.)

24   **Q.**    Did you?  Did you?

25   **A.**    No.

1          THE COURT:  Do you understand his question?

2          THE WITNESS:  No.  Can he say it again.

3     BY MR. COLE:

4     Q.    You did not tell anyone at the time you said the police

5     came up "fast as sh," you never told the police anything at that

6     time or any time that you were forced or coerced to flee.

7          Would that be fair to say?

8          MS. PETRAS:  I would object.  He's confusing two different

9     portions.  He asked if it's fast and he's running, chasing him,

10    and he seems to be talking about different parts.

11         THE COURT:  I think it is confusing.  That's the reason

12    why I asked him to rephrase the question.

13         MR. COLE:  I'll ask it this way.

14    BY MR. COLE:

15    Q.    When you said that the police came up on you as "fast as

16    sh," you said that, right?

17    A.    Yes.

18    Q.    All right.  And the only officer that was talking to you

19    was Officer Wright, the driver, right?

20    A.    I'm not sure who that was.

21    Q.    All right.  We agree his name was Wright.

22    A.    Okay.

23    Q.    That he's the driver.

24         And that was the only one talking to you, right, correct?

25         MS. PETRAS:  At what point, Your Honor?

1          MR. COLE:  When he --

2          MS. PETRAS:  Can we --

3          THE COURT:  Well, wait.  Wait, wait.  Wait just a minute.

4          At what point in time?

5     BY MR. COLE:

6     Q.    At the point when they came up fast as -- before you

7     start running, that's what you meant by this particular comment,

8     correct?  "Y'all pulled up on me fast as sh."

9          You were talking about before you ran, right?

10    A.    Yes.

11    Q.    Okay.  And at that time, sir, Officer Wright, other than

12    what you have said he said, he said nothing else to you prior to

13    you running, correct?

14    A.    Say that again.

15    Q.    At the time -- before you ran, you've indicated to His

16    Honor, based on the questions from Mrs. Petras, you said that

17    Officer Wright said, "Do you have any gun or weapon?  Let me see

18    your waistband."

19          It's your testimony that's all he said to you before you

20    ran; is that correct?

21    A.    No.

22    Q.    What else did he say?

23    A.    He said, "Lift your jacket."

24    Q.    Okay.  And, "lift your jacket"?

25    A.    "Lift your jacket."

1    Q.    Other than those things, he said nothing else, the person

2    that was driving, correct?

3    A.    Correct.

4    Q.    All right.  And at the time he said, according to you,

5    "Lift your jacket," you had already made your mind up that you

6    were going to run because you had a gun on you.

7          That would be correct, wouldn't it?

8    A.    No.

9    Q.    You had already made up your mind you were going to run

10   because you had crack cocaine in your possession, correct?

11   A.    (No response.)

12   Q.    That would be fair to say, correct, sir?

13   A.    I -- it just happened so fast, I didn't really prepare to

14   say -- like, think to myself that I'm going run.  I just -- it

15   just happened.  I just --

16   Q.    You would agree it was within five, ten seconds before

17   the vehicle came up and you running away, 5 to 15 seconds, you

18   agree to that, right?

19   A.    I don't know if I would -- I don't know how many seconds

20   it was.

21   Q.    The record will reflect from the body-worn camera.

22         But in this case when you say Officer Wright asked you to

23   lift your jacket, you really didn't want Officer Wright to see

24   the gun in your waistband on your right-hand side.

25         You didn't want him to see it, did you?  Correct?

1    A.    Correct.

2    Q.    And it's on that basis alone, sir, that you chose to run

3    as fast as you could to get away.

4          That would be fair to say, right?  Correct?

5    A.    Yes.

6    Q.    Now, I had asked you about your undergarments, the white

7    T-shirt.  I'm going to play just a couple more minutes, sir, and

8    I'm going to have a question for you on the backside.

9          (Videotape played.)

10          MR. COLE:  Okay.

11          (Videotape paused.)

12    BY MR. COLE:

13    Q.    Mr. Gibson, your phone had -- you either lost it or threw

14    the phone on one of the corners; is that right?

15    A.    Yeah.

16    Q.    Your cell phone?

17    A.    Yeah.  It came off.  I didn't throw it, though.

18    Q.    Okay.  And as a matter of fact, the officer right there

19    is trying to determine whether or not that is your phone so he

20    could return it to you, correct?

21    A.    Yes.

22    Q.    And that phone was returned to you, correct?

23    A.    Yes.

24    Q.    In your prisoner property, correct?

25    A.    Yes.

1   **Q.**    There was also a black case that was, I guess, several

2   feet away from the firearm that was an empty black case.

3        That was your black case, a headphone case or something

4   like that, correct?

5   **A.**    Yes.

6   **Q.**    And they returned that to you, correct?

7   **A.**    Yes.

8   **Q.**    And it's in your prisoner property?

9   **A.**    Yes.

