**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No. 18-108 (EGS)** |
| | : | |
| **MARK A. GIBSON** | : | |

**POST-HEARING MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE**

Mark Gibson, the defendant, through undersigned counsel, respectfully submits this post-hearing memorandum of points and authorities in support of his motion to suppress tangible evidence and in response to the memorandum filed by the government on September 20, 2018. The Court held hearings on Mr. Gibson's motion to suppress tangible evidence on Monday, September 17, 2018 and on Thursday, September 20, 2018.

**FACTUAL STATEMENT**

I.    **Officer Hiller's Testimony**

Officer Matthew Hiller, a member of the Metropolitan Police Department's Gun Recovery Unit ("GRU"), testified that the mission of the unit is to "recover illegal firearms throughout the District of Columbia" (Tr. 9/17/18:11), although he admitted that his unit did not attempt to recover firearms from <u>all</u> neighborhoods in D.C.    For example, in his three years in the GRU (<u>id</u>.), he has never been asked to patrol the Georgetown neighborhood.    (Tr. 9/20/18:30).    One of the GRU's techniques is to make contacts with citizens for whom they have no suspicion, asking the person whether he or she is in possession of a firearm and, after receiving a negative answer, "try to see their waistbands" nevertheless.    (Tr. 9/17/18:71, 76).    The practice is so pervasive that when the

GRU asks citizens on the street if they have a gun, people sometimes automatically lift their clothing to show their waistbands even before they are asked to do so.   (Tr. 9/20/18:30-31; Defense Exhibit 15)).   Officer Hiller could not estimate how many people he has made such contacts with from the date of Mr. Gibson's arrest to the date of the hearing.   (Tr. 9/17/18:71). It was "uncountable . . .a lot."   (Id:71-72).

Officer Hiller testified that on the evening of April 2, 2018, he was driving around a neighborhood in S.E. Washington, D.C., in an unmarked car, with three other officers from the GRU – Officers John Wright, Merissa McCaw, and Matthew Mancini.   (Tr. 9/17/18:11-12). None of the officers wore police uniforms, but all wore bulky tactical vests with the word "police" written on the front in 3-4 inch block white letters.   (Id:51-52; Government's Exhibit 1-B (video from Officer Mancini's body camera showing vests)).   All four officers wore body cameras on the front of their vests.   (Tr. 9/17/18:13).[1]   All four officers were armed with guns holstered at their waists or thighs.   (Tr. 9/20/18:27).   Officer Wright drove the car; Officer Hiller sat next to him; Officer Mancini sat directly behind Hiller in the rear passenger seat, and Officer McCaw sat behind the driver.   (Tr. 9/17/18:12-13).

The GRU drove into the vicinity of 16th Street and Galen Street, S.E., a residential, high crime neighborhood they had patrolled "many times" (Tr. 9/17/18:15) and from which they had previously recovered guns.   (Id:16).   Hiller saw Mark Gibson -- who he did not know and for

---

[1]  Officer Hiller explained how body-worn cameras issued by the Metropolitan Police Department ("MPD") work:   They are affixed to the outermost garment and "run[] for the entirety of the [officer's] tour," recording video but not audio.   (Tr. 9/17/18:13).   Once the camera is activated by tapping a button on the front of the camera, it begins capturing both audio and video, and it preserves the previous two minutes of video-only recording.   (Id:13-14).

whom he had no suspicion -- as Mr. Gibson walked alone on the sidewalk at just before midnight. (Id:11-12, 17, 19, 37, 98).    Mr. Gibson was walking on 16th Street, then turned left onto the sidewalk on Galen Street.    (Id:17, 19, 37).    Officer Wright also turned onto Galen Street and drove up to Mr. Gibson, who was on their left side.    Hiller testified that "as we drove closer [Mr. Gibson] appeared to start walking at a quicker pace and looking over his shoulder back at our [unmarked] police vehicle," "several times" which indicated to the officers that Mr. Gibson "could possibly be [made] nervous by our presence, and there might be a reason for that."    (Id:18, 121, 141).    Officer Wright pulled the car parallel to Mr. Gibson, trained his flashlight on Mr. Gibson,[2] and "greeted" Mr. Gibson in a "conversational tone, identifying himself as police, and asked Mr. Gibson if he had any firearms on him."    (Id:18, 73; 9/20/18:23).    Mr. Gibson responded by saying, "I ain't got no guns.    I ain't got no guns," and continued to walk.    (Tr. 9/17/18:18).    As is the GRU's practice, Officer Wright did not accept Mr. Gibson's denial: Officer Hiller testified that Wright said "something to [the] effect of asking Mr. Gibson "if he minded showing us his waistband," (Id:18, 56, 88), although Hiller did not remember Officer Wright's exact words.[3] (Id:72).    Mr. Gibson repeated himself, saying "I ain't got no guns.    I ain't got no guns."    (Id.). Officer Hiller testified about what happened next:    "Officer Wright pulled forward a little bit.

