**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.**   **18-108** (EGS) |
| | : | |
| **v.** | : | |
| | : | |
| **MARK GIBSON** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S POST HEARING**
**MEMORANDUM**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully submits this opposition to defendant's post hearing memorandum. As

grounds for this opposition, the United States relies on the following points and authorities and

such other points and authorities as may be cited at a hearing on the motion:

*The Relevant Evidence at the Motions Hearing*

In this case and as outlined below, the parties agree on most of the factual issues. On April

2, 2018, at approximately 11:48 pm, members of the Gun Recovery Unit (GRU) of MPD's

Narcotics Special Investigation Division were driving, in a high crime area northbound on 16th

Street, SE when they observed the defendant walking quickly on the sidewalk from the intersection

of Galen Street, SE., while keeping his hands in his jacket pocket and looking in the direction of

the officers, who was wearing a red jacket which hung past his waistband (Tr. 9/17/18 at 15, 18 &

Tr. 9/20/18 at 47-48, 63). The officers were seated in an unmarked Chevy Impala vehicle, and the

officers were wearing plain clothes, each officer was wearing a tactical vest, marked with police

insignia on the front and back (Tr. 9/17/18 at 12, 51). As the vehicle approached the defendant,

1

the driver MPD Officer John Wright, in a conversational tone, identified himself as the "Police" and asked the defendant if he had any firearms on him. (Tr. 9/17/18 at 18, 56 & Tr. 9/20/18 at 60-61). The defendant stated "I ain't got no guns." Officer Wright asked the defendant if he could see his waistband and the defendant stated "I ain't got no guns, I ain't got no guns." (Tr. 9/17/18 at 18). When Officer Wright asked the defendant if he would mind showing the officers his waistband, the defendant again replied, "I ain't got no guns. I ain't got no guns." (Tr. 9/17/18 at 18). While stating that he did not have a gun to Officer Wright's question, the defendant raised is hands to the level point of his ears and within seconds fled from the officers who were seated in the vehicle. (Tr. 9/17/18 at 18-19, 38, 75 & Tr. 9/20/18 at 61). Officer Wright was the only officer who addressed the defendant. (Tr. 9/17/18 at 18, 56). At no time prior to the defendant running away did the officers get out of their vehicle or threaten the defendant with their weapon or any negative police authority to cause the defendant to run. (Tr. 9/17/18 at 19 & Tr. 9/20/18 at 65, 70).

Moreover, once the defendant begun to run in the opposite direction, Officers Hiller and Mancini activated their body worn cameras and exited the vehicle to stop the defendant at that time. (Tr. 9/17/18 at 20-24, 41). As the defendant ran, the defendant tripped himself in an effort to evade the pursuing officers and prior to hitting the ground the defendant discarded a firearm to the ground. (Tr. 9/17/18 at 21). In addition, they heard the firearm hit the ground, slide on the concrete, and observed it come to a stop ten (10) feet from where the defendant had slipped and fallen to the ground. Thereafter, the defendant was apprehended and placed under arrest. (Tr. 9/17/18 at 18, 56). Nearly all of the officers' contact with the defendant was captured on the body-worn cameras of Officer Hiller and Officer Mancini. (*See*, Tr. 9/17/18 at 20-49, & Government's Exhibit 1 & 2) The body worn-cameras of Officers Wright and McCaw, from their angle and activation, did not

become relevant in this case. A search incident to arrest revealed in the defendant's front right pants pocket, a plastic sandwich bag containing eight (8) pink ziplocks, three (3) green ziplocks, all containing white rocklike substance, which field-tested positive for cocaine. (Tr. 9/17/18 at 55) The weapon recovered was later determined to be a black Taurus, PT140G2, .40-caliber handgun, serial number SIR50763. At the time of recovery, the pistol was found to have one (1) round of ammunition in the chamber and ten (10) rounds ammunition in the magazine. (Tr. 9/17/18 at 53-54).

