UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| Plaintiff, | : | Criminal Action |
| | : | No. 18-108 |
| v. | : | |
| | : | |
| MARK GIBSON, | : | September 25, 2018 |
| | : | 11:30 a.m. |
| | : | |
| | : | |
| Defendant. | : | Washington, D.C. |
| | : | |
| ............................ | : | |

TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE EMMET G. SULLIVAN,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the United States:    **Emory Vaughan Cole, Assistant U.S.
Attorney**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 252-7692
Fax: (202) 616-2296
Email: Emory.Cole@usdoj.gov

For the Defendant:    **Mary Manning Petras, Assistant
Federal Public Defender**
FEDERAL PUBLIC DEFENDER FOR THE
DISTRICT OF COLUMBIA
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
(202) 208-7500 Ext. 109
Fax: (202) 208-7515
Email: Mary_petras@fd.org

APPEARANCES:  Cont.

For the Defendant:               **Sandra Roland, Assistant Federal**
                                 **Public Defender**
                                 FEDERAL PUBLIC DEFENDER FOR THE
                                 DISTRICT OF COLUMBIA
                                 625 Indiana Avenue, NW
                                 Suite 550
                                 Washington, DC 20004
                                 (202) 208-7500
                                 Email:  Sandra_roland@fd.org

Court Reporter:                  **Scott L. Wallace, RDR, CRR**
                                 Official Court Reporter
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                    <u>**AFTERNOON SESSION, SEPTEMBER 25, 2018**</u>

2     (11:48 a.m.)

3          THE COURTROOM CLERK:  Your Honor, this is Criminal Case

4     18-108, *United States of America versus Mark Gibson*.

5          Would parties please come forward to the lectern and

6     please identify yourselves for the record.

7          MR. COLE:  Your Honor, if it pleases the Court, I am Emory

8     V. Cole, representing the United States in this matter.  As

9     always, it's good to see you.  I have with me my paralegal,

10    Jeanette Litz.

11         THE COURT:  All right.  Good morning to you both.

12         MS. PETRAS:  Good morning, Your Honor.  Mary Petras and

13    Sandra Roland on behalf of Mr. Gibson.

14         THE COURT:  Good morning to you both.

15         Mr. Gibson, how are you?

16         THE DEFENDANT:  Good.

17         THE COURT:  Good.  So the evidentiary record is closed.

18         Let me hear from Mr. Cole.

19         MR. COLE:  Yes, Your Honor.  Your Honor, if it pleases the

20    Court, I have a request.  I am aware, and the Court is as well,

21    Mrs. Roland filed a -- at 7:30 last night, I had left the office

22    early.

23         THE COURT:  I was still here.

24         MR. COLE:  But I've got something to say next.

25         At 7:34, I believe, I had left early, but this morning, as

1    I was preparing to go over and make appropriate arguments at

2    3 a.m., I found out she had filed this.  It upset me greatly

3    because I believe counsel now has entered new case law that the

4    government has not had an opportunity to respond.

5         THE COURT:  But you learned about it at 3 a.m.?

6         MR. COLE:  Well, I did.  I couldn't go back to sleep, Your

7    Honor.  And having said that, it was --

8         THE COURT:  Actually, to make you feel better, I was up

9    also reading something else, but anyway.

10        MR. COLE:  But I was reading this.

11        THE COURT:  Right.

12        MR. COLE:  And important to note, Your Honor -- and I

13   know -- I had the go fortune over the last 15 years to appear

14   before you -- this is a fundamental fairness argument that I'm

15   making first.

16        There are new theories that Mrs. Roland has put out.  I

17   just want to highlight to you what the government responded to

18   initially.  I think I did that early, but Ms. Petras wrote, "On

19   that day, officers of the Metropolitan Police Department stopped,

20   arrested Mr. Gibson, and without a warrant they searched him and

21   found a gun and drugs."

22        That's what -- and that was one sentence, two sentences.

23        The government responded fully regarding the warrant.  We

24   had case law.  I want the Court to know there is a whole case law

25   from our circuit and the Supreme Court, the show of authority.

1    There is no mentioning of a show of authority in Ms. Petras'

2    motion.  So we responded and had our opposition, based on what

3    the two or three sentences Ms. Petras makes.

4         And then you asked Ms. Petras to file a reply motion --

5    I'm sorry, a reply to our opposition.  And this is what she said.

6    It's one sentence -- two, I'm sorry, on page 1, "The officer

7    seized Mr. Gibson and searched him based only on the fact that he

8    was walking down the street and turned to look at the officers

9    who were following him in an unmarked police car.  The officers'

10   conduct would have led a reasonable person to believe that he or

11   she was not free to leave."

12        And that was it.  So it wasn't a show of authority, so I

13   didn't address the fulsomeness of the show of authority case law

14   and review.  And in -- as we proceed in this, I think in -- and I

15   had mentioned to you earlier about, I practice a little

16   differently.  I give counsel discovery months in advance,

17   transcripts weeks in advance.  I don't play it close.

18        Now, we closed our testimony in this case -- I'm not

19   talking about the facts.  We closed that last week.  So if

20   counsel, Mrs. Roland, was going to have the argument of a show of

21   authority, at least give the government an opportunity to respond

22   to that argument, because we --

23        THE COURT:  We talked about that, and I think -- I recall

24   specifically asking -- we started talking about theories, and I

25   said, "Well, I think her theory is that at a time when there was

1    a discussion between the officer driving the van or truck or

2    whatever it was, and Mr. Gibson, that amounted to a seizure.  And

3    I assume that's your theory?"

4          And she said, "It is."

5          MR. COLE:  I agree with that.  I don't dispute that, Your

6    Honor, but there was nothing written for which the government

7    could respond to, not just what the Court has surmised.  Because

8    defense counsel, as you know, you may surmise one thing, and they

9    come back with another in a written submission.

10          THE COURT:  That oftentimes happens.

11          MR. COLE:  All right.  So I'm saying fundamental fairness,

12    the government has not had an opportunity to respond to anything

13    that was written, although the -- although you mentioned this

14    several days ago, about a week ago, in the first time we were

15    here, there was nothing written where the government had an

16    opportunity to respond to or to highlight to the Court in a

17    written submission.

18          One thing I want you to realize is that at every point

19    when the Court had something, I put a memorandum in writing, gave

20    counsel an opportunity to respond to it.  I would note on the

21    rule of evidence on 806, that came up.  Ms. Petras just threw it

22    out there, "We're relying on 806."  You recall that, for the

23    admission of those extrinsic items.  And then I said, "Give me an

24    opportunity to respond."

25          THE COURT:  And I gave you an opportunity.

1          MR. COLE:  You did, and I responded.  On that point, Your

2    Honor, it is the government's position that the circuit has

3    already ruled on that issue that extrinsic evidence to a

4    nontestifying declarant is inadmissible.

5          THE COURT:  Period, for all purposes?

6          MR. COLE:  Yes.  Yes, Your Honor, because the witness did

7    not -- Mrs. Petras could have called the witness and had been

8    stuck with her answer.  That's what our circuit has done.

9          Contrast that, Your Honor, Ms. Roland put some statements,

10   in which she just filed at 7:34, last night about that.

11   Specifically -- and I believe that's wrong because you haven't

12   ruled on it, as far as I am aware.  I gave you information on our

13   memorandum that our circuit said it is improper, and that's not

14   the way to go.

15         If you look at -- and, again, I just -- I don't want to --

16   the point I'm making is that I think this is unfair.  The

17   government respectfully asks for time to do it, and I don't know

18   why Ms. Roland would put in her motion a item that's not -- I

19   could give you the exact page.

20         THE COURT:  I mean, in fairness, though, Counsel did file

21   it, and I happened to be here late, and I did read it later on

22   after I left the courthouse.  You know, in fairness, if it's

23   appropriate, I probably should hear from counsel.  I have some

24   questions regarding the 806 issue, and in fairness, I'll probably

25   give the government a short -- a brief opportunity to respond if

1    it's necessary.

2        MR. COLE:  Your Honor, I was asking -- I have just one

3    other point before she comes up.  I'm asking for the full 14 days

4    on a local Rule 7 to respond.  This type of practice -- my point

5    is on that issue -- and I have just one other and then you can

6    ask --

7        THE COURT:  To respond to which issue, the 806 issue?

8        MR. COLE:  Yes.  I have just one other, Your Honor.  We

9    had shown -- there was an issue about -- about -- I had a

10    memorandum of applicable case law about the officers not seizing

11    the defendant.  That came up during our discussion.  So I gave

12    you more like a bench memorandum.  It wasn't a full stated facts

13    and law, I mean, but I gave defense counsel an opportunity, not

14    filing it the day -- the night before to make the arguments.  I

15    did it at an appropriate time.  That is important as we proceed

16    in this matter, and that is my hallmark.  And you know it, and

17    you have never heard me --

18        THE COURT:  I'm going to be fair to both sides.

19        MR. COLE:  Right, but I'm asking for the full 14 days,

20    Your Honor.

21        THE COURT:  That's the Court's hallmark as well to be fair

22    to both sides.

23        MR. COLE:  All right.  I have a little bit more.

24        THE COURT:  I did not rule on the 806 issue.  I said I'd

25    take a look at it.  I think it's probably more appropriate for

1     the Court to address that issue.  I don't recall if there's any

2     other evidentiary issue, other than the 806 that's outstanding, I

3     don't think.  Yeah, that's it.

