# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| v. | ) Criminal Case No. 18-108 (EGS) |
|  | ) |
| MARK A. GIBSON, | ) |
|  | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I.   Introduction

On April 2, 2018 at approximately 11:48 p.m., defendant
Mark Gibson was walking home from the bus stop. As he was
walking east on Galen Street at the intersection of 16th Street
and Galen Street Southeast in the District of Columbia, four
Metropolitan Police Department Gun Recovery Unit Officers ("MPD
officers" or "officers") were patrolling in the same area,
seeking to recover firearms. After a brief encounter between the
officers and Mr. Gibson—the details of which are disputed—Mr.
Gibson fled. He was caught, arrested, searched, and found to be
in possession of cocaine base and a firearm. Thereafter, Mr.
Gibson was indicted on three counts: (1) unlawful possession of
a firearm by a felon in violation of 18 U.S.C. § 922(g); (2)
unlawful possession with intent to distribute cocaine base in
violation of 21 U.S.C. § 841; and (3) possessing a firearm in

1

furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c). *See* Indictment, ECF No. 1.

Pending before the Court is Mr. Gibson's motion to suppress all tangible evidence. *See* ECF No. 6. Mr. Gibson argues that he was unlawfully seized in violation of the Fourth Amendment of the United States Constitution when the MPD Officers approached him and ordered him to show his waistband and lift his jacket. The Court held evidentiary hearings on September 17, 2018 and September 20, 2018, at which both MPD Officer Matthew Hiller ("Officer Hiller") and Mr. Gibson testified. As explained fully below, the Court credits Mr. Gibson's testimony and finds that the government has not met its burden to establish that the seizure was lawful. Accordingly, after careful consideration of Mr. Gibson's motion, the responses and supplemental responses, the replies and supplemental replies thereto, the evidence presented at the evidentiary hearings, and the oral arguments made at the September 25, 2018 and October 10, 2018 motion hearings, Mr. Gibson's motion to suppress all tangible evidence is **GRANTED**.

## II.  Background

On April 24, 2018, Mr. Gibson was indicted for: (1) unlawfully and knowingly possessing a Taurus .40 caliber semi-automatic pistol as a felon; (2) knowingly and intentionally possessing cocaine base; and (3) knowingly possessing a firearm

in furtherance of a drug trafficking offense. Indictment, ECF
No. 1. During the September 17, 2018 and September 20, 2018
evidentiary hearings, the Court viewed the relevant body-worn
camera footage. Officer Hiller and Mr. Gibson also testified
about the circumstances leading to Mr. Gibson's arrest. Their
respective testimony conflicts on the critical question upon
which resolution of this motion depends—namely, whether one of
the MPD officers ordered Mr. Gibson to show his waistband.

**A. Undisputed Facts**

On April 2, 2018 four MPD officers—all members of the Gun
Recovery Unit—patrolled the Seventh District, seeking to recover
firearms in a "high-crime area." *See* Mot. Hr'g Tr. ("Sept. 17
Tr."), ECF No. 16 at 15-16 (Sept. 17, 2018).[1] The officers were
riding in an unmarked car and all wore tactical vests marked
"POLICE" in large letters on the front and back. *Id.* at 12-13;
Gov't's Exs. 1-A, 1-B, 3. Officer John Wright drove the vehicle,
while Officer Hiller sat in the front passenger seat, and
Officers Matthew Mancini and Merissa McCaw sat in the back seat.
Sept. 17 Tr., ECF No. 16 at 12-13.

At approximately 11:48 p.m., the MPD officers encountered
Mr. Gibson as he walked east on Galen Street at the intersection

---

[1] When citing electronic filings throughout this Opinion, the
Court cites to the ECF page number, not the page number of the
filed document.

of 16th Street and Galen Street Southeast. Sept. 17 Tr., ECF No. 16 at 17; Mot. Hr'g Tr. ("Sept. 20 Tr."), ECF No. 17 at 46 (Sept. 20, 2018). Mr. Gibson had been walking home from a bus stop after visiting a friend's house. Sept. 20 Tr., ECF No. 17 at 45-46.

The officers drove alongside Mr. Gibson as he walked on the sidewalk. Officer Wright slowed down, pointed a flashlight at Mr. Gibson, greeted Mr. Gibson, and identified himself as a police officer. *See* Sept. 17 Tr., ECF No. 16 at 18; *see also* Sept. 20 Tr., ECF No. 17 at 49-50; Def.'s Exs. 3, 4. The parties agree that Officer Wright first asked Mr. Gibson whether he had a firearm on him and Mr. Gibson responded that he did not. Sept. 17 Tr., ECF No. 16 at 17-18; Sept. 20 Tr., ECF No. 17 at 49-50. From here, the testimony diverges; the different versions of the events are discussed below.

**B. Officer Hiller's Testimony**

Officer Hiller testified that, after Mr. Gibson stated that he did not have a gun, the MPD officers continued to drive alongside Mr. Gibson. *See* Sept. 17 Tr., ECF No. 16 at 18. Officer Hiller initially testified that Officer Wright asked Mr. Gibson "if he minded showing us his waistband." *Id.* Officer Hiller later hedged this answer, testifying that Officer Wright said "something almost exactly to that effect." *Id.* at 56. On cross-examination, however, Officer Hiller could not confirm the

4

"exact words used." *Id.* at 89. While Officer Hiller could not recall the exact words used, he testified that he had "never heard" Officer Wright "demand to see somebody's waistband." *Id.* at 89. According to Officer Hiller, Officer Wright's tone and demeanor was "conversational." *Id.* at 18, 39, 111-12. Officer Hiller stated that Mr. Gibson again denied having a weapon. *Id.* at 18 ("Mr. Gibson again replied, 'I ain't got no guns. I ain't got no guns.'").