10  **Q.**    Now, I just want to show you -- I've talked about your

11  undergarments of your -- under your jacket, and I just want to

12  make sure we get to the point where that is.  And I'm going

13  to -- hopefully we'll pass through fast and just get to that

14  point.  And I have just a couple of questions on that.

15       (Videotape played.)

16       MR. COLE:  Your Honor, if I can't get it, I'll just move

17  forward.

18       There we go.

19       (Videotape paused.)

20  BY MR. COLE:

21  **Q.**    Now, you agree that's you standing now --

22  **A.**    Yes.

23  **Q.**    -- correct?

24  **A.**    Yes.

25  **Q.**    And you had that red jacket on, and it's fully zipped up,

1    correct, in the front?

2    **A.**    Yes.

3    **Q.**    And you agree that the firearm you had was not carried

4    outside of the red jacket?  You agree with that, right?

5    **A.**    Right.

6    **Q.**    It was underneath the red jacket, correct?

7    **A.**    Yes.

8    **Q.**    Concealed in your waistband, correct?

9    **A.**    Yes.

10   **Q.**    And it was underneath your white shirt as well, correct,

11   your T-shirt or the white shirt that I'm going to show you in a

12   moment, correct?

13   **A.**    No.

14   **Q.**    So it was immediately touching your red jacket, the one

15   that's zipped up?

16   **A.**    Yeah.

17   **Q.**    All right.  I have a question on that.  Just one moment.

18          (Videotape played.)

19          MR. COLE:  All right.

20          (Videotape paused.)

21   BY MR. COLE:

22   **Q.**    Mr. Gibson, the red jacket that we just talked about, it

23   sat below your waist, below your pockets of your jeans that you

24   had on, meaning it's -- its length.

25          That would be fair to say, correct?

```
 1   A.      No.

 2   Q.      It went below your rear, behind.

 3           That would be fair to say, wouldn't it?

 4   A.      No.

 5   Q.      All right.

 6           MR. COLE:  Let's continue.

 7           (Videotape played.)

 8           MR. COLE:  Stop.  All right.  Just missed it.

 9           (Videotape paused.)

10   BY MR. COLE:

11   Q.      Did you see that?  It was below your waist on your

12   jacket, the length, was below your waist.

13           You is a that, right?

14   A.      Can you show it again?

15   Q.      Yes, we can.

16           (Videotape played.)

17   BY MR. COLE:

18   Q.      Right there (indicating).  It's below your waist, and

19   your pants -- it's below your waist, right?  You see it there,

20   right?

21   A.      Yes.  It's not below any actual waist.

22           (Videotape paused.)

23   BY MR. COLE:

24   Q.      And as a matter of --

25           MS. PETRAS:  Can I have a time stamp on that?
```

1        THE COURT:  I'm sorry?

2        MS. PETRAS:  Can I have a timestamp on that?

3        MR. COLE:  That's 3:55:56.

4        MS. PETRAS:  3:50 --

5        MR. COLE:  3:55:56.

6        MS. PETRAS:  Oh, I meant the -- on the video.  That's

7   Officer Mancini's?

8        MS. LITZ:  Yes, ma'am.

9        MR. COLE:  Yes.

10        MS. PETRAS:  Thank you.

11   BY MR. COLE:

12   **Q.**    Sir, let me ask you again.

13        This particular pause of this video shows your jacket

14   rests below your waistband, doesn't it?

15   **A.**    (No response.)

16   **Q.**    Doesn't it?

17   **A.**    Yeah, but it --

18   **Q.**    And as a matter --

19        THE COURT:  I couldn't hear the answer.

20        What's your answer?

21        THE WITNESS:  Yes, but below my actual waist of my body.

22        THE REPORTER:  I couldn't hear you.

23        THE WITNESS:  It's below the actual waist of my body.

24        THE COURT:  Okay.

25   BY MR. COLE:

1    Q.    And it would be fair to say, since the officers took your

2    belt, your pants are even lower than they would normally be,

3    because with your belt your pants would be several inches

4    higher, your waistband of your pants would be higher.

5         That's a fair and accurate statement, isn't it, sir?

6    A.    No.

7    Q.    You wear your pants at that level below, as is shown in

8    this particular photo -- this photograph stoppage of the video?

9    A.    Yes.

10   Q.    All right.  So you then, therefore, agree, even more so,

11   that the jacket is several inches below your waist.

12        You agree with that, right?  Your waist here (indicting),

13   the actual physical human body waist?

14   A.    Oh, yeah.

15   Q.    Okay.  And, therefore, if you raise your hands up to the

16   sky, as I have shown you, that would have shown the officers the

17   gun that was in your waistband?

18        MS. PETRAS:  Asked and answered.

19        THE COURT:  He's already answered that, Counselor.

20        MR. COLE:  Keep going.  There's one more.

21        (Videotape played.)

22        MR. COLE:  There's one more.  Okay.

23        (Videotape paused.)

24   BY MR. COLE:

25   Q.    That white shirt you had on, you agree that's the shirt

1    that you had on at the time?