---

[2]  The high intensity of the flashlight can be viewed on the video from Officer Wright's body camera.

[3]  Officer Hiller testified that Officer Wright spoke in a "conversational manner" throughout, and that if he had spoken in an "authoritative manner," "[it] wouldn't have been a question.    It'd have been, 'Show me your waistband.'"    (Tr. 9/17/18:56).    He testified that while he did not remember what Officer Wright said, he had "never heard him demand to see somebody's waistband like that."    Without elaboration, he testified that, "And I know for a fact he wouldn't have that night."    (Id:89, 118).

Mr. Gibson kind of stopped, turned back towards 16th Street and ran back down towards 16th Street where he was originally seen coming from." (Id:19). Officer Mancini and Officer Hiller left the car and chased Mr. Gibson. (Id:20). As he ran, Mr. Gibson turned to the right, "appear[ing] to try to do a maneuver to lose Officer Mancini," who was closest to him. (Id:21). Mr. Gibson lost his footing and fell, at which time a firearm "came from him" and landed on the ground. (Id.). Officer Hiller can be heard commenting in his own video, "When [Mr. Gibson] was running, he was holding the right side; and when he fell, the gun came out." (Id:25; Government Exhibit 1-A). He did not see Mr. Gibson throw the gun. (Tr. 9/17/18:97). Mr. Gibson's headphone pouch and phone also landed on the ground. (Id.). A search of Mr. Gibson's pockets turned up 11 small "zips of a white rock-like substance" that tested positive for cocaine. (Id:22; Government Exhibits 9, 10). Mr. Gibson asked Officer Mancini, "You're the one that ran up on me?" and commented, "You are fast as sh-t." (Tr. 9/17/18:42; Government's Exhibit 1-B). Officer Hiller testified on direct examination that he could see Mr. Gibson during "the entire time that Officer Wright was talking" to him, (id:61), though he later admitted that was not true. (Id:71-72, 75, 154-155).

When he initially recounted the events in his direct examination, Officer Hiller failed to mention that (as the video from Officer Mancini's body camera makes clear) Mr. Gibson raised his arms in the air in response to what Officer Wright said to him. Furthermore, in his sworn statement in support of probable cause in Superior Court (a "Gerstein") that was written hours after the events, he wrote that

> Officer Wright identified himself as the "Police" and asked Mr.
> [Gibson] if he had any firearms on him. Mr. [Gibson] said, "I ain't
> got no guns, I ain't got no guns". Officer Wright asked Mr.
> [Gibson] if he could see his waistband and Mr. [Gibson] repeated 'I

4

ain't got no guns, I ain't got no guns <u>keeping his hands in his pockets</u>.

(Tr. 9/17/18:58, 63; Defense Exhibit 1 (emphasis added)).   (Officer McCaw's under oath testimony in Superior Court matched Hiller's sworn statement: "When Officer Wright asked to see his waistband he repeated that he didn't have any guns <u>then kept his hands in his pockets</u>." (Tr. 9/17/18:99; Defense Exhibit 12 (page 5)).   After he recounted the events at the suppression hearing, the prosecutor showed Hiller Officer Mancini's video (which he had seen in the past few weeks), and he testified that he could see Mr. Gibson making a "motion" with his right hand in the video.   (<u>Id</u>:38, 39, 67).   He testified that he did not know why Mr. Gibson made such a motion. (<u>Id</u>:38-39).