## ARGUMENT

### I. Defendant's Motion to Suppress Tangible Evidence Should Be Denied

The defendant now argues that he was seized in violation of his Fourth Amendment rights and seeks to suppress tangible evidence seized and that this Court should not rely on Officer Hiller's testimony and video evidence from the officers' body-worn camera footage. See Defendant's Motion at 15-19. These arguments are without merit and are counter to the current case law as outlined below. In fact, some of the same or similar arguments that the defendant raises before this Court were already rejected by our Circuit Court in *United States v. Gross*, 784 F.3d 784, 788 (D.C. Cir. 2015) (no seizure where officer asked defendant, "Do you have a gun?" and "Can I see your waistband?" ; "questions alone . . . ordinarily do not amount to a 'show of authority' sufficient to constitute a seizure").

The Supreme Court has held that a police stop takes place "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968), i.e., "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

3

*California v. Hodari D.*, 499 U.S. 621, 627–28 (1991) (*citing United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion)). "[T]he test must not be what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes." *United States v. Goddard*, 491 F.3d 457 (D.C. Cir. 2007) (brackets in original) (citation omitted). Thus, neither the subjective impressions of the defendant nor the officer determine whether a seizure has occurred. *Id.*

In deciding whether a stop has occurred, our Circuit Court has cited several factors: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," as well as "the demeanor of the approaching officer, . . . whether the officer . . . wore a uniform, . . . [and] the time and place of the encounter." *Goddard*, 491 F.3d at 460 (*citing, inter alia, Mendenhall*, 446 U.S. at 554 (plurality opinion)).

Further, the Supreme Court has held that a Fourth Amendment "seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Thus, no stop or seizure occurs even if officers approach a person in a public place, ask to see his identification, and request consent to search his personal belongings, "so long as the officers do not convey a message that compliance with their requests is required." *See id.* at 437. Therefore this Court should find that the defendant was not seized where Officer Wright merely drove up alongside him, asked from his vehicle whether the defendant had a gun, and requested (not demanded) that the defendant show his waistband. Because nothing in the officer's conduct would have led a "reasonable person" to "believe[ ] that

4

he was not free to leave," *Hodari D.*, 499 U.S. at 627-28, no seizure of any kind occurred here. *See, e.g., United States v. Ford*, 548 F.3d 1, 2-3, 6 (1st Cir. 2008) (finding no seizure where police drove up to defendant, and officer asked defendant questions from car, including whether defendant had anything on him that the officers needed to know about, then got out of the car and asked if defendant had any weapons on his person); *United States v. Cardoza*, 129 F.3d 6, 16 (1st Cir. 1997) (police did not conduct seizure when they pulled up in police car alongside defendant on sidewalk, remained inside car, and asked what defendant was "doing out at this time of night").

In support of his argument that the officers nevertheless stopped or seized him, the defendant cites the facts that (1) the officers "contacted" the defendant very late at the night on a virtually deserted street; (2) by a full car of armed GRU officers in tactical gear and the car followed the defendant momentarily then trained an intensely bright light on the defendant; (3) and that the defendant was purportedly directed by Officer Wright to "let me see your waistband." ( Defendant's Motion at 15-16). None of these factors, even taken together, establishes that a seizure occurred.

First, the fact that the officers briefly rode alongside the defendant in their vehicle while he walked on the sidewalk did not render Officer Wright's encounter with the defendant a seizure. *See Michigan v. Chesternut*, 486 U.S. 567, 575 (1988) (holding that where police "brief[ly] accelerat[ed] to catch up with [the defendant]," and then "dr[o]ve alongside him," but did not use their sirens or overhead emergency lights, command the defendant to stop, display their weapons, or drive aggressively to block or control the defendant's movement, the officers' conduct "was not 'so intimidating' that [defendant] could reasonably have believed that he was not free to disregard the police presence and go about his business"). Indeed, because the officers only approached the