4          So let me hear from counsel because I do have some

5     questions about that, and if it's -- I think it's probably fair

6     to give the government a short opportunity.  I don't know if -- I

7     don't know if it'll be the full 14 days, but I think what I'd

8     like to do is resolve this issue and then hear argument, and to

9     the extent it's necessary for any side to submit supplemental

10    pleadings, then I'll certainly do that.

11         Yes, Ms. Roland.

12         MS. ROLAND:  Your Honor, are you suggesting that you would

13    like first to discuss the 806 issue?

14         THE COURT:  Well, I think the evidentiary record should be

15    established and closed before we get to argument.

16         MS. ROLAND:  Okay.

17         THE COURT:  So --

18         MS. ROLAND:  Ms. Petras will --

19         THE COURT:  -- my recollection is that it was towards the

20    end of the last hearing when Ms. Petras did introduce some

21    exhibits under Rule 806 -- actually, she introduced them, and I

22    don't think it was clear if they came under 806, I don't think,

23    but it's clear now they're being offered under 806, so I should

24    probably hear some argument with respect to the reasons why those

25    exhibits should be admissible and the purpose for those exhibits,

1    so...

2          MS. ROLAND:  Your Honor, Ms. Petras will make that

3    argument.

4          THE COURT:  All right.  Thank you.

5          Tell me what the exhibits are and what they say, first of

6    all.

7          MS. PETRAS:  There are four exhibits that I --

8          THE COURT:  All right.  And they've been marked?

9          MS. PETRAS:  I believe the government admitted exhibit --

10   I mean, that the Court admitted Exhibits 1 through 15, and then

11   there is the question of Exhibits 16-1, 16-2, 16-3 and 16-4.

12         THE COURT:  I'm sorry.  Is that 16 or 15 you're saying?

13         MS. PETRAS:  16.

14         THE COURT:  16-1, -2, -3 and -4?

15         MS. PETRAS:  Yes.

16         THE COURT:  All right.

17         MS. PETRAS:  And 16, that's --

18         THE COURT:  And just so the record is clear, the matter is

19   proceeding nonjury.  I mean, there's case law from our circuit

20   that says when a Court presides -- and the D.C. Court of Appeals

21   as well -- when the Court presides nonjury and allows evidence

22   into the record, presumably the Court's going to focus at a time

23   when it needs to make a decision upon what's properly considered

24   to be competent evidence and disregard the other evidence.  And

25   I've said that before, if I rely upon evidence that I've

1    admitted, then I'll let everyone know what I've relied upon and

2    the reason why I've relied upon it.  So I did allow a lot of

3    exhibits to come into the record over objection, but I just

4    wanted to make that point clear, but 16-1, -2, -3, and -4 came

5    in -- I allowed them to come in provisionally, I believe, at the

6    end of the day.

7         So go right ahead, Counsel, what's your argument there?

8         MS. PETRAS:  Okay.  To begin with, under Federal Rule of

9    Evidence 104, the rules of evidence generally do not apply to

10   pretrial hearings, so the Court is allowed to accept whatever

11   evidence the Court deems appropriate.

12        When I was seeking to admit this evidence, I mentioned

13   that the rules of evidence even permit the introduction of

14   hearsay to rebut hearsay, and that is Rule 806.

15        I'm not specifically relying on 806 because the rules of

16   evidence don't generally apply.  My point was that it would be

17   permissible under there.  The government in response has said

18   that Rule 608 would not allow extrinsic evidence.

19        THE COURT:  Wait, 608 or 806?

20        MS. PETRAS:  608.  806 is the evidence that allows you to

21   enter -- is the rule that allows you to introduce evidence

22   impeaching a hearsay statement with hearsay.

23        Rule 608 is -- 608(b) prohibits the introduction of

24   extrinsic evidence at trial.  So if at trial an hearsay statement

25   as an excited utterance or for whatever, I could then introduce

1   hearsay to rebut it, but I could not introduce extrinsic evidence

2   to support the hearsay --

3          THE COURT:  At trial.

4          MS. PETRAS:  -- which is the government's point here.

5          Yes, at trial.  We're not at trial.  The government's

6   cases all were trial cases, including the *White* case from the

7   D.C. Circuit that the government points to and the *Whitmore* case

8   from the D.C. Circuit.  They do note in a -- even in the trial

9   context, there's some dispute here because there's a 2nd Circuit

10  case in the footnote that specifically says, essentially, if you

11  can't introduce the extrinsic evidence and they've introduced

12  hearsay and they don't have the declarant, how else are you going

13  to rebut it if you -- so Rule 608 shouldn't apply.

14         But the Court doesn't need to -- there is a D.C. Circuit

15  case that suggests that you can't in the trial context introduce

16  extrinsic evidence.  In --

17         THE COURT:  Are there any cases that you found that

18  address the introduction of exhibits pursuant to 806 in the

19  context of a pretrial suppression hearing?

20         MS. PETRAS:  No.  And I can't say that --

21         THE COURT:  And everyone agrees that hearsay is

22  admissible.

23         MS. PETRAS:  Is admissible, and the rule -- and I am

24  relying on Rule 104, which says that the rules don't apply.  So

25  the Court doesn't need to even resolve this issue.  The only

1    issue is whether or not this stuff is relevant.  And it's highly

2    relevant for the reason that the government here didn't even just

3    introduce the hearsay statement from Officer Wright, they

4    introduced Officer Hiller's testimony essentially vouching for

5    Officer Wright in saying, "Officer Wright would never do this.

6    Officer Wright would never say can I see -- would never say let

7    me see your waistband as a command.  He only goes around asking a

8    question, can I see your waistband."

9         THE COURT:  Well, he couldn't -- he couldn't -- I mean,

10   arguably, he couldn't say that anyway.  He couldn't offer an

11   opinion anyway because he's not always with Officer Wright.

12        MS. PETRAS:  Right.  And it also is -- the Court should

13   not believe that, and should discredit that for that reason

14   alone.  But the Court should also discredit that because Officer

15   Wright himself is not very credible.

16        So I think what we've introduced as 16-1 is the

17   transcript -- 16-1 is the transcript in the *District of Columbia*

18   *versus Louis Stanley*, and in that case, it was a hearing before

19   the Honorable Anita Josey-Herring, and in the end, she

20   discredited Officer Wright and granted a motion finding that the

21   defendant was -- believing the defendant over Officer Wright.

22   And --

23        THE COURT:  Was that a gun recovery case?

24        MS. PETRAS:  I don't want to get --

25        THE COURT:  Was that a suppression hearing?

1      MS. PETRAS:  I believe it was.  It was a motions hearing,

2  yes, and it was a suppression hearing, yes.

3      THE COURT:  Were the facts analogous or --

4      MS. PETRAS:  I don't -- it was a car stop, and it was a

5  question of whether or not she discredited Officer Wright when he

6  testified.  She said, "The officer testified that he at that

7  point was not going to arrest the defendant for operating a

8  suspended license [sic], and he would have let the defendant go,

9  but for having further conversation with the defendant, the

10  defendant admitted possessing a gun."

11      And she -- and I'm skipping a part here, but I'm referring

12  to page 132 over to page 133 of Exhibit 16-1.  She said, "I don't

13  honestly credit the officer's testimony," and then she goes on to

14  explain why she discredited him.  And this is the officer that

15  the government chose not to call.  It's the officer that spoke to

16  Mr. Gibson.

17      And then in the case of *United States versus Philip*

18  *Mitchell*, which we've marked the transcript as 16-2, Officer

19  [sic] Yvonne Williams, it was a stop of an individual that

20  Officer Wright testified about, and officer -- and Judge Williams

21  found that it was a violation of the Fourth Amendment.

22      THE COURT:  I thought you said Officer Williams.  I was

23  going to say isn't she a judge?

24      MS. PETRAS:  Officer Williams?

25      THE COURT:  Yeah.

1       MS. PETRAS:  I'm sorry.  Judge Williams --

2       THE COURT:  All right.

3       MS. PETRAS:  -- found --

4       THE COURT:  I know her well.  All right.  Good.

5       MS. PETRAS:  -- found that Officer Wright was not

6   credible, and --

7       THE COURT:  What was the context?  Was that a motions

8   hearing also?

9       MS. PETRAS:  Yes.  It was a stop of an individual on the

10  street and a gun recovery, and officer -- Judge Williams found

11  that Officer Wright was not credible.

12      THE COURT:  For what reason?

13      MS. PETRAS:  Basically did not buy the whole consent.  I

14  guess he was saying that the defendant had consented and she --

15      THE COURT:  Consented to?

16      MS. PETRAS:  Consented to a search.  It was a similar

17  incident where they went -- they were -- just went up to somebody

18  on the street and asked if they had any guns and --

19      THE COURT:  Asked?

20      MS. PETRAS:  Yeah.

21      THE COURT:  And What did he say in that case?

22      MS. PETRAS:  He said that the person -- he asked if he

23  could search the person.  The person held up his hands and

24  consented to a search.  And the judge discredited that and found

25  that there was no consent.

1        THE COURT:  So she didn't believe that it happened that

2   way?

3        MS. PETRAS:  Correct, the way that Officer Wright had

4   testified.