Officer Hiller originally attested in the Gerstein Report[2] he prepared that Mr. Gibson had his hands in his jacket pockets throughout this encounter. *Id.* at 58-59, 63-66; Def.'s Ex. 1, ECF No. 13-1 ("Officer Wright asked Mr. [Gibson] if he could see his waistband and Mr. [Gibson] repeated 'I ain't got no guns, I ain't got no guns' keeping his hands in his jacket pockets"). Moreover, Officer Hiller did not mention Mr. Gibson's hands in his narrative testimony on direct examination. *See* Sept. 17 Tr., ECF No. 16 at 17-20. However, Officer Hiller agreed on cross-examination, after watching the body-worn camera footage, that Mr. Gibson raised his hands in the air with his palms facing the

---

[2] A Gerstein report contains sworn statements by law enforcement officers and is "used by prosecutors to establish probable cause at the defendant's initial appearance before the court following his arrest." *Littlejohn v. United States*, 705 A.2d 1077, 1080 (D.C. 1997) (citing *Gerstein v. Pugh*, 420 U.S. 103, 120, 124 n. 25 (1975)); *see* Sept. 17 Tr., ECF No. 16 at 58; Def.'s Ex. 1, ECF No. 13-1.

officers during the encounter. *Id.* at 62, 70-71. Officer Hiller further testified that he could not remember Mr. Gibson raising his hands in the air or why Mr. Gibson had raised his hands. *Id.* at 70-71, 75-76.

Officer Hiller testified that, after Mr. Gibson denied having a weapon for the second time, Officer Wright "pulled forward a little bit" and Mr. Gibson "kind of stopped, turned back towards 16th Street and ran back down towards 16th Street where he was originally seen coming from." *Id.* at 19. Once Mr. Gibson fled, Officers Mancini and Hiller pursued him on foot. *Id.* at 20-21. Shortly thereafter, Mr. Gibson "lost his footing" and fell to the ground. *Id.* at 21. Officer Hiller testified that a firearm fell and landed on the ground near Mr. Gibson. *Id.*; *see also id.* at 26 ("the gun fell out"). At that time, Mr. Gibson was arrested and searched. *See id.* at 22. The MPD officers found plastic bags containing a substance that tested positive for cocaine base. *Id.*; Gov't's Exs. 4, 6-10; Sept. 20 Tr., ECF No. 17 at 52.

The parties agree that all four MPD officers remained in the car until Mr. Gibson began to run. Sept. 17 Tr., ECF No. 16 at 38; *see also* Sept. 20 Tr., ECF No. 17 at 64. The parties also agree that Officer Wright was the only officer who spoke to Mr. Gibson. Sept. 17 Tr., ECF No. 16 at 39-40; *see also* Sept. 20 Tr., ECF No. 17 at 60. Finally, the parties agree that none of

the MPD officers drew or displayed their weapons. Sept. 17 Tr.,
ECF No. 16 at 19; *see also* Sept. 20 Tr., ECF No. 17 at 61.

### C. Mr. Gibson's Testimony

Mr. Gibson also testified at the evidentiary hearing. His
account of the April 2, 2018 encounter differs from Officer
Hiller's testimony in one crucial respect.

Mr. Gibson agreed that he had been walking home when the
four MPD officers pulled up beside him in an unmarked car. Sept.
20 Tr., ECF No. 17 at 45, 48-49. He agrees that Officer Wright
pointed a flashlight at him, greeted him, and asked if he had a
weapon. *Id.* at 49-50. However, Mr. Gibson disputed that Officer
Wright then asked to see his waistband. Instead, Mr. Gibson
testified that Officer Wright ordered "let me see your
waistband." *Id.* at 50. In response, Mr. Gibson raised both hands
in the air with his palms facing the officers, as Officer Hiller
agreed the body-worn camera footage showed. *See* Gov't's Ex. 1-B.
Mr. Gibson testified that he raised his arms "because they told
[him] to let them see [his] waistband." Sept. 20 Tr., ECF No. 17
at 51.

After Mr. Gibson raised his arms, he testified that Officer
Wright responded by saying "lift your jacket." *Id.* At that time,
Mr. Gibson testified that he turned and fled because he knew he
had contraband and was scared to get in trouble. *Id.* at 51-52.

He agreed he fell while attempting to evade the officers chasing him; the firearm fell out of his waistband. *Id.* at 52.

The Court's task is to determine what Officer Wright said to Mr. Gibson before he fled. Unfortunately, this determination cannot be made from the best evidence available: the body-worn camera footage. There is no audio available of the encounter because none of the four MPD officers activated their cameras when they came into contact with Mr. Gibson. The officers only activated their body-worn cameras when they began to pursue Mr. Gibson on foot. Sept. 17 Tr., ECF No. 16 at 141; Gov't's Exs. 1-A, 1-B. The Court is able to see the encounter, even though the MPD officers did not activate their body-worn cameras, because the cameras store visual footage for the two minutes preceding the moment that the cameras are activated. The camera does not store the audio for those two minutes. Sept. 17 Tr., ECF No. 16 at 7-8, 14. Therefore, the Court is able to view the short encounter between the MPD officers and Mr. Gibson but is unable to hear the dialogue. The officers' failure to activate their body-worn cameras upon encountering Mr. Gibson was a violation of MPD regulations.[3] *Id.* at 84-85.

---

[3] It is undisputed that the MPD officers violated an MPD General Order by not activating their body-worn cameras upon coming into contact with Mr. Gibson. *See* Sept. 17 Tr., ECF No. 16 at 83-85; Def.'s Exs. 5, 6, ECF Nos. 13-4, 13-5; Oct. 10 Tr., ECF No. 28 at 34 (COURT: "[T]here was not compliance with the body camera

### III. Standard of Review

Mr. Gibson argues that the tangible evidence recovered on April 2, 2018 must be suppressed because the MPD officers seized him without probable cause or reasonable suspicion in violation of the Fourth Amendment. *See* Def.'s Mot. to Suppress ("Def.'s Mot."), ECF No. 6.

"When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield,* 799 F. Supp. 2d 22, 28 (D.D.C. 2011)(citing *Wong Sun v. United States,* 371 U.S. 471, 484 (1963)). Typically, "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 130 n.1 (1978)(citations omitted). However, "[w]hen a defendant establishes that he was arrested or subjected to a search without a warrant," as is undisputedly the case here, "the burden then shifts to the government to justify the warrantless search." *United States v. Williams*, 878 F. Supp. 2d 190, 197 (D.D.C. 2012)(citing, among other omitted authority, *Mincey v. Arizona*, 437 U.S. 385, 390-91 (1978)).

---

directive . . . correct?" GOVERNMENT: "I think a literal reading of the general order, the answer is probably yes").