2    **A.**    Yes.

3    **Q.**    And you further agree that the firearm you had was

4    underneath that white shirt, which was underneath that red

5    jacket?  You agree with that, right?

6    **A.**    No, it wasn't underneath the white shirt.

7    **Q.**    Can you describe to His Honor, how did you have that

8    weapon in your -- in your waistband specifically?  Describe it

9    for us.

10   **A.**    It was tucked in my jeans, the waistband of my jeans.

11   **Q.**    Above the white shirt that you have on now -- I mean,

12   that you have on in this particular photograph -- in this

13   particular body-worn camera?  Did it sit on top of the white

14   T-shirt that you had?

15   **A.**    I mean --

16   **Q.**    On the outside?

17   **A.**    Yeah.

18   **Q.**    All right.  Now, I have a couple of questions, sir.

19           Isn't it true, one of the reasons you ran, as you

20   testified with Mrs. Petras, is that you were currently on

21   probation or parole, correct?

22   **A.**    Yes.

23   **Q.**    And by being on probation or parole, one of the things

24   that clearly, I'm sure, your parole -- probation officer told

25   you is don't have any firearms, right?

A.      No.  She didn't tell me that.

Q.      The judge, I'm sure, in Superior Court told you don't do any other criminal acts or possess any firearms.  That judge told you in the case that Mrs. Petras told you, unlawful possession of a liquid PCP, that judge told you don't possess any firearms, didn't he?

A.      I don't remember if she said that.

Q.      But you are aware, having a firearm was illegal in the District of Columbia, and you were unauthorized to carry a firearm on the street, right?

A.      Yes.

Q.      And that was because you, one, had a felony conviction, right, prior felony conviction, right?

A.      Yes.

Q.      And, two, the judge and probation officer in the case told you don't have any guns or firearms, correct?

A.      I don't remember if the judge said that.

Q.      Sir, Mrs. Petras asked you about another conviction, prison breach.

        At the time that you ran from the law enforcement in that date -- on that day in April, you were on probation under supervised release on that case as well, correct?

A.      For the prison breach?

Q.      Yes.

A.      Yes.

1   **Q.**    And, sir, in that case, that was a separate judge that

2   you pled guilty before; is that right?

3   **A.**    Yes.

4   **Q.**    And that judge told you don't carry any firearms, don't

5   have any firearms or --

6         MS. PETRAS:  Objection to the relevance, and improper use

7   of prior convictions.

8         THE COURT:  I'll allow it.  I'll give counsel some leeway.

9         Go ahead.

10         MR. COLE:  Thank you.

11   BY MR. COLE:

12   **Q.**    You are aware -- and I'm sure the judge told you -- not

13   to carry any firearms or possess any drugs, narcotics, right, in

14   that case?

15   **A.**    I don't recall her saying about the --

16   **Q.**    About what?

17   **A.**    -- possess the gun or --

18   **Q.**    Your probation officer truly -- you recall the probation

19   officer telling you don't possess any firearms or drugs?  You --

20         MS. PETRAS:  Asked and answered.

21         THE COURT:  He said he didn't recall.

22         MR. COLE:  No, I said judge, Your Honor.  I just broke

23   them down into two.

24   BY MR. COLE:

25   **Q.**    One of your motives for running was that you didn't want

1   to be revoked on either one of the two supervised release cases

2   if you were caught with that firearm or drugs?  That would be

3   fair to say?  That was part of your motive for running, correct?

4   **A.**   Yes.

5   **Q.**   All right.

6        MR. COLE:  Your Honor, may I just have one brief moment?

7        THE COURT:  Sure.

8        MR. COLE:  I think I have another couple of minutes, but I

9   just want to consult with Mrs. Litz.

10        THE COURT:  All right.  Sure.

11        (Brief pause in proceedings.)

12        MR. COLE:  Your Honor, if it pleases the Court,

13   respectfully, with that answer that he's given to me on

14   cross-examination, Mr. Gibson, I don't have any further

15   questions.  I thank you for the opportunity.

16        THE COURT:  All right.  Redirect?

17              REDIRECT EXAMINATION OF MARK GIBSON

18   BY MS. PETRAS:

19   **Q.**   Mr. Gibson, just before the government takes down that

20   exhibit that they have, this video that they were just showing

21   you, it -- and asking you about your waistband, was your jacket

22   zipped or unzipped in the video that's still shown on the screen

23   there?

24   **A.**   Right now it's unzipped.

25   **Q.**   All right.  And when you were walking on the sidewalk,

1    was your jacket zipped or unzipped?

2    **A.**      Zipped.

3    **Q.**      And other than your jeans, what else did you have on that

4    night from the waist down?

5    **A.**      Other than my jeans?

6    **Q.**      Yeah.

7    **A.**      I had on some thermal, um, like the inside, the bottom

8    piece, and some boxers.

9    **Q.**      Okay.  So you had thermals and boxers.