The video from Officer Mancini's body camera, especially the half-speed video, shows that Mr. Gibson did <u>not</u> keep his hands in his pockets after Wright asked to see his waistband as Hiller previously swore, and Mr. Gibson did not simply make a motion with his right hand as Hiller testified.   Rather, in response to Wright's follow-up regarding a visual search of Mr. Gibson's waistband, Mr. Gibson lifted his arms in the air with his hands at right angles with the palms facing toward [toward Officer Wright]." (Tr. 9/17/18:62, 70; Government's Exhibit 1-B; Defense Exhibit 3 (half-speed copy of video from Officer Mancini's body camera (Tr. 9/17/18:70); Defense Exhibit 4 (screen shot of Mr. Gibson with his arms raised) (Tr. 9/17/18:73)).   On cross-examination, Hiller first denied that Mr. Gibson put both hands in the air in the Mancini video, but agreed that he "could see the one – the right hand."   (Id:62).   Confronted with the half-speed video showing both hands in the air, Hiller agreed that Mr. Gibson held "both of his hands in the air . . .," "in response to what Officer Wright said."   (<u>Id</u>.).   In fact, in the video from Officer Mancini's body camera, Officer Wright completes his turn onto Galen at 1:46 and shines his

5

flashlight on Mr. Gibson at 1:49.   Mr. Gibson puts his hands in the air at 1:51, takes 4-5 steps with his arms still in the air, puts his hands down then quickly back up at 1:54, and runs at 1:55. (Government Exhibit 1-B; Defense Exhibit 3).

Ultimately, Officer Hiller admitted that he had <u>no independent memory</u> of the critical events:

1) he did not remember exactly what Officer Wright said to Mr. Gibson that prompted Mr. Gibson to put his hands in the air (Tr. 9/17/18:56, 72, 88);

2) he did not remember seeing Mr. Gibson's hands in the air at all ("I don't – I don't remember.") (<u>id</u>:71-72) (<u>see</u> <u>also</u> <u>id</u>:154);

3) he did not remember and did not know whether Mr. Gibson raised his arms in the air in response what Officer Wright said ("there's no audio to link up to exactly what we're seeing [on the video]" (<u>id</u>:75);

4) he did not remember whether he could see Mr. Gibson's waistband when Mr. Gibson's hands were in the air ("I don't – I don't remember." (<u>id</u>:154)), and

5) he did not remember if he saw Mr. Gibson turn around to run ("I don't even remember if I saw Mr. Gibson turn around [to run].   I just remember Officer Mancini got out, and that's why I got out with him.   And then once I got out, I saw him running." (<u>Id</u>:155)).

All four officers violated the MPD General Order governing body worn cameras (MPD General Orders 302.13 and 304.10) which state that officers "shall activate their body-worn cameras for all contacts initiated pursuant to law enforcement investigation, whether criminal or civil," and define "contact" as "[c]onduct by a member which places the sworn member in face-to-face communication with an individual citizen under circumstances in which the citizen is free not to respond and to leave."   (Tr. 9/17/18:77, 84-85, 146; Defense Exhibit 5 and 6).   Because each of them violated the General Orders, the critical fact of what Officer Wright said to Mr. Gibson that caused him to put his hands in the air was not recorded for this Court's review.

(Id:20, 86; Government Exhibits 1-A and 1-B; Defense Exhibits 3 and 7).

Hiller testified that none of the four officers intentionally failed to tap the button on the chest-worn cameras, and that "we turn it on as quickly as we can sometimes."   (Tr. 9/17/18:78). He testified that in this case he activated his own camera "as soon as I felt [it to be] reasonably possible": i.e., mid-chase.[4]   (Id:141; Government Exhibit 1-A).   (Three of the officers activated their body cameras for the first time once the chase started, and the fourth did not activate her camera until after Mr. Gibson was arrested.)   (Tr. 9/17/18:20)).