defendant on a public street, did not get out of their vehicle, and remained a significant distance away from him, this encounter had much less coercive potential than other police-citizen encounters in confined quarters which our Circuit Court held did not amount to seizures. *See, e.g., United States v. Tavolacci*, 895 F.2d 1423, 1424-26 (D.C. Cir. 1990) (no seizure where three detectives stood at door of defendant's train compartment and began questioning defendant); *United States v. Lewis*, 921 F.2d 1294, 1296-1300 (D.C. Cir. 1990) (no seizures where multiple officers boarded buses, questioned passengers, and requested permission to search them).

As outlined from the motions hearing testimony, the defendant did not intend to comply with the officers' request to show his waistband and there was never a show of police authority:

**Q.** And the reason -- there was a reason that you didn't raise your hands fully, as I'm saying. For the record, my hands are raised extended above my head, all the way to the heavens. You didn't raise your hands that high, did you? Did you?

**A.** No, I didn't.

(Tr. 9/20/18 at 63)

**Q.** If you did this (indicating), sir, raised your hands to the heaven, the gun would have been exposed, wouldn't it?

**A.** Yeah, it might have been.

**Q.** That's a fair question. You agree with me, right? You agree with me, right?

**A.** Yeah.

**Q.** Okay. And it was a second or two after you did that, that you took off running, right?

**A.** Right.

**Q.** Isn't that true?

6

**A.** Yes.

**Q.** All right. Now let me just get one question in context. At no time did Officer Wright, Hiller, McCaw or Mancini ever exit that car prior to you running, right?

**A.** Right.

**Q.** Okay. And at no time, sir, did Officer Mancini, Wright, McCaw, Hiller, show any weapons to you at any time, right?

**A.** Right.

**Q.** And you're pretty smart. You knew that once you raised your hands up above your head, it was going to be on, right? Man, the police were going to see that weapon, right?

**A.** (No response.)

**Q.** That's true, isn't it? Isn't it? That's true, right?

(Tr. 9/20/18 at 64)

**A**. Yeah.

**Q**. Okay. And, sir, you ran because your mind knew that you had two items of contraband that was arrestable, right, a firearm and drugs? That'd be fair to say, right?

**A.** Yes.

**Q.** And at no time, at no time did Officer Wright, who was driving, jump over the sidewalk with the car and try to cut off your view before -- cut off your route before you ran. That'd be fair to say, right?

**A.** Yes.

**Q.** And at no time did anyone jump out before you ran to have any negative police authority contact with you before you ran, right?

7

**A.** Yes.

(Tr. 9/20/18 at 65)

**Q.** And when I said they treated you with dignity and respect, they did not yank you, choke you, beat you, nothing like that, right?

**A.** Right.

(Tr. 9/20/18 at 68)

**Q.** The record will reflect from the body-worn camera. But in this case when you say Officer Wright asked you to lift your jacket, you really didn't want Officer Wright to see the gun in your waistband on your right-hand side. You didn't want him to see it, did you? Correct?.

**A**. Correct

**Q**. And it's on that basis alone, sir, that you chose to run as fast as you could to get away. That would be fair to say, right? Correct?

**A**. Yes.

(Tr. 9/20/18 at 73-74)

Second, the fact that the police vehicle had four officers in it who were wearing police gear also did not elevate the encounter with defendant to the level of a seizure. Indeed, in *Goddard*, our Circuit Court held that four officers, wearing police jackets and badges, and carrying visible (but undrawn) guns and handcuffs, did not effect a seizure merely by driving up in a vehicle to where the defendant and his companions were standing. 491 F.3d at 458-59, 461 (noting that "[b]y itself, the presence of a police car is an insufficient show of authority to make a reasonable, innocent person feel unfree to leave") and in *United States v. Gross*, 784 F.3d 784, 788 (D.C. Cir. 2015),

our Circuit Court rejected a similar claim to the instant case. Indeed, the only reason the defendant ran and did not lift his arms high enough to expose the firearm was that he did not want the officers to see his weapon. (*See* Tr. 9/20/18 at 73-74). Even when questioned by his attorney about why he ran, the defendant stated, "Because I was -- I was just nervous and scared." (Tr. 9/20/18 at 52). Moreover, the defendant stated his motive for running at the motions hearing.