5        THE COURT:  Did anyone else testify?

6        MS. PETRAS:  In one of the cases the defendant testified.

7   I can't remember if it was this one.  Another officer --

8        THE COURT:  Do we know what her reason was -- Judge

9   Williams' reason was for that?

10        MS. PETRAS:  Officer did not testify -- the defendant

11   looks like did not testify, but she just discredited it, the fact

12   that this -- that it was a consent, and that he did it sort of

13   voluntarily.  Sort of goes to the same issue here as to the

14   conduct of the officers and whether people are giving voluntary

15   consent.

16        THE COURT:  So she heard the testimony, and she said, "I

17   don't believe it happened that way"?

18        MS. PETRAS:  Correct.  So both of those -- so that's two

19   judges in Superior Court who have discredited Officer Wright, who

20   the government chose not to call here but instead called Officer

21   Hiller, and Officer Hiller sort of vouched for Officer Wright.

22   So we think it goes to rebut the evidence that the government

23   presented.

24        THE COURT:  Are you suggesting that the government did not

25   call him because he'd been -- his credibility had been impeached

1    on a couple of other occasions?

2         MS. PETRAS:  I don't know why the government didn't call

3    him, and probably it doesn't matter why the government didn't

4    call him.

5         THE COURT:  Because his testimony can still be impeached,

6    you say?

7         MS. PETRAS:  Yes.

8         MR. COLE:  Your Honor, does --

9         THE COURT:  Wait a minute, by applying 806 and 104, I

10   assume then, right?

11        MS. PETRAS:  Excuse me?

12        THE COURT:  By -- to get to that conclusion, the Court

13   would of to apply 806 as construed by 104, the rules?

14        MS. PETRAS:  No.  To get to allow the Court to consider

15   this evidence, you don't really need to conclude anything about

16   the Federal Rules of Evidence because under Rule 104, the rules

17   of evidence don't apply.

18        THE COURT:  That's what I said.

19        MS. PETRAS:  So the Court would only need to find that you

20   believe that it's relevant to assessing the officer's testimony.

21        THE COURT:  Right.  Okay.  But what we have here is the

22   in-court testimony of -- what's this man's name anyway?

23        MR. COLE:  Hiller.

24        THE COURT:  Officer Hiller.

25        MR. COLE:  Hiller.

1          THE COURT:  The in-court testimony of Officer Hiller.  So

2     what you're asking the Court to do also is to impeach his

3     in-court testimony that writes out-of-court declaration or

4     out-of-court testimony, um, should be objected.

5          MS. PETRAS:  Or to impeach Officer Wright's credibility or

6     the credibility of Officer Hiller's statement that Officer

7     Wright --

8          THE COURT:  To impeach the credibility of the declarant

9     then, correct?  And the declarant being Wright?

10         MS. PETRAS:  I think we're introducing it both to impeach

11    Officer Wright, who hasn't testified, but also to rebut the

12    testimony of Officer Hiller that the officers that he rides

13    around with always do the right things, sort of.  Essentially

14    what he was saying is that, "We never would do that.  I only work

15    with these officers when I presented them with the flag and the

16    other officers" --

17         THE COURT:  Okay.  All right.  What about Exhibits 3 and

18    4?

19         MS. PETRAS:  Exhibits 3 and 4 are similar, but only in

20    that they are complaints filed against Officer Wright for illegal

21    searches and seizures.  It, again, goes to the suggestion that

22    Officer Wright would never do anything unlawful by demanding to

23    see somebody's waistband.

24         THE COURT:  But have they been resolved, those complaints?

25         MS. PETRAS:  Both of them -- the exhibit contains both the

1   complaint, and then at the end of the exhibit I've attached the

2   docket entry for the notice of settlement.  The government

3   settled both of those cases.

4        THE COURT:  The federal government or D.C. government?

5        MS. PETRAS:  It was District of Columbia.

6        THE COURT:  Right.

7        MS. PETRAS:  He was sued in his -- the District of

8   Columbia and Officer Wright were sued.

9        THE COURT:  All right.  And so we don't know the terms of

10  the settlement then?

11       MS. PETRAS:  No, only what was filed.  And one is just

12  simply a --

13       THE COURT:  Can the Court assume there must have been some

14  merit there --

15       MS. PETRAS:  -- stipulation --

16       THE COURT:  -- because of the settlement or what?

17       THE REPORTER:  I'm sorry?

18       THE COURT:  Can the Court assume there must have been some

19  merit because of the settlement or what?

20       MS. PETRAS:  I think the Court can put whatever weight you

21  want to put on it, but I think it certainly rebuts the suggestion

22  that Officer Wright would never violate the Fourth Amendment.

23  There's at least two citizens that thought that he -- enough so

24  to file complaints, and the District of Columbia thought that

25  there was enough to it that they thought to settle it.  And then

1    there's at least two Superior Court judges that found him

2    incredible.

3         THE COURT:  I mean, I don't -- I don't even know if I have

4    to go that far because the testimony was that he would never do

5    that, he would never do that.  So I don't -- not so sure how this

6    person could vouch for that since there's nothing in the record

7    that suggests that, you know, they're joined at the hip 24

8    hours -- 24/7, you know.

9         MS. PETRAS:  And I think -- and I'll leave it to

10   Ms. Roland who will point out, I think, that these -- you never

11   even need to get to Exhibit 16 for a whole number of reasons.

12        THE COURT:  The Circuit opinions you made reference to

13   address the principle that while Rule 806 allows a defense to

14   attack an out-of-court declarant's credibility, the defendant may

15   not seek to admit extrinsic evidence to prove specific instances

16   of a declarant's character truthfulness.

17        That's at a trial, correct?

18        MS. PETRAS:  Correct.

19        THE COURT:  And you're saying here all bets are off,

20   because pretrial hearsay comes in under 104, the rules don't

21   apply?

22        MS. PETRAS:  Correct.

23        THE COURT:  But there's no case law that deals with that?

24   This can't be the first time this has ever come up.

25        MS. PETRAS:  I can't say that I did an exhaustive search,

1    but I couldn't find the use of these -- rules in the context of a

2    motions hearing.  And I think that's probably because the rules

3    don't apply, so it wouldn't come up.

4         THE COURT:  So then why even look at 806 then if the rules

5    don't apply?

6         MS. PETRAS:  I don't think the Court needs to look at 806.

7         THE COURT:  If hearsay comes in, it comes in.

8         MS. PETRAS:  And we're introducing this hearsay, and it's

9    relevant to the credibility of Officer Hiller's testimony.

10        But, again, I don't think the Court even needs to get

11   there, given the state of the evidence and I'll let Ms. Roland

12   address that.

13        I will say -- only because Mr. Cole was saying Ms. Roland

14   filed that late at night, I will -- obviously, we were trying to

15   file our pleading as soon as possible.  I was in court all day

16   yesterday, so she waited for me, and the delay yesterday was my

17   fault.

18        I would also note that Mr. Cole actually did file his last

19   pleading literally as we were walking in the door to the last

20   hearing, so --

21        THE COURT:  So let's -- wait a minute.  So what you're

22   saying is what's good for the goose is good for the gander,

23   right?

24        MS. PETRAS:  No.  I'm just pointing out that it's not as

25   clear-cut as he was suggesting, but --

1    THE COURT:  All right.  You know, it's advocacy and people

2  file when they get time.

3    MS. PETRAS:  Exactly.

4    THE COURT:  You know, I'm not going to be unfair to

5  anyone.  If I need to keep the record open, I'll do that.

6    I just want to be clear.  So the statement we're talking

7  about is the, quote -- it's page 89 of the September 18, 2018

8  transcript, "I've worked with Officer Wright for three years.  I

9  never heard him demand to see somebody's waistband like that.

10  And I know that for a fact he wouldn't have said that night.

11  It's always, 'Hey, man, do you mind showing me your waistband,'

12  or, 'Hey, can I see your waistband,' something along those

13  lines."

14    That's what you're seeking to --

15    MS. PETRAS:  To rebut.

16    THE COURT:  -- to rebut?

17    MS. PETRAS:  And I would also note that the critical

18  point, I think, even before you get to that, is that Officer

19  Hiller says he doesn't even remember what was said.  He doesn't

20  have any specific memory of what was said that night; whereas, on

21  the other hand you have Mr. Gibson's testimony.

22    THE COURT:  What's the transcript site for that?

23    MS. PETRAS:  That he doesn't remember?  I'm going to let

24  Ms. Roland take over from here because --

25    THE COURT:  All right.

1        MS. PETRAS:  -- she's clear on that.

2        THE COURT:  Excuse me one second.

3        (Brief pause in proceedings.)

4        MS. PETRAS:  Your Honor, the transcript --

5        THE COURT:  Just a minute, Counsel.  Just a minute.

6        (Brief pause in proceedings.)

7        THE COURT:  So is this a 608 issue or an 806 issue or just

8   a 104 issue where everything comes in and the Court just has to

9   sort it out?

10        I'm sorry to bring you back.

11        MS. PETRAS:  That's okay.  It's 104.  It's 104.

12        THE COURT:  Right.

13        MS. PETRAS:  It comes in because the rules of evidence

14   don't apply, so the Court can consider whatever is relevant.

15        THE COURT:  Right.  So the two cases you're referring to,

16   *McGill* and *Fonseca* --

17        (Discussion had off the record.)