Here, the parties agree that the government has the burden to prove by a preponderance of the evidence that there was no seizure in violation of the Fourth Amendment. Sept. 20, 2018 Tr., ECF No. 17 at 4-6 (COURT: "So the government has the burden of proof to prove by a preponderance that Mr. Gibson was not seized and searched in violation of the Fourth Amendment, correct?" GOVERNMENT: "Yes. That's correct, Your Honor").

**IV. Analysis**

The Fourth Amendment guarantees that the "right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause . . . ." U.S. CONST. AMEND. IV. Resulting from this guarantee, "all seizures, even ones involving only a brief detention short of traditional arrest," must be "founded upon reasonable, objective justification." *United States v. Gross*, 784 F.3d 784, 786 (D.C. Cir. 2015) (internal quotations and citations omitted); *see also United States v. Mendenhall*, 446 U.S. 544, 551 (1980)("The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest.")(quotations and citations omitted).

Not every interaction between law enforcement and private persons amounts to a seizure within the meaning of the Fourth Amendment. A seizure arises "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n.16 (1968). "Whether police action amounts to a 'show of authority' requires the court to ask whether a 'reasonable person' 'in view of all the circumstances surrounding the incident, . . . would have believed that he was not free to leave.'" *United States v. Castle*, 825 F.3d 625, 632 (D.C. Cir. 2016)(quoting *United States v. Wood*, 981 F.2d 536, 539 (D.C. Cir. 1992)). "That 'reasonable person' test asks, 'not . . . what the defendant himself . . . thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes.'" *Gross*, 784 F.3d at 787 (quoting *United States v. Goddard,* 491 F.3d 457, 460 (D.C. Cir. 2007)(per curiam)).

Accordingly, the Court must first determine whether there was a show of authority. A show of authority "does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434 (1991). Indeed, "even when officers 'have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not

convey a message that compliance with their requests is required.'" *Gross*, 784 F.3d at 787 (quoting *Florida v. Bostick*, 501 U.S. at 435). The United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") has outlined several "factors" that a district court should consider "in assessing whether an officer's actions amounted to a show of authority 'includ[ing] whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled.'" *Castle,* 825 F.3d at 632-33 (quoting *Mendenhall*, 446 U.S. at 554)(alterations omitted).

Assuming the Court finds there has been a show of authority, the Court must also find that the defendant submitted to that authority. *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991); *see also United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014); *Wood*, 981 F.2d at 538, 540-41. Below, the Court separately considers: (1) whether the government met its burden to prove there was no show of authority; and (2) whether the government met its burden to prove there was no submission to any show of authority.

## A. The Government Has Not Met Its Burden: Show of Authority

The MPD officers encountered Mr. Gibson while "ferret[ing]
out illegal firearms," using a method known as a "rolling
roadblock," whereby officers "randomly trawl high crime
neighborhoods asking occupants who fit a certain statistical
profile—mostly males in their late teens to early forties—if
they possess contraband[] [d]espite lacking any semblance of
particularized suspicion when the initial contact is made."
*Gross*, 784 F.3d at 789 (Brown, J., concurring). It is clear that
this technique is "consistent with the Fourth Amendment," so
long as the government meets its burden to prove there was no
show of authority such that a reasonable person would not feel
free to leave. *Id.*[4]

---

[4] Judge Brown notes that the D.C. Circuit's jurisprudence in
approving such techniques "perpetuates a fiction of voluntary
consent where none exists and validates a policy that subverts
the framework of *Terry v. Ohio,* 392 U.S. 1 (1968)." *Gross*, 784
F.3d at 789 (Brown, J., concurring). She observes that
"[n]othing about the Gun Recovery Unit's modus operandi is
designed to convey a message that compliance is *not* required . .
. . [V]iewing such an encounter as consensual is roughly
equivalent to finding the latest Sasquatch sighting credible . .
. ." *Id.* at 790. Having listened to four days of testimony and
argument, the Court must agree. Indeed, the MPD's rolling
roadblock practice is so prevalent in the District of Columbia
that individuals living in high-crime neighborhoods sometimes
show MPD officers their waistbands "without [MPD officers] even
saying anything." Sept. 20 Tr., ECF No. 17 at 31 (Officer Hiller
testimony); *see* Patrick Madden, *D.C.'s Aggressive Confiscation
of Illegal Guns Leaves Residents Feeling Targeted*, NPR, Oct. 24,
2018, available at https://www.npr.org/2018/10/24/659980871/d-c-
s-aggressive-confiscation-of-illegal-guns-leaves-residents-
feeling-targeted ("Young black men say they feel targeted and

Mr. Gibson argues that he was seized when Officer Wright purportedly ordered him to show his waistband, *see* Def.'s Mot., ECF No. 6 at 2, and again when Officer Wright purportedly ordered him to lift his jacket, *see* Def.'s Suppl. Mem., ECF No. 19 at 17-18. Because Officer Wright allegedly ordered Mr. Gibson to comply, Mr. Gibson argues that a reasonable person under the circumstances would not feel free to disregard the command and leave. Def.'s Suppl. Mem., ECF No. 19 at 15-16. The government argues that Mr. Gibson was not seized because Officer Wright merely asked him to see his waistband, an acceptable practice pursuant to Supreme Court and D.C. Circuit precedent. *See generally* Gov't's Opp'n, ECF No. 7; Gov't's Suppl. Mem., ECF No. 14-1. Thus, Mr. Gibson's motion to suppress turns entirely on a factual determination: whether Officer Wright *ordered* Mr. Gibson

---

harassed by these stops. To avoid being frisked, they say they lift up their shirts when police drive by to show they don't have a gun in their waistband."). Mr. Gibson testified that he had at least two other encounters with police officers wanting to see his waistband. Sept. 20 Tr., ECF No. 17 at 52. In each of those experiences, Mr. Gibson did not feel that he had a choice as to whether to show his waistband. *Id.* at 53. As Judge Brown posited and Officer Hiller confirmed, such encounters would never occur in Georgetown. *See Gross*, 748 F.3d at 790 ("[T]ry to imagine this scene in Georgetown. Would results of that neighborhood maintain there was no pressure to comply . . . ?"); Sept. 20 Tr., ECF No. 17 at 30 (Officer Hiller: "we're not asked to go to Georgetown").

to see his waistband or merely *asked* Mr. Gibson to see his waistband.[5]

### 1. Factual Findings

As described above, Officer Hiller and Mr. Gibson provided directly conflicting accounts. The Court has considered the evidence admitted,[6] the demeanor and credibility of the witnesses, and the testimony of Mr. Gibson and Officer Hiller.