10            And where was the gun in relation to those?

11   **A.**      The gun was like in the waistband of my jeans, but like

12   inside of, like -- it was in the waistband of the thermal pants

13   and the jeans together.

14   **Q.**      Okay.  And was the -- which was higher on your waist, the

15   thermals or the jeans?

16   **A.**      I'm gonna say the thermals, the thermals were.

17   **Q.**      Okay.  And I'm going to show you what's previously been

18   marked as Defendant's Exhibit Number 11, and this is the

19   body-worn camera of Officer Seaward that was previously

20   admitted.

21            That's you standing there, correct?

22   **A.**      Yes.

23   **Q.**      Okay.  And can you tell whether your jacket has been

24   unzipped yet at that point?

25   **A.**      Yeah, it's been unzipped.

1   Q.     Oh, wait.  Hold on.  Let me play it for you, and then you

2   can tell.

3          (Videotape played.)

4          THE WITNESS:  Nah, it looks like it's still zipped now.

5          MS. PETRAS:  Okay.

6          (Videotape paused.)

7   BY MS. PETRAS:

8   Q.     Okay.  And when you're looking right there, can you

9   continue to watch this area, the area of the waistband of your

10  jeans?

11         (Videotape played.)

12         MS. PETRAS:  I think I --

13         (Videotape paused.)

14  BY MS. PETRAS:

15  Q.     I'm going to back it up a little bit, Mr. Gibson, because

16  I think I -- I want you to look and tell me if you see them take

17  your belt off of you.

18         (Videotape played.)

19  BY MS. PETRAS:

20  Q.     Does that -- does the video that we're looking at now --

21  oh, well, did you just -- could you see them take your belt off

22  of you?

23         (Videotape paused.)

24         THE WITNESS:  Can you play it back a little bit more?

25  BY MS. PETRAS:

1    Q.    Now, the view that we're looking -- before I do that

2    again, that view that we're just looking at now, does that

3    fairly show where your jacket hit in comparison to where the

4    waistband of your jeans were?

5    A.    Yes.

6          (Videotape played.)

7          MS. PETRAS:  Okay.

8          (Videotape paused.)

9    BY MS. PETRAS:

10   Q.    And did you see what the officer just did?

11   A.    Yeah.  He just took the belt off.

12   Q.    Okay.  And was he taking it -- was the belt around the

13   belt loops of your jeans?

14   A.    Yes.

15   Q.    Okay.  Mr. Cole asked you some questions -- first of all,

16   I think there were a bunch of questions that seemed a little

17   confusing.

18         So when you were on the ground --

19         MR. COLE:  Objection, Your Honor.  Counsel is testifying.

20         THE COURT:  I can disregard it.

21         Go ahead.  It's redirect.  Go ahead.

22   BY MS. PETRAS:

23   Q.    When you were on the ground and you said that one of the

24   officers were -- was fast, were you talking -- what time period

25   were you talking about when the officer was fast?

1    **A.**    What time period?

2    **Q.**    All right.  Okay.

3    At one point you said one of the officers --

4    THE COURT:  Why don't you rephrase that.

5    BY MS. PETRAS:

6    **Q.**    At one point do you remember saying that one of the

7    officers was fast, correct?

8    **A.**    Yes.

9    **Q.**    Okay.  And what were you talking about?

10    **A.**    When the -- when he was chasing me.

11    **Q.**    Okay.  And I think when Mr. Cole was asking you those

12    questions, did you understand that he -- what that referred to?

13    He asked you what that referred to.

14    Do you remember those questions?

15    **A.**    I thought he was talking about when he pulled up fast.

16    THE COURT:  That's what I thought you were talking as

17    well.

18    So when you made the comment about him being fast, were

19    you referring to him running or their activities in the car when

20    they were driving?

21    THE WITNESS:  Well, I said, "They pulled up fast," and

22    then I said, "You fast as" -- as you know...

23    THE COURT:  Okay.

24    BY MS. PETRAS:

25    **Q.**    And the comment on the video that you're fast, was it

1    regarding -- what was that regarding?

2    **A.**    Um, when he was chasing me.

3    **Q.**    Okay.  Mr. Cole asked you some questions, and you said

4    you that didn't know if -- asked you whether or not you knew

5    that those particular police officers had any weapons on them.

6         In your experience, do police officers carry weapons?

7         MR. COLE:  I object to that, Your Honor, respectfully.

8         THE COURT:  It's relevant.  It's relevant.  He's had some

9    experience with the criminal justice system, so he can answer it.

10   BY MS. PETRAS:

11   **Q.**    In your experience do police officers carry weapons?

12   **A.**    Yes.

13   **Q.**    And what do they carry?

14   **A.**    Guns.

15   **Q.**    Okay.  And Mr. Cole asked you some questions about

16   whether or not you wrote anything down in relation to what the

17   officers said to you that night.

18        Where have you been since this night that's depicted on

19   the video?