Officer Hiller identified a photograph of members of the GRU, including Officer Wright, standing before the unit's banner.   (Tr. 9/17/18:89, 93; Defense Exhibits 8 and 9).   The banner depicts a skull with a bullet hole between its eyes, the words "Gun Recovery Unit," and the words, "Vest Up One In The Chamber." (Id:90).   Hiller testified that "one in the chamber" means the gun is ready to be fired.   (Id:54).[5]   He testified that the photograph of a tee-shirt bearing the words "Let me see that waistband Jo" and the image of the grim reaper was from the Powershift Unit, another MPD unit that, like the GRU, does not answer calls to the police but trawls neighborhoods looking for contraband.   (Tr. 9/17/18:94, 116, 149; Defense Exhibit 10).

Officer Hiller admitted that he was the subject of three pending MPD investigations based

---

[4]  On re-cross examination, Officer Hiller attempted to walk back this admission that failing to activate their body cameras when they initiated contacted with Mr. Gibson violated MPD General Orders by testifying that he could not agree without reviewing the General Order "more thoroughly," and arguing about whether the contact was for the purpose of "investigation" and whether the contact was "face-to-face."   (Tr. 9/17/18:142-145).

[5]  Several of the officers that Hiller has worked with in the GRU are depicted in the photograph, including senior Detective Delpo (who was also involved in the June 13, 2018 barbershop stops and frisks), Officer Ashley, Officer Anderson, Officer Ledesma, Officer Mickey, Officer Rogers, and Officer Jaquez.   (Tr. 9/20/18:35-37; Defense Exhibit 15 (Superior Court Gersteins)).

on citizen complaints, each of them arising from allegations of improper conduct during searches and seizures on August 23, 2017 (allegation of mishandling property and money that was not returned to its owner), October 25, 2017 (allegation of harassment in relation to an extended traffic stop), [6] August 7, 2018 (allegation of using demeaning language and conduct, harassing individuals in relation to a traffic stop, and searching a car after the occupant refused to consent), and June 13, 2018 (allegation of improper stops and frisks by the GRU of several individuals sitting in front of a barbershop). [7]   (Tr. 9/17/18:100, 102, 104-106; Defense Exhibit 13 (video of barbershop stop and frisk)).

Pursuant to Rule 806 of the Federal Rules of Evidence, following Officer Hiller's testimony that Officer Wright would never direct someone to show their waistband, but would always ask, the defense introduced the transcript in District of Columbia v. Louis Stanley, in which a Superior Court judge found Officer Wright's testimony not credible (Defense Exhibit 16-1), a transcript in United States v. Phillip Mitchell, in which another Superior Court judge found Officer Wright not to be credible (Defense Exhibit 16-2), a complaint and notice of settlement in A.B, Tamika McCray and James Tucket v. the District of Columbia and Officer John Wright and John Doe Officers 1 through 20, (Defense Exhibit 16-3), and the complaint and notice of settlement in Ella Lane, Adrian Crossland, Terrence Crossland v. the District of Columbia, Officer John Wright, John Doe Officers 1-10 (Defense Exhibit 16-4).

_____

[6]  Hiller testified that he believed the investigation into the October 25, 2017 allegation was closed as sustained with a recommendation that he receive additional training, which he completed this summer.   (Tr. 9/17/18:104).

[7]  Officer Hiller testified that this allegation was wrongly attributed to him:   "My name's on there by accident, but I wasn't on-scene for that."   (Tr. 9/17/18:105).

## II.    **Mark Gibson's Testimony**

Mark Gibson testified that he lived on the street on which he was stopped, at 1747 Galen Street, S.E., Washington, D.C.    (Tr. 9/20/18:44).    On April 2, 2018, he had been to visit a friend who lives near the Anacostia Metro Station, and had taken the B2 bus home.    (Id:45-46).    At about 11:45 p.m., he was walking home from the bus stop at W and 16th Streets, S.E.    (Id:45). He turned right on 16th Street, and then left on Galen Street.    (Id:46; Defense Exhibit 14 (map)). He was walking "kind of fast" because he wanted to get home to eat a meal his aunt had cooked and set aside for him before someone else in the family ate it.    (Id:47).    He walked with his hands in his jacket pockets because it "was kind of cold that night."    (Id:48).    He noticed a "car coming up slowly beside me on my right-hand side," and turned to look at the car because he was concerned that a car was "coming up very slowly beside [him]" "late at night."    (Id:48-49).    He did not know who was in the car, which was not marked as a police car.    (Id:49).    Once the driver pointed a flashlight at him, he "assumed it was the police."    (Id:49).    He testified that an officer said "How you doing tonight, sir?"    (Id:50).    He replied, "good."    (Id.).    The officer said "Do you have any guns or weapons on you?" (Id.).    Mr. Gibson knew with certainty then that they were police officers, and replied, "no."    (Id:50, 60).    The officer responded to Mr. Gibson's denial by saying, "let me see your waistband."    (Id.)    Mr. Gibson testified that he remembered the officer's words, and the officer did not ask, "Can I see your waistband."    (Tr. 9/20/18:61-62).