> **Q.** One of your motives for running was that you didn't want to be revoked on either one of the two supervised release cases if you were caught with that firearm or drugs? That would be fair to say? That was part of your motive for running, correct?
>
> **A.** Yes.
>
> (Tr. 9/20/18 at 82-83)

Third, Officer Wright's question to the defendant about whether the defendant had a gun, and request to see defendant's waistband, did not amount to a seizure. The Supreme Court and our Circuit Court have repeatedly held that officers may approach a person, inform the person that they are looking for contraband, and then ask permission to search without effecting a seizure. *See, e.g.*, *Bostick*, 501 U.S. at 431-32 (no per se seizure where two officers boarded bus, asked to see defendant's ticket and identification, explained that they were narcotics agents looking for illegal drugs, and asked for consent to search defendant's luggage); *United States v. Drayton*, 536 U.S. 194, 198-99, 203-04 (2002) (no seizure where officers approached defendants in bus, informed them they were conducting a drug and weapon interdiction operation, and asked permission to search defendants' luggage and persons); *United States v. Maragh*, 894 F.2d 415, 416-19 (D.C. Cir. 1990) (no seizure where officers approached defendant after he got off of train, and one officer (1) asked where defendant came from, (2) asked to see defendant's train ticket, (3) identified

9

himself as narcotics officer seeking to intercept drugs, (4) asked whether defendant had drugs in his bag, and then (5) asked whether he could look inside defendant's bag); *Lewis,* 921 F.2d at 1296, 1300 (no seizure where multiple officers approached passenger onboard bus, identified themselves as drug-interdiction officers, asked if passenger was carrying any narcotics or weapons, and then asked for permission to search passenger); *United States v. Winston*, 892 F.2d 112, 114, 118 (D.C. Cir. 1989) (no seizure where two officers approached defendant on street, and one officer (1) asked to see defendant's train ticket, (2) identified himself as a narcotics officer seeking to interdict drugs, (3) asked whether defendant had any drugs in his bag, and (4) asked permission to search that bag).

Thus, contrary to the defendant's claims (see Defendant's Motion at 15-19), the mere fact that Officer Wright was asking whether the defendant was in possession of something illegal did not amount to a "show of authority" or suggest that the defendant was not free to leave. (*See* Tr. 9/20/18 at 50, 59-61). In that regard, the defendant testified to the following:

> **Q**. What did they say?
> **A**. They said, "Do you have any guns or weapons on you?"
> **Q**. And what did you say?
> **A**. I said, "No."
> (Tr. 9/20/18 at 50)
> **Q**. And it would be fair to say nobody raised their voice when they asked you, sir -- Ms. Petras asked you -- they said, "Do you have a gun?" That's what you just testified to a moment
> ago. You remember that?
> **A.** Yes.
> (Tr. 9/20/18 at 59)
> **Q**. Okay. Well, "Do you have a firearm on you" -- "Do you have a gun or weapon on you?"
> At that time, sir, you knew that they were police upon that question, in your view of them; is that right?
> **A.** Yes.
> (Tr. 9/20/18 at 60)
> **Q.** And also, sir, when Officer Wright said, "Do you have a

10

weapon," you knew he was an officer, and your response was what?
**A.** I said, "No."
(Tr. 9/20/18 at 61)