18        THE COURT:  Sorry.  My brilliant law clerk found those

19   cases.  *McGill* and *Fonseca*.  I don't know, are you familiar with

20   those cases?

21        MS. PETRAS:  I'm not, Your Honor.

22        THE COURT:  All right.  It may not -- let me just put on

23   the record that -- and Keri found these cases -- this is the D.C.

24   case, circuit case law for the proposition that, quote, Rule

25   608(b)'s bar against extrinsic evidence does not apply where the

1    evidence is used to contradict the statement made by a witness

2    during their testimony.  Such impeachment or contradiction is

3    subject only to the constraints of 401, 402 and 403," and those

4    two cases are cited.

5         But if under 104 the rules don't apply then, then what?

6    Then finish that sentence.

7         MS. PETRAS:  Then the Court can consider whatever the

8    Court thinks is appropriate to the issue.

9         THE COURT:  Right.  So if the government can introduce

10   hearsay, the defendant can introduce hearsay?

11        MR. COLE:  No, that's -- Your Honor, I object.  That's

12   not -- that's not right.

13        MS. PETRAS:  I mean, I --

14        MR. COLE:  I object.

15        THE COURT:  Okay.  All right.  I'm going to -- this is

16   just argument now.

17        MS. PETRAS:  I mean, absolutely we can introduce hearsay.

18   The government introduced hearsay, so of course hearsay is

19   admissible in a motions hearing.

20        THE COURT:  All right.  All right.  Okay.

21        All right.  I want to deal with this exhibit issue first

22   before I move on.

23        MS. PETRAS:  Yes.

24        THE COURT:  You're going to deal with the closing argument

25   part; is that correct?

1          MS. PETRAS:  Yes.  I was going to answer the question --

2     the Court's question:  Where in the transcript did Officer Hiller

3     say he didn't remember the exact words?

4          THE COURT:  Yes, right.

5          MS. PETRAS:  And on September 17th at page 56 --

6          THE COURT:  56?

7          MS. PETRAS:  Yes.

8          -- Officer Hiller testified --

9          THE COURT:  Excuse me one second.

10         (Discussion had off the record.)

11         THE COURT:  All right.

12         MS. PETRAS:  To answer the Court's question, at page 56,

13    Officer Hiller testified.  He said something almost exactly to

14    the effect of, "Do you mind showing me your waistband?"

15         At page 72 he testified that he agreed that it was hard to

16    remember the exact words that were used in Mr. Gibson's arrest.

17         And at page 88 he testified that, "Officer Wright said

18    something to the effect of:  Can I see your waistband."

19         THE COURT:  Right.  All right.  Thank you.  All right.

20         MS. PETRAS:  Your Honor, we're happy to make arguments

21    today, if that's what the Court wishes.

22         THE COURT:  Right.  I want to deal with this exhibit issue

23    first, so I think it's only fair to hear from the government

24    first, and then we can talk about how we use the rest of the day.

25    All right.  Not the rest of the day, the rest of the time

1    allotted.  All right.

2         MR. COLE:  Your Honor, if it pleases the Court, I would --

3    on the issue of my submissions, we were in court the previous

4    day, and I had to research and I stayed late and I submitted it

5    in a timely fashion.  I don't practice that way.  I just want to

6    put that on the record.

7         Your Honor, I disagree.  104 does not --

8         THE COURT:  Disagree with what?

9         MR. COLE:  Regarding the issue of -- 104 just allows

10   hearsay in.

11        THE COURT:  All right.

12        MR. COLE:  If that's the case, we don't even need to call

13   witnesses.  We can just -- I just could have put in a transcript

14   or did a proffer.  So that's not true.  There are fundamental

15   rules the courts must accept, even in a motions hearing.

16        So, for example, Ms. Petras had outlined for you the two

17   cases by Judge Josey-Herring and a Judge Williams.

18        THE COURT:  Yvonne Williams.

19        MR. COLE:  Yvonne Williams, Judge Yvonne Williams.

20        Your Honor, there was another case that said -- a Superior

21   Court judge hearing that case, Judge Epstein, Anthony C Epstein,

22   he filed an order where he disagreed with and found Wright to be

23   upmost credible, and he refuted what Judge Josey-Herring had said

24   and Judge Williams had said, knowing that he had reviewed their

25   testimony.  Because I believe the local Public Defender's

1    Office is saying the same matters up --

2            THE COURT:  Do you have --

3            MR. COLE:  -- because Wright testified.

4            THE COURT:  -- A copy?

5            MR. COLE:  Of the audit?

6            THE COURT:  Just one at a time.

7            Do you have a copy of his order?

8            MR. COLE:  I do.  I just want to highlight it to you, Your

9    Honor, just a couple of points for the record.  And I'll give you

10   that.  Your Honor, I've highlighted a couple of portions, but

11   obviously you can disregard the couple of portions, but he

12   specifically addressed those two cases where he found -- the

13   first page there's an order, and he took into account the

14   findings of the other two judges.  And he specifically ruled,

15   "The Court finds the testimony of both Officer Wright and

16   Joseph" -- the other officer involved in the case -- "to be

17   credible, applying the appropriate standards."

18          He also mentioned specifically that there was no evidence

19   that Officer Wright or any other member of the Gun Recovery Unit

20   has any bias against Mr. Prince.  There's no evidence that any of

21   them knew or knew of Mr. Princes (phonetic) before that night --

22   Prince before that night, or that they had any reason to gain

23   tackle him for no legitimate reason or to strike him, except to

24   prevent him from biting and kicking the officers.

25          In specific detail the whole order is, if we accept the

1    premise that anything is admissible -- and I don't -- it's a

2    30-page order for which he goes through the cases -- and how do

3    we know that?  I notified Ms. Petras a month ago or so and gave

4    her all of the cases and case law.  I told her, and she knew

5    about this case and Judge Epstein's finding in refuting -- that's

6    my word -- the other two findings.  So if --

7         THE COURT:  What does he say about the other two judge's

8    findings?

9         MR. COLE:  I'll tell you, Your Honor.  I have it here.  On

10    page 6, "The Court does not give any weight to Judge

11    Josey-Herring's later e-mail in which she said that she did not

12    intend to hurt anyone in her ruling, although Mr. Prince did not

13    object on best evidence or other grounds to Officer Wright's

14    testimony about this e-mail that was at issue.

15         In the e-mail, Judge Josey-Herring did not modify or

16    retract any of her credibility findings, and the fact that she

17    did not want to hurt anyone is consistent with the adverse -- is

18    consistent with adverse credibility on a relevant factual issue

19    regarding the suppression.

20         He, in fact -- Judge Epstein, specifically said that, "The

21    clearest" -- on page 5 -- "The clearest finding concerning

22    credibility in Judge Josey-Herring's decision not to credit

23    Officer Wright's testimony that he would not have arrested

24    Mrs. Stanley for admittedly driving on a suspended license, here,

25    Judge Herring did not make an explicit finding that Officer

1    Wright fabricated or intentionally exaggerated his testimony."

2         That puts the fact that Mrs. -- and be mindful of the fact

3    that I gave this to Ms. Petras a month ago, so it's no secret.  I

4    gave her both cases where he found -- and a later case by Judge

5    Epstein that he refuted both findings, so everyone knows this to

6    be true.

7         THE COURT:  What did he say about -- Judge Epstein say

8    about Judge Williams?

9         MR. COLE:  I have it.  I have it for you, Your Honor,

10   right here.  This is a *Mitchell* case, and this states --

11        MS. PETRAS:  Do you have a copy?

12        THE COURT:  Do you have a copy for them?

13        MR. COLE:  I just have my copy.  I'm prepared.  And this

14   is --

15        THE COURT:  Well, I don't have a copy.

16        MR. COLE:  I'm going to -- I'm going to give you my copy,

17   Your Honor, but there are parts for the record I want to

18   highlight.

19        THE COURT:  All right.  Can I borrow your copy --

20        MR. COLE:  Oh, yes.

21        THE COURT:  -- to make a copy for me and defense counsel

22   so they can follow this?

23        MR. COLE:  Do you want to take a moment?

24        THE COURT:  So -- and I can follow it as well.

25        Can you just pass it?

```
 1        MR. COLE:  Yes, Judge.  May I approach?

 2        THE COURT:  Sure.  Yeah.  And I'll ask her to make a few

 3   copies.

 4        MR. COLE:  Okay.

 5        THE COURT:  Okay.  Thanks.  Okay.  We'll just wait until

 6   she comes back.

 7        MR. COLE:  That's fine.  But just be mindful, we gave

 8   counsel the dates, the courts, and the sites, and what was found

 9   in that --

10        THE COURT:  All right.  Did you give her --

11        MR. COLE:  -- by way of letter.

12        THE COURT:  Did you give her a copy?  You didn't give her

13   a copy?

14        MR. COLE:  No, but we gave her the site of what was cited.

15        THE COURT:  Okay.

16        (Brief pause in proceedings.)

17        THE COURT:  All right.  Do you need a minute to take a

18   look at that?

19        MS. PETRAS:  Yes, please.

20        THE COURT:  All right.  We'll do that.

21        MR. COLE:  Your Honor, do you mind if I stand up and

22   stretch?

23        THE COURT:  Sure.

24        (Brief pause in proceedings.)

25        THE COURT:  Let me do this.  I'd like to take a look at
```

1    this as well, so -- and, actually, I want to take a look at Rule

2    104.   104 addresses preliminary questions, quote-unquote,

3    whatever that means.