In the final analysis, the Court concludes that the government has not met its burden because its evidence is insufficient to prove the seizure was lawful by a preponderance of that evidence. The government's only witness—Officer Hiller—either could not remember or misremembered many of the critical

---

[5] The government argued that the defendant "put out" "new theories" that were not originally briefed because his initial motion focused on illegal arrest and the search incident to that arrest. *See* Sept. 25 Tr., ECF No. 24 at 4-8. The Court rejects this argument. It is clear that Mr. Gibson argued in his initial motion that he was seized "at the point that the police officer stopped him." Def.'s Mot., ECF No. 6 at 2. Moreover, the Court allowed the parties to submit supplemental briefing to remedy any lack of clarity in the original motion. The government indeed filed a supplemental response, which the Court has considered. *See* Gov't's Suppl. Mem., ECF No. 14-1.

[6] The Court provisionally admitted several exhibits over objection. *See, e.g.*, Sept. 17 Tr., ECF No. 16 at 152-53 (COURT: "I can let it in provisionally, take a look at it, if it's not relevant I can disregard it."); Sept. 20 Tr., ECF No. 17 at 34. Ultimately, the Court did not rely on any opposed exhibit in granting Mr. Gibson's motion, including defense exhibits 8 (Gun Recovery Unit banner photograph), 9 (banner photo), 10 (photo of MPD t-shirt), 13 (video of barbershop incident), and 15-16 (records from other proceedings). Thus, the Court need not resolve such objections.

facts from the April 2, 2018 encounter. Specifically, Officer Hiller could not remember the words Officer Wright used when speaking to Mr. Gibson, the issue central to resolving the motion. First, Officer Hiller testified that Officer Wright asked Mr. Gibson "if he minded showing us his waistband." Sept. 17 Tr., ECF No. 16 at 18. Then, after the Court asked Officer Hiller what Officer Wright said to Mr. Gibson, Officer Hiller hedged his answer, testifying that Officer Wright said "something almost exactly to that effect." *Id.* at 56. On cross-examination, however, Officer Hiller could not confirm the "exact words used," *id.* at 89, and agreed that it was "hard to remember," *id.* at 72; Mot. Hr'g Tr. ("Oct. 10 Tr."), ECF No. 28 at 23-25 (Oct. 10, 2018)(conceding that Officer Hiller could not testify to the specific words uttered by Officer Wright); *id.* at 26 (COURT: "Wasn't [Officer Hiller] still unclear about the precise language [Officer Wright] used in his question to Mr. Gibson?" GOVERNMENT: "I think the answer to that is yes, he did not say he recalled these words specifically").

Accordingly, the government asks the Court to accept Officer Hiller's testimony that Officer Wright would never demand to see a waistband. *See, e.g.* Oct. 10 Tr., ECF No 28 at 32 (GOVERNMENT: "[W]e can prevail because the Officer said it was in question form, whatever it was, was in question form."). True, Officer Hiller testified that Officer Wright never demands

to see a waistband because MPD officers are "instructed" to not make demands: "every time we say that [referring to seeing waistbands], it's directed in question form." Sept. 17 Tr., ECF No. 16 at 117-18. However, the Court cannot agree with the government that the actual words used are "not critical" in light of Officer Hiller's avowal that Officer Wright would never demand to see a waistband. Oct. 10 Tr., ECF No. 28 at 36-37, 40. Moreover, it would be error on the part of the Court to credit without hesitation Officer Hiller's testimony and accept the government's conclusory argument that "whatever it was" that Officer Wright said, he "said [it] in question form."

Of utmost importance in this case is Mr. Gibson's Fourth Amendment right: "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry,* 392 U.S. at 9 (quotations and citations omitted). The Court cannot find that the government met its burden of proof merely by offering Officer Hiller's blanket assurance that Officer Wright always asks questions and never demands. That declaration is insufficient because Officer Hiller could not recall what Officer Wright actually said and because—due to the officers' failure to activate their body-worn cameras during the initial

encounter—the audio was not captured in the footage. Oct. 10 Tr., ECF No. 28 at 38; *see* Sept. 17 Tr., ECF No. 16 at 75. A mere assertion that Officer Wright asks questions rather than makes demands is unsatisfactory considering Mr. Gibson's significant liberty interests and the Court's solemn duty to enforce the Constitution.

Likewise, the Court is troubled by other significant gaps in Officer Hiller's memory. For example, Officer Hiller did not remember Mr. Gibson raising his two arms in the air—the most salient part of the short encounter. Sept. 17 Tr., ECF No. 16 at 70-71 (Q: "You remember him having two hands in the air?" A: "I don't – I don't remember"); *id.* at 154 (COURT: "Do you recall seeing [Mr. Gibson's] hands in the air . . .?" A: "I don't remember"). Indeed, Officer Hiller did not mention Mr. Gibson raising his arms during his initial narrative testimony, despite having viewed the body-worn camera footage in advance to prepare for his testimony. *Id.* at 17-20, 67-68. Testimony about Mr. Gibson's lifted hands was only elicited on cross-examination. *Id.* at 62. Moreover, Officer Hiller *also* omitted the key fact that Mr. Gibson had raised his arms in response to Officer Wright when he prepared and filed under oath a Gerstein Report the day after arresting Mr. Gibson. *See* ECF No. 13-1 at 1-2; Sept. 17 Tr., ECF No. 16 at 59-60. In that detailed document, Officer Hiller attested that Mr. Gibson responded to Officer

Wright's request to see his waistband while "keeping his hands in his jacket pockets." ECF No. 13-1 at 1. At no point did Officer Hiller mention the fact that Mr. Gibson raised his arms in the air in response to Officer Wright. *See id.* Although, a Gerstein Report need not contain "every" detail about a particular encounter, Oct. 10 Tr., ECF No. 28 at 74, the omission is problematic, given the overall brevity of the encounter and the significance of the surrendering act.