20   **A.**    In jail.

21   **Q.**    Okay.  And was this a significant event to you?

22   **A.**    Yes.

23   **Q.**    And how well do you remember what was said to you?

24   **A.**    Pretty well.  I remember real -- really good.

25   **Q.**    Okay.

1    MS. PETRAS:  I have no further questions, Your Honor.

2    THE COURT:  All right.

3    MR. COLE:  Your Honor, may I?

4    THE COURT:  All right.  Sure.  It's Ms. Petras' witness.

5  She can close with her witness, but I'll let you ask another

6  question or two, sure.

7    MR. COLE:  Your Honor, I assure you I won't be long.  And

8  I believe I have some relevant questions, and if you don't think

9  so I'll shut it down.  May it please the Court?

10    THE COURT:  Yeah.  Sure.

11    MR. COLE:  Okay.  Thank you.

12    THE COURT:  Just non-repetitious, though.

13    MR. COLE:  Oh, I agree, Your Honor.

14              RECROSS-EXAMINATION OF MARK GIBSON

15  BY MR. COLE:

16  Q.    Sir, I wanted to make -- just on what Mrs. Petras just

17  asked you, you said that you had jeans and thermals, and the gun

18  was in-between your skin, jeans and thermals?

19  A.    Well --

20  Q.    Well, tell us because I didn't get --

21  A.    Between --

22  Q.    -- I didn't understand.

23  A.    -- my boxers --

24  Q.    Okay.

25  A.    -- the gun --

1          THE COURT:  Wait.  Wait.  I'm sorry.

2          What's your answer?

3          THE WITNESS:  I was about to say that I had my boxers on,

4     then the gun right there, then the thermals over top, and then my

5     jeans.

6          THE COURT:  All Right.  So the gun was tucked into the

7     boxers?

8          THE WITNESS:  No, the thermals.

9          THE COURT:  All right.

10    BY MR. COLE:

11    Q.    And so that we're clear, you had boxers material --

12    boxers, thermals, jeans?

13    A.    Yes.

14    Q.    So the boxers were close to your skin?

15    A.    Yes.

16    Q.    And based on what you said -- I want to just make sure

17    the record is clear -- you had the gun -- that was number two.

18    The gun was right there, is that right, next to the boxers, then

19    your thermals and jeans?

20    A.    Yes.

21    Q.    So the gun was being held up by your thermals and your

22    jeans, correct?

23    A.    Yes, yes.

24    Q.    All right.  I just wanted to make sure we were sure about

25    that.

1          Mrs. Petras had asked you just a moment ago about the

2     police officers carrying guns.  You know through your experience

3     police officers carry guns.

4          Do you recall that?  She just asked you that.

5     **A.**     Yes.

6     **Q.**     You know police officers are authorized to carry guns.

7          You're aware of that, right?

8     **A.**     Yes.

9     **Q.**     You are not authorized to carry a gun --

10         THE COURT:  He's already testified about that, not being

11    authorize to do carry.

12         MR. COLE:  All right.  Your Honor, with that, I have

13    nothing further.  I thank you for the opportunity.

14         THE COURT:  All right.

15         It's your witness.  Do you have any other questions?

16         MS. PETRAS:  May I have the Court's indulgence?

17         (Brief pause in proceedings.)

18         MS. PETRAS:  No further questions.  Thank you.

19         THE COURT:  All right.  You can rejoin your attorney,

20    Mr. Gibson.  Okay?

21         THE DEFENDANT:  Okay.

22         THE COURT:  Any other witnesses?

23         MS. PETRAS:  No, Your Honor, but I have some additional

24    exhibits.

25         THE COURT:  All right.

1          MR. COLE:  Your Honor, before --

2          THE COURT:  I think we need to give the court reporter --

3     let's take about a five-minute recess.

4          You have to leave at 4:30?  Counsel, it's 4:00 now.

5          MS. PETRAS:  I do.

6          THE COURT:  We've been going almost two hours.

7          MR. COLE:  Could we do this, Your Honor.  And just

8     respectfully, not to stop Mrs. Petras, could we have -- could we

9     just start fresh.  I -- these items that she's going to attempt

10    to withdraw -- to introduce, I have, I believe, reasonable legal

11    arguments to make.  Can we just set a time, and so that

12    Ms. Petras won't be rushed, since we're going to come back

13    another day, could we just come back another day?

14         THE COURT:  What's your pleasure, Counsel?

15         MS. PETRAS:  That's fine.  I'll just offer them and

16    provide the Court with the copies of defendant's exhibit --

17    everything else was submitted to the Court this morning.  I'll

18    provide a copy of Defendant's Exhibit Number 15, and I would move

19    to admit Defendant's Exhibit Number 15.