In response to the command "let me see your waistband," Mr. Gibson put his arms in the air at right angles with his palms facing out to display the waistband of his jeans by raising his

jacket, which lifted above the waistband of his jeans.   (Tr. 9/20/18:50-51, 62).[8]   The officer said "lift your jacket," and Mr. Gibson ran in the opposite direction. (Id:51).   He ran because he was nervous and scared, he knew he possessed contraband, and he knew he was under court supervision.   (Id:52, 65, 80, 83).   The police got out of the car and chased.   (Id:52, 64).   While running, he lost his balance and fell, and a police officer caught him.   (Id.).   When he fell, the gun fell out of his waistband, and his phone and headphone pouch fell, too.   (Id:52, 74-75).   The officers searched him, finding cocaine in his pocket.   (Id.).

At least twice in the past, Mr. Gibson had experienced officers wanting to see his waistband, and he had seen officers asking or telling other people to show their waistband (9/20/18:52-53).   Based on those past experiences, he thought he had to do what the police told him to do on April 2, 2018.   (Id:53, 55).   He did not think he could refuse the officer's directive to show his waistband, even though he "really didn't want [the officers] to see the gun in [his] waistband."   (Id:56-57, 73-74).   After he was handcuffed, Mr. Gibson gave the officers a false name because he "was scared" because he was on parole, and "didn't want to be found out." (Id:43).   He testified that he pleaded guilty to robbery in 2011, possession of PCP in 2013, and prison breach (based on walking away from a half-way house) in 2014.   (Id:44-45).

---

[8] Mr. Gibson agreed that if he had extended his arms and hands as high as they would go it might have exposed the gun in the waistband of his thermals.   (Tr. 9/20/18:64).   He wore jeans low on his hips and a tee shirt under the zipped jacket, both of which can be seen in the video recorded by Officer Mancini's body camera (Government Exhibit 1-B).   (Id:67, 76; see also Defense Exhibit 11 (video from Officer Seward's body camera)).   The jacket extended below Mr. Gibson's actual waist, but not below the waistband of his jeans.   (Id:78-79, 85-86).   The gun was on the outside of Mr. Gibson's tee shirt, positioned between his boxer shorts and a pair on thermals that he wore beneath his jeans.   (Id:80, 84, 90).

# ARGUMENT

## I.      Overview of the Law.

"No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."    Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891).    The Bill of Rights guaranteed in the Fourth Amendment this most sacred right: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."    Interpreting the Fourth Amendment, the Supreme Court has "[t]ime and again . . . observed that *searches and seizures 'conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'*"    Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (quoting Thompson v. Louisiana, 469 U.S. 17, 19-20 (1984) (per curiam) (quoting Katz v. United States, 389 U.S. 347, 357 (1967) (footnotes omitted))) (emphasis supplied).    Where there has been a warrantless search or seizure, the government bears the burden of proving by a preponderance of the evidence that the search or seizure was lawful.    United States v. Mendenhall, 446 U.S. 544, 550-01 (1980).

A seizure occurs when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."    Terry, 392 U.S. at 19 n.16.    A seizure requires "submission to the assertion of authority," and no seizure occurs where "the subject does not yield."    California v. Hodari D., 499 U.S. 621, 626 (1991).    The seizure can be momentary, however, and "later acts of noncompliance do not negate a defendant's initial submission, so long as it was authentic."    United States v. Brodie, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (defendant

11

was seized when he put hands on car as instructed, even though he fled a few seconds later).