As the Supreme Court has held, "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *INS v. Delgado*, 466 U.S. 210, 216 (1984); *see also United States v. Wylie*, 569 F.2d 62, 67 (D.C. Cir. 1977) ("police-citizen communications which take place under circumstances in which the citizen's 'freedom to walk away' is not limited by anything other than his desire to cooperate do not amount to 'seizures' of the person"); *Tavolacci,* 895 F.2d at 1425 (officers are "allow[ed] . . . to make inquiries so long as they don't throw their official weight around unduly[,]" and thus do not effect seizures merely by making such inquiries). Accordingly, Officer Wright's questions simply did not amount to a *Terry* stop or other type of seizure. Finally, the defendant fails to show that the totality of Officer Wright's actions constituted a seizure (see Defendant's Motion at 17-19). Notably, the defendant cites no decision in our jurisdiction, or any other appellate court that has held a seizure occurred under circumstances substantially similar to those present in this case. In fact, prior to running, the defendant was free to leave. (*See* Tr. 9/17/18 at 119-120)

Significantly, the defendant never complied with Officer Wright's when he asked the defendant if he would mind showing the officers his waistband. (Tr. 9/17/18 at 18). Based on the defendant's own testimony on cross-examination, the defendant objective was to run, showing further that he was not seized at any time. In fact, the defendant testified to the following:

**Q**: But in this case when you say Officer Wright asked you to lift your jacket, you really didn't want Officer Wright to see the gun in your waistband on your right-hand side. You didn't want him to see it, did you? Correct?

**A**: Correct.

11

(Tr. 9/20/18 at 73)

**Q**. And it's on that basis alone, sir, that you chose to run as fast as you could to get away. That would be fair to say, right? Correct?

**A**. Yes.

(Tr. 9/20/18 at 74)

**Q**. One of your motives for running was that you didn't want to be revoked on either one of the two supervised release cases if you were caught with that firearm or drugs? That would be fair to say? That was part of your motive for running, correct?

**A**. Yes.

(Tr. 9/20/18 at 82-83)

Moreover, in a very recent D.C. Circuit's case (*United States v. Antoine Miller*[1], No. 17-3035) involving the GRU and a Fourth Amendment argument of seizure by the officers of a suspect on the street, our Circuit Court rejected that claim, as well. In that case, Officers Hiller and Wright testified before the Honorable United States District Court Judge Ketanji B. Jackson, our Circuit Court agreed with Judge Jackson's opinion that there was no seizure, *inter alia*, when Officer Wright identified himself as 'Police' and asked if [Miller] had any guns on them tonight. That defendant immediately stated "no!," and turned around so his back was facing the officers and then lifted the back of his puffy vest jacket, deliberately not showing the officers the front of his waistband Officer Hiller approached the defendant. When Officer Hiller approached the defendant, he calmly asked the defendant, "hey man can I talk to you?", whereupon the defendant stopped walking and turned and faced Officer Hiller. At no time did the officers draw their weapons or

---

1 A copy of the Circuit's non-published opinion is attached, *United States v. Antoine Miller*, No. 17-3035 – remanded on other grounds. (Attachment #1)

touch the defendant. Officer Hiller asked the defendant again if he had any firearms on him tonight, whereupon the defendant turned facing towards a rod iron fence and lifted the rear of his puffy vest jacket again. Officer Hiller then again calmly asked the defendant if he had anything in the front of his waistband, at which time the defendant, without request from the officers, put his arms up and grabbed the rod iron fence in front of him and mumbled something that Officer Hiller was unable to understand. Because Officer Hiller did not understand the defendant, Officer Hiller asked him to repeat himself. At which time, the defendant mumbled something again which Officer Hiller also could not understand. Officer Hiller, because he was unable to understand what the defendant was trying to communicate to him, asked the defendant to turn around so he could better hear him. . . . Officer Hiller asked, "man, do you have a gun on you?," the defendant voluntarily stated, "I told you I have! I been telling you I have one! You can have it! Just take it! Just take it! You can have it!" *See* Judge Jackson's Memorandum Opinion at 3-7 - Attachment #2

Our Circuit Court held on those facts that the officers' actions were not a seizure and further stated the following:

> In this case, the district court's determination[2] that Miller was not seized when an officer exited the vehicle and questioned him is consistent with our precedents. In *United States v. Gross*, for example, we found no seizure when officers followed the defendant in a police car and asked him questions. 784 F.3d 784, 787-88 (D.C. Cir. 2015). We similarly found the encounter in *United States v. Goddard*, 491 F.3d 457 (D.C. Cir. 2007), did not constitute a seizure. There, four uniformed policemen drove their car into a gas station, parked near a group of men, got out of the car, and approached the men. Id. at 462. Here, the record reveals that the officers neither made physical contact with Miller before arresting him nor used language or tones of voice indicating that he was required to comply. *See United States v. Castle*, 825 F.3d 625, 632-33 (D.C. Cir. 2016) (listing circumstances indicating a seizure,

---

2 A copy of the Honorable United States District Court Judge Ketanji B. Jackson's finding is attached, *United States v. Antoine Mille*r, case number 16-072. (Attachment #2)

including touching the suspect and using language or a tone of voice compelling compliance). Although Miller may have felt compelled to answer the officer's questions, his subjective beliefs are not relevant to this issue. *See United States v. Carrasquillo*, 877 F.2d 73, 76 (D.C. Cir. 1989). Therefore, on the record at hand, there is no permissible ground for this court to disturb the district court's ruling that Miller was not seized.

*United States v. Antoine Miller*, No. 17-3035, pages 1-2.

## II. Government responses to the Court's questions

### A) Whether the MPD Officers' failure to activate their body cameras, purported in violation of MPD Regulations, could and should lead to an adverse inference.

It is well-settled that evidence tending to show a violation of an internal operating procedure or guideline existing at the state law level is not only insufficient to prove a violation of the United States Constitution, but it is also irrelevant to such a claim. *See Kraushaar v. Flanigan*, 45 F.3d 1040, 1047, 1049 (7th Cir.1995) (stating that "plaintiff cannot rely upon provisions of state law to determine what conduct is reasonable under the federal Constitution" and holding that "state-created liberty interests do not create federally enforceable rights"); *United States v. Moore*, 36 F.3d 127, 1994 WL 535734 at *2 (D.C.Cir.1994) (unpublished disposition) (recognizing that a strip search conducted in violation of a Special Order of the Metropolitan Police Department may still pass muster under the Fourth Amendment's reasonableness calculus); *Doe v. Burnham*, 6 F.3d 476, 480 (7th Cir.1993) (stating that "just because [a state] chooses to regulate police behavior in a certain way does not mean the police officers violate the Constitution by transgressing those rules" and recognizing that "the norms embodied in the Constitution and the norms authorized by [a state] legislature are not necessarily interchangeable . . . a state may provide greater protections under its laws than the Constitution requires").

Based on the testimony in this case, Officers Hiller and Mancini turned on their body-worn

cameras at the time that the defendant fled from vehicle. At the motions hearing, there were questions to Officer Hiller regarding when he activated his camera and why he did not at the first point his saw the defendant, although the entire interaction with the defendant was captured on video but the audio only started after the defendant fled and the two officer activated the audio portion of their body-worn camera video as they got out of the vehicle. Officer Hiller explained: "A body-worn cameras are affixed to -- I had mine affixed to my vest, but it's usually affixed to your outermost garment, and it runs for the entirety of the tour. The body-worn camera, once activated, there's a two-minute buffer without audio, but it captures video, and once you activate it, that's when the camera picks up audio and video." (Tr. 9/17/18 at 13). Moreover as clearly stated on the record by Officer Hiller by not activating the audio portion of the initial contact with the defendant it was not intentional or a concerted effort by the officers in anyway. In fact, Officer Hiller tested, *inter alia*, that "We would actually want that to be recorded. It would probably help us in these types of situations. . . . It's just that when we're on patrol things happen so quick, and we try to do -- we turn it on as quickly as we can sometimes." (Tr. 9/17/18 at 78). Simply stated, there were no intentional or constitutional violations in this case. However, if the Court finds there was an administrative lapse regarding the MPD General Order regarding body worn camera procedure in this case, from this record, the error cannot and does not raise to a constitutional level. Therefore, no constitutional adverse inference should apply. *See United States v. Donovan*, 429 U.S. 413, 432 n.22 (1977) ("The availability of the suppression remedy for . . . statutory, as opposed to constitutional, violations . . . turns on the provisions of [the statute] rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.").