4         MS. PETRAS:  It's 104(a) that says, "The Court must decide

5    any preliminary question about whether a witness is qualified, a

6    privilege exists or evidence is admissible.  And so deciding the

7    Court is not bound by the evidence rules except those on

8    privilege."

9         This is why the government can -- it's Rule 104 that

10   allows the government to put on hearsay evidence in motions

11   hearings.

12        THE COURT:  Right.  So I assume you have no objection to

13   counsel introducing this *Prince* order?

14        MS. PETRAS:  No.

15        THE COURT:  All right.

16        MR. COLE:  Your Honor, I just want to mark that for the

17   purpose of --

18        THE COURT:  All right.  I'd like to take a look it,

19   though.

20        MR. COLE:  I know, but for the purposes of you -- I want

21   to mark it as an exhibit so that you can --

22        THE COURT:  Oh, sure.

23        MR. COLE:  The government's Exhibit Number 1 today, Your

24   Honor.

25        And before you take a --

1          THE COURT:  Well, wait, wait, wait.  You already have an

2     Exhibit 1, so --

3          MR. COLE:  Oh, sorry.

4          THE COURT:  -- it should be the next number.

5          MR. COLE:  It's 11.  It's 11, Your Honor.  I apologize.

6          THE COURT:  All right.

7          MR. COLE:  Your Honor, before you -- were you intending on

8     taking a break or something?

9          THE COURT:  Right now so I can just read it.

10          MR. COLE:  Yes, Your Honor.

11          THE COURT:  All right.

12          MR. COLE:  But can I just -- I just want to put one

13     thing in.  We gave Mrs. Petras this in a letter dated -- I

14     e-mailed it to her August 17, so that the record is clear.  I

15     just want to read that, and then I don't have anything else.

16          THE COURT:  I accept your representation, Counsel.

17          MR. COLE:  But this is what we said about what was in

18     the -- in all three cases, Your Honor.  That's important because

19     this is not something that the government hid or had any

20     nefarious meaning to.  But on August 17th, 2018, Ms. Petras got

21     this -- the second paragraph.  "Out of abundance of caution, the

22     government provides you the following.  On August 1st, 2013, in

23     the case of *United States versus Philip Mitchell*," and then we

24     list it, "Judge Williams made an adverse credibility finding

25     regarding Officer John Wright.  On December the 16th, in a case

1    of *District of Columbia versus Louis Stanley*" -- and we list the

2    case number, "Judge Josey-Herring made an adverse credibility

3    finding regarding Officer Wright.  Please note, however, that on

4    October the 24th, 2017, in the case of *United States versus*

5    *Dominique Price*," the case number, "Judge Anthony Epstein,

6    following a suppression hearing in which Officer Wright

7    testified, Judge Epstein considered the adverse opinions in the

8    *Mitchell* and *Stanley* cases, and nonetheless found the testimony

9    of Officer Wright to be credible.  The official transcript of

10   this matter was prepared by official court transcriber, Latisha

11   Williams."

12        THE COURT:  All right.

13        MR. COLE:  That was on August 17th, so that she will know

14   who did the transcript and what the findings were.

15        THE COURT:  So which finding is entitled to greater

16   weight?

17        MR. COLE:  Judge, it's my position the 80- -- 104, that

18   Ms. Petras said, I categorically believe, as a senior member in

19   my office, I don't believe that's true, because we don't need to

20   call witnesses if all hearsay is admissible.  I don't believe

21   that, and I think that's what she -- the road that I think she's

22   trying to take you on, so I don't believe it.

23        And there are no -- you've asked her, "Is there a case?"

24   That's the importance of having it.  There is no case that says

25   that, I submit to you, because if there were, you would have

1    heard of it.  You've been on the bench several years now,

2    decades -- and I say that respectfully.  I say that with all due

3    respect.

4         THE COURT:  About 10 decades.

5         MR. COLE:  Right.  But you've never heard that.

6         THE COURT:  I've never heard what?

7         MR. COLE:  That rule 104 you can just put all hearsay in.

8    You've never heard that issue.  This is not a case of first

9    impression.

10        I want to just note --

11        THE COURT:  But everyone knows that hearsay is admissible

12   during suppression hearings.

13        MR. COLE:  There are certain types of hearsay, Your Honor.

14   I could not -- I could not put testimony in to vouch for Hiller's

15   credibility, and someone has ruled that he was most credible in

16   this Court.  I can't just put that in.  That's hearsay.  Another

17   judge of competent jurisdiction found Hiller to be credible, so

18   I'm not suggesting that.

19        THE COURT:  Now, wait a minute.  Aren't you offering this

20   for that purpose, though?

21        MR. COLE:  No.  I'm offering that because Ms. Petras has

22   told you something I believe to be wrong and improper.  I have

23   argued, and I have submitted to you under 806, extrinsic evidence

24   is not admissible to a nondeclarant testifying witness, and I

25   have presented you great case law to that fact.

1        THE COURT:  But those are cases involving trials, though.

2        MR. COLE:  No, Your Honor.  If I may.  The rules of --

3    certain rules of evidence, although hearsay is admissible, let's

4    be clear.  It's not only to get to trial, there are fundamental

5    underpinnings in our judicial system, and as you so well know,

6    the arc of justice should always intersect at fact and law, even

7    at a motions.  And that arc is not flawed by hearsay of certain

8    types, not hearsay on hearsay.

9        Finally, let me say this, Your Honor, Counsel has

10   suggested to you a nontestifying witness, some other judge in

11   their opinion said he did something.  And another judge has

12   said -- Judge Epstein said, "No, he did not," and he disagreed

13   with those judges.  So, therefore, that's the conflicting episome

14   [sic] you have here, but the government's position is clear.

15   Under 806 items like that, extrinsic evidence, to prove something

16   of a nontestifying witness is not admissible.  This circuit has

17   said it's not admissible, and I'm saying you should not in any

18   way consider it.

19       If, however, you have concluded, as Ms. Petras would want

20   you to do, that all hearsay is admissible, what if the government

21   produced to you some credibility finding on Hiller?  I'm not, but

22   what if that's the truth?

23       THE COURT:  But isn't that what this is?

24       MR. COLE:  No.  That's on Wright.  That's on Wright.

25   That's not on Hiller.

1         THE COURT:  On Wright, all right.

2         MR. COLE:  That's nontestifying.  So I totally disagree

3    with that.  I'm asking you in our submission regarding extrinsic

4    evidence, Your Honor, it is clear.  The 3rd Circuit said, "In

5    reaching this conclusion that extrinsic evidence is inadmissible,

6    it's inadmissible even in a motion hearing."

7         THE COURT:  Does that case say that?

8         MR. COLE:  It just says -- it just says regarding a

9    nontestifying declarant.

10        THE COURT:  Right, and that was in the context of a trial,

11   though, wasn't it?

12        MR. COLE:  I will look at it and -- I believe it was, Your

13   Honor, in relationship to a trial.  But motions are not the wild,

14   wild west.  We have certain girders to follow and certain

15   barriers that we must follow at all times, so that's not the

16   case.

17        If, for example, you can't be a cross-examine -- and I say

18   this as someone who's -- that's been around for quite a while

19   here and for other jurisdictions.  That's important.  If it was

20   improperly admissible at trial, it would be improperly admissible

21   at the motion.  I categorically disagree.  104 does not allow

22   that, and I can give you several examples.

23        I couldn't vouch for Hiller, Officer Hiller at a motions

24   hearing, and I couldn't do it at trial.  The rules of evidence

25   and the rules of criminal procedure would apply still.  The

1    difference with a motion is, as opposed to -- as opposed to

2    putting on a trial within a trial, that certain items of hearsay

3    are admissible.  How do we know that?  I could tell you without a

4    doubt, you have Mrs. Roland there, one of their senior appellate

5    attorneys; you have Ms. Petras, one of their senior trial

6    attorneys.  There's no case that they have cited to you out of

7    all the time they've had to think about this issue.  And the fact

8    that there's no case, in particular, in this circuit, this

9    circuit is far advanced in its opinions, I would submit to you in

10   all due respect.

11        But I would note, Your Honor, in this circuit, it is said

12   that in *White*, in that case the District Court had allowed

13   defense counsel to cross-examine a police officer about a hearsay

14   declarant's drug use, drug dealers and prior conviction, but had

15   not allowed defense counsel to impeach the declarant's

16   credibility by asking the officer whether the declarant had made

17   false statements on an employment form or disobeyed a court

18   order.  See, that's the difference.  That's this circuit.

19        Now, I've also cited to you *Whitmore*.  So contrast no case

20   law on this issue, but at least contrast case law from this

21   circuit, that specifically outlines not only if it's -- if it's

22   inadmissible at trial, it would be inadmissible at the motion as

23   well.

24        But in this particular case, what counsel wants you to do.

25        THE COURT:  Well, turn that around, though.

1          MR. COLE:  I'm sorry, Judge?

2          THE COURT:  Turn that around.  Evidence is admissible

3     during the suppression hearings that arguably is not admissible

4     during the context of a trial, though.