Finally, Officer Hiller could not remember other details about the encounter. For example, because Officer Hiller did not remember Mr. Gibson raising his hands in the air, he also could not remember whether the MPD officers could see Mr. Gibson's waistband, a fact significant to the Court's analysis. Sept. 17 Tr., ECF No. 16 at 154 (COURT: "At the time when [Mr. Gibson's] hands were in the air, could you see his waistband?" A: "I don't – I don't remember, Your Honor"). Additionally, the MPD officers encountered another individual and spoke to that individual shortly before coming across Mr. Gibson. *See* Gov't's Ex. 1-B at about 0:24-0:55. When asked about that encounter, Officer Hiller could not remember who Officer Wright had been speaking to or what Officer Wright said to that unknown individual, even though the officers spoke to the individual less than a minute before encountering Mr. Gibson. Sept. 20 Tr., ECF No. 17 at 20-21, 29 (Q: "So you have no memory of that?" A: "No, I don't have a

memory of that. Like I said, I – it appeared from the video"). Finally, Officer Hiller testified that he did not "even remember" if he saw Mr. Gibson turn around to run away: "I just remember Officer Mancini got out [of the vehicle], and that's why I got out with him. And then once I got out, I saw [Mr. Gibson] running." Sept. 17 Tr., ECF No. 16 at 155.

Clearly, the best evidence of what was said to Mr. Gibson would have been the body-worn camera footage, had the audio been captured. As discussed, the audio would have been captured had *any* of the four MPD officers activated their cameras upon "contact" with Mr. Gibson, as **required** by an MPD General Order. Sept. 17 Tr., ECF No. 16 at 77-78 (Q: "But you knew by not having activated [the body-worn camera] the conversation would not be recorded, correct?" A: "Yes"); Def.'s Ex. 5, ECF No. 13-4 (MPD General Order 302.13). Officer Hiller and government counsel agreed that the General Order required the officers to activate their body-worn cameras once Officer Wright began speaking to Mr. Gibson. Sept. 17 Tr., ECF No. 16 at 84-85; Oct. 20 Tr., ECF No. 28 at 34.

However, even without the audio, the video footage is the best evidence of what happened when the MPD officers stopped Mr. Gibson. The video shows the MPD officers driving down the street in the dark for about two minutes. *See* Gov't's Ex. 1-B. Suddenly, the vehicle's speed decreases and Officer Wright

immediately takes out his flashlight and shines it at Mr. Gibson from the front seat. *See* Gov't's Ex. 1-B at about 1:45-1:55. Moments later, Mr. Gibson raises both hands in the air with his palms facing the MPD officers at about head height. He holds his hands in the air for a few seconds, taking about four or five steps, and then quickly turns and runs away. *See id.* This footage is consistent with Mr. Gibson's testimony and inconsistent with Officer Hiller's. And it suggests that the MPD officers may have directed Mr. Gibson to comply with an order, as raising one's hands is a gesture that symbolizes surrender and compliance.

In light of the significant memory gaps in Officer Hiller's testimony, the lack of evidence in the record regarding the words Officer Wright said to Mr. Gibson, and the video footage corroborating Mr. Gibson's testimony, the Court concludes that the government has not met its burden to prove there was no show of authority.

## 2. Credibility Findings

In view of the Court's finding that the government has not met its burden, the Court need not make any further credibility determinations. *See* Oct. 10 Tr., ECF No. 28 at 42-43 (government counsel conceding that the government cannot prevail if the evidence is in equipoise). However, after presiding over two days of testimony, the Court had the opportunity to observe the

demeanors of both witnesses and make determinations about whether each "testified truthfully and also whether the witness accurately observed, recalled, and described the matters about which the witness testified." Criminal Jury Instruction for the District of Columbia 2.200 ("Credibility of Witnesses")("[a juror] may consider the demeanor and the behavior of the witness on the witness stand; the witness's manner of testifying; whether the witness impresses you as a truthful person; whether the witness impresses you as having an accurate memory and recollection; whether the witness has any motive for not telling the truth . . . .").

The Court credits Mr. Gibson's testimony and finds that it was more consistent with the body-worn camera footage, the best evidence available in the case. As previously noted, Mr. Gibson testified on September 20, 2018. *See* Sept. 20 Tr., ECF No. 17 at 43-91. His demeanor was calm—even under aggressive cross-examination—and his answers were forthcoming, consistent, and straightforward. Moreover, Mr. Gibson exhibited a high degree of recall. *See, e.g.*, *id.* at 61-62 (Q: "Would it be possible . . . you don't remember every word that Officer Wright said to you that night. That'd be fair to say, right?" A: "No, I do" . . . Q: "And if he had said, 'Can I see your waistband,' that's possible, isn't it?" A: "No, he didn't"). Unlike Officer Hiller, Mr. Gibson did not have any significant memory lapses or revised

or inconsistent answers during his testimony. Finally, it is probable and reasonable that Mr. Gibson's memory is "really good," as he testified, because the arrest was a significant event in his life. *Id.* at 88.

Most importantly and as discussed above, Mr. Gibson's testimony is corroborated by the body-worn camera footage. He testified that he lifted his arms in response to a direct command—"let me see your waistband"—so his jacket would "raise enough that [the MPD officers] could see the waist of [his] . . . jeans." Sept. 20 Tr., ECF No. 17 at 50-51. His gesture is a probable and reasonable reaction to an MPD officer shining a flashlight on him while ordering him to show his waistband. *See* Gov't's Ex. 1-B at about 1:45-1:55.

The government argues that the Court should not credit Mr. Gibson's testimony because he has a stake in the outcome, has a criminal history, and was on court supervision at the time of the arrest. *See* Oct. 10 Tr., ECF No. 28 at 31-32. But the Court may find Mr. Gibson credible notwithstanding his interest in the outcome and his prior convictions. *See Reagan v. United States*, 157 U.S. 301, 305 (1895) ("It is within the province of the court to call the attention of the jury to any matters which legitimately affect his testimony and his credibility. This does not imply that the court may arbitrarily single out his testimony, and denounce it as false. The fact that he is a

defendant does not condemn him as unworthy of belief, but at the same time it creates an interest greater than that of any other witness, and to that extent affects the question of credibility."); *see also* Criminal Jury Instruction for the District of Columbia 2.209 ("Defendant As Witness")("[A defendant's] testimony should not be disbelieved merely because s/he is the defendant."). The Court has considered Mr. Gibson's stake in the outcome, his criminal history, and the fact that he readily admitted his criminal past. Sept. 20 Tr., ECF No. 17 at 44-45, 55. Indeed, Mr. Gibson was forthcoming; he *admitted* that he ran because he was scared: he knew he possessed contraband, knew he was under court supervision, and knew he would get in trouble. *Id.* at 43. Nothing about his testimony undermines his credibility.