20         THE COURT:  What is 15, the Gerstein?

21         MS. PETRAS:  15 are the Gersteins.

22         THE COURT:  Yeah.  All right.

23         MR. COLE:  It's several Gersteins, Your Honor.

24         THE COURT:  All right.  15.

25         What else?

1        MS. PETRAS:  And then I have Defendant's Exhibit

2    Numbers 16-1, 16-2, 16-3 and 16-4.

3        Yesterday Officer Hiller essentially vouched for Officer

4    Wright, and Officer Wright is not being called to testify, and

5    there's a reason for that, and that's because Officer Wright was

6    found to be incredible by Judge Josey-Herring, and he was found

7    -- his credibility was questioned by Judge Williams in Superior

8    Court, and there were two complaints filed and two lawsuits

9    settled against him in this courthouse for unlawful searches and

10   seizures.

11       So to rebut the suggestion that Officer Wright would never

12   do that, he would never ask an improper question or he would

13   never ask -- you know, he would never demand to see a waistband,

14   as opposed to asking to see a waistband, we think it's fair to

15   challenge his credibility and these materials do that.

16       So Defendant's Exhibit 16-1 is the transcript of the

17   proceedings before the Honorable Anita Josey-Herring, in which

18   his credibility was -- he was found not to be credible.

19       And Defendant's Exhibit 16-2 is the transcript of the

20   proceeding before the Honorable Yvonne Williams in which he was

21   found to be not credible.

22       Defendant's Exhibit 16-3 is the complaint and the notice

23   of settlement in the case of *Tamika McCray and James Tucker*

24   *versus the District of Columbia and Officer John Wright and John*

25   *Doe Officers 1 through 20.*

1          And Defendant's Exhibit Number 16-4 is the complaint and

2     notice of settlement in the case of *Ella Lane, Adrian Crossland,*

3     *Terrence Crossland versus The District of Columbia, Officer John*

4     *Wright, John Doe Officers 1-10.*

5          MR. COLE:  Your Honor, may I --

6          MS. PETRAS:  So our --

7          MR. COLE:  I'm sorry.  Please forgive me.

8          MS. PETRAS:  Our position is, given that the government's

9     put on Officer Wright, who then suggested -- put on Officer

10    Hiller to say that Officer Wright would never ask -- or demand as

11    opposed to asking, that these materials go to the credibility

12    of --

13         THE COURT:  It's very interesting.  I mean, hearsay's

14    permissible during these hearings, and you're offering another

15    hearsay to rebut --

16         MS. PETRAS:  Hearsay.

17         THE COURT:  -- the in-court testimony of a witness who did

18    not testify.

19         MS. PETRAS:  And the rules specifically allow where

20    hearsay is introduced that you can then rebut with hearsay.

21         MR. COLE:  Your Honor, on those, I believe they're so --

22         THE COURT:  Let's do this.  Let's give the court reporter

23    a short recess before he runs out of here.

24         MS. PETRAS:  I'm fine with if we adjourn now, and if we

25    need to come back anyway, and that way --

1      THE COURT:  Well, we need to come back.  I need to hear

2  argument.  Let's do this, Counsel.

3      MR. COLE:  I think we have an agreement, Your Honor.

4      THE COURT:  It's 4:04.  Let's just take a ten-minute

5  recess.  You're okay if you leave by 4:30, correct?

6      MS. PETRAS:  Yes.

7      THE COURT:  All right.  Let's do that.

8      MR. COLE:  Just 30 seconds.  I believe -- I don't believe

9  the Court should even accept these.  There's no case law -- I

10  believe we need a written response.  Counsel has not given us --

11      THE COURT:  It's interesting.  What rule were you

12  referring to?

13      MS. PETRAS:  Well, first of all, hearsay is admissible,

14  and I can look to see the rules on hearsay, but there are rules

15  that allow you to, once they introduce hearsay, you can then

16  rebut it with additional hearsay.  So -- and I can certainly

17  proffer them to the Court.

18      THE COURT:  Right.

19      MS. PETRAS:  Whether or not the Court accepts them is --

20      THE COURT:  It's interesting.  I want to give the court

21  reporter a short recess.

22      MR. COLE:  Okay.  All right.

23      THE COURT:  Thank you.

24      MR. COLE:  Your Honor, before you accept -- the Court

25  accepts that --

1          THE COURT:  No, I'm not accepting it.  I'm going to hear

2     from you, Counsel.

3          MS. PETRAS:  Okay.

4          THE COURT:  I just want to give the court reporter his

5     break before he runs out of here from all of us.

6          (Thereupon, a break was had from 4:08 p.m. until 4:18

7     p.m.)

8          THE COURT:  Counsel, there's an event in the courthouse

9     tomorrow that my staff and I would like to see at 2:00 in the

10    ceremonial courtroom from 2 to 4.  I have a meeting from --

11    with -- in Chief Judge Howell's office at 10:30, which probably

12    would not go longer than noon, probably 11:30, and I have another

13    matter that's not going to take long.

14         I think it's at noon tomorrow, right?  What time is that?

15    Is that noon tomorrow?

16         So 2:00 is not a good time, but I could do it at 12:30 or

17    so.