The test to determine if an encounter between the police and a citizen is a show of authority is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554 (1980), regardless whether the police expressly instructed the person not to leave. United States v. Williams, 615 F.3d 657, 665 (6th Cir. 2010).   "[W]ords alone may be enough to make a reasonable person feel that he would not be free to leave."   United States v. Richardson, 385 F.3d 625, 629 (6th Cir. 2004).

In this case, the GRU did not have reasonable suspicion or probable cause to seize Mr. Gibson; they were driving around looking for citizens for whom they had no suspicion but with whom they would make contact to ask the person whether he or she is in possession of a firearm and to "try to see their waistbands."   (Tr. 9/17/18:71, 76).   As Judge Brown described it in United States v. Gross, 784 F.3d 784, 789 (D.C. Cir. 2015) (Brown, J. concurring), the GRU has

> implemented a "rolling roadblock."   Officers randomly trawl high crime neighborhoods asking occupants who fit a certain statistical profile – mostly males in their late teens to early forties – if they possess contraband.   Despite lacking any semblance of particularized suspicion when the initial contact is made, the police subject these individuals to intrusive searches unless they can prove their innocence.   . . . Our jurisprudence perpetuates a fiction of voluntary consent where none exists and validates a policy that subverts the framework of Terry v. Ohio.[9]

Here, the GRU officers violated the Fourth Amendment's guarantee against unreasonable

---

[9]  See also Robinson v. United States, 76 A.3d 329, 331 (D.C. App. 2013) (officer testified that GRU "employ[s] a simple technique: they ask[] any individual they encounter[] if he or she ha[s] a gun and then watch[] to see if that individual engage[s] in what the officers perceive[] to be suspicious behavior.").

seizures if at any time before Mr. Gibson ran from the officers 1) there was a show of authority by the officers, and 2) Mr. Gibson submitted to it.   In that event, he is entitled to suppression of all the tangible evidence.   Wong Sun v. United States, 371 U.S. 471, 484-86 (1963).

The government has failed to carry its burden of proving that the warrantless seizure of Mr. Gibson was lawful.

## II.   Credibility Findings.

For several reasons, the Court should not rely on Officer Hiller's testimony regarding what Officer Wright said to Mr. Gibson, and should rely on Mr. Gibson's testimony.

First, Officer Hiller and all of the other officers failed to activate their body worn cameras during the "contact" with Mr. Gibson as required by MPD regulations.   Officer Hiller testified that he activated the audio on the camera "as soon as [it] felt reasonably possible" to do so, (Tr. 9/17/18:141) which was when he leapt from the car to join the chase but not while Officer Wright engaged in an allegedly calm, conversationally-toned, conversation with Mr. Gibson.   It is not plausible that Officer Hiller, and every one of the other officers, felt that it was not reasonably possible to tap the button on their chests when Officer Wright trained his flashlight on Mr. Gibson, but found it reasonably possible to tap the button once they started running.   When all four officers failed to activate their cameras, they deprived the Court of the ability to review what Officer Wright actually said that caused Mr. Gibson to put his arms in the air.

Second, Officer Hiller did not remember what Officer Wright actually said, only that he is certain that Wright would only pose a conversational question – Do you mind showing us your waistband? – and would not state a directive – Let me see your waistband.   Hiller's testimony is not only insufficient to meet the government's burden, it is not plausible that Officer Wright would

never veer from a conversational question (one that Mr. Gibson allegedly could have refused to answer) in light of the history and mission of the unit, its violent logo, an MPD-worn tee shirt stating "Let me see that waistband," recent video-taped events demonstrating the unit's aggressive and unconstitutional techniques, and its pervasiveness in certain neighborhoods that causes people to lift their clothing without even being told or asked to do so.

Third, Officer Hiller and Office McCaw previously swore to an accounting of events that was different from the video tape evidence.   Both officers swore that Mr. Gibson kept his hands in his pockets after Wright asked to see Mr. Gibson's waistband.   Even after seeing the video, Hiller claimed that Mr. Gibson made a motion with his right hand, a motion that Hiller did not understand.   The video shows otherwise – as Hiller was forced to admit – Mr. Gibson raised both hands in the air and kept them there for 4-5 steps.[10]   In the end, Officer Hiller admitted he did not know exactly what words Officer Wright spoke; he had no memory what Mr. Gibson did with his hands; he had no memory of whether Mr. Gibson's waistband was visible when he raised his hands in the air, and he did not see Mr. Gibson run.