**B) Whether a defendant's testimony may be found credible notwithstanding prior felony conviction and a stake in the outcome.[3]**

Instruction 2.209 DEFENDANT AS WITNESS

A defendant has a right to become a witness in his/her own behalf. His/Her testimony should not be disbelieved merely because s/he is the defendant. In evaluating his/her testimony, however, you may consider the fact that the defendant has [a vital] [an] interest in the outcome of this trial. As with the testimony of any other witness, you should give the defendant's testimony as much weight as in your judgment it deserves.

Instruction 2.219 IMPEACHMENT BY PROOF OF PENDING CASE, PROBATION OR PAROLE WITNESS (IF APPLICABLE)

You have heard evidence that Mr. Gibson is [on probation] [on parole] [on supervised release] [charged with a crime] [awaiting sentence] [under investigation]. You may consider this evidence when deciding whether the witness has a bias in favor of one of the parties that may affect his/her willingness to tell the truth.

Instruction 2.220 IMPEACHMENT BY PROOF OF CONVICTION OF A CRIME – DEFENDANT

You have heard evidence that Mr. Gibson has previously been convicted of a crime. This prior conviction is admitted into evidence solely for your consideration in evaluating his credibility as a witness. The evidence that he was convicted of a crime in the past is not evidence that Mr. Gibson is guilty of the offenses charged in this case and you must not draw such an inference.

---

3 The D.C. Court of Appeals has outlined the following: That it is permissible for the trial court to weigh the defendant's interest in his case when making its credibility determination. *See, e.g., Walker v. United States*, 982 A.2d 723, 740 (D.C. 2009)(permissible to instruct jury that it may take defendant's "vital interest in the outcome" of the case into account when weighing defendant's testimony). Indeed, ("[W]here there is a direct conflict between the testimony of a defendant and that of a witness for the government, the trier of the facts has a right to accept the version of the government's witness.") (*quoting Brenke v. United States*, 78 A.2d 677, 678 (D.C. 1951)). Moreover, a witness's personal interest in the outcome of a trial is "always relevant" in assessing the witness' credibility, *Foreman v. United States*, 792 A.2d 1043, 1056 (D.C. 2002), because such an interest "might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party." *United States v. Abel,* 469 U.S. 45, 52 (1984). When a defendant testifies in his own defense, the fact finder may therefore consider whether the credibility of his testimony has been affected by his interest in not being convicted of a crime, because "anything that might sway the truthfulness of [a defendant's] testimony" is "a relevant fact in assessing his motive to lie." *Johnson*, 636 A.2d at 981 (noting that a defendant's "prospect of incarceration," and the "potential punishment" that he faces, may be properly considered by the fact finder in assessing a defendant's credibility).

16

**C) Whether testifying law enforcement officers have a stake in the outcome.**

Instruction 2.207 POLICE OFFICER'S OR LAW ENFORCEMENT AGENT'S TESTIMONY

A police officer's or law enforcement agent's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's or agent's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because he or she is a police officer or law enforcement agent.

WHEREFORE, this Court should deny defendant's motion to suppress.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

_____/S/_____
EMORY V. COLE
ASSISTANT UNITED STATES ATTORNEY
PA. Bar No. 49136
U.S. Attorney's Office
555 4th Street, N.W., Room 4213
Washington, DC 20530
Emory.Cole@usdoj.gov

17