5          MR. COLE:  I agree, but not all, not all.  I mean, there

6     are some -- the law recognizes certain differences, Your Honor,

7     but not everything, as Mrs. Petras has opined, would be

8     admissible at a motion nor a trial.  It's just not reserved to a

9     trial, because if you make an adverse decision, Your Honor, we

10    wouldn't get to a trial before an appeal.

11         My point to you is, so the issue is we're stuck with the

12    facts and law.  And, remember, I just said that arc of justice

13    has to intersect with the fact and law in all points.

14         THE COURT:  All right.  Can the arc take a recess for a

15    second?

16         MR. COLE:  Yes, Your Honor.

17         THE COURT:  I just want to read this.  All right.

18         MR. COLE:  Your Honor, it says that the -- can we -- it's

19    1:30.  We had suggested to you that there's an event going on

20    that I am -- at 2:00, and I wanted to make that event.

21         THE COURT:  Sure.

22         MR. COLE:  I just wanted to make sure.  I have to go to a

23    location.  I had notified you and all parties that we wanted to

24    do that.

25         THE COURT:  I know that, and I thought two hours might be

1   appropriate to wrap this up, but I may have underestimated the

2   time.

3        MS. PETRAS:  Could I just respond, because Mr. Cole keeps

4   saying I did something wrong or improper, and this is really just

5   offensive.

6        And, first of all, rule -- we don't -- we didn't cite a

7   case to that rule because Rule 104.A says exactly what it says,

8   exactly what we all know has happened in this courthouse for

9   years and years, "hearsay is admissible in motions."  And if the

10  government wants to take the position that hearsay's not

11  admissible in motions, then that would be fine by me.  I will

12  move to strike all of Officer Hiller's testimony about what

13  Officer Wright said.

14       THE COURT:  Right.

15       MS. PETRAS:  It is admissible, and it --

16       THE COURT:  You know --

17       MS. PETRAS:  -- and under the government's own cases --

18       THE COURT:  Can I stop you for a second?  It's very

19  interesting.

20       You know, for years judges, including me, decades, would

21  invoke the rule on witnesses.  So one day I said, "What's the

22  number for the rule on witnesses?"  And you know what?  No one

23  knew.  So just to make the point.

24       MS. PETRAS:  Right, because --

25       THE COURT:  There is a rule, number.  I can't tell you

1    what it is now, but there is a rule.  Ms. Roland may know what it

2    is, I don't know.  But I could not tell you right now what the

3    rule on witnesses is, but there is a rule.  And for years, I

4    think it's accepted case law, that hearsay is admissible during

5    suppression hearings.

6            MS. PETRAS:  Yes.

7            THE COURT:  What's the origin of that?  Is it 104?

8            MS. PETRAS:  It's 104.  And I just -- and I found 104 by

9    just Googling or just putting into Westlaw, you know, "motions

10   hearing evidence," "rules of evidence don't apply," and all kinds

11   of stuff came up.

12           THE COURT:  You're the only one who uses Google for legal

13   research.

14           MS. PETRAS:  Right.  I didn't mean Google.  But can I also

15   say --

16           THE COURT:  Now my law clerks know.

17           MS. PETRAS:  The difference between what Mr. Cole gave you

18   and the transcripts that we gave you, if Officer Wright had been

19   testifying under *Whitmore,* the case the government is citing, if

20   Officer Wright was testifying at a trial, we could cross-examine

21   him on the transcripts that we provided you and his previous

22   findings of incredibility.  We're introducing the transcripts

23   instead of cross-examining him because they did not present him.

24   The government would not then be able to introduce what --

25   sometime when he was found actually to be credible.  I mean,

1    we're not saying he lies every single time or he's always

2    incredible.  We're saying that there are two findings, and that

3    detracts from his credibility.  So there the -- Judge Epstein's

4    ruling, which did not say that Judge Josey was wrong or that

5    Judge Williams was wrong, it's completely irrelevant.  But I

6    don't have any objection to --

7         THE COURT:  Do you know which ruling is entitled to

8    greater weight?

9         MS. PETRAS:  It's not a greater weight thing.  It's only

10   an issue of whether or not his -- the issue of his credibility

11   and does any of it apply to his credibility.  A previous finding

12   that he was credible on one hand -- in one case does not undercut

13   the fact that in two other cases he was incredible.

14        THE COURT:  Right.

15        MS. PETRAS:  So our point is only to undercut judge -- or

16   Officer Hiller's testimony to suggest that it would never happen.

17        THE COURT:  What about your time for this afternoon?

18   Counsel, I did set aside two hours for today.  I don't think we

19   can finish today, so I do want to take a look at this opinion

20   very briefly, and I will let you go at 1:30.

21        MR. COLE:  Yes, sir.  Thank you.

22        THE COURT:  But you need to start thinking about what do

23   we do after today because I'm not so sure we're going to finish

24   today.  But I'll take -- I'll take a ten-minute recess right now.

25        MR. COLE:  Yes, Your Honor.  Thank you.

1          THE COURT:  Sure.

2          (Thereupon, a break was had from 12:46 p.m. until 1:13

3     p.m.)

4          THE COURT:  All right.  Just a couple of things, Counsel.

5     I didn't realize it was that late.  It's hard to see what time it

6     is on that clock because of the glare.  I actually thought that

7     was after 12:00, but it's apparently after 1:00, so my fault.

8     Not that we've wasted any time, but just a couple of things.

9          So there's at least, I'll call it probably the

10    Fountainhead case, *Raddatz*, *U.S. v. Raddatz* or Raddatz, R-A

11    double D --

12         MS. LITZ:  Could you spell that again, please.  I didn't

13    hear you.

14         THE COURT:  R-A, double D, A-T-Z, 447 US 667, wherein the

15    Court -- Supreme Court held that -- and I quote, "This Court on

16    other occasions has noted that the interest at stake in a

17    suppression hearing are of a lesser magnitude than those in a

18    criminal trial itself.  At a suppression hearing the Court may

19    rely on hearsay and other evidence, even though that evidence

20    would not be admissible at trial."

21         And that opinion has been cited many times by our Circuit

22    Court, and I think -- I just have a recollection, probably within

23    the last six months or so, our circuit said something about

24    evidence coming in during a suppression hearing and the fact that

25    it could be a hearsay.  I may be wrong, but I -- you read so many

1    cases, but I think that's a pretty good recollection.

2         And also Rule 1101, the applicability of the rules, which

3    addresses the applicability of the Federal Rules of Evidence, the

4    exceptions to the rules, 1101(d), which addresses 104(a), so I

5    just point those out to counsel.

6         You know, look, I don't have any problems giving the

7    government a week, maybe a week to respond to whatever it wants

8    to respond to, Counsel.

9         Will a week be a sufficient time?

10        MR. COLE:  Your Honor, I hesitate and I thank you.  Could

11   I have 10 days?  I have some other matters that are coming up.  I

12   originally asked for 14 days, but if you can give me half, 10

13   days.

14        THE COURT:  Today's what, Tuesday?  That would be -- I

15   don't know.

16        Any objection?  I want to get on with the argument.  I

17   want to schedule an argument in this case and get on with it.

18        MS. PETRAS:  First of all, just to be clear, we were --

19   what we filed yesterday was a response to what Mr. Cole filed

20   last week.

21        THE COURT:  Right, right.

22        MS. PETRAS:  So I don't know if giving him that much time

23   makes sense since we're responding to what he had filed.  And

24   my -- but my only real concern is that Mr. Gibson is being

25   detained.  The Court may recall that he's being detained also on

1    a parole detainer that has not been executed.  I feel a lot

2    better about extending the time if the Court would be willing

3    to -- I'm good to go say the word "release," but he's not going

4    to get released.  If the Court were to release him in this case,

5    the parole detainer would be executed, and then they would start

6    their process of a parole hearing.  I've had a number of other

7    cases where courts have been willing to, even just release him

8    for a day so that the parole detainer can be executed.

9            THE COURT:  Well, what I can do also -- and Marshal Turner

10   has been very accommodating.  It's kind of a slay of hand, but I

11   have released an individual in open court for the purpose of the

12   marshal executing the parole warrant and then vacating the order.

13           MS. PETRAS:  Yes.

14           THE COURT:  So I can do that.

15           MS. PETRAS:  I would appreciate that, Your Honor.

16           THE COURT:  All right.  I can't do it today.  I mean, they

17   don't have the warrant.  The marshals here don't have the

18   warrant.

19           MS. PETRAS:  Well, if the Court -- I don't know how that

20   process took place, what the Court just said, but I know that

21   if --

22           THE COURT:  Well, it took place because the marshal had

23   the warrant or the detainer, and he served the defendant who was

24   later erroneously released into the community.  He served him

25   with it, and then I just vacated the order of release and he was

1    detained.  But what happened was, the Parole Commission actually

2    had a hearing, and the individual was taken to the facility and

3    then erroneously released from the facility, so...

4         MS. PETRAS:  Well, what I was asking actually wasn't even

5    that much.  If the Court just released him for a day.  When the

6    marshals go to release him, they execute the warrant, and they --

7    then the parole process starts, and then the Court could put

8    another detainer in this case, but the parole process will still

9    go forward because the detainer's been executed, so...

10        THE COURT:  What's his backup time?

11        MS. PETRAS:  I don't have the answer to that.  I could

12   check.