Conversely, the Court does not credit Officer Hiller's testimony. As thoroughly discussed, Officer Hiller admitted that he could not remember the words Officer Wright used when speaking to Mr. Gibson. He also admitted that he could neither remember Mr. Gibson raising his arms in the air, nor whether Mr. Gibson's waistband was visible. Finally, Officer Hiller could not remember if he saw Mr. Gibson flee. *See supra* Sec. IV.A.1.

The Court also observed Officer Hiller's demeanor on the stand and found his answers to be evasive and inconsistent. For example, Officer Hiller originally testified that Officer Wright

asked Mr. Gibson "if he minded showing us his waistband." Sept. 17 Tr., ECF No. 16 at 18. He did not originally testify that he was unsure of the exact words used. As discussed, Officer Hiller gradually changed his answer until he ultimately admitted that he could not remember the words used. *See, e.g.*, *id.* at 72. Officer Hiller also originally testified that the MPD officers had not complied with the MPD General Order because they did not activate their body-worn cameras upon face-to-face contact with Mr. Gibson. *Id.* at 77-78, 83-85. However, Officer Hiller later changed his testimony on redirect, testifying that the MPD Order may not have been invoked as the officers may not have had "contact" with Mr. Gibson because they were in a vehicle while Mr. Gibson was on the sidewalk, despite facing Mr. Gibson and being in close proximity. *Id.* at 142-45. Upon further questioning by the Court, Officer Hiller again changed his answer, admitting that he would characterize the particular encounter as a face-to-face contact. *Id.* at 145 (COURT: "[I]f's it's not face to face, what is it? How would you characterize this particular moment? . . . ." A: "I guess the best way to characterize it is face to face.").

Officer Hiller was also less forthcoming than Mr. Gibson, omitting important details from his narrative testimony. Most significantly, Officer Hiller failed to mention that Mr. Gibson had raised his arms in response to something Officer Wright

said. This is a critical fact. Officer Hiller's omission is notable because he testified that he had watched the body-worn camera footage to prepare for his testimony. *Id.* at 67-68. Officer Hiller's testimony was therefore also less consistent with the body-worn camera footage. Moreover, as previously discussed, Officer Hiller also failed to note that Mr. Gibson had raised his arms in his sworn Gerstein report. *See supra* Sec. IV.A.1.

Finally, the Court concludes that portions of Officer Hiller's testimony were not plausible. For example, Officer Hiller testified that he and the other three MPD officers in the vehicle failed to activate their body-worn cameras while Officer Wright was speaking to Mr. Gibson because it was not possible at the time. *Id.* at 141. He testified that he activated his camera "as soon as I felt it reasonably possible." *Id.* However, Officer Hiller and Officer Mancini both activated their cameras while pursuing Mr. Gibson on foot. *See* Gov't's Exs. 1-A, 1-B. Plainly, it is not plausible that all four officers felt it was not possible to activate their cameras by pushing a button while seated in a car listening to a conversation, but *did* find it possible to do so while sprinting after a fleeing defendant. The Court need not infer that the MPD officers were *intentionally* not activating their body-worn cameras. That said, the Court is troubled that all four officers failed to adhere to MPD policy,

especially because the officers knew that not activating their cameras would prevent the conversation from being recorded. Sept. 17 Tr., ECF No. 16 at 78. Indeed, the very purpose of the "Body-Worn Camera Program," as set forth in General Order 302.13 is to "promote public trust, and enhance service to the community by accurately documenting events, actions, conditions, and statements during citizen encounters . . . and to help ensure officer and public safety." Def.'s Ex. 5, ECF No. 13-4 at 1. By failing to adhere to MPD policy and activate their body-worn cameras, the MPD officers deprived the Court from reviewing the best evidence available.

The government argues that the Court should credit Officer Hiller's testimony because, unlike Mr. Gibson, he does not have a stake in the outcome of the case. Oct. 10 Tr., ECF No. 28 at 27-28. As discussed, the Court has considered the fact that Mr. Gibson has a significant stake in the outcome of this motion. However, the Court cannot agree that Officer Hiller has *no* stake in the outcome. *See id.* As government counsel stated, there is significant "import" to this Court not crediting Officer Hiller's testimony. *Id.* at 76-77. For one, "he'll be on the Louis [sic] list[7] for the next several years or so." *Id.* at 77.

---

[7] The Lewis list is a list containing impeachable information for government witnesses, including MPD officers. *See Humberson v. U.S. Attorney's Office for District of Columbia*, 236 F. Supp. 2d

Of course, Officer Hiller's stake is small compared to Mr. Gibson's, but the Court cannot agree that he is a completely unbiased witness and that his impartiality warrants crediting his otherwise flawed testimony. Moreover, Officer Hiller's testimony is not afforded greater weight because he is a law enforcement officer. *See* Criminal Jury Instruction for the District of Columbia 2.207 ("Police Officer's testimony")("A police officer's testimony should be evaluated by you just as any other evidence in the case. In evaluating the officer's credibility, you should use the same guidelines that you apply to the testimony of any witness. In no event should you give either greater or lesser weight to the testimony of any witness merely because s/he is a police officer.").

### 3. Legal Analysis

Having found that the government did not meet its burden, the Court must now evaluate whether ordering Mr. Gibson to "let me see your waistband" and "lift your jacket" constitutes a show of authority under the circumstances. In directing district courts to consider certain factors, the D.C. Circuit confirmed that "the officer's use of language or tone of voice" may indicate that "compliance with the officer's request might be

---

28, 29 (D.D.C. 2003). Inclusion on the list may therefore affect an officer's ability to testify.

compelled" in certain circumstances. *Castle*, 825 F.3d at 632-33 (quoting *Mendenhall*, 446 U.S. at 554)(quotations omitted).