18         MS. PETRAS:  I'm available.

19         THE COURT:  12:30, and then I'd have to -- I really want

20    to see this event at 2:00, though.

21         MR. COLE:  No, I understand that, Your Honor.  I have

22    another proposition.  I think it's going to be a little lengthier

23    than 90 minutes, even if we start at 12:30.

24         THE COURT:  Right.

25         MR. COLE:  I wanted to do it all, and I want to have an

1   opportunity, Your Honor to -- I just got these documents that

2   counsel proposes to introduce.

3          THE COURT:  Yeah.  I think there's probably some case law.

4          MR. COLE:  Right.  And I want an opportunity to -- I just

5   got them just moments before we started.  I want a opportunity to

6   write a memorandum on that as well, because I don't believe

7   there's nowhere possible that those will come in, just like I

8   can't tell -- can't put in an opinion where Hiller was said to be

9   most credible in his testimony in District Court.  I can't do

10   that, Your Honor, because that's buttressing or vouching.

11          THE COURT:  Well, you couldn't do that, but she's -- what

12   counsel's doing is offering hearsay to impeach the hearsay

13   testimony of that witness who is unavailable and did not testify.

14   That's what she's doing.

15          MR. COLE:  No, she can -- she can call him, Your Honor.

16   He's on the force.

17          MS. PETRAS:  It's 806, actually.

18          THE COURT:  Pardon?

19          MS. PETRAS:  It's Rule 806, actually.

20          MR. COLE:  I want an opportunity, Your Honor, for to

21   respond, just like the *Gross* case we found that I believe is

22   highly relevant and significant to this case.  I'm sure I can

23   research this --

24          THE COURT:  No, no.

25          MR. COLE:  -- and pick out an issue.

1          THE COURT:  Sure.  I'll give you a chance.

2          MR. COLE:  My proposal would be -- Mrs. Petras next week

3     is out, but could we just get a date to get a full two hours?

4     That's what I would say, two, three hours to have -- and it would

5     give me an opportunity to respond.  That's the most important

6     thing, Your Honor, because counsel has chosen to give it this

7     way, I need an opportunity to respond and I know you would give

8     the government that opportunity.

9          THE COURT:  I don't have any problems with that.  I didn't

10    bring my calender in, though.

11         MS. PETRAS:  Is the Court available on Tuesday the 25th?

12         THE COURT:  Actually, I am available.  We just -- I don't

13    know.

14         (Discussion had off the record.)

15         THE COURT:  So I have -- I mean, we can start earlier in

16    the day on Tuesday.  Do you want to do that?

17         MS. PETRAS:  10:00 on Tuesday?

18         THE COURT:  That's not my favorite time, but --

19         MS. PETRAS:  10:30?

20         MR. COLE:  I would say -- I have a matter at 2, Your

21    Honor.

22         THE COURT:  Let's start at 10:00.  All right.

23         MR. COLE:  Let's say 10:30.  What about 10:30?

24         THE COURT:  That's music to my ears.  All right.  10:30.

25    All right.

1      MR. COLE:  That's fine, on September 25th.

2      THE COURT:  Tuesday, next Tuesday.

3      MR. COLE:  Yes.  Yes, Your Honor.

4      THE COURT:  All right.  I don't have anything else going

5  on.

6      (Discussion had off the record.)

7      THE COURT:  I'm sorry.  So I'm available tomorrow morning

8  then, correct?  I'm sorry.  The meeting with Chief Judge Howell

9  is next Tuesday at 10:30; is that right, Mark?

10      THE COURTROOM CLERK:  Yes.

11      THE COURT:  All right.  I'm sorry.  So what do I have

12  tomorrow morning?

13      MR. COLE:  Your Honor, I want an opportunity to --

14      THE COURT:  Wait a minute.

15      MR. COLE:  I'm sorry.

16      (Discussion had off the record.)

17      THE COURT:  I have the 12:00 tomorrow, but you want an

18  opportunity to respond.

19      MR. COLE:  I want a opportunity to respond because I just

20  got the material, Your Honor.

21      THE COURT:  I don't -- counsel, I'm going to give you an

22  opportunity.

23      I'm sorry.  Thank you, Mark, for reminding me.  It's next

24  Tuesday at 10:30.  What else on Tuesday?

25      (Discussion had off the record.)

1          THE COURT:  All right.  So the matter on the 25th should

2     not be any more than that an hour or so, so I'm available the

3     rest of the day.

4          So what's your pleasure?  Do you want to do --

5          MR. COLE:  Your Honor, I'm not available after 2 p.m.  I

6     need to be somewhere.

7          THE COURT:  On Tuesday?

8          MR. COLE:  On Tuesday, September the 25th, and I'll be

9     gone the rest of the day Friday from court.

10          THE COURT:  All right.  So I need to get my calendar.

11          (Brief pause in proceedings.)