Finally, Officer Hiller is the subject of MPD investigations based on citizen complaints that he violated the Fourth Amendment.   Officer Wright has twice been found not to be credible in Fourth Amendment cases, and the District of Columbia has twice settled cases in which he was alleged to violate the Fourth Amendment.

Mr. Gibson's testimony was not so plagued with memory lapses, inconsistent statements,

---

[10]  Both officers also swore that Mr. Gibson suspiciously looked over his shoulder at them "numerous" and "several" times, a movement that Hiller found suspicious.   (Defense Exhibit 1; Defense Exhibit 12 at page 4; Tr. 9/17/18:121, 141).   This testimony also is implausible since the video from Mancini's camera shows that Officer Wright turned onto Galen Street at 1:46 and shined his light on Mr. Gibson at 1:49.

and implausibility.   He admitted that he had three prior felony convictions, each of which was resolved with a guilty plea and without his testimony.   He explained why he had his hands in his pockets as he walked (it was cold), why he walked fast (to get the meal his aunt set aside for him before someone else got it; it was late at night and cold), why he looked back at the car (it was coming up slowly behind him; it was late at night; it was not marked as a police car), although none of those facts would have justified seizing Mr. Gibson.   He testified that the officer said "Let me see your waistband," and that he raised to arms to lift his coat above the waistband of his jeans in response.   He admitted that he ran because he was scared, knowing that he possessed contraband and was under court supervision.   Nothing in his testimony suggests that he was misstating the facts.

### III.    Mr. Gibson Was Seized When Officer Wright Directed Him to Show His Waistband.

In determining whether a reasonable person would feel free to leave, courts have considered, among other factors, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicting that compliance with the officer's request might be compelled."   United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)   In view of all the circumstances here, Mr. Gibson was seized when he was directed to "let [the GRU officers] see his waistband" because a reasonable person in that circumstance would not believe that he was free to disregard the officers and walk away, id., 446 U.S. at 553, and because he submitted to the show of authority by raising his arms in the air.   Brodie, 742 F.3d at 1061.

Mr. Gibson was "contacted" very late at night on a virtually deserted street by a full car of armed GRU officers dressed in tactical gear.   The car followed him momentarily then trained an

intensely bright light on him.   He was asked if he had a gun, but when he said "no" the officer would not accept his answer.   He was directed to "let me see your waistband," which was a show of authority.   He understood what was expected from his own prior experience being directed to expose his waistband and from seeing others confronted by this unit.   A reasonable person in that circumstance would not feel free to leave, and Mr. Gibson did not – he submitted to Wright's show of authority, however briefly, by raising his arms to expose the waistband of his jeans.

The government cites United States v. Gross, 784 F.3d 784 (D.C. Cir. 2015), in support of its argument that Mr. Gibson was not seized when Officer Wright told him to show his waistband. (Government's Memorandum of Applicable Case Law, September 20, 1018, Docket #14). Gross, which also involved the GRU, is distinguishable in several respects.

In Gross, the GRU was on "gun patrol," in S.E., Washington, D.C., "which involved '[r]iding through the area looking to see if [they] could recovery any guns.'"   784 F.3d at 785. Early in the evening, they made contact with the defendant, asked if he had a gun, and then "asked Gross, 'Can I see your waistband?'"   Id. (emphasis supplied).   The Court of Appeals held that there was no seizure, i.e., no show of authority, by the officers because "[q]uestions alone, . . . ordinarily do not amount to a 'show of authority' sufficient to constitute a seizure"   Id. at 788.

Here, there was a seizure because there was a show of authority that did not exist in Gross, because here they did not ask Mr. Gibson whether he would show his waistband to prove he wasn't committing a crime, they told him to show his waistband.   As Officer Hiller admitted, a show of authority "wouldn't have been a question.   It'd have been, "Show me your waistband."   (Tr. 9/17/18:56).   There is no meaningful difference between "show me" and "let me see," and when Mr. Gibson submitted to the officers' authority by raising his arms to show his waistband, the

seizure was complete.   Brodie, 742 F.3d at 1060, 1061; California v. Hodari D., 499 U.S. 621,

625 (1991) ("A seizure is a single act, and not a continuous fact.").