13        THE COURT:  That's a Superior Court conviction; is that

14   correct?

15        MS. PETRAS:  Yes, yes.  So I'm really only asking the

16   Court to release him for one day just to let the parole warrant

17   be executed and then to re- --

18        THE COURT:  I don't want to proceed along those lines.

19   I'd rather follow the procedure I put in place that, hopefully,

20   other judges will do.

21        MS. PETRAS:  Okay.

22        THE COURT:  And actually there's a new wrinkle now.  It

23   may well be that the Superior Court marshals are the only law

24   enforcement officials who execute warrants now.  That's a new

25   change, and what the mechanics are of that, I don't know.

1      MS. PETRAS:  How do I get the process done the way the
2  Court would like it to be done?
3      THE COURT:  I'm sorry?
4      MS. PETRAS:  I'm not sure how I -- what do I need to do
5  to --
6      THE COURT:  I don't know.  I don't know.
7      MR. COLE:  Your Honor, can I be heard?
8      THE COURT:  If Ms. Petras was just responding to what you
9  had filed, would you need more time to file then, Counsel?
10     MR. COLE:  Your Honor, I respectfully disagree with
11 Ms. Petras.  That is not true, in all candor.  She has cited --
12 or Mrs. Roland has cited new cases, and they cited specifically
13 in writing the show of authority case load -- cases, and they
14 specifically mentioned -- contrast that, specifically mentioned,
15 if I may -- Your Honor, I can tell you specifically, but what the
16 government had responded to, we gave you bench memorandums, not
17 in a full response to what Mrs. Petras had wrote down.  If you
18 look at from page 12 -- I'm not talking about the facts.  From
19 page -- the argument, page 11 through the end, that is a total
20 completely different argument than which the government initially
21 wrote down, our opposition to their motion.
22     THE COURT:  All right.  Here's what I'm going to do.  I'll
23 give you a week, Counsel.  I can't -- I mean, Mr. Gibson's
24 detained.  I don't think there's anything new that's been raised
25 in this case.  Today is the 26th [sic].  I'll give you until the

1    4th --

2            MR. COLE:  The 25th, Your Honor.

3            THE COURT:  -- which is next Thursday, so that's --

4            MR. COLE:  That's fine, Your Honor.

5            THE COURT:  -- a little bit more than a week.  And I

6    would -- I'm going to schedule argument on the 10th at 11:00.

7            Is the 10th at 11 a good date?

8            MR. COLE:  Wednesday, the 10th, Your Honor, at 11:00?

9            THE COURT:  Yes.

10           MR. COLE:  Yes, that's fine for the United States, Your

11   Honor.  Thank you.

12           THE COURT:  And for defense counsel, October the 10th?

13           MS. PETRAS:  Wednesday the 10th is fine, Your Honor.

14           THE COURT:  All right.

15           MS. PETRAS:  Yes.

16           THE COURT:  October 10th at 11?

17           MR. COLE:  Yes, Your Honor.  That's fine with us.

18           THE COURT:  All right.  Let me ask you something,

19   Mr. Cole.

20           MR. COLE:  Yes, Your Honor.

21           THE COURT:  If the Court were to find that Mr. Gibson --

22   that the statement made to Mr. Gibson was, "Let me see your

23   waistband," would you agree that that was a command?

24           MR. COLE:  No, Judge, because "Let me see your waistband"

25   could be a question or it could be a directive.  But in this

1    case, I submit to you, assume for a moment --

2         THE COURT:  You say it could be a directive or a question?

3         MR. COLE:  Yes, Your Honor.

4         THE COURT:  Well, how could it be a question?

5         MR. COLE:  "Let me see your waistband?"  Yes or no?

6    That's a question, in that tone.

7         But let -- Your Honor, I have the argument on -- I think

8    if you focus on that alone, if you look at *Gross* and you look at

9    the case law which we believe is on all fours with this case,

10   there has to be a show of authority, other than "Let me see your

11   waistband."  So the question that you have to ask that I would

12   ask you to focus in on is whether or not he submitted.  He has to

13   submit to a show of authority.

14        THE COURT:  Well, suppose he's raising his hand and

15   there's a flashlight in his face, why isn't that submission?

16        MR. COLE:  And that's why I need to respond because his

17   testimony is quite different than that, Your Honor.  He said that

18   the reason he raised his hand is so that the police couldn't see.

19   He didn't raise his hands to the heaven so he could see that,

20   that gun, but seconds later he ran.

21        The submission to the show of authority is not a police

22   officer asking a question.  They didn't impede.  No one got out

23   of a car, showed any police insignia, badges or otherwise.

24        So assume the Court is correct.  It is the government's

25   position there was no show of authority that impeded his ability

1    of a reasonable person to believe that he was not free to leave.

2    Because the defendant says the main reason he fled at that time,

3    he knew he had the gun, he knew he had the drugs, and he was

4    going to run to make good his escape, without any other

5    authority.

6         Now, if you look at *Gross* or the case that counsel has

7    cited from this circuit where they held that the officer did, in

8    fact, show authority, this officer got out of his car, told this

9    person to put his hands on the car, got out of the police car --

10   see, that's a show of authority -- and the defendant, the

11   suspect, the target, submitted to that show of authority.

12        So we have no "get out of the car" with the gun and badge

13   and all the insignia of law enforcement, and that person did

14   comply.  There was no compliance in this case to any show of

15   force.  That's the government's position, and we will be writing

16   in fulsome on that, because even if you accepted that to be true.

17        THE COURT:  Counsel, do you want to respond to that?

18        MS. ROLAND:  Yes, Your Honor.  A couple of things.  One is

19   that the facts in this case are that Officer Hiller didn't

20   remember most of what happened.  That was significant.  He didn't

21   remember the exact words, so he couldn't speak to the issue of

22   whether there was a show of authority; and he didn't remember

23   what Mr. Gibson did, so he couldn't speak to the issue of whether

24   Mr. Gibson submitted to the show of authority.

25        He testified that he didn't remember exactly what words

1    Officer Wright used.  He didn't remember seeing Mr. Gibson's

2    hands in the air.  He didn't know when Mr. Gibson put his hands

3    in the air.  He didn't remember if he could see Mr. Gibson's

4    waistband when he put his hands in the air, and he didn't even

5    remember Mr. Gibson running.

6          The case that Mr. Cole was just referring to is *Brody*,

7    which we cited not for the -- to argue whether there was a show

8    of authority, but to argue that there was submission to the

9    authority.  Because *Brody* says that when there is a submission --

10   in that case the defendant put his hands on the car -- even

11   though he broke and ran two seconds later, that was a submission.

12         So in this case, when Mr. Gibson put his hands in the air,

13   that was a submission, even though he later ran.

14         THE COURT:  Is that a command, "Let me see your

15   waistband"?

16         MS. ROLAND:  That is absolutely a command.  And, in fact,

17   that is one thing that Officer Hiller admitted in his testimony,

18   that when the Court questioned him about what was said, he said

19   that -- the Court asked him, "Well, what would be authoritative?"

20   And he testified, "Show me your waistband would be

21   authoritative."  And that is essentially what it was here, "Let

22   me see," "show me" -- there's no meaningful difference between

23   them.

24         There are a lot of reasons to discredit Officer Hiller's

25   testimony.  I can go into them now, but --

1          THE COURT:  No, no.  I just wanted to air that question

2     for both of you.

3          Let me just raise another question.  You're asking me to

4     -- at some point you'll be asking me to credit the testimony of

5     Mr. Gibson --

6          MS. ROLAND:  Yes.

7          THE COURT:  -- over that of the testifying police officer.

8     Mr. Gibson has a stake in the outcome of this case.  He has at

9     least two prior felony convictions, I think, maybe three,

10    impeachable convictions.

11         MS. ROLAND:  Three.

12         THE COURT:  So the question that -- and you can think

13    about it.  You don't have to answer now.  The question is:  Why

14    under those circumstances should I credit Mr. Gibson's testimony

15    period?

16         MS. ROLAND:  Okay.  I have a couple of brief answers to

17    that.  One is that you actually -- you can rule in favor of

18    Mr. Gibson without looking at his testimony at all because the

19    government has simply failed to meet their burden here.

20         THE COURT:  Right, right.

21         MS. ROLAND:  But, if you are going to look at the

22    testimony, the Court certainly can consider his prior convictions

23    for whatever weight that's worth.  His testimony was verified by

24    the videotape.  Officer Hiller's testimony, his sworn statement,

25    as with McCaw's sworn testimony, was that Mr. Gibson kept his

1    hands in the pockets after Officer Wright spoke to him.  We know

2    that isn't true.  We know it because we have the videotape.  Even

3    in his testimony here when he first told the whole story, he

4    didn't mention that.  Then when he saw the videotape on direct

5    examination, he said he made a motion with his right hand.  It

6    wasn't until later, seeing the slow motion video, that he had to

7    admit both hands were in the air.

8         His testimony is not credible, and it's also not credible

9    for other reasons.  The evidence about how the Gun Recovery Unit

10   has treated other citizens in this city.  The violent logo

11   undercuts his testimony that he would ever do anything other than

12   have polite conversations with citizens.

13        His testimony in this case where he agreed -- well, the

14   fact that not one of these four officers tapped a button on their

15   chest to record the actual words, when of course those actual

16   words are the crux of this case.