Finding there was a show of authority here is consistent with D.C. Circuit precedent. For example, in *Castle*, the D.C. Circuit emphasized that a defendant may be seized when he complies with directives. The *Castle* court "agree[d] with the District Court that [the defendant] was seized when Officer Oslzak touched Appellant and instructed him to 'hold on' and Appellant complied." *Castle*, 825 F.3d at 633. The conclusion was warranted because "no reasonable person in Appellant's position and subject to Officer Olszak's directives would have believed that he was free to go on about his business." *Id.* In *Wood*, the D.C. Circuit found that the defendant was seized when a police officer followed the defendant into a dark alley and directed him to "halt right there," an order that "indicate[d] that compliance might be compelled." *United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir. 1992)(quoting *Mendenhall*, 446 U.S. at 554)(internal quotations and alterations omitted). In *Jones*, the D.C. Circuit agreed that the appellant was "seized for purposes of the Fourth Amendment" when a police officer approached the defendant and ordered him to "come here." *United States v. Jones*, 584 F.3d 1083, 1087 (D.C. Cir. 2009).[8] In *Brodie*, the D.C.

---

[8] The seizure in *Jones* was legal because the police officers had reasonable suspicion of possible criminal wrongdoing. 584 F.3d

Circuit agreed that the defendant had been seized when the police pulled alongside the defendant and ordered him to put his hands on a nearby car. *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014). Finally, the D.C. Circuit favorably cited and discussed *In re J.F.*, a District of Columbia Court of Appeals case, in *Castle*. *See Castle*, 825 F.3d at 633-34 (discussing and citing favorably 19 A.3d 304 (D.C. 2011)). In *In re J.F.*, the District of Columbia Court of Appeals found that a defendant was seized after MPD officers, who were wearing tactical vests, pulled up next to the defendant and, after questioning him whether he heard gun shots, "ordered him to remove his hands from his pockets." 19 A.3d at 308-10. The Court of Appeals concluded that a reasonable person would not have felt free to ignore the officers' order. *Id.* at 309.

Consistent with *Castle*, *Wood*, *Jones*, *Brodie*, and *In re J.F.*, there was a show of authority in Mr. Gibson's case. The Court has considered the totality of the circumstances, as it must, and concludes that a reasonable person would not have believed he was free to leave. *See Castle*, 825 F.3d at 632-33. Specifically, the MPD officers were following Mr. Gibson in an unmarked vehicle late at night while wearing tactical vests. When the vehicle pulled up next to Mr. Gibson, Officer Wright

---

at 1087. Here, however, it is undisputed there was no reasonable suspicion of criminal activity.

immediately shined a bright flashlight at him, and issued two, successive directives: "let me see your waistband" and "lift your jacket." Officer Wright's "use of language" indicated that "compliance with the officer's request might be compelled." *Castle*, 825 F.3d at 632-33. In fact, Officer Hiller himself testified that ordering an individual to "show me your waistband" would be "authoritative," as it "wouldn't have been a question." Sept. 17 Tr., ECF No. 16 at 56. The Court sees no meaningful difference between "show me your waistband" and "let me see your waistband." As in *Wood*, "there are no elements of a consensual, 'benign police/citizen encounter'" in Mr. Gibson's case. *Wood*, 981 F.2d at 540 (quoting *United States v. Jordan*, 958 F.2d 1085, 1087 (D.C. Cir. 1992)).

The Court disagrees with the government that *United States v. Gross* is "on all fours" and therefore, the Court must find that there was no show of authority. Sept. 20 Tr., ECF No. 17 at 9; *see also* Gov't's Suppl. Mem., ECF No. 14-1 at 3. In *Gross*, the D.C. Circuit found that the defendant was not seized within the meaning of the Fourth Amendment because the government proved that the law enforcement officers merely asked the defendant to see his waistband and asked if they could check him for a gun. *Gross*, 784 F.3d at 785-86. While noting that "the 'nature of a police officer's question[s]' can bear on whether a person has been seized," *id.* at 788 (quoting *Gomez v. Turner*,

31

672 F.2d 134, 146 (D.C. Cir. 1982)), the Circuit held that
"[q]uestions alone, however, ordinarily do not amount to a 'show
of authority' sufficient to constitute seizure," *id.* In *Gross*,
the police officers merely asked the defendant two questions;
they did not "accuse" Gross or order him to comply with a
directive. *Id.* As discussed above in great detail, the Court
credits Mr. Gibson's testimony that Officer Wright ordered Mr.
Gibson to comply. Accordingly, the government's comparisons[9] are
unpersuasive.

Finally, the government contends that a verbal order alone
cannot constitute a show of authority for Fourth Amendment
purposes. *See, e.g.*, Oct. 10 Tr., ECF No. 28 at 5, 7, 12, 26.
The government argues that the MPD officer either had to
approach Mr. Gibson or stop his progress. *See id.* at 26 ("those
words alone . . . is not enough for a seizure. There has to be
more"). The Court disagrees. *See Brodie*, 742 F.3d at 1061 ("The
government concedes that the police made a show of authority
when they ordered Brodie to put his hands on the car.");
*Goddard*, 491 F.3d at 465 ("Usually, of course, a *Terry* stop
occurs only when police actually physically restrain a person **or**
make some verbal statement indicating the person is not free to

---

[9] Likewise, the government's reliance on *United States v. Miller*
is also misplaced, Oct. 10 Tr., ECF No. 28 at 4, because Judge
Jackson found that the MPD officers merely asked the defendant
questions, 2016 WL 8416761 at *7-8 (D.D.C. Nov. 11, 2016).

leave.")(Brown, J., dissenting)(emphasis added). Moreover, the Supreme Court implied that even one of the *Mendenhall* examples may constitute a seizure by separating show of authority examples with the word "or": "examples . . . [include] the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, **or** the use of language or tone of voice indicating that compliance with the officer's request might be compelled*."* *Mendenhall,* 446 U.S. at 554 (citations omitted)(emphasis added)(finding that there was no show of authority in part because "[the agents] did not demand to see the respondent's identification and ticket").

More importantly, the Court does not base its ruling on Officer Wright's order alone. The Court considered the totality of the circumstances, not just the two successive orders, and made a factual determination based on several factors that a reasonable person would not feel free to disregard Officer Wright's orders. *See Castle*, 825 F.3d at 632-33 (directing the district courts to consider factors such as "the time and place of the encounter," whether the officers "wore a uniform," and whether the officer's "use of language or tone of voice indicated that compliance . . . might be compelled"); *see also* *supra* p. 30-31 (considering the late hour of the encounter, that the four MPD officers wore tactical vests, that Officer Wright

shined a bright light at Mr. Gibson, and that Officer Wright
issued two successive orders).