12          THE COURT:  What about Monday the 24th, is that a bad day?

13          MR. COLE:  I'm available, Your Honor.

14          THE COURT:  I was trying to keep that open because I may

15     have to travel that day, but --

16          MS. PETRAS:  I have a hearing at 10, a hearing at 10:30

17     and a detention hearing at 1:45.

18          THE COURT:  So much for that day, then.  Kerri just went

19     back to get my book.

20          (Brief pause in proceedings.)

21          THE COURT:  So let's go back to the 25th, then.  I have a

22     meeting at 10:30 for an hour, and I'm free the rest of the day.

23          Is that bad?

24          MS. PETRAS:  Which date?

25          THE COURT:  Tuesday the 25th.

1      MS. PETRAS:  Tuesday the 25th is fine any time for me.

2      MR. COLE:  And, Your Honor, on that day -- I'm sorry.

3      THE COURT:  So you have to leave by 2:00?

4      MR. COLE:  Well, I would have to leave at 1:30, Your

5  Honor, and I'll be away from the courthouse from 1:30 until 5.

6      I'm available -- I just --

7      THE COURT:  Tuesday the 26th is a horrible day for the

8  Court.

9      MR. COLE:  What about the 28th, Your Honor.

10      MS. PETRAS:  I'll be out the 27th and the 28th.

11      THE COURT:  All right.  So -- yeah.  I mean, how much --

12  do we really need two hours?

13      MS. PETRAS:  I don't think we need --

14      THE COURT:  Pardon?

15      MS. PETRAS:  I don't think we need that long.  I think we

16  can probably even come back tomorrow, and then Mr. Cole could

17  have an opportunity to write something if he wanted to.

18      MR. COLE:  Your Honor, I thank Mrs. Petras for that.  It

19  takes, among my other case load requirements and things like

20  that, that she wants me to turn it over, and she just gave it to

21  me moments ago before we started this hearing.  That's clearly

22  unfair.

23      THE COURT:  Not only --

24      MS. PETRAS:  These are materials Mr. Cole gave me.

25      THE COURT:  Wait, wait.  Just a minute.  Just a minute.

1          I'm going to give you a change to submit -- maybe just

2   submit a supplemental memorandum or something on that 806 issue.

3   I think it comes in under 806, but I haven't looked at any cases

4   recently.

5          What about just winding up tomorrow with our argument in

6   the morning, and I'll just leave the record open for any

7   supplemental pleadings?

8          (Brief pause in proceedings.)

9          THE COURT:  Kerri suggested maybe filing a supplemental

10  memorandum on Monday, and -- but he can't.  He has to leave at

11  1:30 on Tuesday.

12         You have to leave at 1:30?

13         MR. COLE:  Yes, sir, 1:30.

14         THE COURT:  How about 11:30 then on Tuesday for argument?

15         MR. COLE:  Oh, that's fine, Your Honor.

16         THE COURT:  11:30.

17         MS. PETRAS:  Yes, thank you.

18         THE COURT:  All right.  Okay.

19         And you can file your supplemental memorandum on Monday by

20  noon, Counsel.

21         MR. COLE:  Yes, Your Honor.  Thank you.

22         THE COURT:  On the 806 issue.

23         So the evidentiary record is closed then, right, correct?

24         MR. COLE:  Right.  Thank you, Judge for that.

25         THE COURT:  Sure.  That'll be fine.  Thanks, Kerri.

1    That's a good suggestion.  That way you don't have to wait

2    another two weeks or so.

3         All right.  I'm going to ask the parties to order the

4    transcript, though, pay for it.  All right.

5         MS. PETRAS:  The first --

6         THE COURT:  You should pay for it.

7         FROM THE FLOOR:  (Laughter.)

8         MS. PETRAS:  The first transcript's been prepared.

9         THE COURT:  Pardon?

10        MS. PETRAS:  Monday's transcript's ready and has been

11   prepared already.

12        THE COURT:  Oh, really?  All right.  Okay.  Good.

13        MS. PETRAS:  Yes.  I will order it.

14        THE COURT:  I should have known that.  All right.

15        Good?  All right.

16        All right, Counsel.  So we'll continue the case, continue

17   the hearing to Tuesday --

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  -- at 11:30.  All right.  Thank you.

20        MS. PETRAS:  Thank you, Your Honor.

21        MR. COLE:  Judge, have a wonderful day and a wonderful

22   night.

23        THE COURT:  Likewise.  Likewise.

24        Mr. Gibson, take care.  All right.  We'll see you on

25   Tuesday.  Thank you, Counsel.

1       (Proceedings adjourned at 4:29 p.m.).

2

3

4                          **C E R T I F I C A T E**

5

6              I, Scott L. Wallace, RDR-CRR, certify that
   the foregoing is a correct transcript from the record of
7   proceedings in the above-entitled matter.

8

   /s/ Scott L. Wallace                    9/21/18
9  ---------------------------         ----------------
       **Scott L. Wallace, RDR, CRR**          **Date**
10        **Official Court Reporter**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25