      Furthermore, the Court has evidence here that the Court did not have in Gross.   The Court

has evidence of the GRU's practices -- its violent logo (Defense Exhibit 9, GRU banner) and its

harassment and unconstitutional stops and frisks of citizens (Defense Exhibit 13, videos of the

GRU on June 13, 2018 in front of a barbershop).   The Court has evidence that these particular

officers had and are currently the subject of citizen complaints alleging Fourth Amendment

violations.   This evidence helps shine a light on why a reasonable person – especially a young,

black man in S.E. Washington, D.C. -- would not feel free to disregard the GRU.   See United

States v. Winston, 892 F.2d 112, 1116 (D.C. Cir. 1989) (citizens's awareness of officers' duties

and practices relevant to "reasonable person" test).

**IV.**    **Mr. Gibson Was Seized Even if Officer Wright Asked Him to Show His Waistband.**

      Even if Officer Wright asked to see Mr. Gibson's waistband, rather than commanded him

to show it, a reasonable person would not have felt free to leave.   Judge Brown has proposed

what she calls a "thought experiment:"

> Try to imagine this scene in Georgetown.   Would residents of that
> neighborhood maintain there was no pressure to comply if the
> District's police officers patrolled Prospect Street in tactical gear,
> questioning each person they encountered about whether they were
> carrying an illegal firearm?   Nothing about the Gun Recovery
> Unit's modus operandi is designed to convey a message that
> compliance is not required.

Gross, 784 F.3d at 790.

      Even if framed as a question, the facts here are distinguishable from the facts in Gross.   In

addition to the time of day, the evidence of the GRU's practices, which the court did not have the

benefit of in <u>Gross</u>, and the evidence relating to these particular officers, support the conclusion that after Mr. Gibson denied having a gun, any follow-up request to expose his waistband amounted to a show of authority.   A show of authority politely made is still a show of authority.

Given the context, Officer Wright's follow-up request for proof of innocence would have caused a reasonable person in Mr. Gibson's shoes to think that the officers did not intend to permit him to disregard them until they were satisfied that he did not have a gun in his waistband.   His answer "no" was not good enough.   <u>See</u> <u>e.g.,</u> <u>Florida v. Royer</u>, 460 U.S. 491, 501 (1983) (citing criminal accusation by law enforcement as a factor indicating that the person was seized); <u>United States v. Jones</u>, 678 F.3d 293, 300 (4th Cir. 2012) (whether police "treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter as "routine" in nature'" is a factor in determining whether a seizure has occurred (quoting <u>United States v. Gray</u>, 883 F.2d 320, 322-23 (4th Cir. 1989)); <u>United States v. Camacho</u>, 661 F.3d 718, 725 (1st Cir. 2011) (asking defendant where he was coming from and whether he had seen the fight the officers were investigating were accusatory questions; accusatory questions combined with partially blocking defendant's path and telling companion to put his hands on the car amounted to a seizure); <u>Williams</u>, 615 F.3d at 663 (reasonable person would not feel free to leave upon being approached by two uniformed officers in marked car, singled out of a group, and immediately accused of trespassing); <u>United States v. Tyler</u>, 512 F.3d 405, 410 (7th Cir. 2008) ("A reasonable person would not feel free to walk away after being confronted by two police officers and told he was committing a crime in the officers' presence."); <u>Hawkins v. United States</u>, 663 A.2d 1221, 1226 (D.C. App. 1995) (repeated questioning about whether appellant was carrying a weapon contributed to perception that defendant not free to leave).

## <u>CONCLUSION</u>

For all of the foregoing reasons, for the reasons stated in Mr. Gibson's motion and reply, and for any reasons apparent to the Court, the Court should grant Mr. Gibson's motion to suppress tangible evidence.

Respectfully submitted,


A.  J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____

SANDRA ROLAND

/s/
_____

MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

19