17        THE COURT:  Would that be the best evidence?

18        MS. ROLAND:  The best evidence to discredit Officer

19   Hiller?  Well, I would say the best evidence is that the fact

20   that they all failed to record it in violation of orders, and the

21   fact that he --

22        THE COURT:  Where does that --

23        MS. ROLAND:  -- made a false sworn statement.

24        THE COURT:  Where does that leave the Court, though?  If

25   the Court agrees with you, and I think it's clear they didn't tap

1    the button, so what?  Does that give rise to --

2         MS. ROLAND:  It gives rise to two things.  One, is to --

3    it undermines his credibility.  He testified he hit it as soon as

4    reasonably possible mid-chase, when he's sitting there for nine

5    seconds during the encounter, nine seconds, and he can't manage

6    to tap his chest, and neither can any of the other officers, so

7    that goes to his credibility.

8         THE COURT:  And plus, arguably, he was somewhat evasive.

9    I even had to jump in and ask him questions about what a

10   face-to-face contact is.

11        MS. ROLAND:  Correct.  The fact that he began sort of

12   backing off of his testimony.  He first agreed that it violated

13   MPD general orders not to activate the cameras.  He later said

14   that he needed to study them more thoroughly and then began

15   arguing about whether it was -- the stop -- the contact was for

16   an investigation and whether it was face to face.

17        So that undermines his credibility, but it also goes to,

18   you know, sort of a side from credibility, whether the government

19   has met their burden.  They had a burden of showing that this

20   warrantless seizure was justified.

21        THE COURT:  It doesn't give rise to the Court making an

22   adverse inference, does it?

23        MS. ROLAND:  I think it does.  It absolutely does.  And,

24   you know, it wasn't just Officer Hiller who couldn't push a

25   button.  All four officers couldn't push a button.

1    But the government has a burden of proving that this

2  warrantless search was legally justified.  That certainly was the

3  best evidence if they had recorded the conversation.  They failed

4  to do so, and then they put on a witness who doesn't remember the

5  exact words.

6    THE COURT:  All right.  It's going to be an interesting

7  argument in October.  The Court would be interested in any

8  additional authorities.  Let me just give everyone a deadline for

9  filing anything.

10    MR. COLE:  Yes, Your Honor.

11    THE COURT:  So maybe that -- what did I say, next Thursday

12  for the government?

13    MR. COLE:  Yes, sir.

14    THE COURT:  All right.  So any authorities on adverse

15  inference.  Any authority that addresses -- people always want to

16  argue that -- "Well, this person's credibility has been impeached

17  because of prior convictions," This person has an interest in the

18  outcome of a case."

19    Well, the law can't be that under those circumstances the

20  testimony is inherently in credible, because that just can't be

21  the law.  So there must be some opinions that address that, that

22  they can't be the law.  I mean, it's common sense, it can't be.

23  And I think the Court's job is to assess the credibility of the

24  witness the same way it would any other witness, observe

25  someone's demeanor in court, whether someone took time to answer

```
 1   the questions posed, whether a witness understood the questions
 2   posed, and things of that nature.
 3        But if I'm wrong, if I should be considering the testimony
 4   of someone similarly situated to Mr. Gibson in a different way,
 5   then I think someone needs to tell me what I should be doing.  I
 6   don't think it's any didn't.  Of course you take into
 7   consideration impeachable convictions because the instructions
 8   say we do that.  And, of course, you take into consideration
 9   someone's interest in the outcome of the case.  I mean, arguably
10   a police officer has an interest in the outcome of a case.
11        Would you agree, Counsel?  All right.  Okay.
12        MR. COLE:  I do not, Your Honor.
13        THE COURT:  All right.
14        MR. COLE:  Just for the record, I do not.
15        THE COURT:  All right.  All right.  That's all I have.
16   It's 1:30.  That's all I have to say.
17        Yes, Counsel?
18        MS. ROLAND:  Your Honor, may we have a few days to file a
19   reply before the argument -- a reply to the government's --
20        THE COURT:  All right.  I can see what's happening.
21   What's going to happen is Mr. Cole's going to file something,
22   you're going to file something, and then he's going to ask for
23   more time to file something.
24        MS. ROLAND:  Okay.  Never mind.
25        THE COURT:  No, no.
```

1     MR. COLE:  Well, Ms. Petras said they weren't responding.

2  So that's when we go to being candid.  They were only responding

3  to what I had already written, so this argument goes contrary.

4  So I assume Ms. Roland agrees with me then.

5     THE COURT:  Let me just say --

6     MS. ROLAND:  I --

7     THE COURT:  Let me just say this.  Here's what I'm going

8  to do.  The government can file whatever it wants to in response

9  to Ms. Petras' pleading, and also address the issues the Court's

10  raised about assessing the credibility of someone similarly

11  situated to Mr. Gibson, how the Court should do that, and also to

12  address the issue of an adverse inference.

13     MR. COLE:  Adverse?

14     THE COURT:  Yeah, right.  If the Court -- if the

15  government -- yeah, adverse inference.

16     And I think that it's only fair to give defense counsel a

17  chance to respond to whatever the government files.  All right?

18     So I told the government to file by next -- what did I

19  say, Thursday?

20     MR. COLE:  Thursday, Your Honor.

21     THE COURT:  All right.  So suppose I -- there's a holiday

22  coming up.  When is this hearing?  Wednesday, did I say or

23  Thursday?

24     So, suppose I -- there's a holiday coming up.  When is

25  this hearing, Wednesday, did I say, or Thursday?

1          MS. ROLAND:  The 10th.

2          THE COURT:  That doesn't give me much time.

3          MS. ROLAND:  Your Honor, may I retrieve my calendar?

4          THE COURT:  Sure.  Why don't I do this.  Let's make it

5     2:00 on the 11th for the hearing, and I'll give defense counsel

6     until the 9th to respond.

7          MS. ROLAND:  Your Honor, I'll be out of town on the 11th.

8          THE COURT:  The 12th is -- we'll just leave it on the 10th

9     for the hearing, then.

10          MS. ROLAND:  Your Honor --

11          THE COURT:  Wait a minute.  Let me just see.  Maybe I

12     can -- I can't do the 12th.  There's no way I can do the 12th.

13          MS. ROLAND:  I think I could file a reply on the morning

14     of October 9th.  I'll be out of town that weekend, but I'll be

15     back on Monday, so I could --

16          THE COURT:  All right, by noon.

17          MS. ROLAND:  By noon on October 9th.

18          THE COURT:  All right.  And the government's submission is

19     due by noon on the 4th, and we'll just leave the hearing at 11:00

20     on the 10th.  We'll just leave the hearing for 11:00 on the 10th,

21     and defense counsel's pleading is in response to whatever points

22     the government raises.

23          MS. ROLAND:  Thank you.

24          THE COURT:  All right.

25          MR. COLE:  Your Honor, for the record and respectfully, I

```
 1    do not oppose counsel having more time to respond to my
 2    submission.  I do not oppose.
 3         THE COURT:  She doesn't have more time.  Actually, she has
 4    less time.
 5         MR. COLE:  Actually, I said I don't oppose -- I'm
 6    withdrawing my objection.
 7         THE COURT:  Oh.
 8         MR. COLE:  That's what I'm saying.
 9         THE COURT:  All right.  Counsel.
10         MS. PETRAS:  Your Honor, if I can meet with the marshals
11    for a way to get the parole warrant executed, would the Court
12    allow that?
13         THE COURT:  I'll put the burden on you.  Speak with
14    Marshal Turner about that.  Just tell him that I'm comfortable
15    with that, if he would do the same thing that he did in the Queen
16    case.
17         MS. PETRAS:  Thank you, Your Honor.
18         MR. COLE:  And Your Honor, I have to -- with all due
19    respect to the Court, just for the record, note an objection.
20         THE COURT:  All right.  That's all.
21         MR. COLE:  Because I wouldn't want him to be mistakenly
22    released and I didn't say anything.
23         THE COURT:  I'm not going to release him.  He knows what
24    the procedure was.
25         MR. COLE:  Okay.
```

1          THE COURT:  Just tell him that you're making the request

2     on my behalf, that he -- that his office execute the parole

3     detainer on the next scheduled hearing date, all right.

4          MS. PETRAS:  Thank you.

5          THE COURT:  Actually, you know, I'll let you off the hook.

6     I can send him an e-mail and make the request.

7          MS. PETRAS:  Thank you.

8          THE COURT:  All right.

9          MS. PETRAS:  Thank you.

10         THE COURT:  All right.  Anything further?

11         MR. COLE:  Not from the United States.

12         THE COURT:  All right.

13         MR. COLE:  Have a wonderful day and a wonderful weekend.

14         THE COURT:  Likewise.  Mr. Gibson, take care, and we'll

15    talk again in a couple of weeks.  All right.  Counsel, thank you.

16         MR. COLE:  And your wonderful staff as well, Your Honor.

17         THE COURT:  Don't get carried away now.  Mark is

18    outstanding.

19         (Proceedings adjourned at 1:38 p.m.)

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# C E R T I F I C A T E

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace                         10/2/18
----------------------------            ----------------
**Scott L. Wallace, RDR, CRR**              **Date**
   **Official Court Reporter**