### B. The Government Has Not Met Its Burden: Submission to Authority

When a seizure occurs without physical force, as here, the
Court must also find that the defendant submitted to an
officer's "show of authority." *California v. Hodari D.,* 499 U.S.
621, 626-28 (1991)(holding that the *Mendenhall* test was "a
necessary, but not a sufficient condition for seizure—or, more
precisely, for seizure effected through a 'show of
authority'"). Having found there was a show of authority, the
Court must therefore consider whether Mr. Gibson submitted to
that authority. *See Brodie*, 742 F.3d at 1061; *Wood*, 981 F.2d at
538, 540-41. Submission occurs when the defendant complies with
an officer's order. *See Brodie*, 742 F.3d at 1061. This
compliance may be "momentary." *Id.* Indeed, "it is the nature of
the interaction, and not its length, that matters." *United
States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007)(citing
*Delaware v. Prouse,* 440 U.S. 648, 655 (1979) ("[S]topping an
automobile and detaining its occupants constitute a 'seizure' .
. . even though the purpose of the stop is limited and the
resulting detention quite brief.")). Ultimately, "[w]hether
conduct constitutes submission to police authority will depend,
as does much of the Fourth Amendment analysis, on 'the totality

of the circumstances—the whole picture.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

The uncontroverted evidence—the body-worn camera footage—reveals that Mr. Gibson indeed complied with Officer Wright's order to "let me see your waistband" by raising both hands in the air while walking alongside the police vehicle. *See* Gov't's Ex. 1-B at about 1:45-1:55. Mr. Gibson testified that he raised his hands in the air "because [he] knew if [he] d[id] that, that [his] jacket will raise enough that they could see the waist of [] [his] jeans." Sept. 20 Tr., ECF No. 17 at 50-51. Just as in *Brodie*, complying with an officer's orders provides "no basis" for classifying his action "as anything other than full compliance with the officer's request." *Brodie*, 742 F.3d at 1061; *see also United States v. Brown*, 448 F.3d 239, 245-46 (3d Cir. 2006)(finding that the defendant had submitted to authority either by placing his hands on a car or being in the process of placing his hands on a car when the police implied he was not free to leave the scene). Indeed, "what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Brendlin v. California*, 551 U.S. 249, 262 (2007). By raising both hands in the air after having had his hands in his pockets, Mr. Gibson "signal[ed] submission" to

Officer Wright's orders. *Id.* Moreover, the fact that Gibson later ran away does not "negate a defendant's initial submission." *Brodie*, 742 F.3d at 1061.

Indeed, the record is devoid of *any* evidence to suggest that Mr. Gibson's submissive act was inauthentic or that he had an ulterior purpose in raising his hands in the air. *See id.* As discussed, the government put forward no evidence or testimony that Mr. Gibson's waistband was not displayed. For example, Officer Hiller could not remember whether he could see Mr. Gibson's waistband. Sept. 17 Tr., ECF No. 16 at 154 (COURT: "At the time when [Mr. Gibson's] hands were in the air, could you see his waistband?" A: "I don't remember, Your Honor"). Yet, the government argues that Mr. Gibson did not submit because he lacked the intent to *actually* show his waistband, evidenced by the fact that he did not raise his hands higher than his head. Oct. 10 Tr., ECF No. 28 at 10; *see id.* at 14 ("[T]here's a difference between raising your hands to your ears to prevent the officers from seeing the firearm, and raising your hands to the sky to show the officers your firearm."). The government cites Mr. Gibson's testimony, in which he said that he did not want the officers to be able to see the firearm. Oct. 10 Tr., ECF No. 28 at 10-11 (citing Sept. 20 Tr., ECF No. 17 at 73-74). However, Mr. Gibson did not testify that he did not comply or submit; instead, he testified that he ultimately hoped the MPD

36

would not see his contraband. Sept. 20 Tr., ECF No. 17 at 73-74
(Q: "You didn't want [Officer Wright] to see [the firearm], did
you? Correct?" A: "Correct."). As discussed, Mr. Gibson
testified that he raised his arms to show his waistband, *id.* at
50-51, and the body-worn camera footage corroborates that
testimony, *see* Gov't's Ex. 1-B. Moreover, it is probable that
Mr. Gibson may have indeed displayed his waistband, as Mr.
Gibson was wearing a short jacket and low-slung jeans. *See*
Gov't's Exs. 1-A, 1-B. Most importantly, however, there is no
evidence to the contrary in the record. The government therefore
failed to meet its burden to prove the seizure was lawful.

### C. Mr. Gibson's Remedy

"When the government conducts an unconstitutional search or
seizure, the Court must exclude any evidence obtained as the
'fruit' of that search or seizure." *United States v. Dolberry*,
No. CR 15-0037, 2015 WL 4751023 at *2 (D.D.C. Aug. 11,
2015)(citing *Wong Sun v. United States*, 371 U.S. 471, 484
(1963); *United States v. Matthews*, 753 F.3d 1321, 1324 (D.C.
Cir. 2014) ("The admissibility of all the incriminating evidence
. . . depends upon the validity of the search.")). "An illegal
search or seizure calls for suppression of evidence only if the
seizure is a but-for cause of the discovery of the evidence (a
necessary condition), and if the causal chain has not become

'too attenuated to justify exclusion.'" *Brodie*, 742 F.3d at 1062-63 (quoting *Hudson v. Michigan,* 547 U.S. 586, 592 (2006)).

The government does not argue that the evidence should not be suppressed because the causal chain has become "too attenuated" or there was no but-for causation. *See generally* Gov't's Opp'n, ECF No. 7; Gov't's Suppl. Mem., ECF No. 14-1; Gov't's Suppl. Opp'n, ECF No. 22. For example, the government does not contend, and the record does not suggest, that the contraband would have been found had the officers not seized Mr. Gibson. Indeed, the presence of but-for causation is quite plain. As such, the Court must suppress the fruit of the illegal seizure: the contraband found on Mr. Gibson on April 2, 2018.

## V.    Conclusion

The Court finds that the government has not met its burden to prove there was no show of authority and no submission to that authority. After carefully considering the evidence presented and the extensive briefing, the Court concludes that Mr. Gibson was seized in violation of the Fourth Amendment. As such, the Court **GRANTS** the defendant's motion and **SUPPRESSES** the tangible evidence seized on April 2, 2018. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
            **United States District Judge**
            **December 21, 2018**